UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **HELENA DONOVAN**  )<br>)<br>Plaintiff,  )<br>)              Case No. _____<br>v.            )<br>)<br>**NAPPI DISTRIBUTORS,**  )<br>)<br>Defendant.  ) | |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Helena Donovan, by and through undersigned counsel, hereby complains against Defendant Nappi Distributors as follows:

## INTRODUCTION

1. This is an action for violation of the Federal Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"), the Maine Family Medical Leave Requirements Law, 26 M.R.S. § 8433 *et seq*. ("Maine FMLA"), the Americans with Disabilities Act and amendments thereto, 42 U.S.C. § 12101 *et seq*. ("ADA"), Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. ("Title VII"), the Maine Human Rights Act, 5 M.R.S. § 4571, *et seq*. ("MHRA"), and the Federal Equal Pay Act (29 U.S.C. § 206 *et seq*.).

2. This case challenges Defendant's: (1) interference with Plaintiff's rights under the FMLA and Maine FMLA; (2) disability discrimination against Plaintiff in violation of the ADA and MHRA; (3) sex-based discrimination against Plaintiff on the basis of her gender and sexual orientation in violation of Title VII and the MHRA (4) retaliation against Plaintiff for opposing a practice made unlawful by Title VII; and (5) violation of the Equal Pay Act.

1

## THE PARTIES

3. Plaintiff Helena Donovan ("Plaintiff" or "Donovan") is an individual residing in the Town of Gorham, County of Cumberland, and State of Maine.

4. Defendant Nappi Distributors ("Defendant" or "Nappi") is a duly organized Maine Corporation with a principal place of business in the Town of Gorham, County of Cumberland, and State of Maine.

5. Nappi employed Donovan at all times relevant to this Complaint.

6. Nappi has had more than 200 employees on its payroll in each of 20 or more calendar weeks during the current and/or preceding calendar year.

7. At all times herein relevant, Nappi was engaged in interstate commerce with an annual sales volume of more than $500,000.00 per year.

## JURISDICTION AND VENUE

8. Prior to filing this Complaint, Donovan filed a charge of discrimination with the Maine Human Rights Commission ("MHRC") and the EEOC. Donovan received a notice of right to sue letter from the MHRC pursuant to 5 M.R.S. §§ 4612(6) and 4622(1)(C) on or about January 29, 2021.

9. Venue is proper in this Court because all of the discriminatory practices alleged herein occurred in Cumberland County, Maine.

10. The Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## BACKGROUND FACTS

11. Nappi hired Donovan on December 3, 2013 to work as a Purchasing Manager in the Wine Department.

12. Nappi's former wine sales director, Paul Carr ("Carr") hired Donovan. Carr retired in June 2017. All of Donovan's communications about her compensation package were with Carr.

13. Donovan is female and she is a lesbian.

14. John Houle ("Houle") previously held the position as Purchasing Manager at Nappi. When Donovan first began working for Defendant, Houle informed her that she would not be earning as much as he did in the same position because he was "grandfathered" into the higher rate of pay.

15. Within four to five months of beginning work at Nappi, Donovan's title changed from Purchasing Manager to Purchasing Agent. The change of title did not result in a change of job responsibilities. However, it did result in a significant decrease in benefits. Donovan was no longer entitled to use of a company car or to manager bonuses.

16. Valerie Ellis, now Valerie Hale ("Hale"), worked at Nappi as an administrative assistant. Over the years, Hale treated Donovan in a bullying and harassing manner, causing Donovan significant emotional distress.

17. In September of 2017, Donovan attempted to commit suicide at work. Donovan's mental health issues were caused, in whole or in part, by the stress of Hale's harassment and bullying. Donovan was hospitalized and taken out of work for six weeks due to her suicide attempt.

18. Nappi's Human Resources Director, Christine Fox ("Fox"), spoke to Donovan about the suicide attempt and the stressed caused by Hale's harassment. However, Nappi failed to take appropriate and corrective action to prevent Hale's harassment of Donovan.

19. Donovan continued to struggle with depression after she returned to work at Nappi.

20. Hale continued to harass Donovan after she returned to work from medical leave.

21. The employees at Nappi are predominantly male. Donovan observed that Hale did not treat men with the same kind of disrespect and disdain that she experienced, and she complained about this fact to Nappi.

22. Carr has admitted that he observed Hale treating Donovan very poorly over the years.

23. In August of 2018, Donovan began reporting directly to Matt Watson ("Watson"). Nappi's Wine Department had a meeting at the end of 2018. During the meeting, Donovan complained that she believed Hale was treating her differently than male employees and Hale seemed to go out of her way to make things more difficult for Donovan. Watson agreed that Hale was "overstepping."

24. Donovan believed that Hale was trying to undermine and sabotage her reputation with Watson.

25. After this meeting, Donovan's relationship with Watson similarly deteriorated.

26. Until late 2018, Donovan had a good working relationship with Ian Brown ("Brown").

27. Donovan confided in Brown that she was gay. Donovan was previously married to a man and therefore no one at Nappi knew she was gay. Brown responded by asking, "Do you know anyone at Nappi that is gay? No. Why do you think that is?"

28. Brown, who had the ability to affect the terms and conditions of Donovan's employment, advised Donovan not to come out publicly or tell anyone else at Nappi that she was gay.

29. Donovan felt it was important to come out at work and she did so. Immediately thereafter, Hale and another employee named Becky Douglas began making inappropriate and

sexually harassing jokes in Donovan's presence. For example, Hale walked into Donovan's office and grabbed a bottle of wine. She stated, "Look at my S and M bottle" and held it to her genitals. On another occasion, Hale and Douglas told Donovan a joke about two frogs having oral sex.

30. Another time, when Donovan was listening to a song, Hale said it sounded like a "lesbian song."

31. Donovan began receiving unwarranted and pretextual criticism of her job performance. Nappi closely scrutinized Donovan's performance more harshly than her similarly situated heterosexual and/or male coworkers. Watson falsely accused Donovan of failing to communicate with him and failing to find innovative ways to do her job.

32. Around this time, Donovan's relationship with Ian Brown began to deteriorate.

33. On March 15, 2019, Donovan met with HR Director Christine Fox ("Fox") and complained that Watson and/or Brown were intentionally excluding her from management meetings. At the previous management meeting, Donovan was asked to discuss inventory issues and then dismissed from the meeting.

34. During their meeting on March 15, 2019, Donovan told Fox that Hale was deliberately undermining her. Instead of investigating Donovan's renewed complaints about Hale, Fox told Donovan to, "rise above it."

35. As a result of the stress Donovan was under, her depression symptoms worsened yet again. Donovan felt that she needed to seek treatment because her mental health and wellbeing were at risk. Donovan was crying frequently and recognized that she needed to go out on leave again. At this point, it was obvious to Nappi that Donovan was still suffering from a disability that required an accommodation.

36. Donovan reached out to Fox and confided that her mental health was deteriorating. Donovan requested to go out on FMLA leave. Fox responded that Donovan was: "just looking for a life raft." Fox never followed up with Donovan and never provided her with paperwork advising of her right to take FMLA leave.

37. Fox also never offered Donovan the opportunity to go out on short-term disability, even though it was obvious that Donovan's mental health was declining, and she expressly asked to go out on medical leave.

38. Donovan later had a meeting with Watson and Fox regarding the breakdown of the relationship with Brown. Donovan provided examples of Brown excluding her from issues with inventory and instead addressing them with Hale. Donovan again brought up the fact that Hale was treating her very poorly.

39. During this meeting, Donovan took notes. The act of taking notes caused Fox to become defensive. Fox accused Donovan of being combative. At this point, Donovan no longer felt as though Fox was a resource to assist her with personnel issues. After the meeting, Fox changed the tone and narrative of their discussions and began to focus on Donovan's alleged performance deficiencies.

40. If Donovan was unable to perform her job at this time, and she had already requested leave for her mental health, Nappi was obligated to offer Donovan short-term disability as an employee benefit.

41. By and through its agents as described above, Nappi prevented Donovan from effectively doing her job. Upon information and belief, Nappi representatives instructed suppliers not to contact Donovan. Nappi also instructed warehouse employees working on inventory to stop speaking to Donovan.

42. Nappi representatives excluded Donovan from work-related lunches, business trips, and wine tastings with suppliers.

43. Upon information and belief, in the summer of 2019, Donovan was the only individual whose raise was rescinded by Nappi.

44. In September of 2019, Donovan attended a monthly wine manager meeting, which Brown and Watson also attended. Donovan had always considered Brown a friend. However, at this meeting no one would make eye contact with her, including Brown.

45. At the end of September, Watson presented Donovan with a 120-day performance expectation memorandum. Donovan did not agree with the statements in the memorandum and felt it was clear Nappi was trying to force her out of the company. The memorandum specifically stated that Donovan was expected to "relinquish" her position if unable to meet Watson's expectations.

46. Donovan made good faith attempts to perform the expectations set forth in Watson's memorandum, even though Nappi had been interfering with her ability to complete the job.

47. Regardless of how Donovan attempted to achieve success in her role, she received daily criticism from Hale and Watson that was unfounded and intentionally designed to force her out of the company.

48. It became clear to Donovan that Watson was attempting replace her with Hale. He was unnecessarily harsh and scrutinized everything Donovan did.

49. On October 18, 2019, Watson sent Donovan three separate emails that were critical of her performance. Watson's criticism was unfounded and pretextual because Nappi

representatives were intentionally interfering with Donovan's ability to perform her job successfully.

50. Having been denied the opportunity to take another FMLA leave or short-term disability and given Nappi's interference with her job and unfair criticism of her performance, Donovan found the working conditions at Nappi so intolerable that she was compelled to resign on October 18, 2019.

51. Objectively, any reasonable person in Donovan's situation would have understood that it was impossible to continue working at Nappi under the conditions present in October 2019.

52. Subjectively, Donovan feared that if she continued working in the hostile environment at Nappi until the company terminated her, she was at risk of another mental breakdown or suicide attempt.

53. Nappi constructively discharged Donovan from employment on or about October 18, 2019.

54. Nappi has a pattern of unequal pay practices and discriminatory treatment of women. Nappi has engaged in unequal pay practices that disproportionately affect female employees and perpetuate previous discriminatory hiring practices.

55. Nappi paid Donovan less than her predecessor, who was male, simply because of her gender.

56. Nappi knowingly allowed one of Donovan's colleagues, Hale, to create a hostile and discriminatory working environment based on Donovan's sex and sexual orientation.

57. Nappi retaliated against Donovan for complaining to Watson and Fox that Hale was treating her differently than similarly situated coworkers. Hale created a hostile and discriminatory working environment, of which Watson and Fox were aware. When Donovan complained to Nappi

about how she was treated, the company took adverse action against Donovan by removing or interfering with job duties, excluding her from important management meetings, removing lines of communication that were critical to her job performance, denying her a pay raise, and placing her on a pretextual performance improvement plan that was designed to force her out of the company rather than ensure her success at Nappi.

58. Alternatively, Nappi took the above adverse actions against Donovan in retaliation for her coming out as a lesbian.

59. Alternatively, Nappi took the above adverse actions against Donovan as part of a continuing violation of the FMLA dating back to 2017 when Donovan first took an FMLA-qualifying medical leave of absence for serious mental health issues.

60. Nappi intentionally interfered with Donovan's rights under the FMLA in 2019 by calling her request for another medical leave a "life raft" and refusing to notify her of her rights and responsibilities under the FMLA.

61. Nappi knew that Donovan had a record of a disability based on her depression and ongoing mental illness.

62. Donovan was a qualified individual with a disability under the ADA because her depression and mental illness, which significantly impacted her ability to work and perform many other activities, continued from 2017 up until her constructive discharge from the company on October 18, 2019.

63. Donovan's request for a medical leave in 2019, which Fox dismissed as "life raft," was a request for an accommodation under the ADA that Nappi refused to grant.

64. Nappi refused to engage in the interactive process with Donovan when it was obvious that she needed an accommodation for her disability, in violation of the ADA.

65. Upon information and belief, Nappi representatives violated the ADA by discussing Donovan's confidential medical information with employees.

66. Nappi knowingly and willfully engaged in the above discriminatory and retaliatory acts.

## COUNT I – FMLA INTERFERENCE
### (29 U.S.C. § 2615(a)(1))

67. Plaintiff repeats the allegations contained in Paragraphs 1 through 66 as if fully stated herein.

68. As of March 2019, Donovan was eligible and qualified for leave under the FMLA.

69. Donovan's severe depression constituted a serious health condition within the meaning of the FMLA.

70. Donovan provided Defendant with appropriate notice of her need to take full and/or intermittent leave under the FMLA. Between March 2019 and the date of her resignation in October 2019, Ms. Donovan requested a medical leave of absence to treat her worsening severe depression.

71. Defendant interfered with Donovan's substantive rights under the FMLA by denying, discouraging, or restraining her request for a full medical leave of absence. Defendant mocked and criticized Donovan when she needed time off for mental health treatment.

72. Defendant further interfered with Donovan's rights under the FMLA by failing to provide her with any notice of her right to take leave and responding that she was "just looking for a life raft."

73. As a result of Defendant's FMLA interference, Donovan has suffered and is entitled to damages, including but not limited to lost wages and benefits, front pay, attorney's fees, costs, and expenses.

74. Defendant's violation of the FMLA was willful, justifying an award of liquidated damages under the FMLA.

WHEREFORE, Plaintiff Helena Donovan requests that the Court award her damages for Defendant's violation of the FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT II – VIOLATION OF THE MAINE FMLA
### (26 M.R.S. § 847)

75. Plaintiff repeats the allegations contained in Paragraphs 1 through 74 as if fully stated herein.

76. As set forth more fully in Count I above, Defendant's conduct amounts to a violation of the Maine FMLA.

77. As a result of Defendant's violation of the Maine FLMA, Donovan has suffered and is entitled to damages, including but not limited to lost wages and benefits, front pay, attorney's fees, costs, and expenses.

78. Defendant's violation of the Maine FMLA was willful, justifying an award of liquidated damages under the Maine FMLA. Alternatively, Plaintiff is entitled to liquidated damages of $100 per day beginning on the date that Donovan became eligible and qualified for FLMA leave, March 15, 2019.

WHEREFORE, Plaintiff Helena Donovan requests that the Court award her damages for Defendant's violation of the Maine FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT III – DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA
### (42 U.S.C. § 12101 *et seq.*)

79. Plaintiff repeats the allegations contained in Paragraphs 1 through 78 as if fully stated herein.

80. Donovan was a qualified individual with a disability within the meaning of the ADA.

81. Defendant regarded Donovan as having a disability that substantially impaired her ability to work and resulted in suicidal ideations.

82. Donovan had a record of a disability.

83. Defendant regarded Donovan as having a disability that required treatment and time off from work in the past but failed to provide Donovan the requested time off as an accommodation for her disability.

84. Defendant discriminated against Donovan because of her perceived or actual disability.

85. In addition to failing to accommodate Donovan's disability, Defendant failed to engage in the interactive process with Donovan despite her obvious need for an accommodation.

86. As a result of Defendant's disability discrimination and willful violation of the ADA, Donovan has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

87. Defendant recklessly, knowingly, and/or willfully retaliated against Donovan in violation of the ADA and therefore Plaintiff is entitled to liquidated and punitive damages.

WHEREFORE, Plaintiff Helena Donovan requests that the Court award her damages for Defendant's violation(s) of the ADA, in the form of lost back pay, front pay, compensatory

damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT IV – SEX-BASED DISCRIMINATION IN VIOLATION OF TITLE VII
**(42 U.S.C. § 2000e *et seq*)**

88. Plaintiff repeats the allegations contained in Paragraphs 1 through 87 as if fully stated herein.

89. Donovan is a member of a protected class based on her gender and sexual orientation.

90. Title VII makes it illegal for an employer to discriminate against an employee because of gender and/or sexual orientation.

91. Defendant's action described above amount to sex discrimination in violation of Title VII, because Nappi subjected Donovan to disciplinary action for discriminatory reasons based on her gender and sexual orientation.

92. Defendant also subjected Plaintiff to a hostile working environment in violation of Title VII.

93. As a result of Defendant's sex discrimination and willful violation of the Title VII, Donovan has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Helena Donovan requests that the Court award her damages for Defendant's violation(s) of Title VII, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT V – RETALIATION IN VIOLATION OF TITLE VII
### (42 U.S.C. § 2000e-3(a))

94. Plaintiff repeats the allegations contained in Paragraphs 1 through 93 as if fully stated herein.

95. Donovan opposed a practice made unlawful by Title VII by making an explicit report of gender and sex-based discrimination that she suffered from her coworkers. In her verbal reports of sex-based discrimination, Donovan informed Nappi that she was being harassed and treated differently than her male colleagues.

96. Donovan also came out as a lesbian at work, after which she experienced more sex-based discrimination by coworkers.

97. Within 3 years of filing this Complaint, Donovan repeatedly opposed Nappi's unlawful practices by making complaints of conduct in the workplace that violated Title VII.

98. As a result of Donovan's protected conduct, Nappi took adverse action against her.

99. Nappi's adverse action against Donovan, as set forth in detail above, bears a causal connection to Donovan opposing practices made unlawful by Title VII.

100. As a result of Defendant's willful retaliation in violation of Title VII, Donovan has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, liquidated damages, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Helena Donovan requests that the Court award her damages for Defendant's violation(s) of Title VII, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT VI -- VIOLATION OF THE MAINE HUMAN RIGHTS ACT
**(5 M.R.S. § 4571 *et seq.*)**

101.  Plaintiff repeats the allegations contained in Paragraphs 1 through 100 of her Complaint as if fully set forth herein.

102.  For the reasons set forth in Count III above, unlawful disability discrimination has taken place within the meaning of the Maine Human Rights Act.

103.  For the reasons set forth in Counts IV and V above, unlawful sex-based discrimination and retaliation have taken place in violation of the Maine Human Rights Act.

104.  As a result of Nappi's discriminatory actions, Plaintiff has suffered and is entitled to damages, including but not limited to: lost wages and benefits, compensatory damages including emotional pain and suffering and lost enjoyment of life, liquidated and punitive damages, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## COUNT VII – VIOLATION OF THE FEDERAL EQUAL PAY ACT
**(29 U.S.C. § 206 *et seq.*)**

105.  Plaintiff repeats the allegations set forth in Paragraphs 1 through 104 of her Complaint as if fully set forth herein.

106.  Defendant discriminated against Donovan in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206(d), as amended by the Equal Pay Act of 1963, by subjecting her to unequal pay on the basis of sex.

107.  Nappi failed to pay Donovan equal wages for substantially equal work as her

similarly situated male colleagues and predecessor(s).

108.    Nappi violated the Equal Pay Act by compensating Donovan less for a job requiring substantially equal skill, effort, and responsibility, which was performed under similar working conditions as her male predecessor, who earned more than Donovan.

109.    Nappi's unequal pay on the basis of sex affected not only Donovan's salary but her employee benefits, earning potential, sales incentives, and bonuses as well.

110.    Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the Equal Pay Act. Further, Defendant knew of or showed reckless disregard for the fact that its conduct violated the Equal Pay Act.

111.    As a result of Defendant's conduct alleged herein and/or Defendant's willful, knowing and intentional discrimination, Donovan suffered and will continue to suffer harm, including but not limited to, lost wages, lost benefits, and other financial loss.

112.    Donovan should be awarded all legal and equitable remedies, including underpaid wages and liquidated damages for Nappi's willful violation of the Equal Pay Act, along with reasonable attorneys' fees under 29 U.S.C. § 216, et seq.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## JURY TRIAL DEMAND

Plaintiff Helena Donovan hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

                                                  Respectfully submitted,

Dated: March 8, 2021                    /s/ Laura H. White
                                                  _____
                                                   Laura H. White, Bar No. 4025
                                                   *Attorney for Plaintiff*
                                                   WHITE & QUINLAN, LLC
                                                   62 Portland Rd., Suite 21
                                                   Kennebunk, ME 04043
                                                   (207) 502-7484
                                                   *lwhite@whiteandquinlan.com*

                                                   /s/ Danielle M. Quinlan
                                                   _____
                                                   Danielle M. Quinlan, Bar No. 5480
                                                   *Attorney for Plaintiff*
                                                   WHITE & QUINLAN, LLC
                                                   62 Portland Rd., Suite 21
                                                   Kennebunk, ME 04043
                                                   (207) 502-7484
                                                   *dquinlan@whiteandquinlan.com*