UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| HELENA DONOVAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 2:21-cv-00070-JAW |
| NAPPI DISTRIBUTORS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

An employer-defendant brings a motion for summary judgment against an employee-plaintiff's claims pursuant to Federal Rule of Civil Procedure 56.  The employee alleges that the employer violated the Family and Medical Leave Act and the Maine Family Medical Leave Requirements by interfering with the plaintiff's right to obtain medical leave, violated the Equal Pay Act and the Maine Human Rights Act by discriminating against her on the basis of sex and sexual orientation, violated the Americans with Disabilities Act and the Maine Human Rights Act by discriminating against her for her disability, and violated Title VII of the Civil Rights Act by discriminating against her on the basis of sex and sexual orientation.  The employee further alleges retaliation under Title VII.  The Court denies the motion as to four of the claims because genuine issues of material fact preclude summary judgment and grants the motion on the remaining claims because the employer is entitled to judgment as a matter of law.

## I.     PROCEDURAL HISTORY

On March 8, 2021, Helena Donovan filed a complaint against her former employer Nappi Distributors (Nappi), alleging interference with her rights, unequal pay practices, disability discrimination, sex discrimination, sexual orientation discrimination, and related retaliation. *Pl.'s Compl.* (ECF No. 1) (*Compl.*). The Complaint asserted claims under the Federal Medical Leave Act (FMLA), the Maine Family Medical Leave Requirements Law (Maine FMLA), the Americans with Disabilities Act (ADA), Title VII of the Civil Rights Act of 1964 (Title VII), the Maine Human Rights Act (MHRA), and the Federal Equal Pay Act (EPA). *Id.* ¶ 1.

On December 16, 2022, Nappi filed its motion for summary judgment and statement of material facts. *Def.'s Mot. for Summ. J.* (ECF No. 60) (*Def.'s Mot.*); *Statement of Material Facts in Supp. of Def.'s Mot. for Summ. J.* (ECF No. 61) (DSMF). On February 15, 2023, Ms. Donovan filed her opposition, *Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 77) (*Pl.'s Opp'n*). That same day, Ms. Donovan filed her opposing statement of additional material facts, *Pl.'s Opposing and Additional Statement of Material Facts in Opp'n to Summ. J.* at 1-59 (ECF No. 76) (PRDSMF), and her own statement of additional material facts. *Id.* at 60-132 (PSAMF). On April 11, 2023, Nappi replied, *Def.'s Reply Mem. of Law in Supp. of Mot. for Summ. J.* (ECF No. 89) (*Def.'s Reply*), filing both a response and objections to Ms. Donovan's additional statements of material fact. *Consolidated Statements of Material Facts Including Def.'s Reply Statement of Material Facts in Supp. of its Mot. for Summ. J.* at 1-49 (ECF No. 90) (DRPSAMF).

2

## II.    THE FACTS

### A.    Helena Donovan's Hiring and Position at Nappi

After contacting John Houle, then Nappi's Wine Purchasing Manager, concerning potential employment at Nappi and learning that he was retiring, Ms. Donovan applied.  DSMF ¶ 4; PRDSMF ¶ 4; PSAMF ¶ 2; DRPSAMF ¶ 2.  Paul Carr, former Director of Wine Sales, and Elmer Alcott, then Vice President and Chief Financial Officer,[1] were responsible for hiring Ms. Donovan.  PSAMF ¶ 1; DRPSAMF ¶ 1.  When Ms. Donovan met with Mr. Carr and Mr. Alcott, they told Ms. Donovan they were hiring a Wine Purchasing Manager.  PSAMF ¶ 3; DRPSAMF ¶ 3.  Following the meeting with Mr. Alcott and Mr. Carr, Mr. Carr called Ms. Donovan and told her she was hired for the position of Wine Purchasing Manager, after which Ms. Donovan spoke with Jim Bourque, Vice President of Human Resources for Nappi, to go over the benefits information.[2]  PSAMF ¶¶ 4, 219, 324; DRPSAMF ¶¶ 4, 219, 324.  Before Ms. Donovan began working at Nappi, she met with Mr. Houle again.  Ms. Donovan discussed compensation with Mr. Houle prior to being hired and he

---

[1]    The Statements of Material Fact fail to identify Elmer Alcott's position at Nappi.  The Court located Mr. Alcott's description of his position in his deposition.  *Supp. 56(h) R. Materials for Pl.'s Opp'n to Def.'s Mot. for Summ. J.*, Attach. 4, *Dep. of Elmer Alcott* at 6:1-7:6 (ECF No. 68).  To complete the context, the Court inserted Mr. Alcott's position at the time of Nappi's hiring of Ms. Donovan.

[2]    PSAMF ¶ 4 identifies Jim Bourque only as Mr. Bourque.  The Court found Mr. Bourque's first name at PSAMF ¶ 9 and has inserted it here as this is the first mention of his name.

Nappi qualifies PSAMF ¶ 4, saying "Mr. Carr testified that [Ms.] Donovan was hired for a different position because she did not have the requisite experience for Wine Purchasing Manager," and Ms. Donovan "testified that she was hired as the wine buyer."  DRPSAMF ¶ 4.  Ms. Donovan testified that Nappi was looking to hire her as "[w]ine purchasing manager" and that a few months after commencing her employment at Nappi, her "title went from wine purchasing manager to purchasing agent."  *Donovan Dep.* at 70:12-14; 74:1-5.  Taking the facts in the light most favorable to Ms. Donovan, the Court overrules Nappi's objection and admits PSAMF ¶ 4.

inquired about her prior salary as a wine purchaser working for Pine State.  PSAMF ¶¶ 5, 406; DRPSAMF ¶¶ 5, 406.

Although Ms. Donovan had only two years of experience as a wine purchaser, all at Pine State, DSMF ¶ 3; PRDSMF ¶ 3, Nappi hired her on December 3, 2013. DSMF ¶ 1; PRDSMF ¶ 1.  Ms. Donovan would be performing the same duties she was performing in her role at Pine State, so the only thing she was trained on was Nappi's system.[3]  PSAMF ¶ 308; DRPSAMF ¶ 308.  Ms. Donovan was compensated as discussed with Mr. Houle, DSMF ¶ 5; PRDSMF ¶ 5, and received a $16,000 pay increase when she left Pine State for Nappi.  DSMF ¶ 2; PRDSMF ¶ 2.  After Ms. Donovan started, her salary did not change aside from annual pay increases.  DSMF ¶ 7; PRDSMF ¶ 7.  When Ms. Donovan began working at Nappi her salary was $53,000 and when she left it was $60,000.  PSAMF ¶ 318; DRPSAMF ¶ 318.

Ms. Donovan understood that she was hired for the exact same job Mr. Houle was previously working.  PSAMF ¶ 308; DRPSAMF ¶ 308.  Ms. Donovan was paid less than Mr. Houle, who started working at Nappi as the wine purchasing manager in the early 2000s as part of Nappi's acquisition of Cumberland and York Distributors, a beer and wine distributor.[4]  DSMF ¶ 8; PRDSMF ¶ 8.  Mr. Houle had

---

[3]     PSAMF ¶ 308 provides that "[Ms.] Donovan was hired for the exact same job [Mr.] Houle was previously working.  [Ms.] Donovan would be performing the same duties she was performing in her role at Pine State, the only thing she was trained on was Nappi's system."  Nappi denies PSAMF ¶ 308, saying "Mr. Houle had more duties than Ms. Donovan, including setting up the warehouse, and additionally, Ms. Donovan could not manage the portion of Mr. Houle's responsibilities that were given to her, so Nappi had to take away ordering responsibilities from her, and she was not ordering for several brands."  DRPSAMF ¶ 308.  Having reviewed the relevant record, the Court accepts Nappi's denial as a qualification, slightly alters PSAMF ¶ 308, and admits the fact.
[4]     DSMF ¶ 8 states only that Ms. Donovan "has alleged that she was paid less than Mr. Houle, who started at Nappi as the wine purchasing manager in the early 2000s as part of Nappi's acquisition

considerably more experience than Ms. Donovan,[5]   DSMF ¶ 10; PRDSMF ¶ 10; he had considerable experience prior to his employment at Nappi and continued to gain experience during his tenure there.   DSMF ¶ 9; PRDSMF ¶ 9.   Nappi set Mr. Houle's compensation at $50,440 annually in 2002, based on the terms of the acquisition deal and his level of experience.[6]   DSMF ¶ 11; PRDSMF ¶ 11.   According to Nappi, Ms. Donovan's compensation was set based on her level of experience as a Wine Buyer and any discrepancy in Ms. Donovan's pay compared to Mr. Houle's was based on experience and seniority.[7]   DSMF ¶ 12; PRDSMF ¶ 12.

---

of Cumberland and York" without identifying what Cumberland and York was.  The Court found a reference to Cumberland and York in Mr. Bourque's sworn declaration, *Decl. of James R. Bourque* ¶ 4, and to provide context the Court added the fact that Cumberland and York was a beer and wine distributor.

[5]     DSMF ¶ 10 states that "Mr. Houle had considerably more experience than Ms. Donovan."  Ms. Donovan denies DSMF ¶ 10, saying she "was performing the same duties as [Mr.] Houle while she was at Pine State."  PRDSMF ¶ 10.  When asked whether it "would be fair to say that [Mr. Houle] had considerably more experience than [she] had in that role," Ms. Donovan responded "Sure. Yup." *Donovan Dep.* at 175:15-18.  Based on Ms. Donovan's testimony, the Court finds that the record cited by Ms. Donovan does not support her contention that she and Mr. Houle had an equivalent amount of experience and rejects her objection.

[6]     DSMF ¶ 11 states: "Mr. Houle's compensation upon joining Nappi was set based on the terms of the acquisition deal and his level of experience."  Ms. Donovan denies DSMF ¶ 11, saying the "terms of Mr. Houle's contract provided for compensation of $50,440 annually in 2002."  PRDSMF ¶ 11. Having reviewed the relevant record, the Court finds that these facts do not contradict one another and slightly alters DSMF ¶ 11 to reflect the full record.

[7]     DSMF ¶ 12 states that "Ms. Donovan's compensation was set according to her level of experience as a Wine Buyer."  DSMF ¶ 13 states that "[a]ny discrepancy in Ms. Donovan's pay compared to Mr. Houle's was based on experience and seniority."  Ms. Donovan denies DSMF ¶ 12, saying "Donovan's compensation was set after Houle inquired about [her] salary while employed at Pine State.  Donovan was performing all of the same functions at Nappi as she did at Pine State, the only training Houle provided was learning Nappi's system.  Houle told Donovan he earned more than she did because he was 'grandfathered' into his rate of pay, not because of experience."  PRDSMF ¶ 12.  Ms. Donovan denies DSMF ¶ 13, saying she "testified that she had the experience to perform the duties that Houle was performing as they were the same duties she was performing at her prior job." Although Ms. Donovan's denial is in part beyond the scope of the fact, the Court slightly alters DSMF ¶¶ 12-13 to indicate that these facts reflect only Nappi's contention.

Ms. Donovan later had a conversation with Mr. Houle in which he told Ms. Donovan that he earned more money than she did because he was "grandfathered."[8] PSAMF ¶ 5; DRPSAMF ¶ 5. Mr. Carr testified that Ms. Donovan was paid less than her predecessor Mr. Houle because Mr. Houle had more experience and was "grandfathered" into his rate of pay, manager title, and benefits such as a company vehicle.[9] PSAMF ¶ 6; DRPSAMF ¶ 6. Mr. Carr testified that Ms. Donovan was also paid less than her predecessor because Ms. Donovan had a lot of outstanding difficulties that periodically caused her to miss work such as migraines and domestic relations issues.[10] PSAMF ¶ 7; DRPSAMF ¶ 7.

---

[8]    Nappi qualifies PSAMF ¶ 5, saying Mr. Houle "earned more money because he had more experience and seniority, and he told Donovan he had a contract due to the acquisition of Cumberland & York." DRPSAMF ¶ 5. Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 5.

[9]    PSAMF ¶ 6 states that Mr. Carr "testified [Ms. Donovan] was paid less than her predecessor Houle because Houle was 'grandfathered' into his rate of pay, manager title, and benefits such as a company vehicle." Nappi qualifies PSAMF ¶ 6, saying "[t]he record citation indicates that [Ms.] Donovan's compensation was determined because she had less experience than her predecessor" and further testified that "Mr. Houle had more responsibilities than Donovan." DRPSAMF ¶ 6. Mr. Carr's cited testimony reads: Ms. Donovan "was paid less because she didn't have the experience. Houle was grandfathered by Cumberland & York to get the same pay and have the title and have a vehicle. She wasn't. We hired her because she was an assistant purchaser at Pine State, but she did not have the experience." *Carr Dep.* at 85:17-22. The Court adds to PSAMF ¶ 6 to reflect the cited record.

[10]    PSAMF ¶ 7 states that Mr. Carr "testified Donovan was also paid less than her predecessor because Donovan had a lot of outstanding difficulties that periodically caused her to miss work such as migraines, domestic relations issues, and he sensed she had depression and anxiety." Nappi qualifies PSAMF ¶ 7, saying "[t]he record citation also discusses that her predecessor, Mr. Houle, had more experience and different responsibilities . . . [and] the factual assertion is misleading, in that Mr. Carr testified that he sensed Donovan may have anxiety and depression after he was specifically asked if he was aware of such issues, well after discussing the difference in pay between Donovan and her predecessor." DRPSAMF ¶ 7. Mr. Carr testified that Ms. Donovan was given different pay than her predecessor in part because "she had a lot of other outstanding issues . . . She had problems with her husband. She had – she had, you know, domestic relation problems and she had migraines. And she would be out of work fairly often, not a long-term or anything like that, a day or two call in sick, but she had problems at home. And also she had problems doing the job that [John Houle] did." *Carr Dep.* at 85:22-86:6. When specifically asked whether he ever learned of Ms. Donovan's depression, Mr. Carr later testified that he "sensed" she had depression. *Carr Dep.* at 87:10-13. The Court alters PSAMF ¶ 7 to reflect the full record.

A few months after Ms. Donovan began working for Nappi, her job title changed from wine purchasing manager to wine purchasing agent.[11]  PSAMF ¶ 8; DRPSAMF ¶ 8.  Ms. Donovan lost benefits when her job title changed at Nappi as she was no longer eligible for a company car or manager bonuses.[12]  PSAMF ¶ 10; DRPSAMF ¶ 10; DSMF ¶ 7; PRDSMF ¶ 7.

Ms. Donovan told Mr. Carr or Mr. Bourque that she had her title taken away and that she was compensated less than Mr. Houle and that there was no apparent

---

[11]   Nappi qualifies PSAMF ¶ 8, saying she "testified that she was hired as the wine buyer." DRPSAMF ¶ 8.  Ms. Donovan testified that Nappi was looking to hire her as a "[w]ine purchasing manager" and that a few months after commencing her employment at Nappi, her "title went from wine purchasing manager to purchasing agent."  *Donovan Dep.* at 70:12-14; 74:1-5.  The Court overrules Nappi's objection and admits PSAMF ¶ 8.

[12]   Nappi denies PSAMF ¶ 10, saying Ms. Donovan "did not lose benefits.  She testified that she never had a company car, nor did she ever receive manager bonuses . . .. [t]herefore, Donovan cannot be said to have lost benefits she never had."  DRPSAMF ¶ 10.  Ms. Donovan testified:

> Q.  What position do you believe you were hired for?
> A.  I was hired as the wine buyer.
> Q.  Did your position change over time?
> A.  Not the actual responsibilities.  My title, yes.
> Q.  How did your title change?
> A.  My title went from wine purchasing manager to purchasing agent.
> Q.  When did that happen?
> A.  I couldn't tell you, a few months.
> Q.  When you indicate the position change occurred, did your salary change?
> A.  No.
> Q.  Did your benefits change?
> A.  Yes.
> Q.  What benefits changed?
> A.  I was told that the title change was so that Nappi wasn't liable for a company car or manager bonuses.
> Q.  Prior to the change in your position, as you understand it, did you have a company car – were you assigned a company car?
> A.  No.
> Q.  Prior to the title change, did you receive any manager bonuses?
> A.  No.

*Donovan Dep.* at 73:22-74:22.  The record indicates that although Ms. Donovan had not yet had a company car or received manager bonuses, she would have been eligible for them until her title changed a few months after beginning her employment at Nappi, and she therefore lost access to those benefits at that time.  The Court overrules Nappi's objection and admits PSAMF ¶ 10.

reason for it other than that he was "grandfathered," so it must have been because she was a woman.[13]   PSAMF ¶ 9; DRPSAMF ¶ 9.   Ms. Donovan testified that Mr. Carr told her the decision to change her job title to exclude manager was made by Mr. Alcott because he thought her title should reflect that she would not be entitled to manager's bonuses and a company vehicle.[14]   PSAMF ¶ 11; DRPSAMF ¶ 11.   Ms. Donovan understood that she was hired as the wine buyer and that none of her job functions required her to use a company vehicle.[15]   DSMF ¶ 6; PRDSMF ¶ 6.   Mr.

---

[13]     Nappi denies PSAMF ¶ 9, saying Ms. Donovan "testified that she did not remember the conversation, stating, 'I wish I could remember the specific conversation with Paul [Carr], but you're talking nine years ago and I just don't recall.'"  Ms. Donovan testified:

> Q.  During your employment at Nappi, did you ever tell anyone with management that you felt you were being discriminated against with regard to the terms of your compensation?
> A.  Initially.
> Q.  Who did you talk to about that?
> A.  It would have been I want to say [Mr. Carr] or [Mr. Bourque].  I'm sorry, I don't remember the specific.
> Q.  What do you remember about that conversation?
> A.  Well, the fact that that title was taken away from me, that my compensation was less than [Mr. Houle]'s, that there was no apparent reason for it, other than the excuse that he was grandfathered, therefore, it must be because I am a woman.  I could see no other reason for it, other than to be told that they didn't want to provide me with management bonuses or a car.

*Donovan Dep.* at 91:91:7-23.  Taking the facts in the light most favorable to Ms. Donovan, the Court overrules Nappi's denial and admits PSAMF ¶ 9.

[14]     PSAMF ¶ 11 states that "Donovan testified that Carr told Donovan the decision to change Donovan's job title to exclude manager was made by Alcott because Alcott did not want Donovan to be entitled to manager's bonuses and a company vehicle."

Nappi qualifies PSAMF ¶ 11, saying "[t]he factual assertion is misleading in that Donovan's testimony indicates that Carr told her that Alcott wanted to change her title to reflect her actual benefits package.  The record citation actually states, '[Carr] said that Elmer [Alcott] felt that the title of manager, basically benefits-wise, entitled me to manager bonuses and a company car and that those things were not -- they were not included in my benefits package so they changed the title.'"  DRPSAMF ¶ 11 (quoting *Donovan Dep.* at 171:7-11).

Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 11 to reflect the record.

[15]     DSMF ¶ 6 states: "Ms. Donovan understood that she was hired as the wine buyer and that none of her job functions required her to use a company vehicle."

Brown, Nappi's on-site sales manager—and interim wine director from Paul Carr's retirement in 2017 until August of 2018—does not know whether Ms. Donovan was performing her role as wine purchaser in the same manner as her predecessor Mr. Houle.[16]  PSAMF ¶ 88; DRPSAMF ¶ 88.

Jim Bourque, the former owner of Cumberland and York Distributors, served as the Vice President of Human Resources for Nappi until September 2015 when Christine Fox became the HR Manager at Nappi.  PSAMF ¶¶ 56, 219, 324; DRPSAMF ¶¶ 56, 219, 324.  In 2016, Ms. Donovan reported to Ms. Fox that she thought her job title had changed or was going to change from Wine Purchasing Manager to Wine

---

Ms. Donovan objects to DSMF ¶ 6, saying she "understood she was hired as the Wine Purchasing Manager."  PRDSMF ¶ 6.  When asked what position Nappi was initially looking to hire her for, Ms. Donovan testified: "Wine purchasing manager."  *Nappi R.*, Attach 1, *Dep. of Helena Donovan* at 70:12-14 (*Donovan Dep.*).  But when asked what position she was actually hired for, Ms. Donovan testified that she "was hired as the wine buyer."  Id. at 73:22-23.  Then, when asked how her title changed, she testified that her "title went from wine purchasing manager to purchasing agent."  Id. at 74:1-2.  The record reflects that, depending on the context, Ms. Donovan uses wine purchasing manager and wine buyer interchangeably to refer to the position for which she was hired.

Taking the facts in the light most favorable to the Plaintiff, the Court changes "wine buyer" to "wine purchasing manager" in DSMF ¶ 6 to reflect Ms. Donovan's preferred title, in line with the record.

[16]   Nappi qualifies PSAMF ¶ 88, saying "Mr. Brown testified that he was in sales when Ms. Donovan was hired and therefore had no insight into how either her or Mr. Houle approached their jobs at that time."  DRPSAMF ¶ 88.  Nappi's qualification is beyond the scope of the fact, and the Court admits PSAMF ¶ 88.

Purchaser.[17,] [18] PSAMF ¶ 57; DRPSAMF ¶ 57.  Ms. Donovan complained to Ms. Fox

that Mr. Houle, Ms. Donovan's predecessor, had the title Purchasing Manager,[19]

PSAMF ¶ 60; DRPSAMF ¶ 60, and that she would not have taken the job at Nappi if

her title were not going to be Purchasing Manager.[20]  PSAMF ¶ 59; DRPSAMF ¶ 59.

---

[17]      PSAMF ¶ 57 states that "[i]n 2016 Donovan reported to Fox that her job title had changed from Wine Purchasing Manager to Wine Purchaser."
      Nappi objects to the fact as inadmissible hearsay and qualifies PSAMF ¶ 57, saying "Ms. Donovan told Ms. Fox that she 'thought' her title had changed, and Ms. Fox looked in Ms. Donovan's file and did not see any reference to Ms. Donovan ever having the title 'Purchasing Manager.'" Having reviewed Ms. Fox's deposition testimony, Nappi's objection mischaracterizes what Ms. Fox testified Ms. Donovan told her.  Ms. Fox testified:

> Q. Did Helena ever tell you about her title changing?
> A, She told me I believe it was in - - sometime in 2016 that she thought it either had changed or was going to change.  I think she said she thought that it had changed. Actually, it was she thought that it had changed.

*Stip. R.* Attach. 14, *Dep. of Christine Fox* at 8:2-7.  Nappi's objection implies that Ms. Donovan was guessing about whether her position had changed.  In fact, viewing the record in the light most favorable to Ms. Donovan, she knew that Nappi was in the process of changing her position and was only uncertain about whether the change had become effective.  The Court overrules Nappi's objection.
      Nappi also objects to PSAMF ¶ 57 as inadmissible hearsay.  The Court overrules Nappi's objection.  The record reveals a dispute between Ms. Donovan and Nappi as to whether she was hired as the Wine Purchasing Manager and whether Nappi changed her position from Wine Purchasing Manager to Wine Purchaser.  In DSMF ¶ 6, Nappi asserts that it hired Ms. Donovan as the wine buyer, a fact Ms. Donovan denies.  DSMF ¶ 6; PRDSMF ¶ 6.  In PSAMF ¶ 4, Ms. Donovan asserts that Nappi hired her as the Wine Purchasing Manager, a fact Nappi did not admit.  PSAMF ¶ 4; DRPSAMF ¶ 4. Furthermore, Nappi argues that "[a]t minimum, Ms. Donovan vaguely recalls an unspecific conversation that occurred almost a decade ago, in which she alleged that she told someone at Nappi (she cannot remember who) that she thought her management title was taken away because she was a woman."  *Def.'s Reply* at 10.  As Nappi is challenging whether it hired Ms. Donovan as Wine Purchasing Manager and whether it changed her position after hire, Ms. Donovan's statement to Ms. Fox, the HR Manager, that Nappi had either already or was about to change her employment position is not hearsay.  It is admissible under Federal Rule of Evidence 801(d)(1).

[18]      PSAMF ¶ 58 duplicates PSAMF ¶ 57, and the Court therefore omits it.

[19]      PSAMF ¶ 60 states that "Donovan told Fox that Houle, who was Donovan's predecessor, had the title Purchasing Manager when he held Donovan's position."  Nappi objects to PSAMF ¶ 60 as inadmissible hearsay and qualifies the fact, saying "[t]he record citation does not support the assertion that Ms. Donovan assumed Mr. Houle's position."  DRPSAMF ¶ 60.  The Court rejects Nappi's hearsay objection for the same reason explained in footnote 17.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 60 to reflect the record.

[20]      Nappi objects to PSAMF ¶ 59 as inadmissible hearsay and argument rather than fact.  The Court rejects Nappi's hearsay objection for the same reason explained in footnote 17 and rejects Nappi's remaining objection because the statement is a factual assertion of what Ms. Donovan said to Ms. Fox.

The application that Ms. Donovan filled out for employment with Nappi indicated that she desired to apply for the "Purchasing Manager" position.[21]   PSAMF ¶ 61; DRPSAMF ¶ 61.

Ms. Fox testified that after Ms. Donovan reported the job title change to her, she looked into the issue by reviewing Ms. Donovan's file and speaking with Mr. Carr and Mike Hale.[22]  Ms. Fox testified that nothing in Ms. Donovan's file referenced the title Purchasing Manager.[23]  PSAMF ¶ 62; DRPSAMF ¶ 62.  Ms. Fox spoke "at length" with Mr. Carr and Mr. Hale about the fact that Ms. Donovan felt her job title should be "Purchasing Manager" just like her predecessor.  PSAMF ¶ 63; DRPSAMF ¶ 63.  Both Mr. Carr and Mr. Hale told Ms. Fox that Nappi never intended for Ms. Donovan to have the same "Purchasing Manager" title as Mr. Houle.[24]   PSAMF ¶ 64; DRPSAMF ¶ 64.  Yet, according to Ms. Donovan, she received two versions of business

---

[20]  Nappi qualifies PSAMF ¶ 59, saying "Ms. Fox testified that Ms. Donovan commented that she would not have taken the job if it was not that title.  Further, Ms. Donovan filled out her new hire paperwork with the job title listed as 'Wine Purchaser.'"  DRPSAMF ¶ 59.  Nappi's qualification is beyond the scope of the fact and the Court admits PSAMF ¶ 59.

[21]  Nappi qualifies PSAMF ¶ 61, saying "[t]he application does not indicate that she was applying for that position, but that was the 'employment desired.'"  DRPSAMF ¶ 61.  The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 61 to reflect the record.

[22]  Based on the trial in *Tourangeau v. Nappi Distributors*, 2:20-cv-12-JAW, the Court is aware that Mike Hale, who testified at the trial, was a manager at Nappi.  *See id.*, *Tr. of Proceeding* at 334:5-341:1 (ECF No. 209).  However, the parties have elected not to identify Mr. Hale in the statements of material fact, except obliquely as Valerie Hale's husband.  DSMF ¶ 114; PRDSMF ¶ 114.  Despite its knowledge of Mr. Hale's former position at Nappi, the Court has not further identified Mike Hale and has not considered his position within Nappi management.

[23]  PSAMF ¶ 62 provides that "Fox testified that after  Donovan reported the job title change to Fox she looked into the issue by speaking with  Carr and  Hale as well as looking at  Donovan's file.  Fox testified that nothing in Donovan's file referred to her position as a Wine Purchasing Manager."  Nappi denies PSAMF ¶ 62, saying "Ms. Fox testified that the file did not have any reference to Purchasing Manager."  DRPSAMF ¶ 62.  The Court accepts Nappi's denial as a qualification and slightly alters PSAMF ¶ 62 to reflect the record.

[24]  Nappi admits PSAMF ¶ 64 but objects to the fact as inadmissible hearsay.  The Court rejects Nappi's objection for the same reason explained in footnote 17.

cards while working at Nappi Distributors that identified her job title as Wine Purchasing Manager.[25]  PSAMF ¶ 410; DRPSAMF ¶ 410.

### B.    Discrimination within the Industry

Mr. Bourque worked at Nappi Distributors until 2015 and had a chance to work with Ms. Donovan, seeing her at weekly sales meetings. [26]  PSAMF ¶¶ 325; DRPSAMF ¶¶ 325.  Mr. Bourque believes a woman was not hired into the sales representative position prior to 2014 because it was typically male dominated.[27]  PSAMF ¶ 327; DRPSAMF ¶ 327.  Often, Nappi did not post available sales representative positions.[28]  PSAMF ¶ 329; DRPSAMF ¶ 329.  Nappi Distributors

---

[25]     Nappi admits PSAMF ¶ 410 but objects because these cards "were produced for the first time in a photograph . . . on January 30, 2023 . . . [that] is grainy and possibly altered and has differing versions of Ms. Donovan's cell phone number.  Nappi has been deprived of the opportunity to question the authenticity of these cards, and they must be stricken or disregarded."  DRPSAMF ¶ 410.  The Court admits PSAMF ¶ 410 over objection at the summary judgment stage.

[26]     PSAMF ¶ 326 reads: "Mr. Bourque had a chance to work with Ms. Tourangeau.  He attended the weekly sales meetings and saw her there."  Ms. Donovan cites the so-called Bourque deposition at ECF Number 65, Attachment 6.  *Id.*

Nappi objects to PSAMF ¶ 326 as immaterial and further qualifies the fact, saying "Mr. Bourque's testimony is that he met Ms. Tourangeau but did not interact with her often."  DRPSAMF ¶ 326.

Ms. Donovan's citation is to a deposition docketed in a separate case in which a Nappi employee, Michele Tourangeau, filed suit against Nappi alleging discrimination.  *See Michele Tourangeau v. Nappi Distributors*, 2:20-cv-00012-JAW, *Local R. 56(h) Stip. R.*, Attach. 6, *Dep. of Paul D. Carr* (ECF No. 65).  Thus, Ms. Donovan's citation is a mystery.  She is citing a deposition in a different case without acknowledging it.  Furthermore, Ms. Donovan cites the Bourque deposition, but the actual citation is to the Paul Carr deposition.  Finally, the Paul Carr deposition references his, not Mr. Bourque's, interactions with Michele Tourangeau, not with Ms. Donovan.

The Court is not sure what is going on.  However, the Court declines to include PSAMF ¶ 326 because it is not at all certain that counsel for the Plaintiff intended the reference and the Court is not clear about the relevance of Michele Tourangeau's relationship with either Mr. Carr or Mr. Bourque.

[27]     Nappi objects to PSAMF ¶ 327 as immaterial and further qualifies the fact, saying "[t]he statement is misleading as it does not reflect the witness's entire statement.  Mr. Bourque also stated that often times Nappi did not get female applicants for sales positions."  DRPSAMF ¶ 327.  The Court overrules Nappi's materiality objection, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 327.

[28]     Nappi objects to PSAMF ¶ 329 as immaterial and further qualifies the fact, saying "Nappi may have posted sales positions.  In addition, Elmer Alcott testified that he put ads in the paper and would post a sign."  DRPSAMF ¶ 329.  The Court overrules Nappi's materiality objection, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 329.

often did not even get any applicants for sales representative positions—the positions were filled by informal recruiting,[29] PSAMF ¶ 328; DRPSAMF ¶ 328, such as word of mouth and networking through the "grapevine."[30] PSAMF ¶ 330; DRPSAMF ¶ 330. Ultimately, Nappi often hired from within,[31] PSAMF ¶ 331; DRPSAMF ¶ 331, where most of the sales representatives were men.[32] PSAMF ¶ 332; DRPSAMF ¶ 332. Most of the sales representatives working for competitors were also men.[33] PSAMF ¶ 333; DRPSAMF ¶ 333. Historically, the male sales representatives at Nappi helped other men they knew get sales representative positions.[34] PSAMF ¶ 341; DRPSAMF ¶ 341.

---

[29] Nappi objects to PSAMF ¶ 328 as immaterial and further qualifies the fact, saying "[t]he cited testimony does not say that Nappi did not get applicants for positions." DRPSAMF ¶ 328. Having reviewed the relevant record, the Court overrules Nappi's materiality objection, finds PSAMF ¶ 328 supported by the record, and admits the fact.

[30] Nappi objects to PSAMF ¶ 330 as immaterial but otherwise admits the fact. The Court overrules Nappi's materiality objection and admits PSAMF ¶ 330.

[31] PSAMF ¶ 331 states that "Nappi Distributors hired from within." Nappi objects to PSAMF ¶ 331 as immaterial and further qualifies the fact, saying "Mr. Alcott testified that most employees came from suppliers or other distributors [and] Mr. Carr testified that when a position became available, they first looked for employees worthy of promotion, then they would look outside to competitors to fill the position." DRPSAMF ¶ 331. The Court overrules Nappi's materiality objection. Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 331 and admits the fact.

[32] PSAMF ¶ 332 provides that "[m]ost of the employees working at Nappi Distributors were men." Nappi objects to PSAMF ¶ 332 as immaterial and further qualifies the fact, saying "[t]he cited testimony refers only to sales representative positions." DRPSAMF ¶ 332. The Court overrules Nappi's materiality objection. Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 332 and admits the fact.

[33] Nappi denies PSAMF ¶ 333 as unsupported by the record. DRPSAMF ¶ 333. Mr. Bourque's testimony states that "it didn't seem to be that prevalent throughout the industry [to have female sales representatives], not just us but most of the ones in the state," indicating that there were few women sales representatives working for competitors. *Bourque Dep.* at 17:15-18. The Court therefore rejects Nappi's denial and admits PSAMF ¶ 333 but adopts "sales representatives" rather than "employees."

[34] Ms. Donovan's PSAMF ¶ 341 states: "Historically, the male sales representatives at Nappi helped other guys they knew get sales representative jobs at Nappi." For this proposition, Ms. Donovan cites "ECF Doc. 65-6, Bourque dep. 18:9-14. Page ID # 668." *Id.* ECF Number 65 in this case does not contain the Bourque deposition. *See Order Granting Mot. to Extend Time* (ECF No. 65).

The Court believes that Ms. Donovan's citation is to a deposition filed in *Tourangeau v. Nappi Distributors*, 2:20-cv-00012-JAW. *See id.*, Stip. R. Attach. 6, *Dep. of Jim Bourque* (ECF No. 65). Although the Court is aware of no prohibition against citing a deposition entered into the record in

Another reason Mr. Bourque believes there previously was not a female sales representative at Nappi Distributors is the physical component of the position,[35] PSAMF ¶ 334; DRPSAMF ¶ 334, consisting of getting a call from a customer at 4:30 p.m. Friday afternoon with a missed delivery and possibly needing to deliver a barrel which weighs more than he does.[36, 37]   PSAMF ¶ 335; DRPSAMF ¶ 335.

---

another case, it is, at least, unconventional.  Here, Ms. Donovan did not cite the *Tourangeau* docket and simply cited ECF Number 65, leaving it to the Court to figure out that she is citing the docket in another case.  Ordinarily, the Court would not consider citations to the docket in another case without an explanation (or at least a proper citation) from the proponent.  This situation is unusual, however, in that this Judge presided over *Tourangeau* and is aware that counsel for both the Plaintiff and Nappi were the same in *Tourangeau* as here.  Accordingly, it is difficult to imagine a cognizable prejudice to Nappi from citation to a deposition in which a Nappi supervisor was deposed and Nappi was fully represented.

Furthermore, Ms. Donovan's citation to the *Tourangeau* docket did not stop with the Bourque deposition.  PSAMF ¶¶ 342 through 348 all cite depositions on the *Tourangeau* docket without attribution to the *Tourangeau* case.  Not to consider eight statements of material fact in these unusual circumstances would unduly sanction Ms. Donovan, absent any apparent prejudice to Nappi, even though Ms. Donovan's faulty citations and absence of explanation are careless and wanting.

Turning to Nappi's objection, it asserts that the term "guys" in Mr. Bourque's deposition could be gender neutral.  Viewing the facts in the light most favorable to Ms. Donovan, the Court treats Mr. Bourque's reference to "guys" as referring to men.

[35]   Nappi denies PSAMF ¶ 334 because Mr. Bourque "specifically testified that the physical component of the job does not preclude women."  DRPSAMF ¶ 334.  When asked why it "took until 2015 for a female sales representative to be hired at Nappi," Mr. Bourque responded that "[p]art of it is there is -- there can be a large physical component, which doesn't necessarily preclude women.  But, for instance, you'd always get a call late on a Friday afternoon like usually 4:30, a missed delivery or something, and it could involve delivering a barrel, which, you know, weighs more than I do, for crying out loud.  So that's just one little side effect." *Bourque Dep.* at 17:4-11.

The Court rejects Nappi's denial and admits PSAMF ¶ 334, noting that although Mr. Bourque testified that the physical component of the job "doesn't <u>necessarily</u> preclude women," his testimony demonstrates that Nappi in fact considered the presumed lack of physical strength of females in its hiring decisions because it feared that a woman would not be able to deliver a barrel of liquor to a customer.

[36]   Nappi objects to PSAMF ¶ 335 as immaterial but otherwise admits the fact. The Court overrules Nappi's materiality objection and admits PSAMF ¶ 335.

[37]   PSAMF ¶ 336 provides that "Mr. Bourque agrees that there was gender discrimination for sales representatives in the industry."  Nappi objects to PSAMF ¶ 336 as immaterial and further denies the fact, saying "Mr. Bourque testified that he does not believe there was a 'feeling to deny women.'" DRPSAMF ¶ 336.

The Court already admitted Mr. Bourque's statement about women being unable to handle the physical aspect of the sales job.  Here, Ms. Donovan goes further and alleges that Mr. Bourque admitted that liquor distributors discriminated against women in hiring sales representatives.  The Court views PSAMF ¶ 336 as a step too far based on Mr. Bourque's deposition testimony and as argumentative.  Having reviewed the relevant record, the Court finds PSAMF ¶ 336 unsupported by

Joline Masters, the key account wine manager at Nappi, agrees that there is gender discrimination in the industry.[38]  PSAMF ¶ 337; DRPSAMF ¶ 337.  Although Ms. Masters was not certain whether she had been rejected due to her gender or her personality, she thought she may have experienced gender discrimination herself while employed at a prior distributor.[39]  PSAMF ¶ 338; DRPSAMF ¶ 338.  While working for another distributor, Ms. Masters was told they did not think she could do the sales position because she could not handle it.[40]  PSAMF ¶ 339; DRPSAMF ¶ 339.  Ms. Masters was also sexually propositioned by accounts.[41]  PSAMF ¶ 340; DRPSAMF ¶ 340.

Mr. Carr described Melanie Larocca, who held the Wine Director Position before him,[42]  PSAMF ¶ 343; DRPSAMF ¶ 343, as "fluff" and "incompetent."[43]

---

the record and appropriately summarized in PSAMF ¶¶ 334-35.  The Court therefore omits PSAMF ¶ 336 from the statement of facts.

[38]    Nappi qualifies PSAMF ¶ 337 because Ms. Masters "testified she had experienced discrimination in prior distributorships" and "then testified she was uncertain if her experience was due to her personality or her gender."  DRPSAMF ¶ 337.  Having reviewed the relevant record, the Court rejects Nappi's qualification and admits PSAMF ¶ 337, as the record reflects Ms. Masters' agreement that gender discrimination exists in the field, even if she was uncertain whether she was rejected due to her gender.  The Court altered PSAMF ¶ 337 to better reflect Ms. Masters' deposition testimony.  The Court also notes that one of the more insidious aspects of gender discrimination is that an employee is rarely sure whether the employer discriminated against her because of her gender.

[39]    Nappi objects to PSAMF ¶ 338 for the same reason as it objects to PSAMF ¶ 337, and the Court overrules Nappi's objection for the reason explained in the prior footnote.

[40]    Nappi objects to PSAMF ¶ 339 as inadmissible hearsay and immaterial and further qualifies the fact, saying "Ms. Masters testified that she did not know if she was rejected from that position (at Central Distributors) because of her personality or her gender."  DRPSAMF ¶ 339.  The Court overrules Nappi's hearsay objection for the reason explained in footnote 17, overrules Nappi's materiality objection, overrules Nappi's content objection for the reason explained in the footnote 38, and admits PSAMF ¶ 339.

[41]    Nappi objects to PSAMF ¶ 340 as immaterial but otherwise admits the fact.  The Court overrules Nappi's materiality objection and admits PSAMF ¶ 340.

[42]    Nappi objects to PSAMF ¶ 343 as immaterial but otherwise admits the fact.  The Court overrules Nappi's materiality objection and admits PSAMF ¶ 343.

[43]    Nappi objects to PSAMF ¶ 344 as immaterial and further qualifies the fact, saying that these words were said when describing Ms. Larocca's termination and that "Mr. Carr further explained that Ms. Larocca was bad-mouthing the Nappi family in public and was skipping presentations on year-

PSAMF ¶ 344; DRPSAMF ¶ 344.  Mr. Carr heard that Ms. Larocca believed she was terminated because of gender discrimination.[44]  PSAMF ¶ 345; DRPSAMF ¶ 345.

Frank Nappi, Sr. owned and ran Nappi Distributors until he died a few years ago.[45]  PSAMF ¶ 348; DRPSAMF ¶ 348.  Mr. Brown heard Frank Maiorino,[46] who may have been part of redistributing accounts for the wine department,[47]  PSAMF ¶ 346; DRPSAMF ¶ 346, make sexist comments.[48]  PSAMF ¶ 347; DRPSAMF ¶ 347.

Anjali Race Quinn is a female Sales Assistant in the Wine Department who worked at Nappi Distributors from June 9, 2021 to early 2022, reporting to Mr. Monaghan.[49]  PSAMF ¶ 349; DRPSAMF ¶ 349.  Ms. Quinn primarily covered Steve

end projections."  The Court overrules Nappi's materiality objection, rejects Nappi's content objection as beyond the scope of the fact, and admits PSAMF ¶ 344.

[44]    Nappi objects to PSAMF ¶ 345 as inadmissible hearsay and immaterial.  DRPSAMF ¶ 345. The Court overrules Nappi's hearsay objection for the reason explained in footnote 17, overrules Nappi's materiality objection, and admits PSAMF ¶ 345.

[45]    PSAMF ¶ 348 states that "Frank Nappi Senior owned and ran Nappi Distributors until he died a year or two ago."  Nappi qualifies the fact, saying "[t]he statement 'a year or two ago' is vague, particularly given that Mr. Bourque testified to that on February 9, 2021."  DRPSAMF ¶ 348.  The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 348.

[46]    The parties' statements of material fact refer to Frank Maiorino but fail to identify his position at Nappi.  *See* PSAMF ¶¶ 138, 228, 319, 320, 321, 346, 347.  There is evidence from which the Court can infer that Mr. Maiorino was a member of Nappi management.  *See* PSAMF ¶ 346.  But there is no evidence of his position at Nappi, his dates of employment, and his supervisory authority, if any, over Ms. Donovan.

[47]    Nappi objects to PSAMF ¶ 346 as immaterial and further qualifies the fact, saying that "[t]he cited testimony indicates that 'folks like [Mr.] Maiorino' would have been involved, but that '[Mr.] Carr would have been the ultimate guy . . ..'"  DRPSAMF ¶ 346.  The Court overrules Nappi's materiality objection and, having reviewed the relevant record, slightly alters PSAMF ¶ 346 to reflect the record and admits the fact.

[48]    Nappi objects to PSAMF ¶ 347 as immaterial but otherwise admits the fact.  The Court overrules Nappi's materiality objection and admits PSAMF ¶ 347.

[49]    Nappi objects to PSAMF ¶¶ 349-366 because these proposed facts rely on "an affidavit by Anjali Race Quinn" when "Ms. Quinn was never identified in initial disclosures, interrogatories, or any supplement to interrogatories, or during discovery as a person with information relevant to any of Ms. Donovan's claims."  DRPSAMF ¶¶ 349-358.  Given the sequential nature of the parties' submissions, Ms. Donovan has not responded to Nappi's allegations of discovery violations, and the Court declines to exclude evidence about Ms. Quinn based solely on Nappi's say so.  Assuming Ms. Donovan committed a discovery violation, the First Circuit has directed the trial courts to "consider the totality of events and then choose from the broad universe of available sanctions in an effort to fit the

Cohen's sales route, but also aided other sales representatives.   PSAMF ¶ 350;
DRPSAMF ¶ 350.   When Ms. Quinn started working as a Sales Assistant, she
required access to Google Dropbox on her work iPad.   PSAMF ¶ 351; DRPSAMF ¶
351.   Valarie Hale sent Ms. Quinn a Dropbox link, but she was unable to download
the link.   *Id.*   Ms. Quinn first requested assistance downloading the app from Ms.
Hale, but she refused to help.   *Id.*   Ms. Quinn then sought help from an IT employee
named Gavin.   PSAMF ¶ 352; DRPSAMF ¶ 352.   Gavin explained to Ms. Quinn that
because it was Ms. Hale's link, she would have to assist her.   *Id.*   Ms. Quinn responded
to Gavin that she had already asked her for help and Ms. Hale refused but agreed to
try again and said something to the effect of "wish me luck."   *Id.*   Ms. Quinn asked
Ms. Hale to assist her with Dropbox on four separate occasions; she intentionally
made it extremely difficult for Ms. Quinn to accomplish simple tasks like this.
PSAMF ¶ 353; DRPSAMF ¶ 353.   In Ms. Quinn's experience, Ms. Hale made herself
inaccessible to anyone she did not like.   PSAMF ¶ 354; DRPSAMF ¶ 354.

Ms. Quinn notified her manager, Bill Monaghan, of the issues she was having
with Ms. Hale.[50]   PSAMF ¶ 355; DRPSAMF ¶ 355.   Mr. Monahan responded: "Yeah,
I know she has a reputation of not playing well with others."   *Id.*   Ms. Quinn believes
Bill Monaghan was suggesting that Valarie Hale has a reputation for not getting

---

punishment to the severity and circumstances of the violation."   *Young v. Gordon*, 330 F.3d 76, 81 (1st
Cir. 2003).   The Court is not in a position to make the necessary evaluation as to whether a discovery
violation occurred, what prejudice was caused to Nappi, whether a sanction should be imposed, and
what sanction should be imposed.   The Court's consideration of Ms. Quinn's evidence in this dispositive
motion is without prejudice to Nappi's later ability to press for a sanction at trial concerning Ms.
Quinn's testimony.

[50]      Nappi denied PSAMF ¶ 355, citing Mr. Monahan's contrary testimony.   The Court declines to
accept Nappi's denial because it is required to view contested evidence in the light most favorable to
Ms. Donovan.

along with other women, not the men who worked at Nappi.  *Id.*  Ms. Quinn was told by many that, as a new employee, Nappi had "thrown" her "to the wolves" with the route she was assigned to cover.[51]  PSAMF ¶ 356; DRPSAMF ¶ 356.  Even though she had a difficult assignment, Matt Watson and Bill Monaghan took Ms. Quinn into Matt Watson's office and congratulated her on a job very well done.  PSAMF ¶ 357; DRPSAMF ¶ 357.  Bill Monaghan commended Ms. Quinn's work ethic on multiple occasions.[52]  *Id.*

During that time, Ms. Quinn was averaging 50 hours of work per week.  *Id.*  Nappi was short-staffed with drivers, so Ms. Quinn was required to do a significant amount more manual lifting than was normally expected of sales assistants.  PSAMF ¶ 358; DRPSAMF ¶ 358.  Ms. Quinn was overworked and required to perform labor that was beyond her means despite being in stellar physical health.  *Id.*  Ms. Quinn suffered a work-related injury at Nappi in the summer of 2021 when a work van slammed shut on her arm, impacting her elbow.[53]  *Id.*  After Ms. Quinn filed a

---

[51]    Nappi interposed a qualified response, indicating that because it is unclear who made the quoted statement, it is "nearly impossible" for Nappi to respond.  DRPSAMF ¶ 356.  The Court declines to accept the qualified response because Ms. Quinn states that she was told this by "many" employees.  At the same time, given the lack of attribution, the Court does not view Ms. Quinn's statement as especially probative.

[52]    Nappi denied PSAMF ¶ 357 on the ground that "Ms. Monaghan testified that there were multiple issues with Ms. Quinn's performance."  The Court rejects Nappi's denial.  Assuming there were multiple issues with Ms. Quinn's performance does not mean that Mr. Monaghan would not have congratulated Ms. Quinn on the things she had done well.  Furthermore, if there is a conflict between what Ms. Quinn and Mr. Monaghan recall, the Court is required to view conflicting evidence in the light most favorable to Ms. Donovan.

[53]    Nappi interposed a qualified response to PSAMF ¶ 358, asserting that Ms. Quinn did not report the work-related injury until late fall.  DRPSAMF ¶ 358.  Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 358.

worker's compensation claim, Nappi employees began harassing and bullying her.[54] PSAMF ¶ 359; DRPSAMF ¶ 359.   Christine Fox, Matt Watson, Matt Wells, Bill Monaghan, and/or Valarie Hale bullied and harassed Ms. Quinn nearly every day from that point forward.[55]   PSAMF 360; DRPSAMF ¶ 360.

Ms. Quinn left Nappi Distributors shortly thereafter because she felt that it was a very toxic work environment, she was being falsely accused of performance issues, and Nappi was clearly retaliating against her for filing a worker's compensation claim.[56]   PSAMF ¶ 361; DRPSAMF ¶ 361.   From Ms. Quinn's perspective, it was clear from the actions of Christine Fox, Valarie Hale, and the wine department management team that she was not going to be successful at Nappi Distributors based on her gender and her work-related injury.[57]   PSAMF ¶ 362; DRPSAMF ¶ 362.

While working at Nappi Distributors, Ms. Quinn learned from others in the warehouse that Valarie Hale had also mistreated, oppressed, and intimidated a

---

[54]   Nappi issued a qualified response to PSAMF ¶ 359, stating that the alleged employees are not identified.  The Court declines to accept Nappi's qualified response because Ms. Donovan identifies the employees in the very next paragraph.

[55]   Nappi denied PSAMF ¶ 360, asserting that it is "impossible to determine to whom the assertion relates."   DRPSAMF ¶ 360.  The Court declines to accept Nappi's denial, because Ms. Donovan lists five Nappi employees who harassed her after she asserted her workers' compensation claim and Nappi could presumably have asked those employees whether the allegations of harassment were true.

[56]   Nappi denied PSAMF ¶ 361 on the ground that Ms. Quinn left Nappi to take a position in an unrelated field and her performance issues were legitimate and widespread.  DRPSAMF ¶ 361.  The Court declines to accept Nappi's denial because it is required to view conflicting evidence in the light most favorable to Ms. Donovan.  The Court amended PSAMF ¶ 361 to reflect that the assertion is Ms. Quinn's opinion.

[57]   Nappi denied PSAMF ¶ 362 on the ground that Ms. Quinn was unsuccessful at Nappi because of her performance and behavioral issues, and she had little contact with Ms. Hale.  DRPSAMF ¶ 362. The Court declines to accept Nappi's denial because it is required to view conflicting evidence in the light most favorable to Ms. Donovan.  The Court amended PSAMF ¶ 362 to reflect that the assertion is Ms. Quinn's opinion.

former female employee who is a lesbian.[58]   PSAMF ¶ 363; DRPSAMF ¶ 363. Multiple employees referred to this former employee not by her name, but as "the lesbian."   *Id.*   Another employee named Matt Auger told Ms. Quinn that the employees at Nappi were relentless in their tormenting of the former lesbian employee and called her a "muff muncher."[59]   PSAMF ¶ 364; DRPSAMF ¶ 364.   At some point, Ms. Quinn learned the former employee who was a lesbian was Helena Donovan.   PSAMF ¶ 365; DRPSAMF ¶ 365.

Ms. Quinn believes Valarie Hale has a problem with women in the workplace, that she routinely harasses and intimidates other women in the workplace, and that she does not treat her male colleagues with the same contempt and instead is quite pleasant in her interactions with the men at Nappi.[60]   PSAMF ¶ 366; DRPSASMF ¶ 366.

---

[58]    Nappi interposed a qualified response to PSAMF ¶ 363 on the ground that the assertion is too vague to verify.   DRPSAMF ¶ 363.   The Court declines to accept Nappi's qualified response since it is based on Ms. Quinn's sworn declaration.   However, in light of its vagueness, the Court observes that its probative value is minimal.

[59]    PSAMF ¶ 364 reads: "Another employee named Matt Auger told me that the employees at Nappi were relentless in their tormenting of the former lesbian employee and called her a 'muff muncher.'"   Nappi denied PSAMF ¶ 364 on the ground that PSAMF ¶ 364 does not identify who "me" is.   DRPSAMF ¶ 364.   Nappi's objection is entirely frivolous.   Ms. Quinn's entire affidavit, which Ms. Donovan cites in support, is in the first person and it is obvious PSAMF ¶ 364 is referring to something Mr. Auger said to Ms. Quinn.   *See Local R. 56(h) R.*, Attach. 5, *Aff. of Anjali Race Quinn* ¶¶ 1-33 (ECF No. 68).   The Court overrules Nappi's hearsay objection because it is also apparent that the content is not being introduced for its truth.

[60]    Nappi interposed a qualified response, noting that Ms. Quinn had little contact with Ms. Hale and would not be able to opine about Ms. Hale's beliefs.   DRPSAMF ¶ 366.   The Court declines to accept Nappi's qualified response because the extent of Ms. Quinn's familiarity with Ms. Hale goes to the weight, not the admissibility, of her opinion.

### C.    Helena Donovan's Work Duties

Ms. Donovan was managing the inventory and the purchasing at Nappi,[61] PSAMF ¶ 68; DRPSAMF ¶ 68, which had organizational issues.[62]   PSAMF ¶ 69; DRPSAMF ¶ 69.  As Wine Buyer for Nappi, Ms. Donovan was tasked with inventory control and placing orders.  DSMF ¶ 54; PRDSMF ¶ 54.  Ms. Donovan's position was a "big one" with a lot of "moving parts."[63]  PSAMF ¶ 69; DRPSAMF ¶ 69.  Ms. Donovan testified that she was responsible for negotiating the costs of the wine she ordered but that she had "no idea" the approximate annual cost of the total wine she ordered because that was something Ms. Hale monitored.[64]   DSMF ¶ 50; PRDSMF ¶ 50.  Ms.

---

[61]    PSAMF ¶ 68 states that "[Ms.] Donovan was managing the inventory and the purchasing at Nappi."  Nappi qualifies PSAMF ¶ 68, saying "[t]he factual assertion is misleading in that it plucks one statement out of the quoted testimony without context.  In the entirety of the response to the question, Ms. Fox explained that although Ms. Donovan was expected to manage inventory and purchasing in her role, she was not effective because her system was not dynamic enough."  DRPSAMF ¶ 68.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 68 to reflect the full record more accurately.

[62]    PSAMF ¶ 69 provides that "[Ms.] Donovan's position was a "big one" with a lot of "moving parts."  Nappi had organizational issues with inventory and purchasing, but "it wasn't specifically Helena issues."  Nappi qualifies PSAMF ¶ 69, saying "[t]he factual assertion is not in context.  Ms. Fox testified that the purchasing role was a big position, and that Mr. Carr was trying to manage despite Ms. Donovan's system of conducting it.  Later, when specifically asked about note-taking, Ms. Fox testified that in 2016 or 2017, she started to ask specific questions about the disconnect and noted that multiple sides of the organization had issues that seemed to originate from Ms. Donovan's purchasing role."  DRPSAMF ¶ 69.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 69 to accurately reflect the record and its relevant context.

[63]    Nappi asserted a qualified response to PSAMF ¶ 69, saying that the statement was taken out of context.  DRPSAMF ¶ 69.  The Court reviewed Ms. Fox's deposition and disagrees with Nappi.  The Court, therefore, does not accept Nappi's qualified response.

[64]    DSMF ¶ 50 states that "Ms. Donovan had 'no idea' the approximate annual cost of the wine she ordered, and instead relied upon Ms. Hale, the administrative assistant, for that information, although Ms. Donovan was responsible for negotiating the costs."  Ms. Donovan qualifies DSMF ¶ 50, saying she "negotiated the cost, but  Hale monitored the annual costs and the invoicing that came in from purchases."  PRDSMF ¶ 50.  Ms. Donovan testified:

> Q.  What were the approximate total average value of the wine inventory levels during your tenure?
> A.  Approximately, it changed from between 4 and 7 million.
> Q.  And what was the approximate annual cost to Nappi of the wine you purchased on an annual basis?

Donovan could not give a daily or even weekly average number of purchase orders that she issued because it was heavily dependent on Nappi's changing need.[65]  DSMF ¶ 51; PRDSMF ¶ 51.  She did not monitor inventory on a daily or weekly basis and instead worked through a list of suppliers alphabetically and determined what to order in that way.[66]  DSMF ¶¶ 48, 54; PRDSMF ¶¶ 48,54.

### D.    Helena Donovan's Medical History

Ms. Donovan has been prescribed medication for years to treat depression, anxiety, and Post Traumatic Stress Disorder (PTSD).  PSAMF ¶ 12; DRPSAMF ¶ 12. Prior to 2014, Ms. Donovan was diagnosed with depression, but she cannot recall exactly when she was first diagnosed.[67]  PSAMF ¶ 13; DRPSAMF ¶ 13.  Ms. Donovan

---

A. I have no idea.
Q. Do you have an understanding as to what the approximate annual freight costs for the wine you were ordering?
A. No.  That would be Valarie.  She has or she had spreadsheets on those costs.  It was something that she monitored.
Q. Were those cost[s] part of your job?
A. I was responsible for negotiating the cost, yes.
Q. So to that extent, the work that Valarie was doing had a certain amount of overlap with what you were doing?
A. No, she was monitoring the invoicing that came in.

*Donovan Dep.* at 76:11-77:4.  The Court accepts Ms. Donovan's qualification and alters PRDSMF ¶ 50 to reflect the record.

[65]    DSMF ¶ 51 provides that "Ms. Donovan could not give a daily or even weekly average number of purchase orders that she issued."  Ms. Donovan qualifies DSMF ¶ 51, saying she "testified that she could not give a daily or weekly average because it fluctuated according to the needs of Nappi on a particular day or week."  PRDSMF ¶ 51.  The Court accepts Ms. Donovan's qualification and adds to DSMF ¶ 51 to reflect the full record.

[66]    DSMF ¶ 54 provides that "[a]s Wine Buyer for Nappi, Ms. Donovan was tasked with placing orders and inventory control, but she did not monitor inventory and instead worked through a list of suppliers alphabetically."  Ms. Donovan denies "that she did not monitor inventory because she ordered from suppliers alphabetically—the two are not mutually exclusive," and she "testified that the amount she ordered on a daily or weekly basis depended on the needs of Nappi at any given time." PRDSMF ¶ 54.  The Court accepts Ms. Nappi's denial as a qualification and slightly alters DSMF ¶ 54 to reflect the full record.

[67]    Nappi qualifies PSAMF ¶ 13, saying "Ms. Donovan testified that she was diagnosed with depression when she lived in England, and also testified that she moved from England in 2005."

first attempted suicide in August of 2014, DSMF ¶ 15; PRDSMF ¶ 15, which she attributes in part to bullying at Nappi from Valerie Hale (formerly Valerie Ellis).[68, 69] PSAMF ¶ 21; DRPSAMF ¶ 21.

Joshua Altschule is a licensed psychologist in the state of Maine, PSAMF ¶ 31; DRPSAMF ¶ 31, who began treating Ms. Donovan for posttraumatic stress disorder, panic disorder, and major depressive disorder recurrent (moderate at the time) on November 14, 2016, PSAMF ¶¶ 14, 33; DRPSAMF ¶¶ 14, 33; DSMF ¶ 16-17; PRDSMF ¶ 16-17, because of a combination of issues, including her daughter, her marriage, and years of difficulty in her work life from intimidation and bullying by Ms. Hale.[70] PSAMF ¶ 32; DRPSAMF ¶ 32. Major depressive disorder recurrent means there's a history of major depressive episodes with varying degrees of mild,

---

DRPSAMF ¶ 13. Nappi's objection misrepresents Ms. Donovan's testimony. In her deposition, Ms. Donovan was asked if she knew when she was first diagnosed with depression and she responded, "I honestly don't." *Donovan Dep.* 22:2-4. Nappi's counsel then asked:

> Q. Were you first diagnosed with depression when you were here in the states of back in England?
> A. I guess in England, but it wasn't a consistent issue.

*Id.* 22:5-8. Ms. Donovan guessed or speculated that she was first diagnosed with depression in England, which - without more - is not admissible evidence. The Court overrules Nappi's qualified response.

[68]   PSAMF ¶ 21 provides that "[i]n 2014, Ms. Donovan attempted suicide which she attributes to bullying at Nappi Distributors from Hale (formerly Ellis)." Nappi qualifies PSAMF ¶ 21, saying "[w]hile Ms. Donovan did testify to this assertion, her own medical records, which discuss myriad contributing factors such as her marital separation, discord with her daughter, a break-up with a romantic partner, chronic pain, and recent triggers of childhood sexual abuse, directly refute this assertion. These records do not contain references to work stressors, bullying, or Ms. Hale." DRPSAMF ¶ 21. Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 21 to reflect the record.

[69]   PSAMF ¶ 22 duplicates the information provided in PSAMF ¶ 21, and the Court therefore omits PSAMF ¶ 22.

[70]   Nappi qualifies PSAMF ¶ 32, saying "Ms. Donovan testified that work stresses were not the number one factor 'immediately' that she discussed with Dr. Altschule." DRPSAMF ¶ 32. The Court finds Nappi's objection beyond the scope of the fact and admits PSAMF ¶ 32.

moderate, and severe—at that time Ms. Donovan's depressive episode was moderate so the focus of treatment was on posttraumatic stress disorder and panic disorder.[71] PSAMF ¶ 34; DRPSAMF ¶ 34.

Dr. Altschule identifies a decade of neglect coupled with physical and sexual abuse as the traumatic events directly leading to Ms. Donovan's PTSD.[72]  PSAMF ¶ 35; DRPSAMF ¶ 35.  Ms. Donovan was subjected to physical and sexual abuse by her stepfather as a child.  DSMF ¶ 18; PRDSMF ¶ 18.  As a result of her stepfather's abuse, Ms. Donovan was diagnosed with PTSD and suffered flashbacks.  DSMF ¶ 19; PRDSMF ¶ 19.  Ms. Donovan's diagnosed depression, PTSD, panic disorder, and major depressive disorder manifested themselves in the form of nightmares, panic attacks, flashbacks, hopelessness, anhedonia, sleep challenges, intense fear of being harmed or losing control, heightened anxiety, problems breathing, and temporary vision issues.  PSAMF ¶ 36; DRPSAMF ¶ 36.  Ms. Donovan saw Dr. Altschule for a variety of issues, and there was a time before June 2018 when her sessions focused primarily on PTSD and other trauma rather than work stressors.[73]  DSMF ¶ 20;

---

[71]    Nappi objects to Ms. Donovan's PSAMF ¶ 34 as unsubstantiated by the cited record. DRPSAMF ¶ 34. The Plaintiff erred in her citation to the Altschule Deposition at 5:9-18, but the Court finds the relevant supporting record at 5:14-25 and admits PSAMF ¶ 34.

[72]    Nappi qualifies PSAMF ¶ 35, saying "[i]n the record citation, Dr. Altschule clarified that Ms. Donovan suffered childhood abuse and neglect."  DRPSAMF ¶ 35.  Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 35.

[73]    DSMF ¶ 20 states that "Ms. Donovan saw Dr. Altschule for a variety of issues, and there were extended periods of time where she did not mention work as a stressor."  Ms. Donovan denies DSMF ¶ 20, saying "Work stressors was a recurrent and ongoing discussion between Donovan and Altschule but it became the dominant topic of the sessions in June of 2018 and continued through September of 2019."  PRDSMF ¶ 20.

Dr. Altschule testified "So, you know, early – prior to [June 2018] earlier on there really wasn't – it was really focused, as I mentioned, on PTSD, panic disorder, her depression.  But, you know, as we – as time went on and the work kind of progressed, those became less significant . . . She started to experience – to talk about a lot of stress at work with this woman, Valerie, and it was one person

PRDSMF ¶ 20.  During her treatment with Dr. Altschule, Ms. Donovan regularly discussed stressors surrounding marital issues, divorce, starting new romantic relationships, and financial stressors, such as being the sole earner in her household and struggling to pay bills.[74]  DSMF ¶¶ 21, 23; PRDSMF ¶ 21, 23.  Ms. Donovan also spent a fair amount of her time with Dr. Altschule discussing her difficult relationship with her adult daughter, who had substance abuse issues.[75]  DSMF ¶ 22; PRDSMF ¶ 22.

The long-term trauma that Ms. Donovan had endured impacted every aspect of her life, including work,[76]  PSAMF ¶ 37; DRPSAMF ¶ 37, making it very difficult for her to develop trust, and leading much of the focus of Ms. Donovan's treatment to be developing, maintaining, and managing relationships.[77]  PSAMF ¶ 38; DRPSAMF

---

and then with her supervisor."  *Nappi R.*, Attach 17, *Dep. of Joshua Altschule* at 16:1-14 (*Altschule Dep.*).  When asked "It's fair to say, Doctor, that there were extended periods of time where you were meeting with her when she did not mention work as a stressor, correct?", Dr. Altschule responded: "Yeah.  In the beginning – it was always – I mean, all my clients when they're working talk about their work experience.  For Helena, you know, she – you know, she had stress around work.  There were things that came up . . . in the beginning at this stage, it was – the bigger priority was not the work issue.  It was – it was the PTSD ultimately and the trauma."  *Id.* at 49:17-50:4.  The Court accepts Ms. Donovan's denial as a qualification and modifies DSMF ¶ 20 to reflect the full record.

[74]    Ms. Donovan qualifies DSMF ¶ 21, saying she "discussed these issues in addition to work stressors."  PRDSMF ¶ 21.  Ms. Donovan's qualification is beyond the scope of the fact and the Court admits DSMF ¶ 21.

[75]    Ms. Donovan qualifies DSMF ¶ 22, saying she "discussed these issues in addition to work stressors."  PRDSMF ¶ 22.  Ms. Donovan's qualification beyond the scope of the fact and the Court admits DSMF ¶ 22.

[76]    PSAMF ¶ 37 states that "[t]he long term trauma that Donovan had endured impacted almost every aspect of her life including work."  Nappi qualifies PSAMF ¶ 37, saying "[t]he cited testimony does not include the word 'almost.'"  DRPSAMF ¶ 37.  The Court removes "almost" from the fact and admits PSAMF ¶ 37.

[77]    PSAMF ¶ 38 provides that Ms. Donovan's "history of trauma made it very difficult for her to develop trust in others and much of the focus of [Ms.] Donovan's treatment was on developing, maintaining, and managing relationships."  Nappi qualifies PSAMF ¶ 38, saying "[t]he record citation supports the assertion that it was difficult for Ms. Donovan to view Dr. Altschule as a safe person upon whom she could rely, but does not discuss her ability to develop trust in others."  DRPSAMF ¶ 38.  Having reviewed the relevant record, the Court removes "in others" from PSAMF ¶ 38 and otherwise admits the fact.

¶ 38.  The PTSD affected Ms. Donovan's relationships, leading her to not advocate for herself and to allow others to taken advantage of her.[78]  PSAMF ¶ 39; DRPSAMF ¶ 39.

Ms. Donovan testified that her depression and anxiety were worsening as of mid-2018 and that she felt it was obvious to those around her.[79]  PSAMF ¶ 40; DRPSAMF ¶ 40.  In June of 2018, the focus of Ms. Donovan's sessions with Dr. Altschule shifted towards issues she was having at work—first with coworker Ms. Hale and then with Ms. Watson.[80]  PSAMF ¶ 41; DRPSAMF ¶ 41.  Dr. Altschule testified that Ms. Donovan spoke to him about trying to discuss these issues with her supervisor and the HR person but that she didn't feel like it was helpful, and it didn't end up working for her.[81]  PSAMF ¶ 42; DRPSAMF ¶ 42.  Dr. Altschule worked with Ms. Donovan on how to deescalate the situations as they arose and to manage herself in a way where she didn't absorb as much, given that Ms. Donovan perceived that she clearly could not change what was happening after having gone to HR, talked to

---

[78]    Nappi qualifies PSAMF ¶ 39, saying "[t]he rest of Dr. Altschule's response discussed that Ms. Donovan was able to pursue a divorce during therapy, indicating that her marriage was the relationship that was impacted by her PTSD."  DRPSAMF ¶ 39.  Nappi's qualification is beyond the scope of the fact, and the Court, therefore, concludes that the relevant record generally supports PSAMF ¶ 39 and admits the fact.

[79]    Nappi qualifies PSAMF ¶ 40, saying "[t]he record citation does not support the assertion that Ms. Donovan's condition was 'obvious to those around her.'"  DRPSAMF ¶ 40.  Having reviewed the relevant record, the Court alters PSAMF ¶ 40 to indicate that the fact reflects how Ms. Donovan felt people would perceive her condition.

[80]    Nappi admits PSAMF ¶ 41 but objects to the fact as inadmissible hearsay.  The Court rejects Nappi's hearsay objection because what Ms. Donovan or Dr. Altschule may testify to regarding the contents of her therapy sessions is not hearsay under Federal Rule of Evidence 801(d)(2)(D).

[81]    Nappi admits PSAMF ¶ 42 but objects to the fact as inadmissible hearsay.  The Court rejects Nappi's objection for the same reason explained in the previous footnote.

people, and having done everything she could at work to make it better.[82]  PSAMF ¶

43; DRPSAMF ¶ 43.  In December of 2018, Ms. Donovan again discussed her issues

at work with Dr. Altschule and described being singled out by Ms. Hale, who had

influence over people in authority, which exacerbated her anxiety and made her feel

her efforts were met with a negative response.[83]  PSAMF ¶ 44; DRPSAMF ¶ 44.

Although she continues to receive mental health medications from her primary

care physician, Ms. Donovan has not had specialized mental health counseling since

February of 2020 and has no plans to return.[84]  DSMF ¶ 25; PRDSMF ¶ 25.  Ms.

Donovan completed treatment with Dr. Altschule in September of 2019 because she

---

[82]    PSAMF ¶ 43 states that "[Dr.] Altschule worked with [Ms.] Donovan on how to deescalate the situations as they arise and to manage herself in a way where she doesn't absorb it as much because you can't change what's happening clearly after going to HR, after trying to talk to people, after doing everything she could."  Nappi qualifies PSAMF ¶ 43, saying "[t]he factual assertion summarizes Dr. Altschule's testimony but omits that he testified that the situation was 'according to [Ms. Donovan],'" and further submits that "[t]he factual assertion misrepresents Dr. Altschule's testimony, who twice clarified that he provided that advice based on what she told him."  DRPSAMF ¶ 43.  Having reviewed the relevant record, the Court alters PSAMF ¶ 43 to reflect the full record.

[83]    Nappi admits PSAMF ¶ 44 but objects to the fact as inadmissible hearsay.  The Court rejects Nappi's objection for the same reason explained in footnote 17.

[84]    DSMF ¶ 25 states that "Ms. Donovan has not had any mental health counseling since February of 2020 and has no plans to return."  Ms. Donovan denies DSMF ¶ 25, saying she "continues to receive treatment from her [primary care physician], Dr. Gallo, for her mental health diagnoses."  PRDSMF ¶ 25.  Ms. Donovan testified:

> Q.  So since February of 2020, you obviously continued to receive the medications we talked about at the outset of the deposition, correct?
> A.  Yes.
> Q.  And that's been through Dr. Gallo and not Dr. Burton, correct?
> A.  Correct.
> Q.  Have you had any counseling for mental health issues since February of 2020?
> A.  No.
> Q.  Do you feel like you ever needed counseling for mental health issues since February of 2020?
> A.  No.
> Q.  Do you have any current plans to get counseling for mental health issues?
> A.  No.

*Donovan Dep.* at 67:18-68:8.  The Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 25 to reflect the record.

"got to a place in her life in a lot of ways that were—that led to her feeling truer to herself and self-actualized," and Dr. Altschule was winding down his private practice.[85]  DSMF ¶ 189; PRDSMF ¶ 189.  Ms. Donovan did not explicitly identify discrimination based on sex, sexual orientation, or disability as a work stressor during sessions with Dr. Altschule.[86]  DSMF ¶ 190; PRDSMF ¶ 190.

### E.    Helena Donavan's Suicide Attempt in 2017

Ms. Donovan attempted suicide a second time at approximately 10:00 pm on September 23, 2017 in her car in the Nappi parking lot by ingesting drugs prescribed to her by her physician.[87]  DSMF ¶ 26; PRDSMF ¶ 26.  Because it was a weekend, Ms. Donovan was not at Nappi for work and instead was in the parking lot to drop off a co-worker after she gave her a ride from the bus station.  DSMF ¶ 27; PRDSMF ¶ 27.  Ms. Donovan testified that she attempted suicide by taking the prescribed

---

[85]    DSMF ¶ 189 states that "Ms. Donovan completed treatment with Dr. Altschule in September of 2019 because she 'got to a place in her life in a lot of ways that were – that led to her feeling truer to herself and self-actualized.'"  Ms. Donovan denies DSMF ¶ 189, saying "Altshule stopped treating Donovan in September of 2019 because he was winding down his practice and Donovan was his last patient."  PRDSMF ¶ 189.  Dr. Altschule testified that Ms. Donovan "kind of got to a place with her trauma where she – and she changed her life in a lot of ways that were – that led to her feeling more true to herself and self-actualized.  The work that we had just kind of naturally come to an end, even though she was still feeling distressed and symptoms from the issues at work.  It just wasn't something that was going to change in therapy."  *Altschule Dep.* at 29:3-10.  Dr. Altschule also testified that he was winding down his practice and that Ms. Donovan was his "last private practice client."  *Id.* at 29:18-22.  The Court accepts Ms. Donovan's denial as a qualification and adds to DSMF ¶ 189 to reflect the record.

[86]    DSMF ¶ 190 provides that "Ms. Donovan did not identify discrimination on the basis of sex, sexual orientation, or disability as a work stressor with Dr. Altschule."  Ms. Donovan denies DSMF ¶ 190, saying that "[m]uch of Altschule's treatment of Donovan focused on work related issues, feeling isolated, ostracized, set up for failure, and not being supported."  PRDSMF ¶ 190.  Having reviewed the relevant record, the Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 190 to reflect the record.

[87]    DSMF ¶ 26 states that "Ms. Donovan attempted suicide a second time on September 23, 2017, by ingesting drugs in her car in the Nappi parking lot at approximately 10:00 p.m."  Ms. Donovan qualifies DSMF ¶ 26, saying she "attempted suicide by taking too much of a medication that was prescribed to her by a medical provider."  PRDSMF ¶ 26.  Having reviewed the relevant record, the Court slightly alters PRDSMF ¶ 26 to reflect the record.

drugs because of issues with her daughter, marital problems, dealing with trauma from her childhood abuse, and issues at work.[88]  DSMF ¶ 28; PRDSMF ¶ 28.  Ms. Donovan's history of sexual abuse at the hands of her stepfather also contributed to her 2017 suicide attempt.[89]  DSMF ¶ 34; PRDSMF ¶ 34.

That same day, Nappi learned that Ms. Donovan attempted suicide when Mr. Brown, who at the time was the acting interim Wine Director, received an email sent by Ms. Donovan.  DSMF ¶ 29; PRDSMF ¶ 29.  Ms. Donovan's email had the subject line "Thank you," and stated: "Dear [Mr. Brown], I wish I could have been the successful Buyer that you needed, I am so sorry that I failed you.  I thank you so very much for your kindness, patience and support.  I wish you the very best that life has to offer. . . . PS…please tell Patty, Gerry, Carol, Katurah, Mike Hale and Todd Levesque that I wish them all happiness in their life.  They have all been kind to me and for that I am so very grateful."  PSAMF ¶ 108; DRPSAMF ¶ 108.

Ms. Masters, who was aware of Ms. Donovan's message to Mr. Brown, testified that even though she might have been reading too much into it, she said something to him, even though Mr. Brown didn't think the message was an issue.[90]  PSAMF ¶

---

[88]    DSMF ¶ 28 provides "Ms. Donovan testified that she took the drugs because of issues with her daughter, marital problems, dealing with trauma from her childhood abuse, and issues at work."  Ms. Donovan qualifies DSMF ¶ 28, saying she "did not 'take drugs' . . . [she] attempted suicide by taking too much of a medication that was prescribed to her by a medical provider."  PRDSMF ¶ 28.  The Court slightly alters DSMF ¶ 28 to clarify that these are the reasons she took the prescribed drugs to commit suicide.

[89]    Ms. Donovan qualifies DSMF ¶ 34, saying "Donovan's history of sexual abuse contributed to her suicide attempt, but it was also brought on by the bullying from Val Hale at Nappi."  PRDSMF ¶ 34.  Ms. Donovan's qualification is beyond the scope of the fact and the Court admits DSMF ¶ 34.

[90]    PSAMF ¶ 109 provides that "Masters was aware of the message from Donovan to Brown. Masters testified that Brown didn't think the message was an issue, but Masters said something to Brown even though she might have been reading too much into it, and that's when Brown reached out to Fox about the concern."

109; DRPSAMF ¶ 109.  Mr. Brown then forwarded the September 23, 2017 email to

Ms. Fox, the Director of Human Resources, who in time attempted to locate Ms.

Donovan,[91]  DSMF ¶ 30; PRDSMF ¶ 30, because he was concerned that it read like a

suicide note.[92]  PSAMF ¶¶ 109-110; DRPSAMF ¶¶ 109-110.

Earlier on the day of September 23, 2017, a work issue arose where there was

frustration among some of the stakeholders with Ms. Donovan.[93]  PSAMF ¶ 111;

---

      Nappi objects to PSAMF ¶ 109 as inadmissible hearsay and further denies the fact, saying
"[t]he record citation indicates that Ms. Masters was aware of a text message and does not discuss the
e-mail referenced in [PSAMF ¶] 108.  Further, Mr. Brown testified that he interpreted the e-mail as a
suicide note and became 'very concerned,' and reached out to Ms. Fox 'immediately' because it was the
weekend and he did not know how to find Ms. Donovan or which police department to notify."
DRPSAMF ¶ 108.
      Ms. Master's testimony about her reaction to Ms. Donovan's note is not hearsay.  Her
testimony explains her comment to Mr. Brown and, in turn, why Mr. Brown reached out to Ms. Fox.
Furthermore, the contents of the Donovan email are not being offered or admitted for the truth of what
Ms. Donovan wrote.

[91]     DSMF ¶ 30 states that "[u]pon receipt of the email, Mr. Brown forwarded it to Christine Fox,
the Director of Human Resources, who immediately attempted to locate Ms. Donovan."  Ms. Donovan
denies DSMF ¶ 30, saying "[t]here is no record of communication from Fox to Donovan until after
Donovan's second attempted suicide two days later."  PRDSMF ¶ 30.

      Ms. Fox testified:

      Q.  So I am going to share with you – so we can mark this as Exhibit 2.  Have you seen
      this document before?
      A.  Yes.
      Q.  What is this?
      A.  It was an e-mail that [Ms. Donovan] sent to Ian Brown on September 23, 2017.
      . . .
      A.  I think at that time, we were trying to locate her, is what – I think we were trying
      to reach her, is what we were, we were trying to contact her.  After he got that, he was
      trying to contact her.

*Fox Dep.* at 86:12-87:6.  The record indicates that Ms. Fox sent an email to Ms. Donovan on September
25, 2017, two days after her third suicide attempt.  Although Ms. Fox could have attempted to contact
Ms. Donovan before sending her an email, the cited record does not support Nappi's assertion that she
did so "immediately."  The Court has removed the temporal assertion from DSMF ¶ 30.
[92]     Nappi admits PSAMF ¶ 110 but objects to the fact as inadmissible hearsay.  The Court rejects
Nappi's objection for the same reason explained in footnote 17.
[93]     Nappi objects to PSAMF ¶ 111 as inadmissible hearsay.  DRPSAMF ¶ 111.  The Court
disagrees.  Whether there was in fact stakeholder frustration is not offered for the truth of the matter.
It only explains the context of Ms. Donovan's question to Mr. Brown as to whether she was effective
at her job and his response to her, which is not hearsay.  Furthermore, it may explain a work-related
link to Ms. Donovan's suicide attempt.

DRPSAMF ¶ 111.   According to Ms. Fox, Mr. Brown and Ms. Donovan had a conversation in which Ms. Donovan asked Mr. Brown if he thought she was effective at her job.  *Id.*  Mr. Brown expressed uncertainty about whether Ms. Donovan enjoyed what she was doing at Nappi.  *Id.*  Before Ms. Donovan's attempted suicide in 2017, she had indicated to Mr. Brown that she was struggling and bothered by comments made about her work performance. [94]  *Id.*  In response, Mr. Brown told Ms. Donovan that "maybe this wasn't the position for [her]" because there were going to be a lot of people firing at her—Ms. Donovan understood he meant she did not have thick enough skin for the position.  PSAMF ¶ 383; DRPSAMF ¶ 383.

Ms. Donovan was hospitalized immediately following the suicide attempt, but she left the hospital the next day on September 24, 2017.  DSMF ¶ 31; PRDSMF ¶ 31.  She then returned to the hospital the following day, the 25th, after attempting to slit her wrists at home with a lightbulb.  *Id.*  After this third suicide attempt, Ms. Donovan's medical team arranged for her to be hospitalized at Spring Harbor Hospital.  DSMF ¶ 32; PRDSMF ¶ 32.

Before the third attempt, Ms. Donovan sent Mr. Brown an email at 3:41 a.m. on September 25, 2017 that Mr. Brown understood to mean she intended to kill

---

[94]    PSAMF ¶ 383 states that "[b]efore Donovan attempted suicide in 2017 in Nappi's parking lot, Donovan had confided in Brown that she was bothered by comments made about her work performance and she was struggling.  Brown told Donovan in response that 'maybe this wasn't the position for [her]' because there are going to be a lot of people firing at you—Donovan understood he meant she did not have thick enough skin for the position."
         Nappi qualifies the fact, saying "[t]he record citation does not support that assertion that Ms. Donovan, 'had confided in Brown that she was bothered by comments made about her work performance and she was struggling.'"  DRPSAMF ¶ 383.  Having reviewed the relevant record, the Court changes "confided in" to "indicated to" and admits PSAMF ¶ 383.

herself.[95]  PSAMF ¶¶ 112-114, 368, 370; DRPSAMF ¶¶ 112-114, 368, 370.  The email

reads:

> No need to stress.  Life has its ups and downs.  I have tried so very hard
> to be good at what I do but with the constant negative opinion from the
> warehouse, suppliers, sales team, the back stabbing bitches in the office,
> it became too much.  Having my title taken away by Val [Hale] and Paul
> [Carr] (although Paul [Carr] blamed it on Elmer  [Alcott]) was the
> beginning of the end.  If only one of you understood for half a second just
> what I am going through in my life it may have allowed you to look a
> little deeper into your hearts and find some empathy.
>
> Failing that, I have finally given up hope and can no longer cope
> anymore.  Add to that, losing my house without a paycheck, my
> daughter[']s mental illnesses that I can do nothing to control and I
> seemingly only maker her unhappier, a broken marriage and my
> constant go around with the therapist to cope with 9 years of violent
> sexual abuse suffered when I was young and you might just be able to
> understand why that added daily pressure (from the people that only
> care about their own reputation and pay increases (Al/Val… admitted
> freely) at the expense of all others, might get to be overwhelming.
>
> Ultimately.  I have come to the end of my rope as I see no end in sight
> that allows me to keep my job and ever hope to find any kind of respect
> (I don't have it now so what's the point?)  Despite my life, I have always
> done everything I can to be a good person with kindness and genuine
> empathy in my heart . . . only for it to be trampled on at every available
> opportunity without any kind of back-up!
>
> If you could please contact Rick . . . When it is convenient for him to pick
> up my belongings and my final check I would appreciate it . . . Also if
> Becky would help him with clearing my 401k as quickly as possible for
> funeral expenses as I know he has no money once I'm going, I would be
> SO very grateful to you. All the best, always. Helena.[96]

---

[95]     Nappi qualifies PSAMF ¶ 114, saying "[t]he record citation refers to an email that was sent on September 24, 2017."  DRPSAMF ¶ 114.  The Court rejects Nappi's qualification as beyond the scope of the fact because PSAMF ¶ 114 accurately states that the email was sent "[b]efore Donovan attempted suicide on September 25, 2017" and does not state the date Ms. Donovan sent the email.

[96]     Nappi objects to PSAMF ¶ 115 as hearsay and qualifies the fact, saying Nappi "admits only that the document speaks for itself.  The factual assertion is not an accurate word-for-word recitation of the email in question."  DRPSAMF ¶ 115.

Having reviewed the record containing the email, the Court determines that PSAMF ¶ 115 includes only extremely minor punctuation differences from the original email, such as the

PSAMF ¶ 115; DRPSAMF ¶ 115.  Ms. Fox cannot recall whether she asked Ms. Donovan what she was referring to in her emailed suicide note when she wrote "back stabbing bitches in the office."[97]  PSAMF ¶ 123; DRPSAMF ¶ 123.  Mr. Carr testified that he knew Ms. Donovan had attempted suicide while she was employed at Nappi Distributors, but he doesn't recall who he learned that from.  PSAMF ¶ 23; DRPSAMF ¶ 23.

At 4:59 a.m. that very dawn, Ms. Donovan wrote another email saying: "Please ignore" and letting Nappi know that she was "Off to the hospital!"[98]  PSAMF ¶ 116; DRPSAMF ¶ 116.  Neither Ms. Fox nor Mr. Brown called Ms. Donovan between the 23rd and the 25th of September in 2017 until after Ms. Donovan was brought to the

---

capitalization of the letter "I," and the Court overrules the punctuation objection.  *See Nappi R.*, Attach. 34, *Sept. 25, 2017 email.*

        The Court also overrules Nappi's hearsay objection.  The email is not admitted for its truth, such as whether there were in fact "back-stabbing bitches" at Nappi, but rather to demonstrate Nappi's awareness of Ms. Donovan's circumstances in September 2017 and her allegation that her mental health issues were in part caused by her treatment by some employees at Nappi.

[97]     PSAMF ¶ 123 states that "Fox never asked Donovan what she was referring to in her emailed suicide note when she said 'back stabbing bitches in the office.'"  Nappi denies PSAMF ¶ 123, saying "[t]he record citation actually states that Ms. Fox does not recall if she asked to whom Ms. Donovan was referring."  DRPSAMF ¶ 123.  Ms. Fox testified:

> Q: Did you ask her -- you know, I saw in that e-mail she made a reference to the back stabbing bitches in the office. Did you ask her who they -- who she was referring to there?
> A: I -- I don't know if I specifically asked her who. She again was sharing information with me. I thought her reference to it was Mary Johnson. But I -- I didn't -- I mean, she -- she quickly was telling me, you know, she wasn't thinking right, it was not -- not a -- work wasn't a factor.  And I didn't ask a lot of questions.  She was clearly feeling better, I wasn't going to bring her back to what, you know, she was writing in a suicide note.

*Fox Dep.* at 103:11-24.  The Court accepts Nappi's denial as a qualification and slightly alters PSAMF ¶ 123 to reflect the record.

[98]     Nappi admits PSAMF ¶ 116 but objects to the fact as inadmissible hearsay.  The Court rejects Nappi's objection.

hospital.[99]  PSAMF ¶ 369; DRPSAMF ¶ 369.  Ms. Fox responded to the 4:59 a.m. email at 6:45 a.m. and said: "Helena – Thank you so much for your messages and for sharing some of what you have been going through.  We are so very glad you have reached out for help.  Please let me know how we can assist and please let me know when you are ready to talk so I can better understand what you are going through." PSAMF ¶ 117; DRPSAMF ¶ 117.

Ms. Fox testified that Ms. Donovan talked to her about ongoing treatment and counseling after she was released from the hospital, but that Ms. Donovan "didn't characterize it as depression."[100]  PSAMF ¶ 119; DRPSAMF ¶ 119.  Dr. Altschule testified that Ms. Donovan's suicide attempt was the result of a global issue, and that she "felt pretty hopeless about everything . . . in her life."  DSMF ¶ 33; PRDSMF ¶ 33.  After the 2017 suicide attempts, Dr. Altschule continued to treat Ms. Donovan for marital issues, issues with her daughter, issues stemming from the abuse she suffered from her stepfather, and work-related issues, as she recalls that "work was discussed" but not the timing of those discussions.[101]  DSMF ¶ 46; PRDSMF ¶ 46.

---

[99]     Nappi denies PSAMF ¶ 369, saying "[t]he record citation indicates that Mr. Brown and Ms. Fox worked in concert to get aid to Ms. Donovan."  DRPSAMF ¶ 369.  Although the record indicates that Mr. Brown and Ms. Fox attempted to "get[] somebody to her house and make[] sure that she was all right" because that was their "number one and only concern," the record does not indicate that either Mr. Brown or Ms. Fox reached out to Ms. Donovan in any capacity over the weekend.  The Court therefore finds PSAMF ¶ 369 supported by the record and admits the fact.

[100]    Nappi admits PSAMF ¶ 118 but objects to the fact as inadmissible hearsay.  DRPSAMF ¶ 119. The Court rejects Nappi's objection for the same reason explained in footnote 17.

[101]    Ms. Donovan qualifies DSMF ¶ 46, saying she "may not be able to recall the dates they were discussed, [but t]he notes reflect that Donovan regularly discussed work issues with Altschule and they became the focus of their sessions beginning in June of 2018."  PRDSMF ¶ 46.  The Court finds Ms. Donovan's qualification beyond the scope of the fact and admits DSMF ¶ 46.

Ms. Donovan never discussed her suicide attempt, depression, or anxiety with

Ms. Hale.[102, 103]   DSMF ¶ 39; PRDSMF ¶ 39.   Immediately upon returning to work

---

[102]   Ms. Donovan qualifies DSMF ¶ 39, admitting that she "did not discuss it," but noting that Ms. Hale "testified she was aware of the suicide attempt as it was common knowledge at Nappi and she was generally aware [Ms.] Donovan was depressed." PRDSMF ¶ 39.  The Court finds Ms. Donovan's qualification beyond the scope of the fact and admits DSMF ¶ 39.

[103]   DSMF ¶ 40 states that "Nappi was not aware that Ms. Donovan was struggling with depression following her return to work."  Ms. Donovan denies DSMF ¶ 40, saying she "specifically told Fox she was struggling with depression.  Fox observed Donovan was struggling with her mental health and told Watson of her observation.  Donovan's coworkers understood she was struggling with depression."  PRDSMF ¶ 40.

When asked whether "it [is] fair to say . . . [shortly after Ms. Donovan returned to Nappi after attempting suicide multiple times] in September of 2017, you understood that Helena was struggling with depression?", Ms. Fox responded "[n]o, not struggling.  That she had had . . . had an incident, she had gotten the treatment, and she had gotten things, you know, under control and – like any medical condition, and that was it.  I didn't have any impression she was still struggling."  *Fox Dep.* at 91:3-11.

Mr. Hale, however, testified:

Q.  . . . You talked about covering for an extended period of time for [Donovan] while she was out of work.  Do you know why she was out of work?
A.  I don't remember exactly.  I know Ian had come to be one morning and said, you know, do you think you would be able to – to do some ordering for a little while? And I said, yeah, why, is everything okay?  And he said yup, it's – and then I – later it was just kind of common knowledge in and around the office.
Q.  Okay.  And did you ever have any conversations with [Donovan] about that suicide attempt?
A.  No.
Q.  Did you ever have any conversations with [Donovan] about her depression or anxiety or anything like that?
A.  Not specifically, no.
Q.  Did you generally know that [Donovan] struggled with depression?
A.  Yes.

*Nappi R.*, Attach 18, *Dep. of Valerie Hale* at 49:16-50:10 (*V. Hale Dep.*).  Ms. Donovan testified that Nappi "knew [her] situation . . . that it was obvious [her] mental health was declining, i.e. sitting in [her] office in tears, not being able to perform in certain requirements for [Watson].  It was just so obvious."  *Donovan Dep.* at 92:24-93:4.  Paul Carr testified:

Q.  Where do you – okay.  What were the difficulties that she had?
A.  She had problems with her husband.  She had – she had, you know, domestic relation problems and she had migraines.  And she would be out of work fairly often, not a long-term or anything like that, a day or two call in sick, but she had problems at home.  And also she had problems doing the job that John did.
. . .
Q.  Okay.  Did you ever learn that [Ms. Donovan] had depression or anxiety or anything of that nature?
A.  I sensed it, though.

after her 2017 suicide attempt, she indicated to Ms. Fox on one occasion that her mental health conditions were under control. [104]   DSMF ¶ 41; PRDSMF ¶ 41.

Because Ms. Donovan attempted suicide on Nappi premises, the third-party Workers' Compensation administrator required that Nappi file a First Report of Injury with the Workers' Compensation Board.  DSMF ¶ 42; PRDSMF ¶ 42.  When Ms. Donovan learned about the report she was mortified, did not pursue a Worker's Compensation claim, and did not report to Ms. Fox that her suicide attempt was work-related.[105]   DSMF ¶ 43; PRDSMF ¶ 43.   According to Ms. Donovan, she declined

---

*Donovan R.*, Attach 1, *Dep. of Paul Carr* at 85:24-86:6; 87:10-13.  Taking the facts in the light most favorable to the non-moving party, as the Court is required to do, the Court finds sufficient evidence in the record that Nappi or at least multiple employees at Nappi knew of Ms. Donovan's depression during the period that she returned to Nappi in September 2017 after attempting to commit suicide on multiple occasions.  The Court therefore accepts Ms. Donovan's denial and omits DSMF ¶ 40.

[104]   DSMF ¶ 41 states that "[w]hen Ms. Donovan returned to work after her 2017 suicide attempt, she assured Ms. Fox that her mental health conditions were under control.  Ms. Donovan qualifies DSMF ¶ 41, saying that she "said this to Fox in November 2017" but denies "that she gave further assurances.  Donovan specifically told Fox she was struggling with depression.  Fox observed Donovan was struggling with depression.  Donovan's coworkers understood she was struggling with depression." PRDSMF ¶ 41.  Although the Court finds Ms. Donovan's qualification largely beyond the scope of the fact, it slightly alters DSMF ¶ 41 to reflect that Ms. Donovan indicated to Ms. Fox on only one occasion, shortly after returning to the office, that her mental health conditions were under control.

[105]   DSMF ¶ 43 provides: "[w]hen Ms. Donovan learned about the report, she was mortified and told Ms. Fox that her suicide attempt was not work related, and she did not pursue a Worker's Compensation claim."  Ms. Donovan denies DSMF ¶ 43, saying she denies "that the suicide attempt was not work related.  Donovan declined Workers' Comp benefits despite believing it was caused by work because she wasn't mentally in a space where she could take on any questioning and told Fox she didn't want to make waves."  PRDSMF ¶ 43.

Ms. Fox testified: "[Donovan] was saying that work wasn't the dominant – I mean, she wasn't saying work was the cause."  *Fox. Dep.* at 102:17-18.  Ms. Donovan testified:

Q.  It's my understanding that you weren't requesting Workers' Comp benefits with regard to the suicide attempt in 2017; is that correct?
A.  I didn't take up Workers' Comp benefits, no.
Q.  During your treatment after the suicide attempt in 2017, did you ever tell anyone that the attempt was due to your relationship with Val[a]rie Hale?
A.  Likely.
Q.  Who did you say that to?
A.  I don't recall.

Workers' Compensation benefits despite believing the attempted suicide was caused by work because she wasn't mentally in a space where she could take on any questioning and, as she told Ms. Fox, she didn't want to make waves.[106]   PSAMF ¶ 384; DRPSAMF ¶ 384.

After her attempted suicides, Ms. Donovan took a leave of absence from Nappi pursuant to the FMLA and short-term disability.  DSMF ¶ 35; PRDSMF ¶ 35.  While Ms. Donovan was hospitalized at Spring Harbor and on medical leave in September 2017, Ms. Fox helped Ms. Donovan apply for short-term disability benefits.  PSAMF ¶ 120; DRPSAMF ¶ 120.  At this point, Ms. Fox knew that Ms. Donovan had been diagnosed with major depression.  PSAMF ¶ 121; DRPSAMF ¶ 121.  In October of 2017, Ms. Donovan also visited Ms. Fox in person and handed Ms. Fox a form signed by her physician on October 18, 2017, which listed PTSD and major depressive disorder (severe, recurrent) as Ms. Donovan's diagnoses.  PSAMF ¶ 122; DRPSAMF ¶ 122.  Ms. Fox admitted she understood these were Ms. Donovan's diagnoses.  *Id.*

Even though Ms. Donovan was hospitalized in September of 2017 after she attempted suicide, Ms. Fox denied knowing that Ms. Donovan was struggling with

---

Q.  Is there a reason why you didn't pursue a Workers' Comp claim for the suicide attempt?
A.  Yes.
Q.  Why is that?
A.  At the time, I wasn't mentally in a space where I could take on any questioning.  I had told Christine Fox that I just didn't want to make any waves.

*Donavan Dep.* at 62:22-63:13.  Taking the facts in the light most favorable to Ms. Donovan, the record does not clearly indicate that she specifically told Ms. Fox that her suicide attempt was not work-related.  The Court modifies DSMF ¶ 43 to reflect the record.

[106]   Nappi qualifies PSAMF ¶ 384, saying it "denies that the cited record testimony states that Ms. Donovan believed the suicide attempt was caused by work."  DRPSAMF ¶ 384.  Having reviewed the relevant record, the Court concludes that Ms. Donovan's alleged belief that work had contributed to her mental health issues is sufficiently supported by the record and admits PSAMF ¶ 384.

depression when she returned to work because she understood Ms. Donovan to have told her that she was better and that her medication had helped.[107]   PSAMF ¶ 118; DRPSAMF ¶ 118.

Ms. Donovan returned to work at Nappi on November 6, 2017, DSMF ¶ 36; PRDSMF ¶ 36, and the only accommodation Ms. Donovan requested immediately upon her return was to be allowed to attend regular therapy appointments.[108]   DSMF ¶ 37; PRDSMF ¶ 37.   Thereafter, Ms. Donovan was told that she was permitted to attend

---

[107]   PSAMF ¶ 118 states that "[e]ven though Donovan was hospitalized in September of 2017 after she attempted suicide, Fox denied knowing that Donovan was struggling with depression at the time of her hospitalization."   Nappi qualifies PSAMF ¶ 118, saying that "Ms. Fox testified that when Ms. Donovan returned to work, Ms. Donovan told Ms. Fox that the suicide attempt was because of a medication problem, and that upon her return she was not still struggling with depression." DRPSAMF ¶ 118.   Ms. Fox testified:

> Q.  Okay.  Did you have a followup conversation with [Donovan] at any point about what she discussed in this e-mail?
> A.  Yes, when she had returned to work – when she returned to work several weeks later, we – we – we did.
> Q.  And what did she tell you?
> A.  That she was not thinking straight, she didn't mean any of it, she – she was I think kind of embarrassed by what had happened and was, you know, profusely apologize – apologizing for – I – it was – she said that, you know, she needed to have medication and it had helped her, and that – that basically she didn't have any intent of it.  She just didn't – she said she wasn't – you know, she just wasn't functioning or thinking straight.

*Fox Dep.* at 90:4-20.  The Court accepts Nappi's qualification and slightly alters PSAMF ¶ 118 to reflect the record.

[108]   DSMF ¶ 37 states "[w]hen Ms. Donovan returned to her employment at Nappi, the only accommodation she requested was to be allowed to attend regular therapy appointments."   Ms. Donovan denies DSMF ¶ 37, saying she "wanted FMLA for protected leave so that she was not scrutinized for her attendance . . . testif[ying] she did not know what kind of leave her provider would recommend, she just knew she needed help."  PRDSMF ¶ 37 (citing PSAMF ¶¶ 190-202, 210, 311, 312, 371-75).

When asked whether she returned to work with accommodation requests, Ms. Donovan testified "Yes, I needed to have therapy appointments."  *Donovan Dep.* at 63:22-25.  When asked if there were "[a]ny other accommodations [she] requested when [she] returned on the 6th of November," Ms. Donovan responded "No."  *Id.* at 64:4-6.  Ms. Fox's deposition also indicates that Ms. Donovan requested FMLA leave in January 2019.  *Fox Dep.* at 149:15-25.  The Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 37 to clarify that it was only immediately upon her return to work at Nappi in 2017 that she requested an accommodation to attend therapy.

regular therapy appointments; however, she was required to use flex time to do so.[109] DSMF ¶ 38; PRDSMF ¶ 38.

After Ms. Donovan's suicide attempt in 2017, Ms. Donovan's then-husband Richard Stump called Ms. Fox and met with her.  PSAMF ¶ 389; DRPSAMF ¶ 389. Mr. Stump conveyed to Ms. Fox that Ms. Donovan had attempted suicide because of the bullying at work.  *Id.*  Ms. Fox told Mr. Stump that Ms. Donovan was a professional, in management, and needed to "grow thicker skin."[110]  *Id.*

---

[109]    DSMF ¶ 38 provides that "[t]hereafter, Ms. Donovan was, in fact, permitted to attend regular therapy appointments."  Ms. Donovan qualifies DSMF ¶ 38, saying Ms. Fox told her she was "able to attend additional appointments, but was expected to flex her time so that she made up the hours.  Fox refused to provide Donovan the FMLA paperwork that would have enabled her to have a discussion with her provider about what kind of treatment would best help."  PRDSMF ¶ 38.  Having reviewed the relevant record, the Court slightly alters DSMF ¶ 38 to reflect the record and indicate that there were some restrictions on Ms. Donovan's leave to attend appointments.

[110]    PSAMF ¶ 389 states that "[a]fter Donovan's suicide attempt in 2017, Donovan's husband Richard Stump called Fox and met with her.  Stump conveyed to Fox that  Donovan attempted suicide because of the bullying at work.  Fox told Stump that  Donovan was a professional, in management, and needed to 'grow thicker skin' when [Mr.] Stump conveyed that  Donovan was struggling because Donovan felt disrespected, looked down upon, and harassed."  Nappi denies PSAMF ¶ 389, saying "Mr. Stump testified that after Ms. Donovan's suicide attempt, he spoke with Fox and told her that Ms. Donovan felt depressed, disrespected, and bullied at work.  Mr. Stump did not state that he told Ms. Fox that Ms. Donovan 'attempted suicide because of the bullying at work.'  Mr. Stump further testified that any understanding he might have had concerning the reasons for Ms. Donovan's suicide attempt were just assumptions on his part."  DRPSAMF ¶ 389.

Mr. Stump testified:

> Q. So a moment ago I had asked you about emails. Let me move to my next question here. At any point in the hours and days after that that you became aware of her suicide attempt in 2017, did you contact her employer at Nappi Distributors?
> A. Yes.
> Q. Who did you speak with?
> A. I spoke with the HR director.
> Q. Christine Fox?
> A. Yes.
> Q. Do you recall if you called her or she called you?
> A. I believe I called her.
> Q. What did you speak with Christine about?

## F.      Coverage of Helena Donovan's 2017 Medical Leave

While Ms. Donovan was out on leave after her 2017 suicide attempt, Mr. Brown, who was serving as the interim wine sales manager, and Ms. Hale covered her job duties.  DSMF ¶ 55; PRDSMF ¶ 55.  Mr. Brown asked Ms. Hale to fill in for Ms. Donovan during her leave post-attempted suicide.[111]  PSAMF ¶ 191; DRPSAMF ¶ 191.  Ms. Donovan does not know who covered for her while she was out on leave following her suicide attempts but was not surprised to learn that Ms. Hale had taken over most of her tasks.  DSMF ¶ 56; PRDSMF ¶ 56.  As part of this process, Ms. Hale created, with Ms. Donovan's input upon her return, an ordering guide and formulas to help Ms. Donovan predict and populate subsequent orders, in order to facilitate more accurate ordering of necessary inventory.  DSMF ¶ 57; PRDSMF ¶ 57.

---

A. Several things actually.  I'm sure I told her about the suicide attempt and I know I spoke to her about Helena had felt depressed, disrespected, bullied at work.
Q. Do you recall what Christine -- what she said in that conversation?
A. Yes, I do.
Q. What did she say?
A. That Helena is management. She should grow a thicker skin.

*Nappi R.*, Attach 15, *Dep. of Richard Stump* at 30:1-23 (*Stump Dep.*).  Having reviewed the relevant record, the Court overrules Nappi's objection.  It is a logical inference that Mr. Stump was telling Ms. Fox that Ms. Donovan's depression was due to being disrespected and bullied at work and that the depression was a cause of Ms. Donovan's suicide attempt.

[111]      PSAMF ¶ 191 states that "Brown asked Hale to fill in for Donovan during an extended leave of absence because of her attempted suicide."  Nappi qualifies the fact, saying "[t]he record citation does not support the assertion that Mr. Brown asked Ms. Hale for coverage." DRPSAMF ¶ 191.  Nappi is clearly wrong.  During her deposition, while discussing the fact she had covered for Ms. Donovan for an extended period because of her suicide attempt, Ms. Hale testified: "I know Ian [Brown]  had come to me one morning and said, you know, do you think you would be able to – to do some ordering for a little while?  And I said, sure, why is everything okay? And he said, yup, it's - - and then I - - later it was just kind of common knowledge in and around the office." *V. Hale Dep.* at 49:17-50:1.   The Court finds Nappi's objection to be frivolous; PSAMF ¶ 191 is amply supported by the record and the Court admits the fact.

While helping to handle Ms. Donovan's tasks during her mental health leave, Mr. Brown felt that he had been misled by Ms. Donovan and that after he and Ms. Hale "had to dig into it significantly," he learned "that the way she was structuring her job was completely inept."[112, 113]   DSMF ¶ 58; PRDSMF ¶ 58; PSAMF ¶ 90; DRPSAMF ¶ 90. Ms. Donovan left purchase order information on her computer, not on a shared drive, which precluded others from accessing the information.   DSMF ¶ 59; PRDSMF ¶ 59. Mr. Brown testified that Ms. Donovan's performance deficiency was displayed by her practice of ordering wine in alphabetical order by supplier, which he described as "completely absurd."[114]   PSAMF ¶ 91; DRPSAMF ¶ 91.

While Ms. Donovan was on leave, Ms. Fox went through Ms. Donovan's computer to ascertain what she was using for business processes and purchase orders, at which time it became apparent that Ms. Donovan was doing things manually.[115]   DSMF ¶ 60;

---

[112]   Ms. Donovan admits that Mr. Brown "testified as such" but denies that she "was completely inept [because] she was performing her job without issue until suddenly in January of 2019."  PRDSMF ¶ 58.  The Court overrules Ms. Donovan's objection to DSMF ¶ 58.  The fact does not assert that Mr. Brown's opinion is in fact true but only that he felt this way.

[113]   Nappi qualifies PSAMF ¶ 90, saying "Mr. Brown testified that Ms. Donovan's job performance was in the back of his mind prior to her leave, but that he did not understand the severity of the situation until he had 'to dig into her system of doing things . . ..'"  DRPSAMF ¶ 90.  Nappi's qualification is beyond the scope of the fact and the Court admits PSAMF ¶ 90.

[114]   Nappi qualifies PSAMF ¶ 91, saying "Mr. Brown testified that 'one' deficiency he noticed early on was Ms. Donovan's alphabetical system.  He further clarified that her alphabetical system demonstrated that Ms. Donovan did not have a handle on what the company did."  DRPSAMF ¶ 91.  Nappi's qualification is beyond the scope of the fact and the Court admits PSAMF ¶ 91.

[115]   DSMF ¶ 60 states that "[w]hile Ms. Donovan was on leave, Ms. Fox was forced to go through Ms. Donovan's computer to ascertain what she was using for business processes and purchase orders, at which time it became apparent that Ms. Donovan was doing things manually."  Ms. Donovan admits that she was performing the work manually but denies that this was singular to Donovan.  PRDSMF ¶ 60.  She submits that "Nappi as a whole was doing things manually because Nappi had not invested in the tools for inventory software implementation" and Ms. Fox "did not need to go through Donovan's computer because Hale and Brown were involved in assuming Donovan's duties while out on leave."  *Id.*  Ms. Fox testified:

PRDSMF ¶ 60.  Ms. Fox testified that Nappi's business volume is too big to efficiently do purchase orders manually.[116]  DSMF ¶ 61; PRDSMF ¶ 61.  Mr. Carr testified that Ms. Donovan initially was expected to perform all the same job functions as her predecessor with the exception of slotting the wine in the warehouse.[117]  PSAMF ¶ 15; DRPSAMF ¶ 15.  Nonetheless, Mr. Carr testified that at one point during his tenure as the Director of Wine Sales he did the ordering because the ordering for the wine department was massive, wasn't being done right, and had left "out of stocks." PSAMF ¶ 16; DRPSAMF ¶ 16.

---

Q.  Okay.  Do you agree with – I – I think you told me that you were in [Donovan]'s computer, and – while she was on a leave of absence, and during that time, you learned what her processes were for her wine purchasing role, right?

A.  I don't think I learned what they were.  I observed what they appeared to be.  And at that point, I made the assessment that this was – she was pretty much doing it just manually, and in fact was overriding – I mean, I was looking for one document, I was looking for the Purchase Order.  And I expected to see like more of a – a system or some kind of automated, you know, spreadsheet that was feeding, you know, when you order something, that it would log.  And it was strictly manual being done.

*Fox Dep.* at 28:6-20.  The Court concludes that the record does not support the fact that Ms. Fox was forced to go through Ms. Donovan's computer.  The Court alters DSMF ¶ 60 to reflect the record.  Ms. Donovan's objection regarding how other people at Nappi tracked inventory is beyond the scope of the fact, but the Court otherwise admits DSMF ¶ 60.

[116]    DSMF ¶ 61 states that "Nappi's business volume is too big to do purchase orders manually." Ms. Donovan admits that she "was performing the work manually" but denies "that this was singular to Donovan [since] Nappi as a whole was doing things manually because Nappi had not invested in the tools for inventory software implementation.  PRDSMF ¶ 61.  Ms. Fox testified that "it was obvious at that point she was still using a like manual like an either Excel or Word document for every single Purchase Order and didn't really have, you know, something automated to – you know, to – to efficiently order.  We're just – you know, the volume is way too big to be doing it manually." *Fox Dep.* at 25:5-11.  Ms. Donovan's objection regarding how other people at Nappi tracked inventory is beyond the scope of the fact, but the Court slightly alters DSMF ¶ 61 to reflect that this is Ms. Fox's view of inventory practice.

[117]    PSAMF ¶ 15 states that "Carr testified that Donovan performed all of the same job functions as her predecessor with the exception of slotting the wine in the warehouse."

Nappi denies PSAMF ¶ 15, saying the "record citation indicates that Mr. Carr testified that Mr. Houle had 'a lot more expectations than we had of Helena.'  He described the warehouse set up, but also notes that Ms. Donovan was always behind, so they took away ordering responsibilities from her, and she was not ordering for several brands."  DRPSAMF ¶ 15.

Having reviewed the relevant record, the Court accepts Nappi's denial as a qualification and alters PSAMF ¶ 15 to reflect the record.

While covering during Ms. Donovan's leave, Ms. Fox learned that Ms. Donovan, since starting at Nappi, had not introduced new methods or evolved existing ones while performing her job.[118, 119]   DSMF ¶ 62; PRDSMF ¶ 62.  Mr. Brown testified that Ms. Donovan performed her job with no organization or urgency, and he realized that her job was more than she could handle.[120]   DSMF ¶ 64; PRDSMF ¶ 64.   During Ms. Donovan's 2017 medical leave, Mr. Brown and Ms. Hale worked together to revamp the entire way Nappi ordered and prioritized Ms. Donovan's job

---

[118]   Ms. Donovan objects to DSMF ¶ 62 for the same reasons as DSMF ¶ 61, and the Court overrules the objections and admits DSMF ¶ 62 for the reasons explained in the footnote 117.

[119]   DSMF ¶ 63 provides that "[i]n Ms. Donovan's role, she was expected to implement process improvements."  Ms. Donovan denies DSMF ¶ 63, saying the "entire Nappi team was doing things manually [and a]fter Donovan's return to work, [she] spoke to Fox about new inventory management software but Fox said it would have to wait for the new Wine Director."  PRDSMF ¶ 63.  Ms. Fox testified:

> Q.  When you say somebody working at that level, the Wine Purchaser, that's an administrative role, right?
> A.  No.  No, it wasn't an administrative role.
> Q.  What level was that role?
> A.  It was a mid management level.
> Q.  Okay.
> A.  It was definitely not just administrative.
> Q.  And in this management level, did [Donovan] have any ability to make decisions about purchasing new technology or making changes to the processes at Nappi Distributors?
> A.  Absolutely.  In fact, I even understood from Paul Carr that's why she was selected.  She had come from a much larger distributor and had presented as – as I understood from him, you know, the ability to implement improvements.

*Fox Dep.* at 29:18-30:8.  The Court finds that the cited testimony does not support that Ms. Donovan was expected to implement process improvements.  Instead, the record reveals that she was hired with the understanding that she may possess the skills necessary to do so.  The Court therefore omits DSMF ¶ 63.

[120]   Ms. Donovan denies "that the job was more than she could handle" because she "testified that she was capable of performing her tasks, but she was told to trust the numbers and not make independent judgment, and then told to make independent judgment but she knew that would get her in trouble."  PRDSMF ¶ 64.  Ms. Donovan's objection is beyond the scope of the fact, which asserts what Mr. Brown testified to be his opinion, not its truth.  The Court overrules Ms. Donovan's objection and admits DSMF ¶ 64.

duties and created formulas to order what was needed more accurately.  PSAMF ¶ 89; DRPSAMF ¶ 89.

Neither issues with Ms. Donovan's performance nor Nappi's wine inventory management were a "focal point" of Ms. Fox until Ms. Donovan took her leave of absence in 2017, at which point Ms. Fox began focusing on what Ms. Donovan was using for "business processes" and "how the job was being done."[121]  PSAMF ¶ 84; DRPSAMF ¶ 84.  Mr. Brown testified that towards the end of her time at Nappi, Ms. Donovan had become completely incompetent, incapable of thinking outside of the box, paralyzed, and incapable of really doing much.[122]  PSAMF ¶ 92; DRPSAMF ¶ 92.

When Ms. Donovan returned from leave in 2017, she and Ms. Fox discussed whether Nappi should find new technology or an inventory management system so that purchase orders were not done manually; Ms. Fox suggested that Ms. Donovan work with IT and her team to develop process improvements and move towards a more automated system, but the wine department was under the leadership of Mr.

---

[121]     Nappi qualifies PSAMF ¶ 84, saying "[t]he factual assertions in this paragraph take two separate lines of testimony out of context. Ms. Fox testified that when Mr. Carr was on board, she did not focus on the issues surrounding Ms. Donovan's job performance because Mr. Carr was handling it in his capacity as Wine Director.  She further testified that when Ms. Donovan took a leave of absence in 2017, Ms. Fox had to go through Ms. Donovan's computer to 'find what she was using for business processes so that in her absence the wine purchasing operations could continue.  And that's when a lot of the sort of fuzzy questions about what was -- how the job was being done became apparent to me that we were doing things very manually.'"  DRPSAMF ¶ 84 (quoting *Fox Dep.* at 24:10-21).  Nappi's qualification is beyond the scope of the fact and the Court admits PSAMF ¶ 84.

[122]     PSAMF ¶ 92 states that "Brown testified that Donovan had become completely incompetent, incapable of thinking outside of the box, paralyzed, and incapable of really doing much."  Nappi qualifies PSAMF ¶ 92, saying "[t]he factual assertion is misleading in that Mr. Brown made that statement referring to Ms. Donovan's performance 'toward the end of her time here . . ..'"  DRPSAMF ¶ 92.  Having considered the relevant record, the Court slightly alters PSAMF ¶ 92 to reflect the record.

Brown as Interim Wine Director at that point.[123]  PSAMF ¶ 93; DRPSAMF ¶ 93;
DSMF ¶ 68; PRDSMF ¶ 68.  Mr. Brown testified that the Wine Purchaser role is
"definitely a complex role and there are a lot of moving parts."  PSAMF ¶ 99;
DRPSAMF ¶ 99.  Ms. Fox did not know whether the volume of sales within the wine
department increased during the period when Mr. Brown and Ms. Masters were
Interim Wine Directors.[124]  PSAMF ¶ 100; DRPSAMF ¶ 100.

### G.   Helena Donovan's Work Performance and the Inventory Issues

From 2013 to 2015, wine sales representative Mr. Brown did not have any
issues with how Ms. Donovan was performing her job.  PSAMF ¶ 82; DRPSAMF ¶
82.  From 2015 until Mr. Carr retired in 2017, Mr. Brown did not have any
considerable issues with Ms. Donovan's job performance.  PSAMF ¶ 83; DRPSAMF ¶
83.  From 2017 through August of 2018, Mr. Brown did not have any issues with how
Ms. Donovan was performing her job.[125]  PSAMF ¶ 87; DRPSAMF ¶ 87.  Prior to

---

[123]    PSAMF ¶ 93 provides that "[w]hen Donovan returned from leave in 2017, she and Fox
discussed whether Nappi should find new technology or an inventory management system so that
purchase orders were not done manually, but the wine department was without a director at that
point."  Nappi qualifies PSAMF ¶ 93, saying "Ms. Fox testified that she encouraged Ms. Donovan to
work with IT to find business solutions to automate ordering.  Further, Mr. Brown served as Interim
Wine Director during that time period."  DRPSAMF ¶ 93.  Having reviewed the relevant record, the
Court slightly alters PSAMF ¶ 93 to indicate that Mr. Brown was serving as Interim Wine Director at
the time.

[124]    PSAMF ¶ 100 provides that "Fox did not know whether the volume of sales within the wine
department was increasing during the time period referenced above."  Nappi qualifies PSAMF ¶ 100,
saying "[i]t is unclear what time period the factual assertion is referencing.  Ms. Fox testified that after
Mr. Watson was hired, Nappi was able to carry much less inventory because they were able to order
produce on an as-needed basis so it was not sitting in the warehouse and aging."  DRPSAMF ¶ 100.
Having reviewed the relevant record, the Court adds "when Mr. Brown and Ms. Masters were Interim
Wine Directors" to the fact and admits PSAMF ¶ 100.

[125]    PSAMF ¶ 87 states that "[f]rom 2017 through August of 2018, Brown did not have any issues
with how Donovan was performing her job."  Nappi denies PSAMF ¶ 87, saying "Mr. Brown testified
that although he initially did not have understanding of logistics and ordering, when Ms. Donovan
was on a leave of absence in 2017, he covered her position along with Valarie Hale, and he felt that he
had been misled by Ms. Donovan and understood that there were serious issues with the way she was

January 2019, no one told Ms. Donovan that there were any significant job-threatening issues with her job performance, and if an occasional issue arose, her manager would ask her to try to avoid it.[126]  PSAMF ¶ 315; DRPSAMF ¶ 315.

When Ms. Fox started working at Nappi in September of 2015, the company was just introducing the GUI interface with its beverage industry-specific software—to be used in conjunction with the already-existing Legacy system.  PSAMF ¶ 72; DRPSAMF ¶ 72.  Prior to that, Nappi used only the Legacy system that Ms. Fox described as the "green screen" that some people at Nappi still use.[127]  *Id.*  When Ms. Fox first became aware that Nappi had ongoing issues with inventory and wine purchasing, the wine department was without a director because Mr. Carr had retired

---

performing her job, categorizing her performance as 'completely inept.'"  DRPSAMF ¶ 87.  When asked: "[a]nd then during that period of time when [Donovan] was the wine purchaser and you were the interim director, did you have any issues with how [Donovan] was performing her job?", Mr. Brown testified: "No, no."  *Brown Dep.* at 5:22-6:1.  Taking the facts in the light most favorable to Ms. Donovan, PSAMF ¶ 85 is supported by the record and the Court admits PSAMF ¶ 85 over objection.

[126]  PSAMF ¶ 315 provides that "[p]rior to January 2019 no one had told  Donovan that there were any significant issues with her job performance, if an occasional issue arose her manager would ask her to try to avoid it."

Nappi objects to PSAMF ¶ 315 on the ground that the record citation is to "an impermissible leading question."  DRPSAMF ¶ 315 (citing *Robbins v. Small*, 371 F.2d 793, 796 (1st Cir. 1967)).  In *Robbins*, the question was whether in a criminal trial, a state prosecutor's leading questions to a witness after the witness had claimed his Fifth Amendment privilege deprived the defendant of his Sixth Amendment right of confrontation.  *Robbins* has virtually nothing to do with leading questions by counsel at a deposition in a civil action.  The Court overrules the objection pursuant to Federal Rule of Evidence 611.

Nappi denies PSAMF ¶ 315, saying "Ms. Fox, Nick Nappi, Ian Brown, Ms. Masters, Paul Carr, Matt Watson, and Valarie Hale all observed significant issues with Ms. Donovan's performance prior to 2019 and discussed their concerns with her at length."  DRPSAMF ¶ 315.  The Court, having reviewed the relevant record, accepts Nappi's denial as a qualification and slightly alters PSAMF ¶ 315 to reflect the record.

[127]  Nappi qualifies PSAMF ¶ 72, saying "Ms. Fox testified that the GUI interface with the VIP software is used in conjunction with the Legacy system."  DRPSAMF ¶ 72.  The Court adds "used in conjunction with the already-existing Legacy system" and admits PSAMF ¶ 72.

and Nappi expected to have a new Wine Sales Director—not Ms. Donovan—implement new systems.[128]   PSAMF ¶ 73; DRPSAMF ¶ 73.

Nappi had "so many issues" within the wine purchasing department aside from Ms. Donovan that the way the inventory systems were run was not Ms. Donovan's "fault."[129]   PSAMF ¶ 74; DRPSAMF ¶ 74.   In 2016, Nappi did not have a receiving manager helping Ms. Donovan track what inventory came into the warehouse; nor did Nappi have a manager overseeing or tracking which wines were selected for orders—other than Nick Nappi, the director of operations.[130]   PSAMF ¶ 78; DRPSAMF ¶ 78.   Nappi did not have a permanent Wine Sales Director, whom Nappi expected to implement new inventory management systems, for over a year,   PSAMF

---

[128]   Nappi denies PSAMF ¶ 73, saying "[t]he record citation does not support the assertion that a new Wine Sales Director was expected to implement new systems . . . [and] Ian Brown was acting as interim Wine Sales Director upon Carr's retirement."  DRPSAMF ¶ 73.  Ms. Fox testified: "You know, I think we were looking to, you know, have new systems as part of when we hired a new Wine Sales Director."  *Fox Dep.* 17:5-8.  The Court concludes that the fact is supported by the record, finds Nappi's qualification beyond the scope of the fact, and admits PSAMF ¶ 73.

[129]   PSAMF ¶ 74 provides that "Nappi had 'so many issues' within the wine purchasing department, aside from [Ms.] Donovan, and the inventory systems were not [Ms] Donovan's 'fault.'"  Nappi qualifies PSAMF ¶ 74, saying "Ms. Fox testified that Ms. Donovan had not adopted her processes at all, which Ms. Fox found surprising given that Ms. Donovan had been in the position for four years at that point.  Ms. Fox further testified that Ms. Donovan's system demonstrated why there were so many issues in the wine purchasing department."  DRPSAMF ¶ 74.  The Court finds Nappi's qualifications largely beyond the scope of the fact, but slightly alters PSAMF ¶ 74 to reflect the relevant record.

[130]   Nappi qualifies PSAMF ¶ 78, saying "Ms. Fox testified numerous times in the record citation that she does not recall the exact inventory management processes in place in 2016.  Further, she stated that Ms. Donovan was tasked with monitoring inventory.  When asked whether there is a current member of management working in the warehouse to track inventory, Ms. Fox responded no."  DRPSAMF ¶ 78.  Nappi's qualification is beyond the scope of the fact and the Court admits PSAMF ¶ 78.

¶ 79; DRPSAMF ¶ 79, as Mr. Carr left in June of 2017 and Mr. Watson joined Nappi in August of 2018.[131]  *Id.*

Before he retired in 2017, Wine Sales Director Mr. Carr was working together with Ms. Donovan and "the whole team" to improve inventory processes; Mr. Carr referred to the operations people complaining about inventory as "drama queens."[132] PSAMF ¶ 80; DRPSAMF ¶ 80.  However, when Mr. Carr retired, his absence revealed obvious inventory issues in the wine department.[133]  DSMF ¶ 53; PRDSMF ¶ 53.

Mr. Brown determined that Ms. Donovan was performing all ordering alphabetically, which in his view, meant that it might be quite some time before an out-of-stock order was addressed.[134]  DSMF ¶ 65; PRDSMF ¶ 65.  While Nappi was transitioning into a new program to track wine inventory and sales, Mr. Brown thought that Ms. Donovan and the wine department's method of by-the-glass

---

[131]    PSAMF ¶ 79 provides that "Nappi did not have a full time Wine Sales Director, which the company expected to implement new inventory management systems, for over a year.  Carr left in June of 2017 and Watson joined Nappi in August of 2018."
         Nappi qualifies PSAMF ¶ 79, saying "Brown served as Interim Wine Director after  Carr retired up until  Watson was hired."  Having reviewed the relevant record, the Court adds to PSAMF ¶ 79 to reflect the full record.

[132]    Nappi qualifies PSAMF ¶ 80, saying "Ms. Fox testified that Mr. Carr was working with Ms. Donovan to try to fix issues, and that he used the term "drama queens" privately out of frustration to refocus people on problem solving."  DRPSAMF ¶ 80.  Nappi's qualification is beyond the scope of the fact and the Court admits PSAMF ¶ 80.

[133]    Ms. Donovan qualifies DSMF ¶ 53, saying she "[a]dmit[s] there were inventory issues that were department wide and not singularly attributable to Donovan" and that "Nappi has since invested in inventory management software."  PRDSMF ¶ 53.  Ms. Donovan's qualification is beyond the scope of the fact and the Court admits DSMF ¶ 53.

[134]    DSMF ¶ 65 states "Mr. Brown determined that Ms. Donovan was performing all ordering alphabetically, which meant that it would be quite some time before an out-of-stock order was addressed."  Ms. Donovan denies DSMF ¶ 65, saying she "testified her old ordering process forced her to look at the entire portfolio and the number of orders she placed daily or weekly depended on the needs at the time."  PRDSMF ¶ 65.  The Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 65 to confirm that this fact reflects Mr. Brown's opinion, not a fact, and to indicate that it might have been, not necessarily was, quite some time before an out-of-stock order was addressed.

ordering was outdated and was creating impossible tasks for salespeople as Nappi

sometimes did not have the product they needed to sustain supplier programs leading

to out of stocks.[135]  DSMF ¶ 66; PRDSMF ¶ 66.  The out-of-stock issues that existed

---

[135]     DSMF ¶ 66 provides that "Ms. Donovan's method of by-the-glass ordering was outdated and was creating impossible tasks for salespeople, as it sometimes meant that Nappi did not have the product they needed to sustain supplier programs and led to out of stocks."

Ms. Donovan denies DSMF ¶ 66, saying "[i]n 2020 Nappi implemented a new program in the wine department called iDig through VIP that was previously used by the beer department that allows sales representatives to see what product has been ordered, when it is expected to arrive, the quantity they can allocate to a customer, which makes it easier for the sales team to have visibility into the inventory."  PRDSMF ¶ 66.  Ms. Donovan "testified that one of the issues the sales team had was generated because they didn't have access to the correct system to give them visibility into inventory for out of stock items, special order items etc."  *Id.*

Mr. Brown testified:

Q.  Okay.  Did you understand with respect to forecasting by the glass notifications, that [Hale] thought [Donovan] should be doing it by running sales reports as opposed to the way she was doing it currently?

A.  Yes, I mean [Hale] had much more efficient or had ideas about much more efficient processes to do forecasting and by the glass notifications.  [Donovan]'s by the glass specifically was archaic.  It was impossible -- it was an impossible ask for the salespeople.  It would have been really difficult even for the best purchaser to go through and she was creating a task for herself that really accomplished nothing and made no sense to anybody.

Q.  Okay.  So you understand that [Hale] felt [Donovan]'s use of the allocate program was not efficient, and instead, she should be generating sales reports?

A.  Yes, yeah, and that was really just the beginning of what we were starting to develop, but yes, that we had to start somewhere because what was in place was not working at all.

Q.  Okay.  And then the received item notifications, [Hale] provided that [Donovan] was sending out a generalized list that she was just typing out each day and she thought that it should be replaced with a simple report.  Did you understand that?

A.  Yes.  Well, we wanted to see not only received items, but also ETAs on particular items.  We were looking to flesh it out more and to get more information that was valuable.  Items received is important.  It's important to know as a salesperson what comes in on any given day or week, but we also thought more information regarding ETAs, what was on order, when it was ordered, to help with salespeople forecasting to their accounts was important as well.

Q.  My understanding is that this system VIP would have provided visibility into all of these things such as received items, ETAs, what's been ordered, what's out of stock, that sort of thing.  If salesmen had visibility into VIP, wouldn't it have made it so that nobody -- so that this was a void function?

A.  Well, it definitely has now and that's a tool that the salespeople possess.  I can't really speak to the evolution of VIP and what was available and when.  It's definitely something that I don't think [Donovan] was very capable at navigating.  Her VIP and Excel skills paled in comparison to what [Hale] was able to generate.  You are correct,

---

when Ms. Donovan was Wine Buyer were not caused exclusively by supply issues,

but rather in part by her ordering methods.[136]  DSMF ¶ 67; PRDSMF ¶ 67.  Ms. Fox

does not know whether the alphabetical system Ms. Donovan used to manage

---

salespeople do have more tools at their disposal, but I think that was part of an
evolution within VIP.  I don't remember at that time what was and what was not
available, but like any industry, we have evolved with what we have been able to
provide to our salespeople. And there is also an expense to it that you have to consider
as well, so --

*Brown Dep.* 62:18-64:20.  Joline Masters testified that the Nappi wine department implemented iDig
software through VIP in 2020.  *Nappi R.*, Attach 16, *Dep. of Joline Masters* at 18:19-19:4 (*Masters
Dep.*).

        Having reviewed the relevant record, the Court finds that the cited record does not show that
Ms. Donovan was using more "outdated" methods to generate sales reports than others in the wine
department.  Instead, it indicates that the entire wine department was relying on outdated methods
until Nappi implemented the use of iDig through VIP in 2020.  The Court accepts Ms. Donovan's denial
as a qualification and slightly alters DSMF ¶ 66 to reflect the full record.

[136]        DSMF ¶ 67 states that the "out-of-stock issues that existed when Ms. Donovan was Wine Buyer
were not caused by supply issues, but rather by Ms. Donovan's ordering methods."  Ms. Donovan denies
DSMF ¶ 67, saying "[o]ut of stocks occurred intermittently and continue to occur at Nappi with [Ms.]
Hale purchasing," and Mr. Watson "testified that out-of-stocks are not a good measure of performance
for a job like [Ms.] Donovan's because there are so many variables that are mostly attributable to the
supplier."  PRDSMF ¶ 67

        When asked whether there was "an issue with supply at the time or was is simply that [Ms.
Donovan] didn't order enough," Ms. Masters testified: "I think it was more that it wasn't ordered
enough."  *Masters Dep.* at 14:11-14.  Mr. Carr testified that "[i]n fact, we ran out of certain wines many
times because of her lack of experience."  *Additional Nappi R.*, Attach 1, *Decl. of Paul Carr* ¶ 12 (*Carr
Decl.*).  Ms. Fox testified:

        Q. . . . You understand that there is some out of stock that is not in [Ms. Donovan]'s
        control, some that are not.
        A.  Correct.
        Q.  – because the supplier doesn't have the product or doesn't deliver it?
        A.  There's a lot of variables, yes.
        Okay.  And the out of stock that is in [Ms. Donovan]'s control, there's a way for
        management to kind of look at what is and what isn't in her control, right?
        A.  Situationally, I think.  There's not like a report that you can run that shows a
        distinction between the two.
        Q.  Is there a way to run a report that shows you what the out of stocks are and then
        you can kind of individually go through and work out what is and is not in [her] control?
        A.  Well, I think that's what the department was doing on a regular basis, and you
        know, one of the reasons they developed some new tools to – so that she could try, you
        know, ordering differently than what she had been doing . . . .

*Masters Dep.* at 165:22-166:17.  Based on a complicated factual background, the Court concludes that
the record does not support the fact that the stock issues were caused exclusively by Ms. Donovan's
ordering methods, accepts Ms. Donovan's denial as a qualification, and alters DSMF ¶ 67 to reflect the
record.

inventory and purchasing was the same system that Mr. Houle had used when he worked in Ms. Donovan's role.[137] PSAMF ¶ 71; DRPSAMF ¶ 71. However, Mr. Brown testified that Ms. Donovan was ordering excessively on direct import containers that were unnecessary, meaning that Nappi had hundreds, and sometimes thousands, of unnecessary inventory items while other products were out of stock.[138] DSMF ¶ 70; PRDSMF ¶ 70. Ms. Donovan's alphabetical system was not saving Nappi any money.[139] DSMF ¶ 71; PRDSMF ¶ 71. In Mr. Brown's opinion, Ms. Donovan's method of alphabetical ordering was "completely absurd and it explained really the lack of urgency and ability to prioritize."[140] DSMF ¶ 75; PRDSMF ¶ 75. Ms. Fox testified that she did not think that the continuous improvement projects within the wine department were the result of issues with Ms. Donovan's performance; instead, they were just frustrations that the department needed to work on.[141] PSAMF ¶ 81;

---

[137]   Nappi qualifies PSAMF ¶ 71, saying "Ms. Fox testified that she did not know because she was not at Nappi when Mr. Houle conducted the purchasing." DRPSAMF ¶ 71. Nappi's objection is beyond the scope of the fact and the Court admits PSAMF ¶ 71.

[138]   Ms. Donovan qualifies DSMF ¶ 70, saying "[i]nventory levels were not a good measure of performance." PRDSMF ¶ 70. Ms. Donovan's objections are beyond the scope of the fact and the Court admits DSMF ¶ 70.

[139]   Ms. Donovan denies DSMF ¶ 71, saying "[t]he manual ordering process was not [Ms.] Donovan's fault [, and Mr.] Brown testified that Nappi did not update its inventory system because of cost." PRDSMF ¶ 71. Ms. Donovan's objections beyond the scope of the fact and the Court admits DSMF ¶ 71.

[140]   DSMF ¶ 75 states that "Mr. Brown emphasized that Ms. Donovan's method of alphabetical ordering was 'completely absurd and it explained really the lack of urgency and ability to prioritize.'" Ms. Donovan admits that Mr. Brown "testif[ied] as such," but "den[ies] that it was a reflection of [Ms.] Donovan's performance." PRDSMF ¶ 75. The Court accepts Ms. Donovan's denial and alters DSMF ¶ 75 to clarify that this fact reflects Mr. Brown's opinion.

[141]   PSAMF ¶ 81 provides that "Nappi did not view the continuous improvement projects within the wine department (including ordering, receiving, and selecting) as issues with Donovan's performance, it was just a matter of frustrations that the department needed to work on." Nappi qualifies PSAMF ¶ 81, saying "[t]he record citation does not support the factual assertion that the continuous improvement projects to which Ms. Fox was referring were ordering, selecting, and receiving. Further, Nappi says that the record citation does not support any contention about Nappi's views, as Ms. Fox testified: 'I don't think so.'" DRPSAMF ¶ 81.

DRPSAMF ¶ 81.  Nappi never looked into having a consultant come in to create a new inventory management system because "it wasn't a huge issue at that point."[142] PSAMF ¶ 70; DRPSAMF ¶ 70.

Before Matt Watson joined Nappi and for a time thereafter, Ms. Masters would frequently sit with Ms. Donovan ahead of incentive programs and instruct her on what to stock.[143]  DSMF ¶ 69; PRDSMF ¶ 69.  According to Ms. Masters, Ms. Donovan

---

Ms. Fox testified:

Q. Okay.  That one that you're referring to there on the wine on the -- on the floor, was that an issue related to Helena's performance?
A. I'm sorry, the one on the floor?  Oh, the point of sale?  I don't think so.  You know, I don't -- I don't think it was -- again, this -- I -- I don't think we were looking at any of these continuous improvement projects as her performance; it was just frustrations that we needed to work on.

*Fox Dep.* at 80:23-81:7.  The Court concludes that the record supports PSAMF ¶ 81 only in part, alters PSAMF ¶ 81 to reflect the record, and admits the fact.

[142]     Nappi denies PSAMF ¶ 70 as unsupported by the record.  DRPSAMF ¶ 70.  To the contrary, the asserted fact is substantially supported by the cited record and the Court admits PSAMF ¶ 70.

[143]     DSMF ¶ 69 states that "Joline Masters, who is the key account wine manager at Nappi, would frequently sit with Ms. Donovan ahead of incentive programs and instruct her on what to stock."  Ms. Donovan denies DSMF ¶ 69, saying "the communications stopped . . . gradually with Masters, but there was a definite shift where Masters no longer gave any guidance."  PRDSMF ¶ 69.

Ms. Masters testified that she and Ms. Donovan "had the conversations about multiple different wines, you know, in general based on the programming."  *Masters Dep.* at 14:4-6.  She further testified:

Well, like I said, if there's a program . . . we would try to sit down with her and say, hey, Helena, we have this Cupcake program coming on, you know, in the next month or so, and you might want to look at – we literally would go through and look at, okay, there's four different types of varietals of wine . . . let's go heavy on those . . . I think, you know, it definitely was something that, you know, we tried to help her as much as possible to give her that information that she needed because I think at first it was starting out as emails . . . [a]nd then we were going to her physically and sitting down with her.

*Id.* at 14:18-15:11.  Ms. Donovan testified:

Q. Did – in terms of Joline [Masters], did she – as soon as Matt Watson came on board, did she cut you out of communications at that point as well?
A. No.  I'd say Joline [Masters] was not quite as instant.  There was a definite shift with the monthly meeting where she would previously talk to me about inventory

---

was unable to think outside of the box, took frequent smoke breaks, and did not put in extra hours during peak seasons.[144]  DSMF ¶ 72; PRDSMF ¶ 72.  On one occasion, Ms. Donovan and the wine team failed to put in a purchase order in a timely manner on an exciting program for Nappi's largest independent retailer; as a result, the product did not arrive in time, and the substitute was insufficient leading Nappi to lose the program.[145]  DSMF ¶ 73; PRDSMF ¶ 73.  Ms. Masters testified that from June of 2017 to June of 2018, she observed Ms. Donovan doing her job, but it was later during that period that she figured out that Ms. Donovan could have done things

---

issues, previously give me guidance on certain things, and from one very specific meeting on had nothing to say to me, no guidance, no conversation, nothing. And that's pretty much the way it stayed with Joline."

*Donovan Dep.* at 218:9-18.  The Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 69 to reflect that the regular meetings between Ms. Masters and Ms. Donovan took place only until Mr. Watson joined the wine department.

[144]  Ms. Donovan denies DSMF ¶ 72, saying Hale took frequent smoke breaks as well, but her performance was not criticized for doing so.  Ms. Donovan's objections are beyond the scope of the fact and the Court admits DSMF ¶ 72.

[145]  DSMF ¶ 73 states that "[o]n one occasion, Ms. Donovan failed to put in a purchase order in a timely manner on an exciting program for Nappi's largest independent retailer; as a result, the product did not arrive in time, and the substitute was insufficient causing Nappi to lose the program."

Ms. Donovan denies DSMF ¶ 73, saying:

Brown testified that he had given  Donovan notice of the need months in advance because there was a wait time to get wine from California because Nappi didn't have any of the wine in inventory because they didn't regularly sell it. After looking at the email document, Brown changed his testimony to reflect that Nappi did have wine for the RSVP program but needed to order additional wine because Nappi sells 9-12 cases regularly. He also changed his testimony that it took four weeks to get in as he told [Donovan] it would take 5 weeks. [Donovan] also did not receive notice months in advance, she needed to order the product that day to hopefully get it in in time.

PRDSMF ¶ 73.  Having reviewed the record, the Court finds there is some ambiguity surrounding when Ms. Donovan was instructed to order the wine and how many weeks the wine would take to arrive.  Taking the facts in the light most favorable to Ms. Donovan, the Court accepts her denial as a qualification and alters DSMF ¶ 73 to reflect the full record.

a little differently as the wine purchaser.[146]  PSAMF ¶ 102; DRPSAMF ¶ 102.  Ms.

Masters provided, as an example of Ms. Donovan's deficiencies during that time, that

rosés were a big issue because the wine type had gone from being a seasonal, summer

thing to more of an annual-type varietal, so Ms. Donovan should not have looked to

history from the prior year to determine ordering.[147]  PSAMF ¶ 103; DRPSAMF ¶

103.  During that period, Ms. Masters does not recall anyone specifically stating they

were unhappy with Ms. Donovan's job performance, an issue they were all trying to

work on together.[148]  PSAMF ¶ 104; DRPSAMF ¶ 104.  Ms. Masters believes Ms.

---

[146]    PSAMF ¶ 102 provides that "[Ms.] Masters testified that from June of 2017 to June of 2018
she observed [Donovan] was doing her job and it was not until later that she figured out that [Donovan]
could have done things a little differently as the wine purchaser."  Nappi denies PSAMF ¶ 102, saying
"[t]he record citation states that Ms. Masters determined within that time period from June 2017
through June 2018 that there were areas in which Ms. Donovan could have done her job differently to
improve."  DRPSAMF ¶ 102.
        When asked whether Ms. Donovan was doing her job from June 2017 to June 2018, Ms.
Masters testified: "So, yeah, I mean I definitely did see some things that, you know, she – you know,
seeing her how – some parts of how she was doing her job.  But it really was not until probably a lot
later within the year did I figure out as far as, you know, some things that maybe she could have done
a little differently to help her position, and, you know – yes."  *Masters Dep.* at 10:13-19.  The Court
alters PSAMF ¶ 102 to reflect the record.

[147]    Nappi qualifies PSAMF ¶ 103, saying "Ms. Masters testified that ordering rosés required an
understating of the programs, and that despite Ms. Master[s] advising Ms. Donovan on what to order,
she still did not order sufficient quantities or would order too much, so Nappi ended up with excess
product or out-of-stocks.  This left Nappi with another problem: determining how to move excess
product."  DRPSAMF ¶ 103.  Nappi's qualification are beyond the scope of the fact and the Court
admits PSAMF ¶ 103.

[148]    PSAMF ¶ 104 provides that "[d]uring the June 2017 to June 2018 period, Masters does not
recall anyone stating they were unhappy with Donovan's job performance."  Nappi denies PSAMF ¶
104, saying "[t]he record citation indicates that Ms. Masters heard from the entire management team
that Ms. Donovan's performance was an issue to solve, but could not remember specific conversations
from somebody who was not in management."  DRPSAMF ¶ 104.  Ms. Masters testified:

    Q.  Okay.  In that first year did you hear from anybody in management that they
    weren't happy with [Ms. Donovan]'s performance?
    A.  Did I hear from anybody?  I think, you know, it definitely was something we all
    were trying to work together to make sure the team was, you know, being as efficient
    as possible.  So I think we were -- there was definitely comments that people were like,
    you know, how can we help her, you know -- you know, maybe we need to sit down.
    That was something that would transpire from -- from the issues that we were seeing.

Donovan struggled with her job performance because of deficiencies in Excel,[149] PSAMF ¶ 148; DRPSAMF ¶ 148, and believes Ms. Hale was the one who helped Ms. Donovan with Excel.  PSAMF ¶ 149; DRPSAMF ¶ 149.

Mr. Brown believed that Ms. Donovan did not have a good handle on industry trends.[150]  DSMF ¶ 74; PRDSMF ¶ 74.  In early 2018, Mr. Brown, then the interim wine director, had meetings with Ms. Donovan on a near-daily basis to address what he considered to be issues around purchasing and out-of-stocks and to discuss the need, in his view, for Ms. Donovan to use tools to grow her role and improve.[151]  DSMF ¶¶ 76-77; PRDSMF ¶¶ 76-77.

When Mr. Watson was hired as the Director of Wine Sales at Nappi on August 1, 2018, DSMF ¶ 78; PRDSMF ¶ 78, Ms. Donovan's daily meetings with Mr. Brown

---

Q.  Okay.  And did you hear anybody that wasn't a member of management but was an employee at Nappi say they were unhappy with [Ms. Donovan]'s job performance in that first year?
A.  I don't remember that part. I don't remember anybody specifically.

*Masters Dep.* at 15:25-16:16.  The Court accepts Nappi's denial as a qualification and alters PSAMF ¶ 104 to reflect the record.

[149]    Nappi objects to PSAMF ¶ 148, saying: "Ms. Masters also testified that Ms. Donovan was absent from her desk a lot, that she was not able to think outside of the box, and that she did not seem to put in extra work during busy times."  DRPSAMF ¶ 148.  Nappi's objection is beyond the scope of the fact and the Court admits PSAMF ¶ 148.

[150]    Ms. Donovan admits that Mr. Brown "testified as much" but "den[ies] that it was true."  PRDSMF ¶ 74.  Ms. Donovan's objection is beyond the scope of the fact, which asserts what Mr. Brown testified to be his opinion, not the truth of his opinion.  The Court overrules Ms. Donovan's objection and admits DSMF ¶ 74.

[151]    DSMF ¶ 76 provides that "[i]n early 2018, Mr. Brown had discussions with Ms. Donovan concerning the need for Ms. Donovan to improve and utilize tools to grow her role."  DSMF ¶ 77 provides that "Mr. Brown, who was then the interim wine director, was meeting with Ms. Donovan on a near-daily basis to address issues around purchasing and out-of-stocks."  Ms. Donovan admits that these meetings occurred but denies DSMF ¶¶ 76-77, saying "[Ms.] Fox testified that the lack of systems was not an issue with [Ms.] Donovan's performance and was an issue for the entire department."  PRDSMF ¶¶ 76-77.  The Court accepts Ms. Donovan's denials as qualifications and slightly alters DSMF ¶¶ 76-77 to indicate that the statement reflects Mr. Brown's opinion as to why he was holding the meetings.

stopped as Mr. Watson worked directly with purchasing. DSMF ¶ 79; PRDSMF ¶ 79. Ms. Hale changed Nappi's ordering process from an alphabetical system to an as-needed system soon after Mr. Watson's hiring.[152] DSMF ¶ 80; PRDSMF ¶ 80. Shortly after he started, Mr. Watson noted issues with Ms. Donovan's performance and the wine department's performance more generally; namely, overstock product and a lot of out-of-stock inventory, causing him to become concerned about Ms. Donovan's ability to perform her job duties.[153] DSMF ¶ 81; PRDSMF ¶ 81. Mr. Watson could tell that there were significant operational issues and discussed with Mr. Brown how to improve things and help Ms. Donovan improve her work performance.[154] DSMF ¶ 82; PRDSMF ¶ 82. Mr. Watson, the new—as opposed to old—Sales Director, was the person responsible for "driving" process improvements within that department and

---

[152]    DSMF ¶ 80 states that "Mr. Watson changed Nappi's ordering process from an alphabetical system to an as-needed system soon after he was hired." Ms. Donovan denies DSMF ¶ 80, saying "Hale changed the system . . . [and] testified Donovan provided all of the information for the formulas used in the new system." PRDSMF ¶ 80.
        Ms. Donovan testified that the system "got changed – timewise it would have been 2018. No specific month I could give you. Basically after Watson had joined." *Donovan Dep.* at 78:1-3. Ms. Hale testified that "[w]hile Helena [Donovan] was out, I crafted a spreadsheet that could get me to the information I need – needed at the time to be able to order product in her absence. So when she returned, she opted to use my version rather than going back to the one that she was using previously . . . [and later] we got together as a group and put some time and effort into rethinking that process and making it much more efficient." *V. Hale Dep.* at 31:23-32:12. The Court accepts Ms. Donovan's denial as a qualification and changes DSMF ¶ 80 to indicate that Ms. Hale, not Mr. Watson, changed Nappi's ordering process.
[153]    DSMF ¶ 81 provides that "[s]hortly after he started, Mr. Watson noted issues with Ms. Donovan's performance; namely, overstock product and a lot of out-of-stocks, causing him to become concerned about Ms. Donovan's ability to perform her job duties." Ms. Donovan qualifies DSMF ¶ 81, admitting "that there were inventory issues," but saying the "issues were not specific to Donovan and were department wide." PRDSMF ¶ 81. Having reviewed the relevant record, the Court slightly alters DSMF ¶ 81 to reflect the full record.
[154]    Ms. Donovan qualifies DSMF ¶ 82, saying "[t]here were operational issues but Fox testified that the lack of systems was not an issue with Donovan's performance and was an issue for the entire department." PRDSMF ¶ 82. Ms. Donovan's qualification is beyond the scope of the fact and the Court admits DSMF ¶ 82.

automated multiple business processes in his role as a "leader" at Nappi.[155] PSAMF ¶ 106; DRPSAMF ¶ 106.  Nappi still hasn't determined the "right direction" for automating inventory management and purchase orders; it's not something that "happens overnight," and Nappi is "still exploring" the issue with the "whole division" of wine sales.[156] PSAMF ¶ 107; DRPSAMF ¶ 107.

Ms. Donovan initially attended sales meetings after Mr. Watson joined Nappi,[157] DSMF ¶ 104; PRDSMF ¶ 104, and was initially expected to attend the wine team management meetings.[158] DSMF ¶ 105; PRDSMF ¶ 105.  In time, however, Ms. Donovan was either told not to come to the monthly management meetings or her attendance was discouraged by Nappi.[159] PSAMF ¶ 396; DRPSAFM ¶ 396.  In Mr.

[155]    Nappi qualifies PSAMF ¶ 106, saying the "Defendant objects to the use of the word, 'new.'  Mr. Watson has been the Director of Wine Sales at Nappi since August of 2018."  DRPSAMF ¶ 106.  The Court overrules Nappi's objection, noting that "new" is in reference to the former director having left, and the facts already include when Mr. Watson started his employment at Nappi, which will prevent any confusion as to what "new" means here.  Nevertheless, the Court slightly amended PSAMF ¶ 106 to clarify that "new" is as opposed to the "old" director.

[156]    Nappi qualifies PSAMF ¶ 107, saying "[t]he testimony is taken out of context.  The record citation does not support the assertion that Nappi has not 'figured out' what the right direction is for automating inventory."  DRPSAMF ¶ 107.  To the contrary, the relevant record supports the asserted fact and the Court admits PSAMF ¶ 107.

[157]    DSMF ¶ 104 states that "Ms. Donovan attended sales meetings after Mr. Watson joined Nappi."  Ms. Donovan qualifies DSMF ¶ 104, saying she "was excluded from these meetings and reported it to Fox in January of 2019."  PRDSMF ¶ 104.  Having reviewed the relevant record, the Court slightly alters DSMF ¶ 104 to reflect the record.

[158]    Ms. Donovan denies DSMF ¶ 105, saying she "was excluded from these meetings and reported it to Fox in January of 2019."  PRDSMF ¶ 105.  Again, the Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 105 to reflect the record.

[159]    PSAMF ¶ 396 states that "[a]fter Watson became Wine Director, the wine department held monthly management meetings that Donovan was told not to attend."  Nappi denies the fact, saying "Mr. Brown testified that he was not aware of anyone telling Ms. Donovan she was not allowed to attend the monthly management meetings.  He went on to state that he 'can't imagine Matt [Watson] would have said that [she wasn't] allowed to come.'"  DRPSAMF ¶ 396.  Although Nappi accurately quotes a portion of Mr. Brown's deposition testimony, Nappi omits Mr. Brown's acknowledgement that Ms. Donovan was not present at the monthly management meetings and his statement that the reason she was not there was "more that she just wasn't bringing any useful information to those meetings," that she "wasn't coming prepared," and "it wasn't necessary that she was there because she wasn't proving any information that was useful."  *Brown Dep.* 93:7-16.  There are two problems with Nappi's

Brown's opinion, Ms. Donovan did not come to monthly management meetings prepared, nor did she contribute to the meetings in a useful way. PSAMF ¶ 397; DRPSAMF ¶ 397. By January 2019, she was excluded from the meetings altogether.[160, 161] DSMF ¶ 106; PRDSMF ¶ 106. Ms. Donovan did not attend the monthly management meetings because the team felt her presence was not necessary and that she was not bringing anything to the table. PSAMF ¶ 396; DRPSAMF ¶ 396. Although Nappi states that information discussed during meetings was conveyed to Ms. Donovan through other communications, Ms. Donovan states that communication from Mr. Watson, Mr. Brown, and Ms. Masters stopped beginning January 2019.[162] DSMF ¶ 107; PRDSMF ¶ 107.

---

denial. First, Mr. Brown said that the conversation would have been between Matt Watson and Ms. Donovan and, second, the remainder of his answer assumes that someone either told Ms. Donovan not to come or that she received a strong message that she was not wanted at the monthly meeting. The Court declines to accept Nappi's denial.

[160] Ms. Donovan denies DSMF ¶ 106, saying she "was excluded from these meetings and reported it to Fox in January of 2019." PRDSMF ¶ 106. The Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 106 to confirm that DSMF ¶ 106 reflects Mr. Brown's opinion about the reason she was not present at the management meetings.

[161] DSMF ¶ 102 provides that "Ms. Donovan's performance issues were still present in January 2019, and therefore Mr. Watson began regular (weekly, sometimes daily) meetings with Ms. Donovan to go over inventory." Ms. Donovan denies DSMF ¶ 102, saying "[o]n January 16, 2019, Donovan reported to Fox that she had been excluded from team meetings, no one goes to her about inventory, and that she infrequently meets with Watson," and "[o]n March 15, 2019 Donovan reported to Fox that there was no communication from Watson besides hello and goodbye, she was excluded from team meetings, that there was no communication from Watson, Brown or Masters." PRDSMF ¶ 102.

Ms. Donovan's cited record shows that as of January 16, 2019, Ms. Donovan was being excluded from team meetings and had minimal communication with her team. *Fox Dep.*, Ex. 8, *January 16, 2019 Notes* (Page ID #928). As the Court is required to view contested facts in the light most favorable to Ms. Donovan, the Court finds that DSMF ¶ 102 is not supported by the record and omits the asserted fact.

[162] DSMF ¶ 107 states that "[i]nformation discussed during meetings was conveyed to Ms. Donovan through other communications." Ms. Donovan denies DSMF ¶ 107, saying she "reported to Fox that communication from Watson, Brown and Masters had stopped beginning in January of 2019 and again in March of 2019." PRDSMF ¶ 107.

Mr. Brown testified that the information discussed in the meetings "was definitely communicated to [Donovan]. By no means were those meetings the only time at which those issues were discussed." *Brown Dep.* at 94:4-10. Ms. Donovan reported to Ms. Fox in January and March of

The staff and management of the Wine Department became frustrated with Ms. Donovan's performance and the lack of visibility into the inventory system.[163] DSMF ¶ 98; PRDSMF ¶ 98. Ms. Donovan received what she considered unwarranted complaints about her performance from Mr. Watson, John Kiely, Terry O'Brien, Nick Nappi, and other salespeople.[164] DSMF ¶ 99; PRDSMF ¶ 99. Ms. Donovan admitted that she made mistakes at work and could have performed her job better. DSMF ¶ 100; PRDSMF ¶ 100. Despite this, she testified that none of the criticism she received was valid. DSMF ¶ 101; PRDSMF ¶ 101. Nappi's management ultimately chose to offload some of Ms. Donovan's work.[165] DSMF ¶ 103; PRDSMF ¶ 103.

---

2019 that she was receiving little to no communication from her team. *Fox Dep.,* Ex. 6, *March 15, 2019 Notes,* (Page ID # 928); *id.,* Ex. 8, *January 16, 2019 Notes* (Page ID #930). Taking the facts in the light most favorable to Ms. Donovan, the Court accepts Ms. Donovan's denial as a qualification and alters DSMF ¶ 107 to conform to the record.

[163] DSMF ¶ 98 provides that "[t]he staff and management of the Wine Department became frustrated with Ms. Donovan's performance." Ms. Donovan denies DSMF ¶ 98, saying "[Ms.] Donovan provided that the difficulty with sales representatives is they didn't have visibility into the inventory system which caused frustration for them." PRDSMF ¶ 98. The Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 98 to reflect the record.

[164] DSMF ¶ 99 states that "Ms. Donovan admitted that she received complaints about her performance from Mr. Watson, Mr. Brown, John Kiely, Terry O'Brien, Nick Nappi, and other salespeople." Ms. Donovan denies DSMF ¶ 99, saying that she "provided that the difficulty with sales representatives is they didn't have visibility into the inventory system which caused frustration for them." PRDSMF ¶ 99. When asked whether people other than Mr. Watson and Ms. Hale "made unwarranted criticisms about [her] job performance," Ms. Donovan testified "some of the sales team . . . [s]pecifically, the on-premise salespeople which was John Kiely and Terry O'Brien . . . and I would say Nick Nappi." *Donovan Dep.* at 187:12-19; 189:6-10. DSMF ¶ 99 is partially supported by the record and the Court alters DSMF ¶ 99 to reflect the record.

[165] DSMF ¶ 103 provides that "Nappi's management had to offload quite a bit of Ms. Donovan's work for her, at Ms. Donovan's request." Ms. Donovan denies DSMF ¶ 103, saying "[i]t was not at Donovan's request." PRDSMF ¶ 103. Ms. Donovan testified:

> Q. During the time period that Watson was your supervisor, was there ever a sort of shifting of job responsibilities to take some things off your plate?
> A. Yes.
> . . .
> Q. And the things that were moved off your plate to sort of give you some room to do some of the things you needed to get done, who took on those responsibilities?
> A. There were two suppliers that were moved over to [Hale].

Ms. Donovan struggled with effective communication, particularly with stakeholders, supplier representatives, and the warehouse operations manager.[166] DSMF ¶ 88; PRDSMF ¶ 88. Ms. Donovan regularly asked Ms. Hale for assistance in performing her job duties.[167] DSMF ¶ 89; PRDSMF ¶ 89. Ms. Hale was frustrated with the reactive way that Ms. Donovan generated purchasing orders, because it was cumbersome, disorganized, and difficult to manage.[168] DSMF ¶ 90; PRDSMF ¶ 90. At times, many of Ms. Donovan's regular work responsibilities were reallocated to allow Ms. Donovan to "get her head above water."[169] DSMF ¶ 91; PRDSMF ¶ 91. Ms.

---

. . .
Q. And did you welcome that sort of reassignment of those two suppliers?
A. No, I didn't welcome it. I – it had a benefit, but, no, I wasn't happy about it.

*Donovan Dep.* at 143:13-144:6. Taking the facts in the light most favorable to Ms. Donovan, the Court finds that PRDSMF ¶ 103 is only partially supported by the record and alters the fact to reflect the full record.

[166] Ms. Donovan denies DSMF ¶ 88, saying "Hale described the communication difficulty Donovan had related to updating the wine sales team, specifically Nick Nappi and Ashley Day, of an estimated time of arrival for out of stocks by failing to regularly update the information in Nappi's operating software, Vermont Information Processing ('VIP')," and "Donovan testified that one of the issues the sales team had was generated because they didn't have access to the correct system to give them visibility into inventory for out of stock items, special order items etc." Having reviewed the relevant record, the Court finds DSMF ¶ 88 generally supported by the record.

[167] Ms. Donovan denies DSMF ¶ 89, saying "Brown testified that Hale would take it upon herself to complete Donovan's work if she thought she could do it better, 'to her own detriment.'" PRDSMF ¶ 89. When asked if "anybody ever [told her] that [she] was overstepping [her] role into [Ms. Donovan]'s role," Ms. Hale testified: "Overstepping, no, nope. [Ms. Donovan] actually asked me on a regular basis, and that was one of the things identified here was, you know, she wanted me to help do things for her and that I needed to stop doing that so much, so." *V. Hale Dep.* at 90:13-19. Against this testimony, Ms. Donovan cites Mr. Brown's deposition testimony that Ms. Hale would take it upon herself to complete Ms. Donovan's work if she thought she could do it better, "to her own detriment." PRDSMF ¶ 89. Ms. Donovan's denial rests on evidence that it too oblique to be credited.

As DSMF ¶ 89 is supported by the record and Ms. Donovan's denial is both beyond the scope of the fact and based on a tenuous reference to the record, the Court admits DSMF ¶ 89.

[168] Ms. Donovan denies DSMF ¶ 90, saying "[o]ne of the reasons Hale didn't like Donovan because Hale wanted Donovan's job." PRDSMF ¶ 90. Ms. Donovan's objection beyond the scope of the fact and the Court admits DSMF ¶ 90.

[169] DSMF ¶ 91 states that "[a]t times, many of Ms. Donovan's regular work responsibilities were reallocated to allow Ms. Donovan to 'get her head above water.'" Ms. Donovan objects to DSMF ¶ 91, saying "[i]n May of 2019, Watson reassigned Donovan's work related to suppliers Wine Group and Constellation to Hale, which Donovan was not happy about." PRDSMF ¶ 91. Mr. Brown testified:

Hale tried to suggest ideas and tools to help Ms. Donovan succeed at Nappi.[170]  DSMF ¶ 92; PRDSMF ¶ 92.

Despite the efforts of management and staff to assist Ms. Donovan, the inventory issues persisted.[171]  DSMF ¶ 93; PRDSMF ¶ 93.  The out-of-stocks were a significant issue that was discussed regularly at management meetings.[172]  DSMF ¶ 94; PRDSMF ¶ 94.  When present at these meetings, Ms. Donovan often did not have

---

As I understand it or know it to be, I mean what this shows is that [Ms. Donovan] was completely in over her head.  I mean the fact that one person would need four additional people to help her do her job, that is the lengths this company has gone to help her succeed and that's more tools in my experience than anybody has been given in the wine department in the 20 years that I have worked here . . . [t]hat speaks to assisting her to improve and to hopefully at some point take the ball, run with it and not have to depend on all of those people."

*Brown Dep.* at 66:7-17.  When asked if there was anything wrong with Ms. Donovan having other employees do her more administrative tasks, specifically receiving, Mr. Brown testified:

There is nothing wrong with it, but Ashley [Day] had her own distinct role and I don't believe that was part of it.  That was to help – help [Ms. Donovan] get her head above the water, just like Nicole [Nappi] filing her paperwork, I mean that amounts to basically having her own private secretary or admin in her office, you know, filing for her, which seems unimaginable to me, but it was something that we needed to do.  No, I mean currently all of the responsibilities are done by one person.

*Brown Dep.* at 66:25-67:8.  DSMF ¶ 91 is supported by the record and whether Ms. Donovan was happy about any specific reassignment of work is beyond the scope of the fact asserted.  The Court therefore overrules Ms. Donovan's objections and admits DSMF ¶ 91.

[170]    DSMF ¶ 92 provides that "Mr. Watson and Ms. Hale tried to suggest tools and ideas to help Ms. Donovan succeed at Nappi."  Ms. Donovan denies DSMF ¶ 92, saying "Watson told Donovan to come up with her own ideas on how to do her job differently."  DSMF ¶ 92.  Having reviewed the relevant record, the Court finds DSMF ¶ 92 supported in part and slightly alters DSMF ¶ 92 to reflect the record.

[171]    Ms. Donovan denies DSMF ¶ 93, saying "Fox testified that the lack of systems was not an issue with Donovan's performance and was an issue for the entire department."  PRDSMF ¶ 93.  Ms. Donovan's objection is beyond the scope of the fact and the Court admits DSMF ¶ 93.

[172]    Ms. Donovan denies DSMF ¶ 94, saying " Fox testified that the lack of systems was not an issue with Donovan's performance and was an issue for the entire department."  PRDSMF ¶ 94.  Ms. Donovan's objection is beyond the scope of the fact and the Court admits DSMF ¶ 94.

a response about the out-of-stock problem.[173]   DSMF ¶ 95; PRDSMF ¶ 95.   Ms.

Donovan characterized the out-of-stocks and her inability to answer questions about

them as a "minor issue" for which she received what she perceived as unwarranted

criticism.[174]   DSMF ¶ 96; PRDSMF ¶ 96.   Ms. Donovan also perceived complaints

about her inability to answer questions about incorrect product size, incorrect pricing,

and other stock information as unwarranted and minor.[175]   DSMF ¶ 97; PRDSMF ¶

97.   Ms. Hale testified that Mr. Carr, who was then the wine sales manager,

reassigned some of Ms. Donovan's tasks to her because Nappi was having a hard time

guiding Ms. Donovan in how to set them up properly.[176]   DSMF ¶ 52; PRDSMF ¶ 52.

Ms. Fox first became generally aware of possible performance issues with Ms.

Donovan because her office was located close to Ms. Donovan's, and she could

overhear the frustrated tones people used when trying to solve problems with her.[177]

---

[173]   DSMF ¶ 95 states that "Ms. Donovan was present at these meetings but often did not have a response about the out-of-stock problem."   Ms. Donovan denies DSMF ¶ 95, saying at times she was "excluded from the meetings."   PRDSMF ¶ 95.   Nappi's assertion that Ms. Donovan was present at the management meetings is contradicted by Mr. Brown's deposition testimony that he was aware Ms. Donovan was not present at the meetings.   *Brown Dep.* 93:17-20 ("Yes, obviously I was aware if she wasn't in a meeting").   The Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 95 to reflect the record.

[174]   Ms. Donovan denies DSMF ¶ 96, saying she "testified that the supplier would not have provided her with the information when the product would be in stock, but for Watson that wasn't acceptable [and he] expected her to have an answer even if it was information she could not get."   PRDSMF ¶ 96.   Ms. Donovan's objection beyond the scope of the fact and the Court admits DSMF ¶ 96.

[175]   Ms. Donovan denies DSMF ¶ 97 for the same reason as DSMF ¶ 96.   The Court overrules her objection for the same reason explained in the previous footnote and admits DSMF ¶ 96.

[176]   DSMF ¶ 52 states that "Paul Carr, who was then the wine sales manager, reassigned Ms. Donovan's tasks to Ms. Hale because Ms. Donovan was consistently doing them incorrectly."   Ms. Donovan denies DSMF ¶ 52, saying "Carr testified that when Hale complained about Donovan he told Hale to stop."   PRDSMF ¶ 52.   Although Ms. Donovan's denial is largely beyond the scope of the fact, having reviewed the relevant record, the Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 52 to reflect the record.

[177]   DSMF ¶ 47 states that "Ms. Fox initially became aware of Ms. Donovan's performance issues because her office was located close to Ms. Donovan's, and she could overhear the frustrated tones

DSMF ¶ 47; PRDSMF ¶ 47.  Ms. Fox heard a lot of "noise" from Nappi employees and sales representatives about Ms. Donovan, but the conversations "weren't really complaints."[178]   PSAMF ¶ 65; DRPSAMF ¶ 65.   Ms. Fox first received a formal complaint related to the wine department, including Ms. Donovan's role, on or about June 14, 2016, when she met with Nick Nappi to discuss his frustrations with purchasing, inventory, logistics, and out-of-stock issues.[179]   DSMF ¶ 49; PRDSMF ¶ 49. Ms. Fox saw Mr. Hale spending a lot of time in Ms. Donovan's office and she was aware that things were not running smoothly with Ms. Donovan.   PSAMF ¶ 66;

---

people used when speaking with her."  Ms. Donovan denies DSMF ¶ 47, saying "[t]he citation provides Fox testified the conversations she overhead weren't really complaints, just trying to problem solve," and Ms. Fox "further testified that it was not until Donovan was out on medical leave that [her] job performance became a 'focal point,'" addressed with Ms. Donovan for the first time in January 2019.

Ms. Fox testified:

Q.  When was the first time you recall getting a complaint or a report about [Ms. Donovan]'s job performance?
A.  I don't remember specifically.  I think I was probably about six or eight months into the role and there was a lot of noise.  I don't remember from where, but a lot of noise on how wine inventory was being managed.

I think I was hearing some from Operations; definitely, you know, Sales. Because my office was directly across from Helena's; and on occasion, I would, you know, hear some conversations that obviously people were pretty frustrated with it sounded like lack of communication, and I – I'm not sure what it was at that point. But it was – they weren't really complaints, it was more just trying to problem solve what the – what the rising in what seemed to be recurrent issues were.

*Fox Dep.* at 11:5-21.  Having reviewed the relevant record, the Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 47 to reflect the record.

[178]   Nappi qualifies PSAMF ¶ 65, saying "Ms. Fox testified that she was aware of ongoing frustration with Ms. Donovan's performance due to recurring issues."  DRPSAMF ¶ 65.  Nappi's qualification is beyond the scope of the fact and is contained in DSMF ¶ 47; the Court admits PSAMF ¶ 65.

[179]   DSMF ¶ 49 provides that "Ms. Fox first received a formal complaint concerning Ms. Donovan's work performance on or about June 14, 2016, when she met with Nick Nappi to discuss purchasing, inventory, logistics, and out-of-stock issues."  Ms. Donovan denies DSMF ¶ 49, saying Ms. Fox "testified these were problems 'all around' the wine sales department, not specific to Donovan."

Having reviewed the relevant record, the Court concludes that the testimony does not indicate that the purchasing, inventory, logistics, and out-of-stock issues were attributed solely to Ms. Donovan.  The Court therefore accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 49 to reflect the record.

DRPSAMF ¶ 66.  Ms. Fox assumed that Mr. Hale was assisting Ms. Donovan, but she did not actually see that happen.  *Id.*[180]  Ms. Fox believed that recurrent issues started "accelerating" with Ms. Donovan in 2017 because although she was performing, it was differently than how Mr. Houle managed things.[181]  PSAMF ¶ 67; DRPSAMF ¶ 67.

The complaints Ms. Fox received, which were discussed during a meeting on June 14, 2016, were about problems arising from the purchasing role—ordering, scheduling, inventory— and problems "all around" in the wine sales department.[182]

---

[180]    PSAMF ¶ 163 reads "Brown discussed 'a little bit' of Hale being disrespectful to Tourangeau and after viewing the email from Hale to Tourangeau, Masters agreed the email was unprofessional and it is the first time she's seen email to salesm[e]n like that."  The Court does not understand the relevance to Ms. Donovan's case of Ms. Hale's being disrespectful to Michele Tourangeau, and it declines to include PSAMF ¶ 163 in its recitation of uncontested material facts.

[181]    PSAMF ¶ 67 states that "[t]hings started 'accelerating' with Donovan in 2017.  She was performing but differently than how Houle managed things."  Nappi qualifies PSAMF ¶ 67, saying the fact is "vague" and "Ms. Fox testified that the recurrent issues, and particularly communication issues, were accelerating in 2017."  DRPSAMF ¶ 67.  Ms. Fox testified:

> Q.  Okay.  And how about – I think you mentions Carr having conversations with [Ms. Donovan].  Do you know what those conversations were about?
> A.  Well, [Carr] . . . I think it was starting in 2017 when things were – definitely seemed to be accelerating, I had asked him, you know, what – what's going on, it seems like we're having recurrent issues and, you know, there's – there's communication issues. He said that, you know, [Donovan] wasn't – you know, basically she was performing but sort of at a – a middle level, a midlevel, not – it was different than apparently how Houle managed things.

*Donovan Dep.* at 13:1-13.  The Court adds "recurrent issues" to PSAMF ¶ 67 to reflect the full record.

[182]    PSAMF ¶ 75 states that "[t]he complaints that Fox received, which were discussed during a meeting on June 14, 2016 were about ordering, scheduling, inventory, and problems 'all around' in the wine sales department."  Nappi qualifies PSAMF ¶ 75, saying "Ms. Fox testified that she received complaints specifically about the frequency of problems arising from Ms. Donovan's purchasing role."  DRPSAMF ¶ 75.  Ms. Fox testified:

> Q.  What was [Nick Nappi] frustrated about?
> A.  The frequency of problems that he felt were arising from the – the purchasing role.
> Q.  What problems?
> A.  You know, he was – looking at my notes, he was describing problems all around with Sales which would probably be – have been the out of stocks.  He was talking about Operations, and then he – that would have been more the logistics of when it's

PSAMF ¶ 75; DRPSAMF ¶ 75.  During the June 14, 2016 meeting, Nick Nappi was very frustrated with the inventory issues in the wine department, although he did not specifically say it was "all because of" Ms. Donovan; it was more just that "this isn't working."[183]  PSAMF ¶ 76; DRPSAMF ¶ 76.  And yet Nick Nappi may not have even questioned whether Ms. Donovan could handle her job; that may have just been Ms. Fox's observation or assumption.[184]  PSAMF ¶ 77; DRPSAMF ¶ 77.

---

showing up to be delivered, not having notice so that slotting could be determined, coming in batches versus sort of spread out, no visibility on when it was, no management of the freight cost.  Just all the way around, it just – issues.

*Donovan Dep.* at 48:21-49:9.  In addition to clarifying that the asserted fact is Ms. Fox's opinion, the Court adds "problems arising from the purchasing role" to PSAMF ¶ 75 to reflect the record and admits PSAMF ¶ 75.

[183]   Nappi qualifies PSAMF ¶ 76, saying "[t]he record citation is to Ms. Fox's testimony that she could not remember if Nick Nappi specifically said the issues were because of Ms. Donovan.  Further, Ms. Fox testified that Mr. Nick Nappi's complaints were about issues arising specifically from the purchasing role."  DRPSAMF ¶ 76.  Nappi's qualification is beyond the scope of the fact, and the Court admits PSAMF ¶ 76.

[184]   PSAMF ¶ 77 states that "[i]n fact, Nick Nappi may not have even said the inventory issues were Donovan's fault at all during the June 14, 2016 meeting; that may have just been Fox's observation or assumption."  Nappi qualifies PSAMF ¶ 77, saying "Ms. Fox testified that Mr. Nick Nappi's complaints were about issues arising specifically from the purchasing role."  DRPSAMF ¶ 77.  Ms. Fox testified:

Q.  . . . Going back to this exhibit, what do you recall being discussed in this meeting with respect to [Ms. Donovan]'s performance issues?
A.  That there were some frequent issues that related to how Nick [Nappi] felt she was doing her job.
Q.  Okay.  Who – who said this comment: Can she handle the job?
A.  I don't remember if that's my observation or if Nick stated that.  I think -- I think it's actually my observation, you know, based on what I was getting for inputs that -- I don't remember if Nick actually said that or if -- if I just made that observation.  It's kind of off to the side, so I -- I think that just may be sort of me making that assumption, you know, is it -- is this a case of somebody -- is --you know, at that point, I didn't know if it was a process's or system's lack of or inadequate or – I didn't know what it was, or if it was somebody who was --
Q.  Okay.
A.  -- unable to handle the job.  I -- I see in the margin here, I have two and a half years in the role.  And I think that was what was starting to become apparent, that, you know, like we were still doing things the same way we had been, and -- and it needed to evolve with what the challenges were.

During the June 14, 2018 meeting, Ms. Fox and Mr. Brown discussed an incident between Ms. Hale and Ms. Donovan.  PSAMF ¶ 164; DRPSAMF ¶ 164.  In her notes, Ms. Fox wrote that Ms. Hale was raising her voice, and her gestures toward Ms. Donovan were aggressive.  *Id.*  Ms. Fox also wrote: "Something about [Donovan] not doing what job is" and that Ms. Donovan was frustrating Ms. Hale.[185]  *Id.*  Mr. Brown testified that the disciplinary action toward Ms. Hale was based on a culmination of things with respect to her treatment of Ms. Donovan.[186, 187]  PSAMF ¶ 140; DRPSAMF ¶ 140.  Ms. Hale admitted that she yelled at Ms. Donovan and that she was frustrated about how inventory moved; Ms. Hale was then told that her

---

*Donovan Dep.* at 60:15-61:16.  The Court concludes that what Ms. Fox could not recall was whether the question "Can she handle her job?" was her own note in the margin or what Nick Nappi said at the meeting.  The Court therefore alters PSAMF ¶ 77 to reflect the record and admits the fact.

[185]   PSAMF ¶ 164 states that "Fox met with Brown and Frank Ma[io]rino on June 14, 2018 to discuss the incident with Hale.  Fox wrote that Hale was raising her voice, and her gestures toward Donovan were aggressive.  Fox also wrote: 'Something about Donovan not doing what job is,' and Donovan was frustrating Hale."

Nappi objects to PSAMF ¶ 164 as a reference to "handwritten notes which offer out-of-court statements for the truth of the matter asserted" and are "therefore, hearsay" and further qualifies the fact, saying "[t]here is no indication that Frank Maiorino attended that meeting, and the initials on the page are 'IB' and 'JM.'"  DRPSAMF ¶ 164.  The Court overrules Nappi's hearsay objection.  The notes are apparently contemporaneous, handwritten notes by Ms. Fox of a business meeting at Nappi and the notes are admissible as an exception to rule against hearsay under Federal Rule of Evidence 803(6).  As Nappi notes, however, the Court finds no reference to Mr. Maiorino in the cited record, and therefore the Court omits references to Mr. Maiorino.  The Court otherwise admits the fact.

[186]   PSAMF ¶ 139 states that "Brown testified that the language in Hale's August 28, 2017, warning which states 'reprimanding others, making them feel disparaged, nonvalued or offended' was part of the warning because Brown was also aware of Hale's issues with Donovan."  Nappi objects to PSAMF ¶ 139 as unsupported by the record citation and denies the fact, saying "The actual testimony in the record citation is: 'Honestly, I don't remember what kind of was the ultimate straw, but, you know, that disciplinary action regarding Valarie Hale and Helena was a culmination of things, so this may have been, but I don't remember specifically.'"  DRPSAMF ¶ 139.  Having reviewed the relevant record, the Court agrees with Nappi that the record citation does not support the asserted fact.  The Court accepts Nappi's denial and omits PSAMF ¶ 139.

[187]   Nappi objects to PSAMF ¶ 140 as unsupported by the record but otherwise admits the fact.  DRPSAMF ¶ 140.  The Court reviewed the cited deposition testimony and notes that Nappi is correct that the cited record, *Brown Dep.* 26:15-28:3, does not support the asserted fact.

However, in reviewing PSAMF ¶ 139, the Court came upon the correct citation in *Brown Dep.* at 29:17-23, which Ms. Donovan properly provided in PSAMF ¶ 139.  Although the Court has no obligation to search the record, as it has come upon an obvious mistake by Plaintiff's counsel, the Court admits PSAMF ¶ 140.

behavior was unacceptable and unprofessional.[188]  PSAMF ¶ 171; DRPSAMF ¶ 171.

Ms. Donovan testified she reported the incident of Ms. Hale screaming at her in her

office to Mr. Brown via email, text message, and phone call but that it was ignored

until she reported it to Ms. Masters.  PSAMF ¶ 309; DRPSAMF ¶ 309.

Ms. Donovan described the incident as Ms. Hale screaming and flailing at Ms.

Donovan while Ms. Donovan was stuck in her office and shocked.  PSAMF ¶ 310;

DRPSAMF ¶ 310.  Ms. Donovan described the encounter as traumatic and said that

she felt physically threatened and trapped as Ms. Hale attacked her.[189]  *Id.*  Ms. Fox's

notes from June 18, 2018 reflect that Michelle Apt told Ms. Fox that she saw Ms. Hale

make several gestures toward Ms. Donovan that were "very confrontational and

aggressive"; another employee named Ms. Kroot "was bothered by it."[190]  PSAMF ¶

---

[188]    PSAMF ¶ 171 provides that "Hale admitted that she yelled at Donovan and said that she was frustrated about how inventory moved; in response, Fox told Hale that her behavior was unacceptable and unprofessional."

Nappi objects to PSAMF ¶ 171 as a reference to "handwritten notes which offer out-of-court statements for the truth of the matter asserted" and are "therefore, hearsay" and further denies the fact, saying "[t]he handwritten notes do not indicate who told whom that they were unacceptable and unprofessional."  DRPSAMF ¶ 171.  The Court overrules Nappi's hearsay objection for the reason explained in footnote 17.  Because the cited record says only "Told unacceptable unprofessional" and does not identify who made the comment to Ms. Hale, the Court accepts Nappi's denial as a qualification and alters PSAMF ¶ 171 to reflect the record.

[189]    Nappi objects to PSAMF ¶ 310 because Ms. Donovan "does not cite to a particular part of the record, but instead cites generally to twenty-seven pages of deposition testimony" but otherwise admits the fact.  DRPSAMF ¶ 310.  Nappi has a point.  For support, Ms. Donovan cited her deposition at 241:2-268:9 and 311:1-25.  The Court found her description of the incident at 267:2-20 and 311:1-4.

Exclusion of this evidence would be an excessive sanction and the Court therefore admits PSAMF ¶ 310.  Nevertheless, the Court admonishes Ms. Donovan that PSAMF ¶ 310 is not in compliance with Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 56(h), which require citations to particular parts of materials in the record.

[190]    PSAMF ¶ 165 provides that "Fox's notes from June 18, 2018 reflect that Michelle Apt told Fox that she saw [Hale make several gestures toward Donovan that were 'very confrontational and aggressive,' and another employee named Patty 'was bothered by it.'"  Nappi objects to PSAMF ¶ 165 as inadmissible hearsay and further denies the fact, saying "Ms. Fox testified that Ms. Apt was not present the day of the incident between Ms. Donovan and Ms. Hale."  DRPSAMF ¶ 165.  Although Ms. Fox testified that she thought Ms. Apt was out of work the day of the incident, *Fox Dep.* at 119:17-18, her notes from June 18, 2018, indicate that Ms. Apt told her about the incident.  Taking the facts in

165; DRPSAMF ¶ 165.  Ms. Fox's notes reflect that Ms. Donovan said Ms. Hale's tone and physical demeanor toward her were both threatening and intimidating.[191] PSAMF ¶ 166; DRPSAMF ¶ 166.  Ms. Fox wrote in her notes that Ms. Donovan told Ms. Kroot "she had sent an email to [Mr. Brown]" and Ms. Donovan was "bothered" that she got no response.[192]  PSAMF ¶ 167; DRPSAMF ¶ 167.

Additional notes from June 14, 2018 reflect that an employee with the initials "AN" said Ms. Hale definitely wants to tell Ms. Donovan how to do her job and wants things her way "or no way with all work."[193]  PSAMF ¶ 168; DRPSAMF ¶ 168.  Ms. Fox wrote that Ms. Donovan said the issues with Ms. Hale had been going on "forever," but Mr. Brown had not observed the tension between them.  PSAMF ¶ 175; DRPSAMF ¶ 175.  Ms. Fox also wrote that according to Mr. Brown, Ms. Donovan said

---

[191]  the light most favorable to the non-moving party, as the Court must do at the summary judgment stage, the Court admits PSAMF ¶ 165 over objection and overrules Nappi's hearsay objection for the reason explained in footnote 17.  *See Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 37 (1st Cir. 2018) (The Court states the facts "in the light most hospitable to [non-movants] consistent with record support . . . .") (citing *Ahern v. Shinseki*, 629 F.3d 49, 51 (1st Cir. 2010); and *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002)).

[191]  Nappi objects to PSAMF ¶ 166 as a reference to "handwritten notes which offer out-of-court statements for the truth of the matter asserted" and are "therefore, hearsay" and further denies the fact, saying "[t]he document does not indicate to whom Ms. Donovan referred when she said that." DRPSAMF ¶ 166.  Having reviewed the relevant record, the Court admits PSAMF ¶ 166 over objection because the context of the notes indicates to the Court that Ms. Donovan was in fact referring to Ms. Hale.  The Court overrules Nappi's hearsay objection for the reason explained in footnote 17.

[192]  Nappi objects to PSAMF ¶ 167 as a reference to "handwritten notes which offer out-of-court statements for the truth of the matter asserted" and are "therefore, hearsay" and further denies the fact, saying "Ms. Fox testified that she did not meet with Patty, but that the notes reflect a meeting that Michelle Apt represented that she had had with Patty."  DRPSAMF ¶ 167.  The Court overrules Nappi's hearsay objection for the reason explained in footnote 17, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 167.

[193]  Nappi objects to PSAMF ¶ 168 as a reference to "handwritten notes which offer out-of-court statements for the truth of the matter asserted" and are "therefore, hearsay" and further denies the fact, saying "Ms. Fox testified that the notes reflect a conversation she has with Alex Nowinski to specifically ask about the incident wherein Ms. Hale had raised her voice." DRPSAMF ¶ 168.  The Court overrules Nappi's hearsay objection for the reason explained in footnote 17, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 168.

that Ms. Hale was a bully to her and others in the office and got away with too much.[194]  *Id.*  Ms. Fox's notes also say that when Mr. Brown spoke with Ms. Kroot, she said that Ms. Hale was very physical and aggressive toward Ms. Donovan.  *Id.*  Ms. Hale described that Ms. Donovan's communication difficulty concerned failing to regularly update the information in Nappi's operating software in order to update the

---

[194]     PSAMF ¶ 175 provides that "Fox also wrote that Donovan said issues with Hale had been going on 'forever,' but Brown had not observed the tension between them.  Donovan said Hale is a bully to her and others in the office, and she gets away with too much.  When Brown spoke with Patty, she said Hale was very physical and aggressive toward Donovan."  Nappi objects to PSAMF ¶ 175 as inadmissible hearsay and further qualifies the fact as unsupported by the record, specifying that "Ms. Fox testified that Ms. Donovan was not present for the meeting discussed in the notes.  Rather, she testified that she was 'trying to understand from [Mr. Brown] what had happened . . ..'"  DRPSAMF ¶ 175.  Ms. Fox testified:

> Q. Okay.  And then this June 18, 2018 note, are these still your handwritten notes?
> A. Yes.
> Q. Okay.  And is this a meeting between yourself and [Mr.] Brown?
> A. Correct.
> Q. Was [Ms. Donovan] present in this meeting?
> A. No.
> Q. Oh, so you were just talking to [Mr. Brown] about the issue that -- . . .
> A. Yes.
> Q. Okay.
> A. I think -- what I recall was I think I had -- I had spoken with [Ms. Donovan] at that point.  So then I was trying to understand from [Mr. Brown] what had happened with -- she had reached out to [Mr. Brown], and, -- and [Ms. Donovan] was pretty upset that [Mr. Brown] had had the day off or something and didn't respond to her.

*Fox Dep.* at 120:18-121:10.  The Court finds that the testimony in conjunction with the cited exhibit partially supports PSAMF ¶ 175, overrules Nappi's hearsay objection for the reason explained in footnote 17, and supplements the fact to reflect the cited record.

wine sales team, specifically Nick Nappi and Ashley Day, of an estimated time of arrival for out-of-stock inventory.[195, 196]  PSAMF ¶ 176; DRPSAMF ¶ 176.

Ms. Hale testified that she was disciplined for how she treated Ms. Donovan as she expressed her frustration to Ms. Donovan in the summer of 2018, but that she was never disciplined or spoken to on any other occasion for treating her coworkers poorly.  PSAMF ¶ 174; DRPSAMF ¶ 174.

On April 16, 2019, Mr. Watson and Ms. Fox met with Ms. Donovan and encouraged her to ask for help when she fell behind rather than let work tasks fall in arrears.[197]  DSMF ¶ 108; PRDSMF ¶ 108.  Ms. Donovan struggled to communicate

---

[195]     Nappi qualifies PSAMF ¶ 176, saying "[t]he factual assertion understates and oversimplifies Ms. Donovan's communication failures.  Ms. Hale testified that Ms. Donovan struggled to communicate with 'the entire team,' specifically operations, warehouse, sales representatives, management, Ms. Hale, administration, and the receptionist.  Ms. Hale testified that the failure to communicate, which she described as not getting estimated times of arrival from Ms. Donovan, forced employees to constantly call around trying to figure out what products were where, and that the operations manager would be tied up throughout the day fielding phone call from delivery drivers, because out-of-stocks would not show up on invoices, so the product would simply be omitted from an order."  DRPSAMF ¶ 176.  Nappi's objections are beyond the scope of the fact, and the Court admits PSAMF ¶ 176.

[196]     PSAMF ¶ 177 states that "Hale had conversations with members of management about her frustration with Donovan's job performance in 2018 and 2019 during monthly team meetings."  Nappi qualifies PSAMF ¶ 177, saying "[t]he record citation does not state to which deposition it is referring; therefore, it is not properly supported and should be disregarded or stricken.  To the extent Plaintiff is referring to Ms. Hale's deposition testimony, the citation does not support the factual assertion.  Ms. Hale testified that it was, 'never me having a meeting about my issues with Helena's performance.  That was identifying an issue that was happening and trying to figure out the root cause.'  To the extent the citation is to any other deposition, it is hearsay and should be disregarded."  DRPSAMF ¶ 177 (quoting *Hale Dep.* at 29:3-11).

          Having reviewed the record, the Court confirms that record citation to "28:12-29:20, ECF Doc. 52-18" does not support the statement and the Plaintiff's citation to "PageID # 1151" does not exist within the cited document.  Because the Court is under no obligation to independently search the record for the correct supporting citation which has not been provided here, the Court omits the fact.  *See* D. ME. LOC. R. 56(f).

[197]     Ms. Donovan qualifies DSMF ¶ 108, saying she admits "that they said this" but "den[ies] that they meant it."  PRDSMF ¶ 108.  Ms. Donovan's qualification is beyond the scope of the fact and the Court admits DSMF ¶ 108.

with suppliers and warehouses.[198]   DSMF ¶ 109; PRDSMF ¶ 109.   But Ms. Donovan has no direct information of Mr. Watson instructing a supplier to cease communications with her.[199]   DSMF ¶ 110; PRDSMF ¶ 110.

After Ms. Fox reviewed how Ms. Donovan was handling purchase orders, while Ms. Donovan was out on leave, she expressed "shock" that the processes were still being conducted manually.   PSAMF ¶ 86; DRPSAMF ¶ 86.   Ms. Fox was surprised and found it "very odd" that someone at Ms. Donovan's "level," which Ms. Fox described as "mid management," had neither made changes to the manual purchasing and inventory processes for wines sales at Nappi nor improved what her

---

[198]    DSMF ¶ 109 provides that "Ms. Donovan struggled to communicate with suppliers, rarely visited the warehouse, and as a result key industry stakeholders began to bypass her entirely."   Ms. Donovan denies DSMF ¶ 109, saying "Steve Stults told Donovan [that] Hale directed suppliers not to go to Donovan."  PRDSMF ¶ 109.  Having reviewed the record, the Court finds Ms. Donovan's objection beyond the scope of the fact, finds DSMF ¶ 109 only partially supported by the record, and alters DSMF ¶ 109 to reflect the record.

[199]    DSMF ¶ 110 states that "Ms. Donovan has no direct information of anyone at Nappi instructing a supplier to cease communications with her."   Ms. Donovan denies DSMF ¶ 110, saying "Steve Stults told Donovan [that] Hale directed suppliers not to go to Donovan."  PRDSMF ¶ 110.  Ms. Donovan testified:

> Q.  Okay. So on the warehouse thing, though, it was my understanding that Mr. Watson never went to the warehouse and said I want you to deal with [Ms. Hale] and not – not [Ms. Donovan].
> A.  [Ms. Hale] went to Steve Stults, yes.
> Q.  I know [Ms. Hale] did, but I'm just saying, are you aware of Mr. Watson ever doing that?
> A.  No, but [Ms. Hale] wouldn't have done that under her own –
> . . .
> Q.  You're speculating as to whether or not Mr. Watson was even aware, never mind had anything to do with [Ms. Hale] going down to [Mr. Stults]?

*Donovan Dep.* at 247:8-19.  The Court accepts Ms. Donovan's denial as a qualification and alters DSMF ¶ 110 to reflect the record.

predecessor Mr. Houle was doing. [200, 201]  PSAMF ¶ 85, 94; DRPSAMF ¶ 85, 94.  Ms. Fox, though, did not discuss her concerns about Ms. Donovan's manual purchase order processing system with Mr. Watson, the new Sales Director in the wine department, when he was hired.[202]  PSAMF ¶ 95; DRPSAMF ¶ 95.

Frustrations within the wine department were not exclusively about Ms. Donovan, "it was just we as an organization were still doing it very manually."[203]

---

[200]    PSAMF ¶ 85 states that "[e]ven though Nappi did not give Donovan the same 'Purchasing Manager' title as Houle, Fox expected that someone at Donovan's 'level' would have made changes to improve on what her predecessor (Houle) was doing for inventory and purchasing management.  Houle was doing these things manually, which Fox was critical of Donovan for continuing to do."

Nappi objects to PSAMF ¶ 85 as argument, not fact, and denies PSAMF ¶ 85 as unsupported by the record, saying "[t]he record citation does not support any assertion about Ms. Donovan's title, how Mr. Houle was processing purchasing orders, or that Ms. Fox expected Ms. Donovan to 'improve' on what her predecessor was doing.  Further, the statement that Ms. Fox was 'critical' of Ms. Donovan is argument, as should be stricken."  DRPSAMF ¶ 85.

Ms. Fox testified:

> My impression at that time looking at the – her systems is that she had not made any changes to the processes since taking over from Houle, which was surprising to me that somebody at that level wouldn't have made any changes to what her predecessor was doing.  And she had been there for about three years, three or four years at that point.  And so it also was demonstrating, you know, what I thought was why there were so many issues, you know, aside from [Ms. Donovan], but they -- we just – our wine purchasing department was just too big to -- or -- or the inventory levels are too big to be managing it manually like she was.

*Donovan Dep.* at 25:12-24.  The Court finds PSAMF ¶ 85 partially supported by the record and alters PSAMF ¶ 85 to reflect the facts included in the relevant record.

[201]    Nappi qualifies PSAMF ¶ 94, saying "[i]n the record citation, Ms. Fox explained that it was 'very odd for somebody being in a role at that level for so long to not have made some changes to the – to a process.'"  DRPSAMF ¶ 94.  Nappi's qualification is beyond the scope of the fact, and the Court admits PSAMF ¶ 94.

[202]    PSAMF ¶ 95 provides that "Fox did not discuss her concerns with Donovan's manual system of processing purchase orders when Matt Watson, the new Sales Director in the wine department, was hired."

Nappi denies PSAMF ¶ 95, saying "[t]he first part of the record citation discusses whether Ms. Fox discussed inventory management systems updates with Mr. Watson" and "[t]he second part of the record citation is largely Plaintiff's attorney's question, to which there was a form objection."  DRPSAMF ¶ 95.  Having reviewed the relevant record, the Court overrules Nappi's objection and admits the asserted fact.

[203]    PSAMF ¶ 96 provides that "[f]rustrations within the wine department were not about [Ms.] Donovan, 'it was just we as an organization were still doing it very manually.'"  Nappi qualifies PSAMF

PSAMF ¶ 96; DRPSAMF ¶ 96. Ms. Fox admitted that wine purchasing and inventory process decisions were made as part of a team, not by Ms. Donovan alone, and that team included Mr. Brown and Ms. Masters—as interim wine directors—along with Ms. Hale and the sales representatives.[204] PSAMF ¶ 97; DRPSAMF ¶ 97. Ms. Fox talked to Mr. Brown about the fact that Nappi needed to improve a lot of things within the wine department, which still did not have a full-time director; Mr. Hale had left Nappi as well, so it was "sort of a new group" that was trying to make improvements within the wine department.[205] PSAMF ¶ 98; DRPSAMF ¶ 98. Along with Mr. Brown and Ms. Masters, Ms. Fox convened a meeting with Ms. Donovan, Ms. Hale, and an IT department employee to "take the manual Purchase Order and semi automate it."[206] PSAMF ¶ 101; DRPSAMF ¶ 101. Ms. Donovan would not have been able by herself to accomplish the transition from manual to automated purchase orders. *Id.*

¶ 96, saying "[t]he record citation is taken out of context. Prior to the cited statement, Ms. Fox testified that [Ms.] Donovan was doing all the ordering manually, without even recording the date, and it was not an automated system or even logged on a spreadsheet." DRPSAMF ¶ 96. Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 96 to reflect the record.

[204]    PSAMF ¶ 97 provides that "Fox admitted that wine purchasing and inventory process decisions were made as part of a team, not by Donovan alone, and that team included Brown, Hale, and Masters as interim wine sales directors at the time." Nappi qualifies PSAMF ¶ 97, saying "[t]he record citation does not support the assertion that Ms. Fox testified that Ms. Hale was an interim wine sales director. Further, Ms. Fox testified that she gave Ms. Donovan a directive to work with IT and her 'team' (which included Mr. Brown, Ms. Masters, Ms. Hale, and all the sales reps), to improve purchasing processes." DRPSAMF ¶ 97. Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 97 to reflect the record and admits the fact.

[205]    Nappi qualifies PSAMF ¶ 98, saying "Mr. Brown, Ms. Masters, and Ms. Hale have been with Nappi for twenty-one, six, and twenty-three years, respectively." DRPSAMF ¶ 98. Nappi's qualification is beyond the scope of the fact, and the Court admits PSAMF ¶ 98.

[206]    PSAMF ¶ 101 states that "[a]long with Brown and Masters, Fox convened Donovan, interim director Hale, and an IT department employee to 'take the manual Purchase Order and semi automate it'; this was not a process that Donovan could automate by herself. Other than the employee from IT and Hale, all individuals involved in this 'semi' automation process were superior to Donovan within the organization." Nappi qualifies PSAMF ¶ 101, saying "[t]he record citation does not support the assertion that Ms. Fox testified that Ms. Hale was an interim wine sales director. Further, the record citation does not support the assertion that the process was one that Ms. Donovan could not automate

Ms. Hale testified that out of stocks were rampant in 2018 and 2019, so she was trying to facilitate information received from sales representative to Ms. Donovan.[207]  PSAMF ¶ 169; DRPSAMF ¶ 169.  Ms. Hale testified that previously Ms. Donovan had intermittent difficulty with out-of-stocks but not as consistently as she did in 2018 and 2019.  PSAMF ¶ 170; DRPSAMF ¶ 170.   Mr. Brown testified out of stocks have continued to be an issue for Nappi.[208]  PSAMF ¶ 385; DRPSAMF ¶ 385.

Ms. Hale does not know what the cause of the out-of-stocks was in 2018 and 2019.[209]  PSAMF ¶ 172; DRPSAMF ¶ 172.  Mr. Brown testified that the 2018 wildfires

---

[207]   herself, rather, Ms. Fox testified that she gave Ms. Donovan a directive to work with IT and her 'team' (which included Mr. Brown, Ms. Masters, Ms. Hale, and all the sales reps), to improve purchasing processes.  Finally, the factual assertion does not identify the titles or hierarchy of Ms. Hale or Mr. Terrano [the IT employee]."  DRPSAMF ¶ 101.  The Court overrules Nappi's objection to the portion of PSAMF ¶ 101 that states that Ms. Donovan would not have been able to automate the process by herself.  It is obvious that as Ms. Fox convened a meeting to address the transition among Mr. Brown, Ms. Masters, Ms. Donovan, Ms. Hale, an IT employee, and herself that Ms. Donovan would not have been able to accomplish the transition alone.  Having reviewed the relevant record, the Court alters PSAMF ¶ 101 to reflect the record.

[207]   Nappi qualifies PSAMF ¶ 169, saying "[t]he record citation indicates that Ms. Hale testified that the sales representatives were asking her to help with the situation, and that because of those requests she tried to facilitate and would pass along the requests to Ms. Donovan."  DR PSAMF ¶ 169.  Nappi's qualification is beyond the scope of the fact, and the Court admits PSAMF ¶ 169.

[208]   Nappi qualifies PSAMF ¶ 385, saying "[w]hile Mr. Brown did testify that out of stocks are still an issue at Nappi, he went on to explain that the cause of the current out of stocks is the pandemic, which is completely different from the causes Nappi was running into when Ms. Donovan was the wine purchaser."  DRPSAMF ¶ 385.  Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 385.

[209]   PSAMF ¶ 172 states that "Hale does not know what the cause of the out of stocks was in 2018/2019."  Nappi denies PSAMF ¶ 172, saying "Ms. Hale testified that the out-of-stocks were rampant because Ms. Donovan was not doing her job well."  DRPSAMF ¶ 172.

    Ms. Hale testified:

    Q. Do you know what was causing the out-of-stocks [in 2018-2019]?
    A. No, not specifically.  I'm speaking on a large scale basis, you know.  I'm sure there are one-off situations that, you know, maybe I was aware of but there were a lot.

*V. Hale Dep.* at 20:3-7.  Taking the facts in the light most favorable to the non-moving party, PSAMF ¶ 172 is supported by the record, and the Court admits the fact over objection.

in California may have caused a few hiccups to inventory in the following years.[210] PSAMF ¶ 388; DRPSAMF ¶ 388. From an inventory standpoint, out-of-stock items may not be a good measure of performance for a job like Ms. Donovan's because there are many variables related to out of stock items, mostly having to do with the supplier.[211] PSAMF ¶ 208; DRPSAMF ¶ 208.

Ms. Hale also believes that Ms. Donovan struggled in her communication with stakeholders (the wine sales team). PSAMF ¶ 173; DRPSAMF ¶ 173. Ms. Donovan testified that one of the issues the sales team had was that they didn't have access to the correct system to give them insight into inventory for out-of-stock items, special order items, etc.[212] PSAMF ¶ 296; DRPSAMF ¶ 296.

Ms. Johnson testified that Nick Nappi complained or spoke negatively about Ms. Donovan's job performance and that Ms. Hale spoke negatively about Ms. Donovan in the smoking room. PSAMF ¶ 246; DRPSAMF ¶ 246. Ms. Johnson

---

[210]    PSAMF ¶ 388 states that "Brown testified in 2018 the wildfires in California may have caused a few hiccups to inventory."

Nappi denies the fact, saying "Mr. Brown testified that the wild fires in 2018 did not affect inventory in 2018, only the years after that. He further testified that he is not aware of any issues with obtaining products and 'while there might have been a few hiccups,' as far as he knows, wineries were able to get their inventory to warehouses to ship out of state." DRPSAMF ¶ 388. The Court accepts Nappi's denial as a qualification and slightly alters PSAMF ¶ 388 to reflect the record.

[211]    PSAMF ¶ 208 states that "[f]rom an inventory standpoint, out of stock items are not a good measure of performance for a job like Donovan's, because there are many variables related to out of stock items, mostly having to do with the supplier."

Nappi qualifies the fact, saying "[t]he assertion that 'out of stock items are not a good measure of performance' is argument, and not a statement of fact; therefore, it should be stricken or disregarded . . . [and i]n any event, Ms. Fox testified only that 'some' of the out-of-stocks were not in Ms. Donovan's control. Further, Mr. Watson specifically testified that he was reviewing Ms. Donovan's performance to see an improvement in the out-of-stock numbers." DRPSAMF ¶ 208. Nappi's content objection is beyond the scope of the fact. The Court changes "are" to "may not be" and admits the PSAMF ¶ 208.

[212]    Nappi qualifies PSAMF ¶ 296, saying "Ms. Donovan testified that she had access to that information and that she could have provided it to the sales team." DRPSAMF ¶ 296. Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 296.

believes she reported this behavior to Mr. Black.[213]   *Id.*   Ms. Johnson testified that Ms. Hale told her directly that she was complaining to Nick Nappi of Ms. Donovan's job performance; Ms. Johnson believes it was to skew his opinion of her performance.[214]   PSAMF ¶ 247; DRPSAMF ¶ 247.   Mr. Black made derogatory

---

[213]   PSAMF ¶ 246 states that "Johnson testified Hale complained or spoke negatively to Nick Nappi about Donovan's job performance, to others in the smoking room about Donovan's job performance, and to suppliers about Donovan's job performance.  Johnson reported the behavior to Black."

Nappi objects to PSAMF ¶ 246 as inadmissible hearsay and qualifies the fact, saying "[i]n the record citation, Ms. Johnson testified that she heard the complaints from Nick Nappi himself, and that she did not witness Ms. Hale complain to Mr. Nappi.  Furthermore, Ms. Johnson could not any recall specific complaints."  DRPSAMF ¶ 246.  Ms. Johnson testified:

> A. I would -- a couple of times when I would go out into the warehouse, Nick Nappi would complain about [Ms. Donovan] and her ability to do her job and her out of stocks.  And a lot of the complaints that he said sounded like it came directly from [Ms. Hale].  There were a couple of times in the smoking room that she had complained about Helena's ordering.
> . . .
>
> Q. Did you observe [Ms. Hale] treat [Ms.] Donovan poorly?
> A. Not directly except for her complaints in the smoking room.  Not to me but to other people in the smoking room, she would just complain about [Ms. Donovan] and her work.

*Johnson Dep.* at 65:4-10; 65:24-66:4.  The Court overrules Nappi's hearsay objection.  Ms. Johnson's testimony about what Mr. Nappi said is obviously not for the truth of Mr. Nappi's criticisms.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 246 to reflect the record and admits the fact.

[214]   Nappi objects to PSAMF ¶ 248 as inadmissible hearsay and further qualifies the fact, saying "Ms. Johnson admitted in her deposition that the quoted citation, which is from her affidavit, is inaccurate, and that she does not recall what Ms. Hale allegedly told her that she allegedly told Mr. Nappi, and she was not present for any alleged conversation between Ms. Hale and Mr. Nappi."  DRPSAMF ¶ 248.  Ms. Johnson testified:

> Q. When did [Ms. Hale] directly tell you that she was criticizing [Ms. Donovan] to Nick Nappi to skew their opinion of [Ms. Donovan]'s performance?
> A. Well, I think that that's written differently than the way you're reading it.  I was told directly by [Ms. Hale] that she was – this is not written correctly.
> I was told directly by [Ms. Hale], comma, she was constantly criticizing [Ms. Donovan] to Nick Nappi and other members of management, period.  I feel as though that was to skew their opinion of her job performance.

*Johnson Dep.* at 68:8-17.  The Court overrules Nappi's hearsay objection since Ms. Hale's criticism of Ms. Donovan is obviously not asserted for the truth of the criticism.  The Court admits Ms. Johnson's opinion testimony pursuant to Federal Rule of Evidence 701.  Having reviewed the relevant record, the Court finds PSAMF ¶ 248 supported by the record and admits the fact.

comments about Ms. Donovan's job performance to Ms. Johnson.[215]   PSAMF ¶ 248;
DRPSAMF ¶ 248.

### H.   Ms. Donovan's Relationship with Ms. Hale and the 2018 Incident

Mr. Carr and Mr. Houle warned Ms. Donovan to expect Ms. Hale to be difficult
and to watch her back when she began working for Nappi.[216]   PSAMF ¶ 17;
DRPSAMF ¶ 17.   Staff at Nappi characterized Ms. Donovan and Ms. Hale's
relationship as "very warm and cold," noting that at times they seemed close, friendly,
and professional, whereas other times they seemed distant.[217]   DSMF ¶ 111;
PRDSMF ¶ 111.

Ms. Fox observed Ms. Donovan and Ms. Hale spending time together,
organizing work and non-work events, taking smoking breaks together, and confiding
in each other.   DSMF ¶ 112; PRDSMF ¶ 112.   Ms. Donovan and Ms. Hale had private
jokes together and occasionally socialized outside of work.[218]   DSMF ¶ 114; PRDSMF
¶ 114.   Ms. Hale classified her working relationship with Ms. Donovan as "really

---

[215]   Nappi objects to PSAMF ¶ 248 as inadmissible hearsay and further qualifies the fact, saying "Ms. Johnson could not remember what was allegedly said or when it was allegedly said." DRPSAMF ¶ 248.   The Court overrules Nappi's hearsay objection because Mr. Black's derogatory comments are obviously not being admitted for their truth, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 248.

[216]   Nappi admits PSAMF ¶ 17 but objects to the fact on the grounds that "assertions in the paragraph offer out of court statements for the truth of the matter asserted." DRPSAMF ¶ 17.   As Mr. Carr was the outgoing Director of Wine Sales and Mr. Houle the outgoing wine purchasing manager, their statements are not hearsay.   *See* FED. R. EVID. 801(d)(2).   Their opinions are admissible under Federal Rule of Evidence 701.

[217]   Ms. Donovan denies DSMF ¶ 111, saying "[o]n June 1, 2018 Hale blew up on Donovan and no one reported it because it was like any other day." PRDSMF ¶ 111.   Ms. Donovan's objection is beyond the scope of the fact, and the Court admits DSMF ¶ 111.

[218]   Ms. Donovan denied DSMF ¶ 114 on the ground that she testified that she was close to her husband, Mike Hale, and would see Valarie when she socialized with him.   PRDSMF ¶ 114.   Ms. Donovan's objection is beyond the scope of DSMF ¶ 114, and the Court admits it.

good," aside from one specific incident that occurred in June of 2018.[219]  DSMF ¶ 113; PRDSMF ¶ 113.

Ms. Donovan testified that Ms. Hale would come to her office, stand in the doorway blocking Ms. Donovan in, and loudly shout about things Ms. Hale believed Ms. Donovan had done wrong; Ms. Donovan further testified "that kind of thing happened a lot."[220]  PSAMF ¶ 390; DRPSAMF ¶ 390.  As an example of badmouthing, Ms. Donovan testified that if Ms. Hale had an issue with her, instead of going directly to her, Ms. Hale would speak with the director or whoever would listen who would then speak to Ms. Donovan about the issue.[221]  PSAMF ¶ 391; DRPSAMF ¶ 391. During the end of Ms. Donovan's employment, Ms. Hale stopped providing administrative support that was part of her responsibilities, such as reporting, macros, and V look ups.   PSAMF ¶ 376; DRPSAMF ¶ 376.  Ms. Donovan testified

---

[219]    Ms. Donovan denies DSMF ¶ 113, saying she admits that Ms. Hale testified as such but denies "that it was true."  PRDSMF ¶ 113.  Ms. Donovan's objection is beyond the scope of the fact, and the Court admits DSMF ¶ 113.  Furthermore, Ms. Hale's testimony is admissible as lay opinion testimony under Federal Rule of Evidence 701.

[220]    PSAMF ¶ 390 provides that "Donovan testified that Hale would stand at her door blocking Donovan in her office and shout loudly about things Hale believed Donovan had done wrong stating 'that kind of thing happened a lot.'"  Nappi qualifies the fact, saying "Defendant admits all facts asserted in this paragraph except use of the term, 'blocking,' which is not supported by the cited record material."  DRPSAMF ¶ 390.

    Ms. Donovan testified that Ms. Hale's bullying entailed "her need to come to my office, for instance, and stand at my door with absolutely nowhere for me to go other than to listen to her stand there and shout loudly about things that she considered I had done wrong."  *Donovan Dep.* at 28:14-18.  The Court finds the word "blocking" is supported by the record and admits PSAMF ¶ 390.

[221]    PSAMF ¶ 391 states that "Donovan testified that if Hale had an issue with Donovan, instead of going directly to Donovan she would speak with the director or whoever would listen who would then tell Donovan of the issue as an example of badmouthing  Donovan."

    Nappi qualifies the fact, saying Nappi "denies this assertion to the extent it is convoluted and does not truly represent the cited record material.  Ms. Donovan testified that Ms. Hale would bad-mouth her or critique her work, and when asked for an example of what she meant by 'badmouthing,' Ms. Donovan testified that Ms. Hale would learn of an issue, tell Carr or Nick Nappi, who would then speak with Ms. Donovan about the issue."  DRPSAMF ¶ 391.  The Court admits the fact over Nappi's objection.

that Ms. Hale was very flirty, smiley, and bubbly at work and dressed very girly, but that Ms. Donovan was not those things, and she believes Mr. Watson preferred Ms. Hale to her because of it.[222]   PSAMF ¶ 317; DRPSAMF ¶ 317.  Ms. Donovan did not observe Ms. Hale treating men poorly yet did observe her treating females poorly, just not to the extent she treated Ms. Donovan.  PSAMF ¶ 18; DRPSAMF ¶ 18.  Ms. Donovan does not believe Ms. Hale would have gotten away with treating men as poorly as she did women and believes Ms. Hale was "threatened" by women and Ms. Donovan in particular because Ms. Donovan got the job as Wine Purchaser, a job Ms. Hale unsuccessfully tried to get.[223]   PSAMF ¶ 18; DRPSAMF ¶ 18; DSMF ¶ 119; PRDSMF ¶ 119.  Ms. Donovan alleges that Ms. Hale tried to get a man, Frank Maiorino, fired because she disliked him.  DSMF ¶ 121; PRDSMF ¶ 121.  Ms. Donovan also alleges that Ms. Hale bullied her in the way that she spoke to her— being spoken down to constantly in a derogatory and belittling way—and by refusing to cooperate with her.[224]   DSMF ¶ 120; PRDSMF ¶ 120; PSAMF ¶ 27; DRPSAMF ¶ 27.  Ms. Donovan described that the bullying from Ms. Hale included using language

---

[222]   PSAMF ¶ 317 states that "Donovan testified that Hale was very flirty, smiley, and bubbly at work and dressed very girly, but that Donovan was not those things and she believes Watson preferred Hale to Donovan because Hale acted and dressed that way."

Nappi objects to PSAMF ¶ 317, saying "Ms. Donovan's testimony about what she believed Mr. Watson preferred is speculative and not based on her contemporaneous perceptions" but otherwise admits the fact.  DRPSAMF ¶ 317.  The Court admits Ms. Donovan's testimony over objection pursuant to Federal Rule of Evidence 701.

[223]   Nappi qualifies PSAMF ¶ 18, saying Ms. Donovan testified that "Ms. Hale did not get along with some men."  DRPSAMF ¶ 18.  Nappi's objection is beyond the scope of the fact, and the Court admits DRPSAMF ¶ 18.

[224]   Ms. Donovan qualifies DSMF ¶ 120, saying she "categorized Ms. Hale's conduct as 'bullying,' 'derogatory,' 'belittling,' 'harassment,' 'physically threatening,' 'undermining,' 'badmouthing,' 'intimidation.'"  PRDSMF ¶ 120.  Ms. Donovan's qualification is beyond the scope of the fact, and the Court admits DSMF ¶ 120.

such as "fuck," "bitch," and other curse words daily.[225]  PSAMF ¶ 28; DRPSAMF ¶ 28.  Ms. Donovan also indicated the bullying from Ms. Hale included talking to peers or management to undermine her any chance she got.[226]  PSAMF ¶ 29; DRPSAMF ¶ 29.  Ms. Donovan also reported that she felt as though Ms. Hale overstepped by speaking with suppliers.  DSMF ¶ 125; PRDSMF ¶ 125.  In addition to specific bullying and harassment related to her sexual orientation, Ms. Donovan categorized Ms. Hale's conduct as "just a general mistreatment."[227]  DSMF ¶ 126; PRDSMF ¶ 126.

Ms. Donovan complained of Ms. Hale's conduct to Mr. Carr and Mr. Bourque almost immediately after starting work because she was taken aback, having never

---

[225]  Nappi denies PSAMF ¶ 28, saying "[t]he record citation states that Ms. Donovan could not identify any specific curse word.  Further, Ms. Donovan testified that she does not recall Ms. Hale referring to her by an expletive or derogatory name."  DRPSAMF ¶ 28.

> Ms. Donovan testified:
>
> Q.  Okay.  When you describe it as derogatory, those kind of comments, what do you mean?  Did she use any kind of foul language?
> A.  I think at the time was a daily use of language anyway.  Yes.
> Q.  Okay, so what kind of foul language did she use in communicating with you?
> A.  It depends on the context, swearing for sure, I mean, any curse really.  I can't tell you specifically, any curse, fuck, bitch, whatever it might be.
> Q.  Okay, and she used all those terms in communicating with you?
> A.  Absolutely.  Excuse my language, I'm sorry.

*Donovan Dep.* at 26:3015.  The Court concludes that PSAMF ¶ 28 is amply supported by the record and admits the fact over objection.

[226]  Nappi qualifies PSAMF ¶ 29, saying "[w]hen asked to elaborate on this behavior, Ms. Donovan described an example in which an incorrect wine order was received and Ms. Hale notified Mr. Carr."  DRPSAMF ¶ 29.  Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 29.

[227]  DSMF ¶ 126 provides that "Ms. Donovan categorized Ms. Hale's conduct as 'just a general mistreatment.'"  Ms. Donovan denies DSMF ¶ 126, saying she "categorized Ms. Hale's conduct as 'bullying,' 'derogatory,' 'belittling,' 'harassment,' 'physically threatening,' 'undermining,' 'badmouthing,' 'intimidation.'"  PRDSMF ¶ 126.  When asked "[o]ther than [the specific harassment related to your sexual orientation] you mentioned, any other harassment that you believe [Ms. Hale] or Becky engaged in that was specific to your sexual orientation?"  Ms. Donovan responded "[i]t was just a general mistreatment."  *Donovan Dep.* at 138:2-5.  The Court accepts Ms. Donovan's denial as a qualification and alters DSMF ¶ 126 to reflect the record.

experienced that level of hostility in the workplace.[228]  PSAMF ¶ 19; DRPSAMF ¶ 19.

Ms. Donovan testified Mr. Bourque was not very responsive to her complaint about

Ms. Hale, stating "He wasn't really responsive.  He didn't – I would have expected

him to – I would have expected him to elaborate on my thoughts and feelings.  He

didn't.  It was more like he wanted to just sweep it under the rug and, you know, hope

it goes away, you know, placate me basically."[229]  PSAMF ¶ 20; DRPSAMF ¶ 20.

When she made complaints about Ms. Hale's conduct shortly after being hired in

December of 2013, Ms. Donovan did not explicitly tell members of Nappi management

that she believed Ms. Hale was discriminating against her.[230]  DSMF ¶ 197; PRDSMF

¶ 197.

Ms. Donovan complained to Mr. Brown that she was having issues with Ms.

Hale.  DSMF ¶ 127; PRDSMF ¶ 127.  Mr. Brown understood that in his role as a

manager, he was responsible for documenting and referring complaints to human

resources.[231]  DSMF ¶ 128; PRDSMF ¶ 128.  Ms. Hale is "extremely capable" at her

---

[228]    Nappi denies Ms. Donovan's PSAMF ¶ 19 as unsubstantiated by the cited record.  Ms. Donovan's citation was: "Donovan dep. 28:8-20 ECF Doc. 51-1, PageID # 184."  As Nappi noted, Ms. Donovan's citation to her deposition at 28:8-20 does not substantiate PSAMF ¶ 19.  However, the page citation, PageID # 184, contains testimony that supports PSAMF ¶ 19.  Thus, although a part of Ms. Donovan's citation does not support PSAMF ¶ 19, another part does and the Court admits PSAMF ¶ 19 over objection.

[229]    Nappi objects to PSAMF ¶ 20, saying "Donovan testified that she has no knowledge of whether Mr. Bourque ever followed up with Ms. Hale about Ms. Donovan's complaints . . . [and] Mr. Carr testified that he did speak to Ms. Hale after receiving complaints from Ms. Donovan."  DRPSAMF ¶ 20.  Nappi's qualification is beyond the scope of the fact, and the Court admits PSAMF ¶ 20.

[230]    DSMF ¶ 197 provides that "[w]hile she made complaints about the conduct of her co-worker, Ms. Hale, shortly after being hired in December of 2013, Ms. Donovan did not tell members of Nappi management that she believed Ms. Hale was discriminating against her."  Ms. Donovan qualifies DSMF ¶ 197, saying she "did not use the 'magic words' discriminating, but she repeatedly reported to Fox that she was being treated differently by Hale."  PRDSMF ¶ 197.  Having reviewed the relevant record, the Court slightly alters DSMF ¶ 197 to reflect the record.

[231]    Ms. Donovan denies DSMF ¶ 128, saying Mr. Brown "failed to do so for weeks after Donovan emailed and made multiple calls to him about the incident with no follow up."  PRDSMF ¶ 128.  Ms. Donovan's denial is beyond the scope of the fact, and the Court admits DSMF ¶ 128.

job, which Mr. Brown suspected was difficult for Ms. Donovan.  DSMF ¶ 117; PRDSMF ¶ 117.  Mr. Brown testified that in his opinion, Ms. Donovan was passive and struggled to accept tools that Ms. Hale provided to make her job more effective because she was not at the same technical skill level as Ms. Hale.[232]  DSMF ¶ 118; PRDSMF ¶ 118.

Although she repeatedly informed management about her difficulties with Ms. Hale, Ms. Donovan cannot specifically recall a conversation prior to leaving Nappi in which she informed Nappi that she felt she was being harassed by Ms. Hale because of her sex.[233]  DSMF ¶ 123; PRDSMF ¶ 123.  In fact, she testified that she told management that Ms. Hale was "difficult," and that she "didn't understand why." DSMF ¶ 124; PRDSMF ¶ 124.

In March of 2017, Ms. Fox, Mr. Carr, and Mr. Brown spoke with Ms. Hale about the need to follow directions and/or communicate proactively when unable to do something as asked, as well as reviewed the need to get back on track towards supporting the wine division and for her attitude to be consistently positive.[234]

---

[232]    Ms. Donovan denies DSMF ¶ 118, saying she denies that she "struggled to accept tools that Ms. Hale provided because [she] lacked technical skill level." PRDSMF ¶ 118. Ms. Donovan's objection is beyond the scope of the fact, which asserts what Mr. Brown testified to be his opinion, not its truth. The Court overrules Ms. Donovan's objection and admits DSMF ¶ 118. The Court amended DSMF ¶ 118 to clarify that the assertion is Mr. Brown's opinion.

[233]    DSMF ¶ 123 states that "Ms. Donovan was unable to identify any conversation in which she informed Nappi that felt she was being harassed by Ms. Hale because of her sex." Ms. Donovan denies DSMF ¶ 123, saying she "repeatedly reported to management difficulties with Hale including [to Brown, Masters, Fox, Carr, [and] Watson." PRDSMF ¶ 123. Having reviewed the relevant record, the Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 123 to reflect the record.

[234]    Nappi objects to PSAMF ¶ 30 as containing "immaterial factual assertions that were not plead" and further qualifies PSAMF ¶ 30, saying "Ms. Fox testified that she remembered that the meeting was in reference to a specific supplier, and that the note about a positive attitude referred to when she received criticism from management." DRPSAMF ¶ 30. The Court overrules Nappi's objection

PSAMF ¶ 30; DRPSAMF ¶ 30.  Ms. Masters believes her meeting with Ms. Fox, Mr. Brown, and Ms. Hale occurred after Ms. Masters and Mr. Brown tried to resolve the conflict between Ms. Hale and Ms. Donovan.[235]  PSAMF ¶ 136; DRPSAMF ¶ 136.  Mr. Brown does not recall whether this meeting happened, but he understands that Ms. Masters felt that Ms. Hale was treating her poorly and he agreed that the March 5, 2018 email written by Ms. Hale was disrespectful of Ms. Masters.[236]  PSAMF ¶ 137; DRPSAMF ¶ 137.

In August of 2017, Ms. Donovan had issues with Ms. Hale that resulted in a workplace memorandum.  PSAMF ¶ 125; DRPSAMF ¶ 125.  In the August 28, 2017 written workplace memorandum, Mr. Brown wrote that Ms. Hale had engaged in unprofessional communications with suppliers, customers, and co-workers.[237]  *Id.*

---

regarding materiality, noting that Ms. Hale's prior disciplinary interactions may be material to Ms. Donovan's claims as they relate to her disciplinary proceedings at Nappi with Ms. Hale.  Furthermore, Nappi's qualification is beyond the scope of the fact, and the Court admits PSAMF ¶ 30.

[235]     PSAMF ¶ 136 states that "Masters believes this meeting with Masters, Fox, Brown and Hale occurred after Masters and Brown were trying to resolve the conflict between Hale and Donovan."

Nappi qualifies the fact, saying "Ms. Masters testified that the meetings with Ms. Donovan were to understand how she was doing the ordering, and the tension was secondary."  DRPSAMF ¶ 136.  Nappi's qualification is beyond the scope of the fact, and the Court admits PSAMF ¶ 136.

[236]     PSAMF ¶ 137 provides that "Brown denies this meeting happened, but understood that Masters felt Hale was treating her poorly and agrees the email written by Hale was disrespectful of Masters."

Nappi qualifies PSAMF ¶ 137, saying "[t]he record citation does not support the factual assertion [because] Mr. Brown testified that he does not recall that the meeting occurred [and f]urther, the factual assertion does not identify the email to which Mr. Brown allegedly referred."  DRPSAMF ¶ 137.  The cited testimony refers to the email "marked as Exhibit 3 in [Ms. Master]'s deposition and this is an e-mail string that started with you calling out of work."  *Brown Dep.* at 25:16-18.  Having reviewed the entire relevant record, the Court slightly alters PSAMF ¶ 137 to reflect the record and clarify which email is referenced.

[237]     PSAMF ¶ 125 states that "[s]hortly before Donovan attempted suicide, she had issues with Hale that resulted in employee discipline on August 28, 2017.  In the written warning on that date, Brown wrote that Hale had engaged in unprofessional communications with suppliers, customers, and co-workers."

Nappi denies PSAMF ¶ 125, saying "[t]he record citation is to a workplace memorandum, not employee discipline, that was issued to Ms. Hale as the result of an interaction that Ms. Hale had with a supplier. Ms. Donovan was not involved in conduct that led to that memorandum in any way.

That month, Ms. Fox documented a meeting with Ms. Hale in which she communicated that Ms. Hale and Mary Johnson needed to work together to restore their relationship because it had been very strained for at least the entire time Ms. Fox had been at Nappi.[238]  PSAMF ¶ 126; DRPSAMF ¶ 126.  Mr. Brown is also aware of a time that Mary Bridges, a female supplier, reported that she had an encounter with Ms. Hale in which Ms. Hale was disrespectful and unprofessional to her and made her feel disparaged, unvalued, or offended.[239]  PSAMF ¶ 133; DRPSAMF ¶ 133.  On August 28, 2017, Ms. Hale was spoken to by Mr. Brown, Ms. Masters, and Mr. Maiorino because of her interactions with Santa Margharita supplier representative,

---

Further, the factual assertions attempt to link the memorandum to Ms. Donovan's suicide attempt is impermissible argument and must be stricken."  DRPSAMF ¶ 125.

     Having reviewed the relevant record, the Court accepts Nappi's denial as a qualification and alters PSAMF ¶ 125 to reflect the record.  First, in view of Nappi's representation that the August 28, 2017 memorandum is not discipline, but a workplace memorandum, the Court altered the language to reflect this distinction.  Second, although Nappi is correct that the memorandum expressly mentioned Ms. Hale's interaction with two suppliers, the memorandum also mentions Ms. Hale's issues with coworkers.  Third, although there is no direct link between this memorandum and Ms. Donovan, viewing the memorandum in the light most favorable to Ms. Donovan, the Court concludes that such an inference could be drawn, given Ms. Hale's other issues with Ms. Donovan and the timing of this memorandum.

[238]    PSAMF ¶ 126 states that "[i]n August of 2017 Fox documented a meeting with Hale in which Fox communicated that Hale and Johnson need to work together to restore their relationship as it's been very strained for at least the entire time Fox had been at Nappi.  Nappi admits that the meeting occurred but objects to the contents of the meeting as inadmissible hearsay."  DRPSAMF ¶ 126.  The Court rejects Nappi's objection for the same reason explained in footnote 190 and admits the fact.

[239]    PSAMF ¶ 133 states that "Masters and Brown are aware of a time that Hale was disrespectful and unprofessional to a female supplier, Mary Bridges, with conduct that made her feel disparaged, nonvalued, or offended."

     Nappi objects the PSAMF ¶ 133 as inadmissible hearsay and further denies the fact, saying that "[t]he record citations indicate that Ms. Masters was not involved, and Mr. Brown testified that he does not remember the specifics."  DRPSAMF ¶ 133.  The Court accepts Nappi's objection as to Ms. Masters since she testified that she "did hear something."  *Masters Dep.* 40:19.  But she said that she was "not involved or was not around it to know exactly how it was tran - - how it transpired."  *Id.* 40:19-21.  By contrast, Mr. Brown acknowledged that he recalled a meeting among Valarie Hale and Jolene Masters where the issue about Ms. Hale's conduct with two suppliers was discussed.  *Brown Dep.* 26:16-23.  Although Mr. Brown testified that he did not have an exact memory of the incidents, he testified at some length about them.  *Id.* 26:24-27:18.  The Court rejects Nappi's denial of Mr. Brown's involvement as unsupported by his testimony.  The Court overrules Nappi's hearsay objection because the asserted fact does not involve the truth of Mary Bridge's allegation but her complaint and Nappi's response.  The Court has reframed PSAMF ¶ 133 to clarify what is being asserted.

Mary Bridges—the memo states "It is not within the boundaries of your role to reprimand others, make them feel disparaged, non-valued, or offended." PSAMF ¶ 138; DRPSAMF ¶ 138. Three days prior, on August 25, 2017, Ms. Masters, Ms. Fox, Mr. Brown, and Ms. Hale had a meeting about acting more professionally, including no longer being disrespectful to Ms. Bridges and Ms. Masters. PSAMF ¶¶ 134-35; DRPSAMF ¶¶ 134-35. This meeting, however, did not address how Ms. Hale was treating Ms. Donovan.[240] *Id.*

On March 5, 2018, less than one year after being spoken to about being disrespectful to Ms. Masters, Ms. Hale forwarded an email chain involving a message from Mr. Brown and Ms. Masters' responding to Ms. Donovan and said "I just think she's stupid and she usually replies to everyone, so they are also aware she's stupid. And [Mr. Brown] is out today as a side note." Ms. Hale was referring to Ms. Masters being stupid; Ms. Masters is sure Ms. Hale thought she was stupid and treated her as such given how she questioned her at times.[241] PSAMF ¶ 142; DRPSAMF ¶ 142.

---

[240]    PSAMF ¶ 134 states that "[s]ubsequent to Masters speaking to Fox about the bullying from Hale, Masters, Fox, Brown and Hale had a meeting about acting more professionally, including being disrespectful to a female supplier, Mary Bridges, and being disrespectful to Masters—This meeting did not address how Ms. Hale was treating Ms. Donovan."

Nappi first objects on the ground that the record citations do not establish that Ms. Hale was disrespectful to a supplier. DRPSAMF ¶ 134. Nappi's objection on this basis is wholly frivolous. In the cited portion of Ms. Masters' deposition, she confirms that the August 25, 2017 meeting contained notes that referred to Ms. Hale's interaction with the supplier, Santa Margherita, whose broker was Mary Bridges. *Masters Dep.* 44:5-18.

Nappi also objects to PSAMF ¶ 134 as inadmissible hearsay and qualifies the fact, saying "[t]he record citations do not support the assertion that Ms. Hale was disrespectful to a supplier." DRPSAMF ¶ 134. The Court rejects Nappi's hearsay objection for the same reason explained in footnote 17 and 228 and admits the fact over Nappi's qualification, noting that PSAMF ¶ 133 points the Court to the correct record citation at *Brown Dep.* at 26:16-27:18.

[241]    PSAMF ¶ 142 provides that "[o]n March 5, 2018, less than one year after being spoken to about being disrespectful to Masters, Hale forwarded an email chain involving a message from Brown and Masters' response to Donovan and said 'I just think she's stupid and she usually replies to everyone,

Mr. Brown testified that Ms. Hale made statements to him that portrayed Ms. Donovan in a bad light, not daily, but often, and it was Ms. Hale who told Mr. Brown of Ms. Donovan's technical deficiencies.[242]   PSAMF ¶ 147; DRPSAMF ¶ 147.   Mr. Brown understood that Ms. Donovan was struggling with Ms. Hale because Ms. Donovan told him that Ms. Hale was bullying her and because it's something he had to take disciplinary action on.[243, 244]   PSAMF ¶ 146; DRPSAMF ¶ 146.

In June of 2018, Ms. Hale became frustrated when Ms. Donovan ran an invoice incorrectly because she felt that she had already gone over the process of how to run

---

so they are also aware she's stupid. And Ian is out today as a side note.' Donovan was referring to Masters being stupid and Masters is sure Hale thought Masters was stupid and treated her in such a way by how she questioned her at times."

Nappi qualifies PSAMF ¶ 142, saying "[t]he record citation does not establish when the first meeting occurred.   Further, Ms. Masters clarified that she interpreted Ms. Hale's frustration as thinking she was not capable."   DRPSAMF ¶ 142.   Noting that the date of the email is printed on the email exhibit, *Masters Dep.*, Attach 3 (*3/15/18 email*), rather than the record citation, the Court admits PSAMF ¶ 142 over objection.   The Court rejects Nappi's qualification because Ms. Masters agreed that Ms. Hale thought she was stupid, even though she later used the phrase "not capable."

[242]   Nappi objects to PSAMF ¶ 147 as hearsay and further qualifies the record, saying "[t]he record citation indicated that Mr. Brown noticed Donovan's performance deficiencies on his own, and that the conversations with Hale were collaborative."   DRPSAMF ¶ 147.   Nappi's content objection is beyond the scope of the fact, and the Court overrules Nappi's hearsay objection because the statements are not being offered for their truth.

[243]   PSAMF ¶¶ 143-45 refer to the contents of notes Ms. Fox took of her meeting with Mr. Brown on September 25, 2017.   For each statement, Ms. Donovan's record citation is merely to "EXHIBIT."   PSAMF ¶¶ 143-45.   Nappi objects to each statement because the record citation is inadequate.   The Court agrees with Nappi and strikes the contents of PSAMF ¶¶ 143-45.   *See* D. Me. Loc. Civ. R. 56(f) ("An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion.   The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment").

[244]   PSAMF ¶ 146 states that "Brown understood Donovan was struggling with Hale because it's something he had to take disciplinary action on and Donovan told Brown that Hale was bullying her."   Nappi objects to PSAMF ¶ 146 as hearsay and further qualifies the fact, saying "[i]n the record citations, Mr. Brown testified that both Donovan and Hale reported issues to him, and Mr. Brown characterized the relations as 'unusual' in that they at times were friendly and professional, and other times were cold and distant."   DRPSAMF ¶ 146.   The Court finds Nappi's content objection beyond the scope of the fact.   Nappi's hearsay objection is frivolous; PSAMF ¶ 146 is clearly directed to whether Mr. Brown was aware of allegations of Ms. Hale's bullying of Ms. Donovan, not for the truth.   The Court therefore overrules Nappi's hearsay objection.

an invoice with her on more than one occasion.[245]   DSMF ¶ 129; PRDSMF ¶ 129.   On

June 1, 2018, after once again coming across an incorrect invoice from Ms. Donovan,

Ms. Hale went to the hallway outside Ms. Donovan's office and asked her in a raised

voice to run the invoices correctly.[246, 247]   DSMF ¶ 130; PRDSMF ¶ 130.   Ms. Fox

admitted that Ms. Donovan had an issue with Ms. Hale in the summer of 2018 where

Ms. Hale stood in Ms. Donovan's doorway and questioned her aggressively.   PSAMF

¶ 151; DRPSAMF ¶ 151.   Ms. Fox denied that Ms. Hale "yelled" but admitted that

---

[245]   DSMF ¶ 129 states that "[i]n June of 2018, Ms. Hale became frustrated when Ms. Donovan was continuously running an invoice incorrectly, despite being taught the correct way dozens of times." Ms. Donovan denies DSMF ¶ 129, saying she "testified that in [an] effort to get a supplier to make payment to Nappi for a product there had been an issue with, Donovan said something, pointed out something, or asked something about the transaction which resulted in Hale going to Donovan's office and flailing and screaming at Donovan," and Ms. Hale "was frustrated with how inventory moves." PRDSMF ¶ 129.   Having reviewed the relevant record, the Court accepts Ms. Donovan's denial as a qualification and alters DSMF ¶ 129 to reflect the record.

[246]   Ms. Donovan denies DSMF ¶ 130 for the same reason as DSMF ¶ 129.   Ms. Donovan's denial is beyond the scope of the fact, and the Court admits DSMF ¶ 130.

[247]   DSMF ¶ 131 provides that "Ms. Hale did not swear at Ms. Donovan or make any gestures." Ms. Donovan denies DSMF ¶ 131, saying that "[d]uring the investigation into the incident between Hale and Donovan on June 1, 2018, Fox, Brown, and Masters interviewed employees that witnessed the incident.   During the interview with Patty Kroot, Fox's notes reflect that Kroot stated Hale's gestures were more aggressive than tone and that [she] reported that Hale ma[de] several gestures, very confrontational and aggressive, and [she] was bothered by it.   Donovan reported to Fox that the tone and physical demeanor was threatening.   Brown reported to Fox a conversation he had with Kroot in which Kroot reported the incident was very physical/aggressive."   PRDSMF ¶ 131.

Having reviewed the relevant record, the Court finds that Ms. Fox's notes indicate that reports of aggressive tones and movements were made.   *See Fox Dep.*, Exh. 25, *Notes from June 14, 2018* (Page ID # 912-13); *id, Notes from June 18, 2018* (Page ID # 914-916).   Viewing the facts in the light most favorable to Ms. Donovan, the Court omits DSMF ¶ 131.

Ms. Hale raised her voice aggressively and publicly so that others overheard. [248, 249] *Id.*

Ms. Donovan emailed Mr. Brown the day that Ms. Hale confronted her and told Mr. Brown she had been "shouted at for the entire office to hear."[250]  PSAMF ¶ 152; DRPSAMF ¶ 152.  Ms. Hale testified that she was frustrated with Ms. Donovan in the summer of 2018 because Ms. Donovan incorrectly entered a transaction as a sale instead of a transfer which created some additional work for Ms. Hale—Ms. Hale testified this was the first time she had been frustrated with Ms. Donovan to the point of expressing her frustration to that degree.[251]  PSAMF ¶ 153; DRPSAMF ¶ 153.  Ms. Donovan spoke to Ms. Masters about the incident with Ms. Hale, explaining she did

---

[248]      PSAMF ¶ 150 provides that "Fox's September 25, 2017 notes reflect that  Donovan told Brown she may look for other employment, and Brown asked her for a proper notice period then: 'Told her didn't think was good fit for her.'  EXHIBIT.  The bottom of the page on Exhibit ___ is cut off, but it appears as though Brown told Fox that Donovan "seemed relieved" when Brown told her she was not a good fit for the job."

Nappi objects to PSAMF ¶ 150 as hearsay and denies the fact because "[t]here is no record citation for the factual assertion."  DRPSAMF ¶ 150.  The Court omits PSAMF ¶ 150 because Ms. Donovan provides no record citation and appears to be citing to an exhibit with the bottom of the page "cut off" and speculating as to what is contained in the exhibit.  The Court will not admit facts based only on speculation and without a record citation and is under no obligation to independently search the record for the correct supporting citation.  *See* D. ME. LOC. R. 56(f).

[249]      Nappi objects to PSAMF ¶ 151 as inadmissible hearsay and further qualifies the fact, saying "Ms. Fox testified she was not there when the incident occurred, she did not use the term 'confronted' but rather said Ms. Hale 'questioned' Ms. Donovan, and she did not deny yelling, but stated that what was described to her was not yelling. But rather raised voices."  DRPSAMF ¶ 151.  Nappi's content objection is largely beyond the scope of the fact, but the Court alters "confronted" to "questioned" to reflect the cited record.  The Court overrules Nappi's hearsay objection because Ms. Fox is testifying about the results of an investigation about the incident she carried out on behalf of Nappi.

[250]      Nappi objects to PSAMF ¶ 152 as inadmissible hearsay but otherwise admits the fact.  The Court overrules Nappi's hearsay objection and admits the fact because the fact that Ms. Hale was shouting is not offered for the truth of what was said.

[251]      Nappi qualifies PSAMF ¶ 153, saying "[t]he factual assertion understates Ms. Donovan's error.  Ms. Hale testified that the error had occurred dozens of times before, and Ms. Hale had explained it to Ms. Donovan repeatedly, and that each time Ms. Donovan entered it incorrectly it created 'a nightmare of paperwork,' which was left to Ms. Hale to fix."  DRPSAMF ¶ 153.  Nappi's qualification is beyond the scope of the fact, and the Court admits PSAMF ¶ 153.  Furthermore, the Court is required to view contested facts in the light most favorable to Ms. Donovan.

not want to go to a concert with Ms. Masters if Ms. Hale was going to be there, but

nobody specifically followed up with Ms. Donovan on the issue because it was just Ms.

Donovan and Ms. Hale's "up and downs" or "hot and cold days."[252]  PSAMF ¶ 154;

DRPSAMF ¶ 154.  Ms. Masters testified that Ms. Donovan may have complained to

Ms. Masters that Ms. Hale was "overstepping," but she did not understand what Ms.

Donovan meant by that.[253]  PSAMF ¶ 155; DRPSAMF ¶ 155.

---

[252]    PSAMF ¶ 154 states that "Donovan spoke to Masters about the incident with  Hale, explaining she did not want to go to a concert with Masters if Hale was going to be there, but Hale did nothing to follow up on the issue because it was just Donovan and  Hale's 'up and downs' or 'hot and cold days.'"

Nappi objects to PSAMF ¶ 154 as hearsay and further qualifies the fact, saying "[t]he record citation does not support the assertion that Hale 'did nothing to follow up on the issue.'  The record citation discusses that Ms. Masters met with Mr. Brown and Ms. Donovan to discuss the issue and how to handle it."  DRPSAMF ¶ 154.  Ms. Masters testified:

> Q. Okay. Okay. First indication this is still an issue is when Joline went to get Zac Brown tickets with Helena Stump and spoke in detail. And I also just want to show you, just to kind of refresh your recollection on this, right here we're looking at Helena's notes from some -- like a timeline of issues that she was dealing with. So it indicates on June 8th, Val shouted and flailed at her. This is kind of the incident that sparked the interviews and the discussions with Val.
> And then it says on 6/13: Joline came into my office to ask if I would like to go to the Zac Brown concert on the 15th. I asked if Val would be attending and declined when Joline confirmed that she would.  Joline asked if there was an issue. I explained what had happened and that it was ignored and that I didn't feel it was acceptable. Joline and Ian spoke with me at the gazebo to understand my side of the events.
> Does that refresh your recollection at all as to --
> A. How could it have been ignored if we spoke with her in the gazebo?
> Q. Because she had already contacted Ian Brown the week before when it had happened.
> A. Oh, so you -- I thought you meant I had ignored her. Okay.
> Q. No, that she felt that Ian had ignored her.
> A. Oh, oh, oh. Okay. I was going to say I don't -- yeah, again, I don't remember. It could have been after the fact when -- I think it came out when we actually sat in the gazebo that she was, you know -- it might have been because of her saying she didn't want to go that I might have been the one saying let's have another meeting with her because I knew that there was something happening. And again that might have been at the beginning.  I don't remember.

*Masters Dep.* at 54:13-55:22.  Having reviewed the relevant record, the Court alters PSAMF ¶ 154 to reflect the record.

[253]    PSAMF ¶ 154 provides that "Masters testified that Donovan complained to  Masters that Hale was 'overstepping' but Masters did not ascertain what Donovan meant by that."  Nappi objects to PSAMF ¶ 154 as inadmissible hearsay and further qualifies the fact, saying "[t]he record citation

As a result of the growing interpersonal issues between Ms. Hale and Ms. Donovan, a disciplinary meeting was held with Mr. Brown, Ms. Fox, Ms. Hale, Ms. Donovan, and Ms. Masters on June 14, 2018 to discuss the June 1, 2018 incident between Ms. Hale and Ms. Donovan.[254]   PSAMF ¶ 156; DRPSAMF ¶ 156; DSMF ¶ 132; PRDSMF ¶ 132.  Ms. Hale testified that during this interaction her conduct was limited to saying "can you please, please run these correctly" with a raised voice. PSAMF ¶ 180; DRPSAMF ¶ 180.  During the meeting, Mr. Brown told Ms. Donovan that "the emotional rollercoaster needs to stop," and Ms. Fox told Ms. Donovan to

indicated that Ms. Masters testified that Ms. Donovan 'may have said something like' overstepping, but Ms. Masters interpreted it as Ms. Hale trying to help Ms. Donovan." DRPSAMF ¶ 154.  The Court overrules Nappi's hearsay objection.  Ms. Donovan's statements are admitted not for their truth but for Ms. Donovan's prior consistent statements and notice to Nappi.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 154 to reflect the record.

[254]   Nappi objects to PSAMF ¶ 156 as a reference to "handwritten notes which offer out-of-court statements for the truth of the matter asserted" and are "therefore, hearsay," but otherwise admits the fact.  DRPSAMF ¶ 156.  The Court overrules Nappi's hearsay objection because contemporaneous handwritten notes by an employee of a business meeting fit within the business records exception to the rule against hearsay and admits PSAMF ¶ 156.

discontinue the "minion attitude."[255, 256, 257]   PSAMF ¶¶ 158, 185; DRPSAMF ¶¶ 158,

185.   During that meeting, Nappi issued Ms. Hale a warning, and issues were

discussed to "clear the air and move forward in a productive and professional

manner."   DSMF ¶ 133; PRDSMF ¶ 133.   Those present reviewed issues within the

department that needed to get fixed.[258]   DSMF ¶ 134; PRDSMF ¶ 134.   Mr. Brown

---

[255]   PSAMF ¶ 185 states that "[d]uring a meeting with Fox, Brown and Donovan on June 21, 2018, Brown told Donovan that 'the emotional rollercoaster needs to stop' and Fox told Donovan to discontinue the 'minion attitude.'   This meeting occurred in conjunction with Donovan's complaints of Hale and of Brown's failure to respond to her complaint."

Nappi qualifies PSAMF ¶ 185, saying "Mr. Brown does not recall saying 'the emotional roller coaster needs to stop,' further, he testified it does not sound like something he would say.   Further, Mr. Brown does not know to what the 'minion attitude' is in reference.   Finally, the record citation does not support the assertion that the meeting occurred in conjunction with any complaint of Brown's failure to respond to the complaint."   DRPSAMF ¶ 185.   Having reviewed the relevant record, the Court finds that Mr. Brown's testimony in conjunction with Ms. Fox's notes that Plaintiff cites at "ECF Doc. 52-19, PageID # 1249" substantiate the first sentence of the fact.   The Court finds no support in the cited record to indicate that the meeting occurred in conjunction with Ms. Donovan's complaints of Ms. Hale and of Mr. Brown's failure to respond to her complaint.   The Court thus omits the second sentence of PSAMF ¶ 185 and otherwise admits the fact.

[256]   PSAMF ¶ 157 provides that "[p]rior to the incident where Hale yelled at Donovan, Hale was spoken to about being disrespectful in an email to Michele Tourangeau."

Nappi objects to PSAMF ¶ 157 as inadmissible hearsay and further denies the fact as unsupported by the record.   DRPSAMF ¶ 157.   Ms. Masters testified:

> Q: And then it says over here that this is the second time since last year has spoken of issues, same with MT last month.   Did Valarie Ellis have an issue where she was disrespectful to Michele Tourangeau?
> A.   I don't know.

*Masters Dep.* at 58:10-15.   The Court concludes that PSAMF ¶ 156 is unsupported by the cited record and is under no obligation to independently search the record for the correct supporting citation.   *See* D. ME. LOC. R. 56(f).   The Court omits PSAMF ¶ 156.

[257]   PSAMF ¶ 158 states that "[d]uring the meeting, Hale expressed that she knew she needed to approach Donovan differently because . . . Donovan is fragile, emotional and because of her suicide attempt."

Nappi objects to PSAMF ¶ 158 as inadmissible hearsay and further qualifies the fact, saying "[t]he factual assertion refers to Ms. Masters' perception of Ms. Donovan and does not indicate what Ms. Hale understood."   DRPSAMF ¶ 158.   The Court agrees with Nappi that the cited record does not support the assertion in PSAMF ¶ 158.   Although counsel quoted Ms. Hale's comment about the need to approach Ms. Donovan differently, Ms. Masters answered the question by explaining her, not Ms. Hale's perceptions of Ms. Donovan.   The Court omits PSAMF ¶ 158 as unsupported by the cited record.

[258]   DSMF ¶ 134 states that "[d]uring the meeting, those present reviewed multiple deficiencies in Ms. Donovan's performance and discussed how she could improve in her role."   Ms. Donovan denies DSMF ¶ 134, saying Mr. Brown "testified that they discussed issues within the department as a whole

felt that the meeting was very productive, that Ms. Donovan and Ms. Hale laid out their feelings, and that the meeting ended in a good place.[259]  DSMF ¶ 135; PRDSMF ¶ 135.  Ms. Hale took responsibility for her actions, was emotional, and understood that her behavior was unacceptable and that she needed to change her approach.[260]  DSMF ¶ 138; PRDSMF ¶ 138.  In Ms. Hale's view, she worked very hard to repair her relationship with Ms. Donovan, both professionally and personally.[261]  DSMF ¶ 139; PRDSMF ¶ 139.  Mr. Brown was proud of Ms. Hale's development of self-awareness in her approach after the disciplinary action.[262, 263] DSMF ¶ 140; PRDSMF ¶ 140.

---

that needed to get fixed that were not specific to Hale or Donovan—they were refining procedures within administrative work, within purchasing to make the department better as a whole." PRDSMF ¶ 134.  Referring to what was discussed at this meeting, Mr. Brown testified that he "wouldn't characterize them as issues specifically that [Ms. Hale] was having an issue with.  I think I would characterize them as issues that were – that were issues within department that needed to get fixed. These don't just apply to – they don't apply to [Ms. Hale] and [Ms. Donovan] at all.  These are refining procedures within administrative work, within purchasing, these are all things that are geared at making our department better and more efficient, more effective." *Brown Dep.* 56:20-57:3.  The Court accepts Ms. Donovan's denial as a qualification and alters DSMF ¶ 134 to reflect the record.

[259]    Ms. Donovan denies DSMF ¶ 135, saying "Hale stated she was not as emotional as [Ms.] Donovan and didn't think the event was significant." PRDSMF ¶ 135.  Ms. Donovan's denial is beyond the scope of the fact, and the Court admits DSMF ¶ 135.

[260]    Ms. Donovan denies DSMF ¶ 138, saying "Hale's behavior did not change [and l]ess than one year after receiving that disciplinary action Hale sent an email referring to Masters as stupid . . . [t]he bullying from Hale was continuous throughout Donovan's employment."  PRDSMF ¶ 138.  Ms. Donovan's denial is beyond the scope of the fact, and the Court admits DSMF ¶ 138.

[261]    DSMF ¶ 139 states that "Ms. Hale worked very hard to repair her relationship with Ms. Donovan, both professionally and personally."  Ms. Donovan denies DSMF ¶ 139, saying "[t]he bullying from [Ms.] Hale was continuous throughout [Ms.] Donovan's employment."  PRDSMF ¶ 139.  The Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 139 to reflect the record.

[262]    Ms. Donovan objects to DSMF ¶ 140, admitting that Mr. Brown testified as such but denying "that it changed Hale's behavior."  PRDSMF ¶ 140.  Ms. Donovan's objection is beyond the scope of the fact, and the Court admits DSMF ¶ 140.

[263]    DSMF ¶ 141 states that "Ms. Donovan never reported to Mr. Brown that Ms. Hale was withholding information that was necessary to be able to perform her job effectively."  Ms. Donovan denies DSMF ¶ 141, saying "[o]n June 21, 2018, Donovan told Brown and Fox that Hale won't let Donovan in the BTG (by the glass) files." PRDSMF ¶ 141.  On June 21, 2018, the record notes indicate that in a meeting among Ms. Fox, Mr. Brown, and Ms. Donovan, Ms. Donovan reported that Ms. Hale

92

Ms. Hale also met with Ms. Fox, Mr. Brown, and Ms. Masters on June 18, 2018, and stated she was not as emotional as Ms. Donovan and didn't think it was a significant event.  PSAMF ¶ 162; DRPSAMF ¶ 162.  Management also told Ms. Hale that this was maybe the second time since last year that Ms. Hale was spoken to about these issues.[264]  *Id.*

Around June 20, 2018, Mr. Brown solicited a list of the top three priorities/frustrations Ms. Hale had about Ms. Donovan.[265]  PSAMF ¶ 182; DRPSAMF ¶ 182.  Mr. Brown either provided the list of issues to Ms. Fox or discussed it point by point with her.[266]  PSAMF ¶ 183; DRPSAMF ¶ 183.  That same day, Mr. Brown sent an email to Ms. Donovan asking to meet the following day and forwarded the email to Ms. Fox.  PSAMF ¶ 184; DRPSAMF ¶ 184.

---

would not let her into the BTG files.  *See Brown Dep.*, Exh. 25, *June 21, 2018 Notes* (Page ID # 1249).  When asked whether Ms. Donovan ever told him that "she felt like [Ms. Hale] was withholding information from her that was necessary for [her] to do her job effectively," Mr. Brown testified "No, absolutely not."  *Brown Dep.* at 92:24-93:2.  Taking the facts in the light most favorable to Ms. Donovan, the Court finds that the record does not support DSMF ¶ 141 and omits the fact.

[264]    PSAMF ¶ 162 states that "Hale also met with Fox, Brown, and Masters on June 18, 2018, and stated she was not as emotional as Donovan and didn't think it was a significant event.  Management also told Hale that this was maybe the second time since last year Hale was spoken to of these issues including once with Michele Tourangeau in the past month."

Nappi objects to PSAMF ¶ 162 as inadmissible hearsay and denies the fact as unsupported by the record.  DRPSAMF ¶ 162.  The Court overrules Nappi's hearsay objection and, having reviewed the relevant record, omits the portion of the fact that refers to Michelle Tourangeau because it is not supported by Ms. Master's testimony.

[265]    PSAMF ¶ 182 provides that "[a]round June 20, 2018, Brown solicited a list of issues Hale had about Donovan."  Nappi qualifies PSAMF ¶ 182, saying "[t]he record citation does not support that Mr. Brown solicited a list of 'issues' but rather he asked for a list 'top three priorities/frustrations.'"  DRPSAMF ¶ 182.  The Court slightly alters PSAMF ¶ 182 to reflect the record.

[266]    PSAMF ¶ 183 states that "Brown provided the list of issues Hale had with  Donovan's performance to Fox."  Nappi objects to PSAMF ¶ 183 as unsupported by the record and qualifies the fact, saying "[t]he record citation appears to be incomplete and only supports that Mr. Brown 'perhaps' provided the first page of an unidentified document created by Ms. Hale to Ms. Fox."  DRPSAMF ¶ 183.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 183.

On June 21, 2018, Nappi issued a formal written warning to Ms. Hale citing inappropriate conduct that occurred on June 1, 2018 "with a co-worker."  PSAMF ¶¶ 178-79; DRPSAMF ¶¶ 178-79.  The co-worker was Ms. Donovan.  *Id.*  Nappi wrote that Ms. Hale behaved in a "disparaging, hostile, and intimidating" manner toward Ms. Donovan and "[f]urther, we expect that you will take the necessary steps to transform the dysfunctional relationship you have with this co-worker."  *Id.*  She was told that additional disciplinary action would be taken if she made retaliatory comments or behavior towards others. [267]  DSMF ¶ 136; PRDSMF ¶ 136.

On June 22, 2018, Ms. Fox held a meeting with Ms. Donovan and others about the incident with Ms. Hale.  PSAMF ¶ 186; DRPSAMF ¶ 186.  The meeting notes

---

[267]    DSMF ¶ 137 states that "Ms. Hale has not received any other disciplinary action or coaching aside from that one incident."  Ms. Donovan denies DSMF ¶ 137, saying Ms. Hale was "previously disciplined for bullying Masters and being rude and unprofessional to a supplier representative, Mary Bridges, and was spoken to for how she communicated about incentives with Michele Tourangeau." PRDSMF ¶ 137.  Ms. Hale testified:

> Q.  Okay.  Have you ever had any disciplinary action or performance issues while at Nappi Distributors?
> A.  The incident we talked about where I showed [Ms. Donovan] my frustration, I was written up for that.
> Q.  Aside from the June 2018 issue between you and [Ms. Donovan], did you have any disciplinary action or coaching related to your performance at Nappi Distributors?
> A.  No.
> Q.  Has anybody in management at Nappi Distributors ever spoken to you about how you're treating some of your coworkers?
> A.  No.
> Q.  Have any of your coworkers ever expressed to you that they felt like you were treating them poorly?
> A.  No.

*V. Hale Dep.* at 35:13-36:7.  On August 28, 2017, Ms. Hale received a memo from Mr. Brown, Ms. Masters, and Mr. Maiorino regarding Nappi's expectations on her communications with others, in which Nappi wrote: "Your interactions with two of our major suppliers . . . were inappropriate. Unprofessional communications of this nature, even in a joking manner, is damaging to your own reputation within the industry, and also reflects negatively upon everyone at Nappi . . .." *Fox. Dep.*, Attach 25, *August 28, 2017 Email* (Page ID # 920).  The Court accepts Ms. Donovan's denial and omits DSMF ¶ 137.

reflect that Ms. Donovan felt her job title should be "manager." *Id.* After the altercation that Ms. Donovan perceived as threatening, Ms. Donovan suggested to Mr. Brown that he communicate directly with Ms. Hale instead of her having to do so. PSAMF ¶ 187; DRPSAMF ¶ 187. This suggestion frustrated Mr. Brown, and Nappi did not grant Ms. Donovan's request to no longer work in direct communication with Ms. Hale.[268] *Id.* In 2019, Ms. Donovan told Ms. Fox that Ms. Hale was trying to undermine her and that Ms. Hale had formed a close alliance with new Wine Sales Director Mr. Watson, which Ms. Donovan did not feel a part of.[269] PSAMF ¶ 124; DRPSAMF ¶ 124.

Ms. Masters testified that she sat down with Ms. Hale and spoke to her about her approach and that the way she was dealing with things needed to change because her approach can rub people differently. PSAMF ¶ 127; DRPSAMF ¶ 127. Ms. Masters testified that she previously went to Ms. Fox because she felt that Ms. Hale was bullying her and that Ms. Hale needed to be spoken to by the whole management

---

[268] PSAMF ¶ 187 provides that "[a]fter the threatening altercation that occurred on June 1, 2018, Donovan suggested to Brown that he communicate directly with Hale instead of Donovan having to do so. This suggestion frustrated Brown and Nappi denied Donovan's request to no longer work in direct communication with Hale." Nappi objects to PSAMF ¶ 187 as hearsay and qualifies the fact, saying that "using of the word 'threatening' is argument and not a statement of fact; therefore, it should be stricken or disregarded." DRPSAMF ¶ 187. The Court overrules Nappi's hearsay objection and slightly alters PSAMF ¶ 187 to be fact rather than argument.

[269] PSAMF ¶ 124 states that "[t]he year after Donovan's suicide attempt, she told Fox that Hale was trying to undermine her, and Hale had formed a close alliance with new Wine Sales Director Watson, which Donovan did not feel a part of." Nappi objects to PSAMF ¶ 124 as inadmissible hearsay and further qualifies the fact, saying "[i]n the record citation, Ms. Fox testified that in January or February of 2019, Ms. Donovan told Ms. Fox that she felt as though Ms. Hale and Mr. Watson were working well together and that Ms. Donovan did not feel a [part] of that. The argument that this occurred 'the year' after Ms. Donovan's suicide attempt is inaccurate, as those occurred in 2017." DRPSAMF ¶ 124. Having reviewed the relevant record, the Court changes "the year after Ms. Donovan's suicide attempt" to "in 2019" and otherwise admits the fact, rejecting Nappi's hearsay objection.

team.  PSAMF ¶ 128; DRPSAMF ¶ 128.  Ms. Masters testified that the bullying she experienced from Ms. Hale consisted of her being quiet around her and giving her the cold shoulder because Ms. Hale was frustrated that Ms. Masters' knowledge of the systems did not match her expectations.  PSAMF ¶ 129; DRPSAMF ¶ 129.  Ms. Masters testified that at times during private meetings, Ms. Hale was disrespectful and Ms. Masters had to tell her not to speak to her that way.  PSAMF ¶ 130; DRPSAMF ¶ 130.

Ms. Masters agrees that Ms. Hale treated Ms. Donovan in the same way that Ms. Hale treated her.[270]  PSAMF ¶ 131; DRPSAMF ¶ 131.  Ms. Masters is aware that Ms. Kroot and Ms. Murray may have complained to her about how Ms. Hale also treated them disrespectfully.[271]  PSAMF ¶ 132; DRPSAMF ¶ 132.  Ms. Masters is not aware of Ms. Hale being disrespectful to Mr. Brown, Mr. Watson, or any other male employee at Nappi.[272]  PSAMF ¶ 141; DRPSAMF ¶ 141.

Ms. Hale testified that Ms. Donovan's suicide attempt became common knowledge in and around the office.  PSAMF ¶ 159; DRPSAMF ¶ 159.  Ms. Hale generally knew Ms. Donovan struggled with depression.  PSAMF ¶ 160; DRPSAMF

---

[270]    PSAMF ¶ 131 states that "Masters agrees that Hale treated Donovan in the same disrespectful way that Hale treated Masters."  Nappi qualifies PSAMF ¶ 131, objecting "to the phrase 'disrespectful' as it is argumentative and not supported by the record."  DRPSAMF ¶ 131.  The Court slightly alters PSAMF ¶ 131 to state a fact.

[271]    PSAMF ¶ 132 states that "Masters is also aware of Patty Kroot and Carol Murray making complaints to Ms. Masters of how Ms. Hale treated them disrespectfully."  Nappi objects to PSAMF ¶ 132 as inadmissible hearsay and qualifies the fact, saying that "[i]n the record citation, Ms. Masters testified that, '…they may have said things to me.'"  DRPSAMF ¶ 132.  The Court rejects Nappi's hearsay objection and, having reviewed the relevant record, slightly alters the fact the reflect the record.

[272]    Nappi objects to PSAMF ¶ 141, saying "[t]he record citation indicates that Ms. Masters would not have been privy to those conversations, which would have occurred behind closed doors."  DRPSAMF ¶ 141.  The Court finds Nappi's objection beyond the scope of the fact and admits PSAMF ¶ 141.

¶ 160.  Ms. Hale had conversations with members of management about her frustration with Ms. Donovan's job performance in 2018 and 2019 during monthly team meetings.  PSAMF ¶ 177; DRPSAMF ¶ 177.  Ms. Masters recalls Ms. Hale and Mr. Brown making comments about disapproving of Ms. Donovan's job performance because they were frustrated.  PSAMF ¶ 181; DRPSAMF ¶ 181.

Ms. Fox met with Ms. Donovan on January 16, 2019.  PSAMF ¶ 188; DRPSAMF ¶ 188.  Her notes reflect that Ms. Donovan was being excluded from team meetings and she wanted to take intermittent FMLA leave.[273]  *Id.*  That same meeting, Ms. Donovan told Ms. Fox that decisions were being made by Ms. Hale that should have been made by Ms. Donovan, saying: "no one comes to me anymore." PSAMF ¶ 189; DRPSAMF ¶ 189.  Sales representatives, Mr. Brown, and Ms. Masters all "go to [Ms. Hale]" instead.[274]  *Id.*  Mr. Brown testified that Ms. Donovan was excluded from general sales meetings where they had suppliers present and discussed inventory, industry trends, and products Nappi was trying to push.[275]  PSAMF ¶ 190; DRPSAMF ¶ 190.

---

[273]   Nappi objects to PSAMF ¶ 188 as inadmissible hearsay and further qualifies the fact, saying "Ms. Fox's notes indicate that Ms. Donovan requested leave to attend an additional appointment, and that her performance issues were not the result of poor attendance."  DRPSAMF ¶ 188.  The Court overrules Nappi's hearsay objection, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 188.

[274]   Nappi objects to PSAMF ¶ 189 as inadmissible hearsay but otherwise admits the fact. DRPSAMF ¶ 189.  The Court overrules Nappi's hearsay objection.

[275]   PSAMF ¶ 190 states that "Brown testified that Donovan was excluded from General Sales Meetings (GSM) where they had suppliers present on wine, discussed inventory and industry trends and products Nappi was trying to push."  Nappi qualifies PSAMF ¶ 190, saying "[t]he use of the word 'excluded' is argumentative.  Mr. Brown testified that Ms. Donovan stopped attending the meeting for a period of time because she was unprepared and unproductive."  DRPSAMF ¶ 190.  Having reviewed the relevant record, the Court finds that the word "excluded" appropriately describes the situation and admits PSAMF ¶ 190 over objection.

Ms. Donovan testified that she reported to Mr. Carr many times throughout her employment at Nappi—until Mr. Carr retired—that she was having issues with Ms. Hale. PSAMF ¶ 292; DRPSAMF ¶ 292. When asked if Mr. Carr was aware of any issues between Ms. Hale and Ms. Donovan, Mr. Carr provided: "This is hard. Valarie [Hale] is still working there, and she's in Helena [Donovan]'s position. Valarie [Hale] wanted Helena [Donovan]'s—she wanted John Houle's position when John Houle was there. So she would always try to claim that these two people weren't doing their job or were incompetent. Valarie [Hale] is a whiz on the computer. Valarie [Hale] can get you a report. She can do stuff using the computer. She's very adept at what she does, and she's probably great in the position she's at. But Valarie [Hale] has always been aggressive and looking for more." PSAMF ¶ 24; DRPSAMF ¶ 24. When asked if Mr. Carr was aware of any conflict between Ms. Hale and Ms. Donovan because of Ms. Hale's desire to be in the position Ms. Donovan had, Mr. Carr testified "Yeah. Helena [Donovan] always felt like she had a knife in her back from Valarie [Hale]. And I'd always try to console Helena [Donovan] and say, I don't care, just tell me and I'll tell Valarie [Hale] to stop. I told Valarie [Hale] at points to stop badgering Helena [Donovan] about her performance and stuff." PSAMF ¶ 25; DRPSAMF ¶ 25. Ms. Hale denies Mr. Carr ever speaking to her about how she treated Ms. Donovan. PSAMF ¶ 26; DRPSAMF ¶ 26.

Prior to 2017, Ms. Hale met with Allan McInnis, Warehouse Supervisor, Nick Nappi, Frank Nappi, and Mr. Carr to discuss inventory, but Ms. Donovan was not

invited to the meeting.  After the meeting Ms. McInnis told Ms. Donovan that Ms. Hale's aim was to get Ms. Donovan fired.[276]  PSAMF ¶ 297; DRPSAMF ¶ 297.

## I.   Donovan's Issues with Management

Ms. Donovan testified that she was receiving unwarranted criticism from Mr. Watson that increased five to six months after he began working at Nappi in August of 2018.  PSAMF ¶ 293; DRPSAMF ¶ 293.  Ms. Donovan alleges that she faced criticism of her work by other members of the wine sales team beginning after Mr. Watson joined Nappi and that she was not included in certain wine sales team activities during that same period out of hostility.[277]  DSMF ¶ 83; PRDSMF ¶ 83. Even though Ms. Donovan was supposed to be responsible for inventory, she was not getting information that she needed, and Mr. Watson had no respect for or confidence in Ms. Donovan.[278]  PSAMF ¶ 192; DRPSAMF ¶ 192.  Mr. Watson never explicitly told Ms. Donovan that he would not give her any specific information she

---

[276]   Nappi objects to PSAMF ¶ 297 as inadmissible hearsay and immaterial and further qualifies the fact, saying "Ms. Donovan admits she was not present for the meeting and has no first-hand knowledge of it."  DRPSAMF ¶ 297.  The Court overrules Nappi's hearsay objection, overrules Nappi's materiality objection, and admits PSAMF ¶ 297.

[277]   DSMF ¶ 84 states that "[t]here was a time period when Ms. Donovan did not attend general sales meetings because she was unable to answer questions posed by salespeople, she showed up unprepared, she would discuss irrelevant topics, and it was wasting time."

Ms. Donovan denies DSMF ¶ 84, saying "[a]s early as January 16, 2019, Donovan reported to Fox that she was excluded from sales meetings," and "Brown and Masters both testified that Donovan's performance was as expected until 2019."  PRDSMF ¶ 84.  There are two issues with Nappi's paragraph 84.  First, it only describes a "time period" without saying when.  Second, the absence of a specified time requires that the Court view disputed matters in the light most favorable to Ms. Donovan, which in light of her denial that describes her performance in 2019, the Court must credit.

[278]   Nappi denies PSAMF ¶ 192 as unsupported by the record citation.  DRPSAMF ¶ 192.  Having reviewed the relevant record, the Court finds that PSAMF ¶ 192 is amply supported by the record citation to "Doc. 52-14, [*Fox Dep.*] PageID # 930" and admits the fact over objection.

requested.[279]  DSMF ¶ 143; PRDSMF ¶ 143.  Ms. Donovan testified that she was not

invited to and excluded from meetings Mr. Watson held in his office with the entire

team and once he implemented monthly meetings, he would go over inventory and

then dismiss her from the meeting despite much information that would have a direct

impact on her job being discussed.[280]  PSAMF ¶ 300; DRPSAMF ¶ 300.  The

information discussed at the monthly meetings were incentives, inventory needs, and

activities in chain and on-premises accounts—all information that would have been

helpful to Ms. Donovan in her role as the wine purchaser.  PSAMF ¶ 398; DRPSAMF

¶ 398.  The information discussed at these meetings was communicated to Ms.

Donovan later, meaning at times she only became aware of the information when it

was critical.[281]  *Id.*  Ms. Donovan participated in team lunches before Mr. Watson

---

[279]    DSMF ¶ 143 provides that "Mr. Watson never told Ms. Donovan that he would not give her information she needed, and she was never refused information after she requested it."
    Ms. Donovan denies DSMF ¶ 143, saying Mr. Watson "dismissed Donovan from every Wine Management meeting when information that was necessary for Donovan to have to perform her job was discussed [and Ms.] Donovan testified that Watson stopped speaking to her."  PRDSMF ¶ 143.
    In the Court's view, Ms. Donovan's denial does not respond to the proposed fact.  Nappi is asserting that Mr. Watson never told Ms. Donovan that he would not give her certain information; the fact that he held team meetings without her and that at one point he stopped speaking to her are not contradictory.  The Court rejects PRDSMF ¶ 143's denial, but it slightly amended the fact to emphasize that the paragraph asserts that Mr. Watson never explicitly refused to give Ms. Donovan information she requested.

[280]    Nappi qualifies PSAMF ¶ 300, saying "Ms. Donovan testified that she received the information relayed during monthly meetings, and that Mr. Watson never refused to provide her with information.  Further, Ms. Donovan admitted that she never approached Mr. Watson to discuss a lack of pertinent information."  DR PSAMF ¶ 300.  Nappi's objection beyond the scope of the fact, and the Court admits PSAMF ¶ 300.

[281]    PSAMF ¶ 398 provides that "[t]he information discussed at the monthly meetings were incentives, inventory needs, and activities in chain and on premise accounts which is all information that would have been helpful to [Ms.] Donovan in her role as the wine purchaser.  The information discussed at these meetings was withheld from her until the information became crucial, meaning she could not anticipate purchasing needs preemptively and only became aware of the information when it was critical."
    Nappi qualifies the fact, saying it "denies that this information was withheld from Ms. Donovan, as the very next sentence in Mr. Brown's testimony was that such information 'was definitely communicated to [Ms. Donovan].'  Mr. Brown testified that those meetings were by no means the only

arrived, but after Mr. Watson arrived she was, except for one work-related lunch, excluded from the lunches while Mr. Watson, Mr. Brown, Ms. Masters, Mr. Wells, and Ms. Hale would leave for two to three hours for a team lunch.[282]  PSAMF ¶ 302; DRPSAMF ¶ 302.

Ms. Donovan told Ms. Fox on March 15, 2019 that she had been excluded from a team wine tasting meeting and that in other meetings Mr. Brown and Ms. Masters refused to even make eye contact with her; Ms. Donovan felt she had "zero communication" with these individuals who should have been working as a team with her.[283]  PSAMF ¶ 204; DRPSAMF ¶ 204.  Ms. Donovan also told Ms. Fox that she had been backed into a corner with no place to turn and that Mr. Watson and Ms. Masters wanted her out of Nappi.  She further said to Ms. Fox: "Just tell me"; "[Management] has no confidence in me"; that she was "taking it personally," and it could not be "any clearer it's personal."  PSAMF ¶ 205; DRPSAMF ¶ 205.  Ms. Donovan also told Ms.

---

time at which those issues were discussed."  DRPSAMF ¶ 398.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 398 to reflect the record and admits the fact.

[282]     PSAMF ¶ 302 provides that "Donovan participated in team lunches before Watson arrived, but after Watson arrived she was excluded from the lunches, whereas Watson, Brown, Masters, Wells, and Hale would leave for 2-3 hours for a team lunch."

  Nappi qualifies the fact, saying "Ms. Donovan testified that she did attend a work-related lunch after Mr. Watson arrived."  DRPSAMF ¶ 302.  Having reviewed the relevant record, the Court adds "except for one work-related lunch" to the fact and admits PSAMF ¶ 302.

[283]     PSAMF ¶ 204 provides that "Donovan told Fox on March 15, 2019 that she had been excluded from a team meeting to do a wine tasting and in other meetings Brown and Masters refused to even make eye contact with her; Donovan had 'zero communication' with these individuals who should have been working as a team with her."

  Nappi objects to PSAMF ¶ 204 as inadmissible hearsay and further qualifies the fact, saying "[t]he record citation does not support the assertion that Donovan had 'zero communication' with these individuals who should have working as a team with her."  DRPSAMF ¶ 204.  The Court overrules Nappi's hearsay objection and slightly alters PSAMF ¶ 204 to indicate that the fact reflects Ms. Donovan's perception.

Fox that Ms. Hale was "bullying" her.[284]  *Id.*  After Mr. Watson began working at

Nappi, Mr. Stultz told Ms. Donovan that Ms. Hale instructed him to bring issues

directly to Ms. Hale, not to Ms. Donovan.[285]  PSAMF ¶ 301; DRPSAMF ¶ 301.

Ms. Donovan testified that toward the end of her employment, Mr. Watson was

coming to her office daily with issues she perceived were not legitimate and with

unwarranted criticisms, often blaming her for issues that were out of her control or

Ms. Hale's responsibility.[286]  PSAMF ¶ 294; DRPSAMF ¶ 294.  Ms. Donovan also

testified that toward the end of her employment, Mr. Watson required her to come up

---

[284]    PSAMF ¶ 205 states that "[d]uring the March 15, 2019 meeting, Donovan told Fox that she
had been backed into a corner with no place to turn; Watson and Masters wanted her out of Nappi and
Donovan said to Fox: 'Just tell me'; '[Management] has no confidence in me'; Ms. Donovan 'taking
it personally,' and it could not be 'any clearer it's personal.'  Donovan also reiterated that Hale was
'bullying' her."

        Nappi objects to PSAMF ¶ 205 as inadmissible hearsay and further qualifies the fact, saying
"[t]he record citation does not support the assertion that Ms. Donovan told Ms. Fox that she was
'backed into a corner with no place to turn.'  Further, the record citation does not support the assertion
that Ms. Donovan 'reiterated' that Ms. Hale was bullying her, as Ms. Fox testified this was the first
time that Ms. Donovan said as much."  DRPSAMF ¶ 205.  Ms. Fox testified:

        Q. Okay.  And in this meeting with [Ms. Donovan] in March of '19, she told you [Ms.
        Hale] was bullying her?
        A. Yes, that was the first time she had actually said – said that, or implied that it was
        even at that level.

*Fox Dep.* at 141:12-15.  The Court overrules Nappi's hearsay objection and having reviewed both the
cited testimony and exhibit record, the Court finds PSAMF ¶ 205 largely supported by the record
citation but slightly alters the fact.

[285]    Nappi objects to PSAMF ¶ 301 as inadmissible hearsay and immaterial but otherwise admits
the fact.  The Court overrules Nappi's hearsay objection for the reason explained in footnote 17,
overrules Nappi's materiality objection, and admits PSAMF ¶ 301 at the summary judgment stage.

[286]    PSAMF ¶ 294 provides that "[t]oward the end of her employment, Watson was going to
Donovan's office daily with issues that were not legitimate and unwarranted criticisms often blaming
Donovan for issues that were out of her control or that were Hale's responsibility."

        Nappi denies the fact, saying "Ms. Donovan testified that Mr. Watson was dissatisfied that she
did not know when a product was arriving, but she indicated she did not have an answer for him.
Further, Mr. Watson testified that his primary concern was the 'major out-of-stocks,' and that he had
expectations for someone in her position."  DRPSAMF ¶ 294.  Nappi's objection is largely beyond the
scope of the fact, but the Court accepts Nappi's denial as a qualification and adds to PSAMF ¶ 294 to
reflect  that this fact is based on Ms. Donovan's testimony and how she perceived her interactions with
Mr. Watson.

with a new way of doing her job without any parameters or guidelines on how that should happen or what it would look like.[287]  PSAMF ¶ 295; DRPSAMF ¶ 295.  Ms. Hale thought that Ms. Donovan did her job deficiently at times, and Ms. Hale took it upon herself to fulfill Ms. Donovan's duties.[288]  DSMF ¶ 85; PRDSMF ¶ 85.  Ms. Fox admitted that Nappi "offloaded" quite a bit of work from Ms. Donovan so she could get caught up, and the timing of when work was offloaded was not left to Ms. Donovan's discretion.[289]  PSAMF ¶ 206; DRPSAMF ¶ 206.  When Ms. Donovan

---

[287]   PSAMF ¶ 295 states that "[t]oward the end of Donovan's employment, Watson required Donovan to come up with a new way of doing her job without any parameters or guidelines on how that should happen or what it would look like."

Nappi denies PSAMF ¶ 295, saying "Mr. Watson testified that he was asking Ms. Donovan to do things that she should have been able to do based on the level of her position."  DRPSAMF ¶ 295.  Nappi's objection is largely beyond the scope of the fact, but the Court accepts Nappi's denial as a qualification and adds to PSAMF ¶ 294 to confirm that this fact reflects Ms. Donovan's testimony.

[288]   DSMF ¶ 85 provides that "Ms. Donovan had deficiencies in her job performance, which at times fell to Ms. Hale to complete."  Ms. Donovan denies DSMF ¶ 85, saying "Brown testified that  Hale would take it upon herself to complete Donovan's work if she thought she could do it better, 'to her own detriment.'"  PRDSMF ¶ 85.

Ms. Donovan denied DSMF ¶ 85, noting that Mr. Brown testified that Ms. Hale would take it upon herself to complete Ms. Donovan's work if she thought she could do it better.  For support, Ms. Donovan cites portions of Mr. Brown's deposition testimony.  *Id.*  In his deposition, Mr. Brown testified that Ms. Donovan and Ms. Hale "had two distinctive roles and that, you know, Valarie [ Hale] did have her own responsibilities and that it was important that she continue those and kind of stay within her role.  Like I said when we first began, Valarie [Hale] is very capable and if she sees an opportunity where she can be helpful and provide something, she's going to do it, I think sometimes to her detriment because it just creates more than I think one person should have to deal with."  *Brown Dep.* at 55:23-56:6.  The Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 85 to reflect the full record.

[289]   PSAMF ¶ 206 provides that "Fox admitted that Nappi 'offloaded' quite a bit of work from Donovan, and the timing of when work was offloaded was not left to Donovan's discretion."

Nappi qualifies PSAMF ¶ 206, saying "[t]he record citation indicates that the tasks were reassigned at Ms. Donovan's request."  DRPSAMF ¶ 206.  Ms. Fox testified that "[a]t this point, we had offloaded quite a bit of work for her at her request."  *Fox Dep.* at 137:24-25.  Nappi's objection is not directly responsive to PSAMF ¶ 206.  PSAMF ¶ 206 asserts that the timing of when the work was offloaded was not left to Ms. Donovan's discretion, but Nappi has objected by asserting that the reassignment itself was done at Ms. Donovan's request.  Viewing disputed facts in the light most favorable to Ms. Donovan, she could have requested the offloading but had no discretion as to the timing.

The Court therefore rejects Nappi's qualified response as beyond the scope of PSMAF ¶ 206.

reported mistreatment from Ms. Hale to Ms. Fox, Ms. Fox responded in part by telling Ms. Donovan to "rise above it."[290]  PSAMF ¶ 313; DRPSAMF ¶ 313.

Ms. Donovan testified that her job performance was not scrutinized harshly until Mr. Watson arrived, before that her job performance was as expected.[291] PSAMF ¶ 298; DRPSAMF ¶ 298.  Ms. Donovan never directly told her supervisor Mr. Watson that she was suffering from depression.[292]  DSMF ¶ 24; PRDSMF ¶ 24.  Yet Ms. Donovan testified the scrutiny she was under from Mr. Watson was because of her mental health and sexual orientation.[293]  PSAMF ¶ 299; DRPSAMF ¶ 299.

Ms. Donovan testified that during a meeting with Ms. Fox and Mr. Watson, she disclosed that she began maintaining notes at work and she brought them with her to the meeting.  PSAMF ¶ 314; DRPSAMF ¶ 314.  After Ms. Donovan disclosed that she was taking notes, Ms. Fox became defensive, changed her tone and outlook,

---

[290]    PSAMF ¶ 313 states that "[w]hen Donovan reported mistreatment from Hale to Fox, Fox responded by telling Donovan to 'rise above it.'"

    Nappi denies PSAMF ¶ 313, saying "Ms. Fox met with Ms. Hale and members of management and Ms. Hale was issued a warning after Ms. Donovan complained.  As part of her response to that complaint, Ms. Fox conducted an investigation and spoke with multiple Nappi employees to determine what occurred."  DRPSAMF ¶ 313.  Nappi's objection is largely beyond the scope of the fact, but the Court accepts Nappi's denial as a qualification and slightly alters PSAMF ¶ 313 to reflect the record.

[291]    PSAMF ¶ 298 provides that "Donovan testified that her job performance was not scrutinized harshly until Watson arrived, before that her job performance was as expected."

    Nappi denies the fact, saying "Ms. Donovan testified that she has been criticized for her performance since before 2017.  Mr. Watson joined Nappi in 2018."  DRPSAMF ¶ 298.  As there is an obvious difference between being criticized and scrutinized harshly, the Court rejects Nappi's denial on the ground that the denial is beyond the scope of PSMF ¶ 298.  Furthermore, viewing contested facts in the light most favorable to Ms. Donovan, the Court viewed "job performance . . . as expected" as entailing the level of routine criticism reflected in the cited record.

[292]    DSMF ¶ 24 states "Ms. Donovan never told her supervisor, Matt Watson, that she was suffering from depression."  Ms. Donovan qualifies DSMF ¶ 24, saying "did not specifically tell Watson this information.  However,  Watson learned of Donovan's depression and mental health diagnoses from Christine Fox, Human Resources on September 13, 2018."  PRDSMF ¶ 24.  The Court accepts Ms. Donovan's qualification and slightly alters DSMF ¶ 24 to reflect the record.

[293]    Nappi denies PSAMF ¶ 299, saying "Ms. Donovan testified that Mr. Watson did not say or do anything the led her to think his criticisms were based on her sexual orientation."  DRPSAMF ¶ 299. Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 299.

and told Ms. Donovan that her taking notes was "combative."   PSAMF ¶ 314; DRPSMAF ¶ 314.   From that point forward, it was very clear that she was siding with Mr. Watson and did not have any interest in helping Ms. Donovan with her situation.   PSAMF ¶ 382; DRPSAMF ¶ 382.

Ms. Donovan testified that on multiple occasions she spoke in detail with Ms. Fox about her mental health diagnoses, treatment, and severity.[294]   PSAMF ¶ 312; DRPSAMF ¶ 312.   Ms. Donovan believes she was deliberately treated poorly by Nappi to ensure that her mental health worsened, eventually reaching the point where she was sitting in her office crying, unable to perform work requirements.[295]   PSAMF ¶ 377; DRPSAMF ¶ 377.   Ms. Donovan testified that she did not go to Ms. Fox to speak about her issues on the day she resigned because at that point Ms. Fox "was clearly not a course for [her] to actually go to.   That was very clear."[296]   PSAMF ¶ 381; DRPSAMF ¶ 381.

---

[294]   Nappi qualifies PSAMF ¶ 312, saying "[t]he record citation only discusses conversations that Ms. Donovan had with Ms. Fox when she returned to work in 2017.   Ms. Donovan admitted that when she discussed needing an additional therapy appointment in 2019, she did not give Ms. Fox any specifics."   DRPSAMF ¶ 312.   Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 312.

[295]   PSAMF ¶ 377 states that "Donovan believes she was treated poorly by Nappi as a deliberate decision to ensure that her mental health worsened to the point where she was sitting in her office crying, unable to perform work requirements."

Nappi denies the fact, saying "Ms. Donovan testified that she believed that, while she never told anyone at Nappi that she was being discriminated against because of her disability, that it was deliberate to ensure that her mental health got worse and that it was obvious that her mental health was declining because she was sitting in her office in tears, unable to perform certain requirements for Mr. Watson."   DRPSAMF ¶ 377.   Nappi's objection is largely beyond the scope of the fact, and having reviewed the relevant record the Court accepts Nappi's denial as a qualification and slightly alters PSAMF ¶ 377.

[296]   Nappi qualifies PSAMF ¶ 381, saying "[t]he cited portion of the deposition does not state that Ms. Donovan did not speak with Ms. Fox about her issues on the day she resigned, only that she did not speak to Ms. Fox at all on 'that day.'   Nappi also objects because in its view, the cited deposition testimony also does not state that Ms. Donovan 'resigned' as represented."   DRPSAMF ¶ 381.

Ms. Donovan referred to Mr. Watson as "Twatson" with one colleague at Nappi.[297]   DSMF ¶ 115; PRDSMF ¶ 115.   Mr. Watson never shouted or used vulgarities when speaking with Ms. Donovan.   DSMF ¶ 116; PRDSMF ¶ 116.   Mr. Watson told Ms. Donovan "let's communicate" but then when she attempted to communicate with him he was too busy or would look at the clock and say "I've got five minutes."   PSAMF ¶ 379; DRPSAMF ¶ 379.   Ms. Donovan testified that Mr. Watson insisted on finding something negative daily and that he would communicate hostilely.   PSAMF ¶ 380; DRPSAMF ¶ 380.   On one occasion, Mr. Brown said to Ms. Donovan "haha, you're not part of the team."[298]   PSAMF ¶ 378; DRPSAMF ¶ 378.

Mr. Brown was aware of Ms. Donovan regularly attending appointments with her therapist,  PSAMF ¶ 386; DRPSAMF ¶ 386, and observed Ms. Donovan appearing depressed at work.   PSAMF ¶ 387; DRPSAMF ¶ 387.   Ms. Fox sent an email to Mr. Watson referring to Ms. Donovan's mental health on September 13, 2018, providing in part:

---

[297]   The Court considers Nappi's objection to be frivolous.  If Ms. Donovan did not speak to Ms. Fox at all the date Ms. Donovan resigned, it follows that she did not speak to Ms. Fox about her issues that day.   As for the cited testimony not demonstrating that Ms. Donovan resigned, Ms. Donovan's testimony immediately prior to the cited testimony confirms that she was discussing her date of resignation.   Finally, Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 381.

[297]   DSMF ¶ 115 provides that "Ms. Donovan referred to Mr. Watson as 'Twatson' with colleagues at Nappi."  Ms. Donovan qualifies DSMF ¶ 115, saying she "did not refer to Watson as Twatson . . . [her] former coworker referred to Watson as Twatson in a text message after Donovan left Nappi."  PRDSMF ¶ 115.   However, when asked whether "Twatson" was a "nickname used by you?", Ms. Donovan testified "Yup."   *Donovan Dep.* at 107:14-20.   She then testified that she used the nickname "[o]nly between [her colleague Ms. Ottawa] and [herself]."   *Id.* at 107:21-23.   Based on her testimony, the Court overrules Ms. Donovan's general objection.   In addition, the Court slightly alters DSMF ¶ 115 to reflect the record.

[298]   Nappi qualifies PSAMF ¶ 378, saying "Ms. Donovan testified that Brown said this in jest."  DRPSAMF ¶ 378.   Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 378.

> She stated she just wanted to let me know that she had to put her house on the market . . . She was pretty emotional and seems very fragile so I spent some time with her to encourage her to take things step by step so she doesn't overwhelm herself (which she clearly is doing!!)
>
> FYI: I'm not certain but I believe putting the house on the market is due to a foreclosure process.  Most importantly, I wanted you to be aware that I am now definitely seeing [Ms. Donovan] display some of the issue she had last year and hope that she is still under treatment as her anxiety seems to be escalating over the past 3+ months.  I'm certain that the stress of going thru a potential foreclosure process is very significant.  At the same time, it's imperative that she get the help/tools she needs to cope with all her stressors and at the same time, keep on doing what Nappi needs her to be doing.  She did tell me that she is still under treatment.[299]

PSAMF ¶ 367; DRPSAMF ¶ 367.

In March of 2019, Ms. Donovan reported to Ms. Fox that things at work had deteriorated and the exclusion at work had escalated.[300]  PSAMF ¶ 316; DRPSAMF ¶ 316.  Ms. Fox met with Ms. Donovan on April 16, 2019 and told her: "Don't fall behind again; wave white flag."[301]  PSAMF ¶ 209; DRPSAMF ¶ 209.  In May of 2019, Mr. Watson reassigned Ms. Donovan's work related to suppliers Wine Group and

---

[299]    Nappi objects to PSAMF ¶ 367, saying Ms. Donovan "has not laid a proper foundation for the admissibility of this document, and therefore it should not be considered on summary judgment" and further qualifies the fact because "[t]he assertion is not an accurate re-typing of the email and contains misspellings . . . [and] does not place the e-mail in context, which is that Ms. Fox started the email by indicating that Ms. Donovan had advised that her work schedule would be erratic due to her housing situation."  DRPSAMF ¶ 367.  The Court overrules Nappi's foundation objection, slightly alters PSAMF ¶ 367 to reflect the record, and admits the contents of the email.

[300]    Nappi objects to PSAMF ¶ 316 as citing "an impermissible leading question" but otherwise admits the fact.  DRPSAMF ¶ 316.  Acting within its discretion under Federal Rule of Evidence 611, the Court overrules the leading question objection.

[301]    PSAMF ¶ 209 provides that "Fox met with Donovan on April 16, 2019 and told her: 'Don't fall behind again; wave white flag.'"  Nappi qualifies the fact, saying "[t]he record citation cites to the question."  DRPSAMF ¶ 209.  Nappi correctly states that the phrase "wave the white flag" appears in the question, but the questioner is quoting from Exhibit 9, which are Ms. Fox's handwritten and contemporaneous notes of the April 16, 2019 meeting and are separately admissible as business records.  *See* FED. R. EVID. 803(6).

Constellation to Ms. Hale, which Ms. Donovan was not happy about.[302]   PSAMF ¶ 291; DRPSAMF ¶ 291.

On May 15, 2019, Ms. Fox emailed Becky Douglass, who handled the software program that tracks when employees enter the building, to determine what time Ms. Donovan had come to work because her boss, Mr. Watson, had informed Ms. Fox that she had not shown up for a wine group management team meeting.[303]   PSAMF ¶ 211; DRPSAMF ¶ 211.

On October 18, 2019, Mr. Watson sent an email to Ms. Donovan criticizing her for notifying suppliers for FOBs [Free On Board] and for not copying supplier sales on POs [Purchase Order].[304]   PSAMF ¶ 307; DRPSAMF ¶ 307.   Ms. Donovan explained that FOBs were Ms. Hale's duty and she had been waiting for weeks for Ms. Hale to put supplier sales contact info into the database so that she could copy them on POs but Ms. Hale still had not done so, an example of both Ms. Hale

---

[302]   Nappi qualifies PSAMF ¶ 290, saying "Ms. Donovan testified that she benefited from the reassignment because she was overloaded and it was a good idea." DRPSAMF ¶ 290. Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 290.

[303]   PSAMF ¶ 211 states that "[o]n May 15, 2019, Fox emailed Becky Douglass who handled the software program that tracks when employees enter the building. The purpose of the email was to determine what time Donovan had come to work that day because her boss, Watson, was asking." Nappi qualifies PSAMF ¶ 211, saying "Ms. Fox testified that she asked Ms. Douglass because Mr. Watson informed her that Ms. Donovan had not shown up for a wine group Management Team meeting." DRPSAMF ¶ 211.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 211.

[304]   The parties use the initials FOB and PO without defining them.  The Court assumes F.O.B. refers to free on board, a contract where "the seller's duty is fulfilled by placing the goods aboard the carrier."  BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE AT 367 (3rd ed. 2011).  In this context, the Court assumes PO refers to Purchase Order.

purposefully making it impossible for Ms. Donovan to do her job and Mr. Watson criticizing Ms. Donovan for something that wasn't part of her job.[305]  *Id.*

### J.    VIP Software at Nappi

Vermont Information Processing (VIP) is an operating system used at Nappi for inventory management that Nappi started using for semi-automated purchase orders sometime in 2017, before Mr. Watson arrived in 2018.[306]  PSAMF ¶ 105; DRPSAMF ¶ 105; PSAMF ¶ 407; DRPSAMF ¶ 407.  According to Ms. Fox, Nappi began using VIP software in 2017 for the purchase order process.[307]  PSAMF ¶ 404; DRPSAMF ¶ 404.  Until 2017 it was not important for her job that Ms. Donovan be adept with the software.  *Id.*  However, while she was out on a medical leave of absence Ms. Hale began implementing new processes that required advanced knowledge of VIP, which Ms. Donovan did not possess.[308]  *Id.*  Ms. Hale testified that

---

[305]     Nappi denies PSAMF ¶ 307, saying "Mr. Watson testified that the tasks outlined in the email were Ms. Donovan's job and it was within her role."  DRPSAMF ¶ 307.  Nappi's objection is beyond the scope of the fact and, taking the fact in the light most favorable to the Plaintiff, the Court admits PSAMF ¶ 307.

[306]     PSAMF ¶ 105 states that "Nappi did not start using the VIP system for semi-automated purchase orders until shortly before or shortly after the new Wines Sales Director, Matt Watson, arrived in 2018."  Nappi qualifies PSAMF ¶ 105, saying "[t]he factual assertion is misleading with the use of the word 'shortly.'  The record citation indicates that Nappi began using the VIP system for semi-automated purchase order 'sometime' in 2017.  Mr. Watson was hired at Nappi in August 2018."  DRPSAMF ¶ 105.  Having reviewed the relevant record, the Court alters PSAMF ¶ 105 to reflect the record and admits the fact.

[307]     PSAMF ¶ 404 states that "Nappi began using VIP software in 2017 for the purchase order process."  Nappi objects to the fact, saying "[t]he record citation indicates that Ms. Fox testified that she believes Nappi began using the VIP software for the purchase order process in 2017."  DRPSAMF ¶ 404.  The Court slightly alters PSAMF ¶ 404 and admits the fact.

[308]     PSAMF ¶ 407 states that "VIP is an operating system used at Nappi for inventory management.  Until 2017 it was not important for Donovan's job to be familiar with the software.  However, while she was out on a medical leave of absence Hale began implementing new processes that required advanced knowledge of VIP but which Donovan did not possess."  Nappi denies the fact, saying "[i]t was very important to the wine purchasing role to use VIP, or some type of software system to automate purchase orders."  DRPSAMF ¶ 407.  Nappi's qualification is beyond the scope of PSAMF ¶ 407, and the Court admits ¶ 407.

Ms. Donovan provided the necessary input for the Excel formula used to order wine sometime in 2019.[309]  PSAMF ¶ 405; DRPSAMF ¶ 405.

Ms. Donovan was not as skilled in VIP or Excel as Ms. Hale and those tasks would often fall to Ms. Hale to perform.[310]  DSMF ¶ 86; PRDSMF ¶ 86.  Nappi offered VIP and Excel training to some employees but not to Ms. Donovan.[311]  DSMF ¶ 87; PRDSMF ¶ 87.  Mr. Brown is aware of training services offered by VIP and of Ms. Hale, Nick Nappi, Paglio, and Gupta attending VIP trainings in Vermont, but he is not aware of anyone suggesting Ms. Donovan attend a VIP training.  PSAMF ¶ 393; DRPSAMF ¶ 393.  Mr. Brown is not aware of Ms. Donovan taking an excel training course.  PSAMF ¶ 394; DRPSAMF ¶ 394.  At no point did anyone at Nappi offer to send Ms. Donovan to the annual training at VIP nor did Nappi offer to set her up with online or on-site training with VIP.  PSAMF ¶ 409; DRPSAMF ¶ 409.  Ms. Hale, on the other hand, was sent every year for a three-day training in Vermont.[312]  *Id.*  Since Ms. Donovan left Nappi, Nappi management discussed and budgeted for

---

[309]   PSAMF ¶ 405 provides that "Hale testified that Donovan provided all of the input for the Excel formula used to order wine in early 2019."  Nappi qualifies the fact, saying "Ms. Hale testified that Ms. Donovan provided all of the input for the Excel formula used to purchase wine sometime in 2019. She did not testify that this occurred specifically in 'early 2019.'"  DRPSAMF ¶ 405. The Court changes "in early" to "sometime in" and admits PSAMF ¶ 405.

[310]   DSMF ¶ 86 states that "Ms. Donovan was not very skilled in VIP or Excel, and those tasks would often fall to Ms. Hale to perform."  Ms. Donovan qualifies DSMF ¶ 86, saying "Donovan was capable of using VIP, but Hale was sent to an annual training every year [while] Donovan was never offered the training."  PRDSMF ¶ 86. Having reviewed the relevant record, the Court slightly alters DSMF ¶ 86.

[311]   DSMF ¶ 87 states that "Nappi has offered VIP and Excel training to employees."  Ms. Donovan qualifies DSMF ¶ 87, saying she admits "that they were offered to some, but never to [Ms.] Donovan."  Having reviewed the relevant record, the Court accepts Ms. Donovan's qualification and alters DSMF ¶ 87 to reflect the record.

[312]   Nappi qualifies PSAMF ¶ 409, saying "Ms. Donovan declined Excel training and insisted she was at an intermediate level."  DRPSAMF ¶ 409.  Having reviewed the record, the Court finds record support for the fact, and taking the facts in the light most favorable to the Plaintiff, the Court overrules Nappi's objection and admits PSAMF ¶ 409.

expansion of budgeting to improve the inventory systems in place at Nappi.  PSAMF
¶ 395; DRPSAMF ¶ 395.

When Nappi changed the wine ordering process, Mr. Watson told Ms. Donovan
to "trust the numbers."  PSAMF ¶ 401; DRPSAMF ¶ 401.  Mr. Brown testified that
the formulas created to generate orders were not foolproof and required the purchaser
to monitor them because trends change and there were moving parts, but he was not
aware of Mr. Watson telling Ms. Donovan to just trust the numbers.[313]  PSAMF ¶
402; DRPSAMF ¶ 402.  Mr. Brown did not have an understanding that Ms. Donovan
felt paralyzed when she was told to "trust the numbers" while also being expected to
make independent work judgments while under scrutiny.[314]   PSAMF  ¶  392;
DRPSAMF ¶ 392.

On one occasion, Ms. Donovan used the information generated by the formula
created for ordering, assessed variances from what the formula generated and what
she thought needed to be ordered, and raised it to Mr. Watson—which is what Mr.
Brown hoped and expected Ms. Donovan would do—yet neither Mr. Brown nor Mr.

---

[313]    Nappi qualifies PSAMF ¶ 402, saying "Plaintiff left out Mr. Brown's testimony contained
within that cited testimony that indicates that 'the formulas worked very well.'"  DRPSAMF ¶ 402.
Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 402.

[314]    PSAMF ¶ 392 provides that "Brown does not agree that Helena [Donovan] would have felt
paralyzed because she was told to 'trust the numbers' but also expected to make independent judgment
while under scrutiny."  Nappi denies the fact, saying "[t]he cited record material indicates that Mr.
Brown stated that he did not know or have an understanding (not that he does not agree with the
assertions made, assertions which, notably, lack foundation) that Ms. Donovan felt paralyzed because
she understood that she was under scrutiny and did not know what to do one way or the other because
she was told to trust the numbers, but then also told to make independent judgments."  DRPSAMF ¶
392.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 392 and admits the fact.

Watson thought Ms. Donovan could think independently.[315]   PSAMF ¶ 403; DRPSAMF ¶ 403.

In 2019 after Mr. Watson became the Wine Director, he implemented more processes that required advanced knowledge of VIP than Ms. Donovan possessed.[316] PSAMF ¶ 408; DRPSAMF ¶ 408.  In 2020 Nappi implemented a new program in the wine department through VIP, iDig, which the beer department previously used; iDig allows sales representatives to see what product has been ordered, when it is expected to arrive, and the quantity they can allocate to a customer, which makes it easier for the sales team to track inventory.[317]  PSAMF ¶ 286; DRPSAMF ¶ 286.

One of Mr. Brown's criticisms of Ms. Donovan was that she was manually generating reports as inventory arrived and didn't provide ETAs on other items even

---

[315]    PSAMF ¶ 403 provides that "Donovan used the information generated by the formula created for ordering, made an assessment of variances from what the formula generated and what she thought needed to be ordered and raised it to Watson, which is what Brown hoped and expected Donovan would do, but Brown believes Watson did not think Donovan was capable of thinking independently to do so."

Nappi qualifies the fact, saying "Defendant objects to this assertion to the extent it suggests this occurred on more than one occasion.  The cited record material indicates that Ms. Donovan raised questions with Matt Watson about what the formula generated for orders and what she believed should be ordered on one occasion.  Moreover, the record reflects that neither Mr. Brown nor Mr. Watson believed Ms. Donovan was capable of thinking independently.  The cited record materials indicates that Mr. Brown believed Ms. Donovan was 'completely incompetent,' 'not capable of making any decisions outside the box,' and 'incapable of really doing much,' and that instead of raising this issue with Matt [Watson], Mr. Brown thought Ms. Donovan 'should have just made these decisions.'" DRPSAMF ¶ 403.  Although the Court finds Nappi's objection largely beyond the scope of the fact, having reviewed the relevant record, the Court slightly alters PSAMF ¶ 403 to reflect that Ms. Donovan is discussing one, not multiple occasions, and the Court otherwise admits the fact.

[316]    Nappi qualifies PSAMF ¶ 408, saying "Mr. Watson testified that Ms. Donovan was expected to learn and utilize the new processes, and that she did do it, but did not seem to do it efficiently." DRPSAMF ¶ 408.  Nappi's qualification is beyond the scope of the fact, and the Court admits PSAMF ¶ 408.

[317]    Nappi objects to PSAMF ¶ 286 as immaterial and further qualifies the fact, saying "[t]he iDig system has not changed how communication channels change when a there is an increased need for a product."  DRPSAMF ¶ 286.  The Court overrules Nappi's materiality objection, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 286.

though it is important for a salesperson to know what was on order to forecast their accounts; this, however, is theoretically no longer an issue because salespeople possess this information through VIP.[318]  PSAMF ¶ 249; DRPSAMF ¶ 249.  Mr. Brown testified that Ms. Donovan's VIP skills paled in comparison to Ms. Hale's. PSAMF ¶ 250; DRPSAMF ¶ 250.

Ms. Johnson testified that VIP is a program Ms. Donovan would use in her work at Nappi, but that on the occasions Ms. Johnson attended VIP trainings, Ms. Donovan was not present.[319]  PSAMF ¶ 251; DRPSAMF ¶ 251.  Ms. Johnson also testified that almost every year Nappi sent some employees to a VIP training program and that Ms. Hale always attended; on an occasion Ms. Johnson was not informed of the training date, Ms. Hale told her "that's on [Ms. Fox]."[320]  PSAMF ¶ 252; DRPSAMF ¶ 252.  Prior to Ms. Fox assigning who went to VIP trainings, it was Peter

---

[318]    Nappi qualifies PSAMF ¶ 249, saying "Mr. Brown testified that Ms. Donovan was not capable of navigating VIP.  Further, he testified that VIP tools evolved, and that Nappi salespeople and administration had to evolve with it."  DRPSAMF ¶ 249.  Having reviewed the relevant record, the Court adds "theoretically" to the fact to indicate that Nappi's adoption of VIP, in theory, when used correctly would eliminate the need to generate sales reports.

[319]    Nappi qualifies PSAMF ¶ 251, saying "Ms. Johnson testified that she did not know if Ms. Donovan was invited, stating, 'I usually didn't involve with who was going or ask who was going.'" DRPSAMF ¶ 251.  Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 251.

[320]    Nappi objects to PSAMF ¶ 252 as inadmissible hearsay and further qualifies the fact, saying "Ms. Johnson testified that she was told about the training beforehand but could not attend because of a medical appointment and a second job."  DRPSAMF ¶ 252.  Ms. Johnson testified: "[s]o I went by [Ms. Hale]'s cubicle and I had said, you're going to the training at VIP this week?  And she says yup. And I said, well, I don't understand why I wasn't told about it.  And she goes, well, that's on [Ms.] Fox."  *Johnson Dep.* at 71:25-72:4.  The Court overrules Nappi's hearsay objection, finds the fact supported by the record, and admits PSAMF ¶ 252.

Paglio and Frank Nappi, Jr.'s decision who attended.[321]  PSAMF ¶ 253; DRPSAMF ¶ 253.  Mr. Paglio is Ms. Hale's uncle.[322]  PSAMF ¶ 254; DRPSAMF ¶ 254.

### K.   Ms. Donovan's 2019 FMLA Request

By January of 2019 the conversation between Ms. Donovan and Dr. Altschule continued to focus on her increased distress due to work causing increased anxiety and depression.[323]  PSAMF ¶ 45; DRPSAMF ¶ 45.  Dr. Altschule testified that as of January 7, 2019, Ms. Donovan expressed feeling hopelessness, that she felt "damned if she did, damned if she didn't," and that no matter what she did it would result in a negative reaction—which was not her experience with her previous supervisor.[324]  PSAMF ¶ 46; DRPSAMF ¶ 46.  Dr. Altschule testified that as of January 14, 2019, his sessions with Ms. Donovan continued to focus on increased workplace distress and feeling singled out and isolated.  PSAMF ¶ 47; DRPSAMF ¶ 47.  Dr. Altschule

---

[321]    PSAMF ¶ 253 states that "[p]rior to Fox assigning who went to VIP trainings it was Peter Paglio and Frank Nappi Jr.'s decision who attended the VIP training."  Nappi qualifies PSAMF ¶ 253, saying "[t]he record citation does not support the assertion that Ms. Fox was in charge of assigning who went to VIP trainings."  DRPSAMF ¶ 253.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 253 and admits the fact.

[322]    Nappi objects to PSAMF ¶ 254 as immaterial and otherwise admits the fact.  DRPSAMF ¶ 254.  The Court overrules Nappi's materiality objection and admits PSAMF ¶ 254 over objection.

[323]    Nappi objects to PSAMF ¶ 45 as inadmissible hearsay.  The Court rejects Nappi's hearsay objection.  Nappi qualifies PSAMF ¶ 45, saying "Dr. Altschule testified that Ms. Donovan reported increased anxiety, but he did not testify to an increase in depression."  DRPSAMF ¶ 45.

The following interchange took place at Dr. Altschule's deposition:

> Q. Did Helena express to you that her depression and anxiety were increasing at this time?
> A. Yes.  I think - - I think there was more of her anxiety, you know. . . .

*Stip. R.*. Attach. 17, *Dep. of Joseph Altschule, Phy.D.*, 19:17-20 (ECF No. 52) (*Altschule Dep.*).  Viewing Dr. Altshule's testimony in the light most favorable to Ms. Donovan, the Court overrules Nappi's objection in part, clarifying that she reported both anxiety and depression but emphasized anxiety.

[324]    Nappi objects to PSAMF ¶ 46 as inadmissible hearsay.  The Court rejects Nappi's objection.  Nappi qualifies PSAMF ¶ 46, saying "Dr. Altschule testified that it 'seemed to [him] when she talked about work, she was damned if she did, damned if she didn't in a lot of ways.'"  DRPSAMF ¶ 46.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 46 to indicate that the quoted language reflects how Ms. Donovan told Dr. Altschule that she felt.

described his perception of Ms. Donovan's workplace environment as being akin to an abusive relationship where no matter what you do you can't please the person you're with.[325]  *Id.*

Ms. Donovan told Ms. Fox on January 16, 2019, that she needed intermittent FMLA leave so she could add an extra therapy session each week.  PSAMF ¶ 193; DRPSAMF ¶ 193.  Ms. Fox wrote in her notes: "FMLA resolves attendance for 12 weeks but not underlying relationship issues, Performance."[326]  *Id.*  Ms. Fox admitted that Ms. Donovan asked for FMLA leave on January 16, 2019, to attend additional counseling appointments and that "she said she needed it because she had no sick leave."  PSAMF ¶ 194; DRPSAMF ¶ 194.  Ms. Fox explained that sick leave had been allotted as of January 1st, but Ms. Donovan told her she needed to save her sick time.[327]  *Id.*  Ms. Fox asked Ms. Donovan why she needed FMLA leave, and Ms. Donovan said it was for additional appointments.  PSAMF ¶ 195; DRPSAMF ¶ 195.  Ms. Fox told Ms. Donovan to just take the time she needed and to let her boss (Mr. Watson) know by leaving a note on "your office door or something."[328]  *Id.*

---

[325]     PSAMF ¶ 47 states that "[Dr.] Altschule testified that as of January 14, 2019, his sessions with Donovan continued to focus on increased workplace distress, feeling singled out and isolated.  [Dr.] Altschule described Donovan's workplace environment as being akin to an abusive relationship where no matter what you do you can't please the person you're with."  Nappi qualifies PSAMF ¶ 47, saying "[t]he record citation indicates that Dr. Altschule testified that '[his] experience of the situation was like an abusive relationship.'"  DRPSAMF ¶ 47.  Having reviewed the record, the Court slightly alters PSAMF ¶ 47 to indicate that the fact reflects Dr. Altschule's perception of the situation.

[326]     Nappi objects to PSAMF ¶ 193 as inadmissible hearsay but otherwise admits the fact.  DRPSAMF ¶ 193.  The Court overrules Nappi's hearsay objection and admits PSAMF ¶ 193.

[327]     Nappi objects to PSAMF ¶ 194 as inadmissible hearsay but otherwise admits the fact.  DRPSAMF ¶ 194.  The Court overrules Nappi's hearsay objection and admits PSAMF ¶ 194.

[328]     Nappi qualifies PSAMF ¶ 195, saying "[t]his statement is misleading in that it does not include the entirety of Ms. Fox's answer.  Ms. Fox went on to say, 'just communication – you don't have to communicate what you're doing, but just communication, you know, that you're not going to be there if it's when you're normally there.'"  DRPSAMF ¶ 194.  Nappi's qualification is beyond the scope of the fact, and the Court admits PSAMF ¶ 194.

During the January 16, 2019 meeting, Ms. Donovan told Ms. Fox that Mr. Watson told her, "I feel like you want this to fail."  PSAMF ¶ 196; DRPSAMF ¶ 196.  Ms. Donovan said Mr. Watson had not been critical of her for attendance issues, but he probably would be if she needed more time off for a second therapy appointment each week.  PSAMF ¶ 196; DRPSAMF ¶ 196.  Ms. Donovan felt "weird" leaving early for therapy appointments without having FMLA leave approved.[329]  PSAMF ¶ 196; DRPSAMF ¶ 196.

Dr. Altschule testified that a few days later, on January 21, 2019, Ms. Donovan presented with increased anxiety and mild to moderate depressive symptoms.  PSAMF ¶ 48; DRPSAMF ¶ 48.  Dr. Altschule, who was actively treating Ms. Donovan, never recorded in his notes that Ms. Donovan would benefit from two sessions per week, FMLA leave, or a leave of absence from work.[330]  DSMF ¶ 45; PRDSMF ¶ 45.

---

[329]    Nappi objects to PSAMF ¶ 196 as inadmissible hearsay and further qualifies the fact, saying "[t]he record citation combines separate sections of notes out of context to create an assertion that is not actually supported by the record."  DRPSAMF ¶ 196.  The Court overrules Nappi's hearsay objection.  Having reviewed the relevant record, the Court finds the fact supported by the record but adds a citation between each sentence to indicate that each sentence is a statement of fact not necessarily connected to the prior sentences.

[330]    DSMF ¶ 45 provides that "Dr. Altschule, who was actively treating Ms. Donovan, never suggested that she would benefit from two sessions per week, FMLA leave, or a leave of absence from work."  Ms. Donovan denies DSMF ¶ 45, saying "Altschule testified he would have recommended a continuous leave had Donovan presented him with FMLA paperwork to remove her from the hostile work environment."  PRDSMF ¶ 45.  Dr. Altschule testified:

> Q.  Having reviewed your notes at some point, it's fair for me to say that nowhere in these notes do you recommend that Ms. Donovan attend two sessions with you a week, correct?
> A.  I didn't – I never wrote that in the notes, yeah.
> Q.  And if you thought it would be helpful for her to have two sessions a week, you would have included that in your notes, correct?
> A.  You know what, I don't think I would have, and that would have been an error on my behalf.  You know, there – it's hard for me to remember, but sometimes I have a client who just is struggling a lot more, I'm a little concerned about them, or they just need – we're at a point in therapy where a little extra contact is important.  But that

116

However, Dr. Altschule testified that if Ms. Donovan had presented him with FMLA paperwork on January 21, 2019, he would have agreed that she needed leave and would have recommended a continuous leave of absence, as opposed to intermittent leave, due to the history of attempted suicide coupled with the ongoing stressor increasing Ms. Donovan's anxiety and feelings of hopelessness.[331]  PSAMF ¶¶ 49, 54-55; DRPSAMF ¶ 49.

In February of 2019, Ms. Donovan expressed to Dr. Altschule that she felt undermined and set up to fail due to her supervisor not being an advocate for her and instead joining in on the criticism, likely resulting in more feelings of hopelessness.[332]  PSAMF ¶ 50; DRPSAMF ¶ 50.  On March 4, 2019, Ms. Donovan expressed to Dr. Altschule that she continued to have difficulty in the workplace, reporting an increase in depressive and anxious symptoms.  PSAMF ¶ 51; DRPSAMF ¶ 51.  Dr. Altschule noted that he was worried due to Ms. Donovan's increased anxiety and depressive

---

wouldn't have been something that would have been an ongoing, long-term thing ever with her.

Q.  It's fair for me to say, Doctor, that nowhere in your notes do you recommend that she take FMLA leave, correct?

A.  That's correct.

Q.  And there's nowhere in your notes do you recommend that she take a leave of absence from work, correct?

A.  That's correct.

*Altschule Dep.* at 41:8-42:6.  The Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 45 to reflect the record.

[331]  Nappi admits PSAMF ¶ 49, but objects to the fact as speculative, saying "Dr. Altschule has not been designated to testify about what he would have recommended if certain factors had been presented to him."  DRPSAMF ¶ 49.  The Court concludes that at the summary judgment stage, Dr. Altschule's testimony regarding his professional impressions of Ms. Donovan garnered from therapy sessions with Ms. Donovan are admissible without specific designation.  The Court admits PSAMF ¶ 49 over objection.

[332]  Nappi objects to PSAMF ¶ 50 as inadmissible hearsay.  The Court rejects Nappi's objection. Nappi qualifies PSAMF ¶ 50, saying "Dr. Altschule testified that more feelings of hopelessness 'would likely have' resulted, but that that 'didn't quite happen.'"  DRPSAMF ¶ 50.  Having reviewed the record, the Court adds "likely" to PSAMF ¶ 50 and admits the fact.

symptoms and her history of suicide attempts.[333]  *Id.*  Dr. Altschule also noted,

though, that Ms. Donovan denied feeling suicidal when he specifically asked her

about it. PSAMF ¶ 51; DRPSAMF ¶ 51.  On March 18, 2019, Ms. Donovan reported

to Dr. Altschule that she was experiencing panic attacks at work.[334]  PSAMF ¶ 52;

DRPSAMF ¶ 52.

Dr. Altschule stopped treating Ms. Donovan in September of 2019 because

their work together naturally came to an end, Dr. Altschule was winding down his

private practice, Ms. Donovan was his last patient, and even though she was still

feeling distressed and experiencing symptoms from the issues at work, he believed

he had done what he could for her in the therapeutic environment.[335]  PSAMF ¶ 53;

DRPSAMF ¶ 53.  Dr. Altschule had previously suggested to Ms. Donovan that she

consider leaving her employment at Nappi and looking for other jobs.[336]  PSAMF ¶

---

[333]     Nappi objects to PSAMF ¶ 51 as inadmissible hearsay and partially unsupported by the record.
The Court rejects Nappi's hearsay objection.  Nappi qualifies PSAMF ¶ 51, saying "Dr. Altschule
testified that he 'vaguely' recalled discussions surrounding difficulty in the workplace."  Nappi's
objection is beyond the scope of the fact; the Court finds the fact supported by the record and admits
PSAMF ¶ 51.

[334]     Nappi objects to Ms. Donovan's PSAMF ¶ 52 as unsubstantiated by the cited record.
DRPSAMF ¶ 52.  The Plaintiff erred in her Altschule Deposition at 25:19-26:16 citation, but the cited
Page ID pointed the Court to the relevant supporting record at 27:16-23, and the Court admits PSAMF
¶ 52.

[335]     PSAMF ¶ 53 states that "Altschule stopped treating Donovan in September of 2019 because
Altschule was winding down his private practice, Donovan was his last patient, and he believed he
had done what he could for Donovan in the therapeutic environment even though she was still feeling
distressed and experiencing symptoms from the issues at work."

     Nappi denies PSAMF ¶ 53, saying "Dr. Altschule testified that the work he was doing with
Ms. Donovan naturally came to an end, and that there was nothing more to be done in a therapeutic
environment."  DRPSAMF ¶ 53.  Having reviewed the relevant record, the Court amends PSAMF ¶
53 to reflect the full record and admits the fact.

[336]     PSAMF ¶ 54 provides that "Altschule had previously suggested to Donovan [to] leave
employment at Nappi and look for other jobs."  Nappi objects to PSAMF ¶ 54 as non-responsive and
qualifies the fact, saying "Dr. Altschule testified that he said, '. . . have you thought about other jobs.'"
DRPSAMF ¶ 54.  Dr. Altschule testified:

54; DRPSAMF ¶ 54.  Dr. Altschule testified that Ms. Donovan repeatedly discussed

feeling isolated and ostracized with him, as well as feeling she was treated differently

than others at work and poorly by her coworkers and manager.[337]   PSAMF ¶ 55;

DRPSAMF ¶ 55.

On January 18, 2019, Ms. Donovan met with Ms. Fox and asked for leave

pursuant to the FMLA because she needed additional help.  DSMF ¶ 144; PRDSMF ¶

144; PSAMF ¶ 371; DRPSAMF ¶ 371.  Ms. Donovan was specific that she was unwell

because of her depression.[338]  PSAMF ¶ 371; DRPSAMF ¶ 371.  Ms. Fox asked if Ms.

---

Q.  Is that something – is Helena [Donovan] leaving work something that you had ever
discussed with her, leaving her job at Nappi?
A.  Yeah, in that, you know, I – I suggested if this dynamic in the workplace is such a
hardship for you or challenging, have you thought about other jobs.

*Altschule Dep.* at 30:13-18.  The Court finds Dr. Altschule's testimony responsive to the question asked,
slightly alters PSAMF ¶ 54 to reflect the record, and admits the fact.
[337]     Nappi admits PSAMF ¶ 55 but objects to the fact as inadmissible hearsay.  The Court rejects
Nappi's objection.
[338]     PSAMF ¶ 371 provides that "[o]n January 18, 2019, Donovan met with Fox specifically to
request FMLA as an accommodation for her depression because she needed additional help, but Fox
refused to give Donovan FMLA paperwork, despite Donovan being eligible.  Donovan was specific that
she was unwell because of her depression."
Nappi qualifies the fact, saying "[t]he cited testimony does not state that Ms. Donovan met
with Ms. Fox specifically to discuss an 'accommodation' for her depression.  Ms. Donovan testified that
the meeting with Ms. Fox was to discuss that Ms. Donovan felt unwell, meaning depressed, and needed
further treatment.  Ms. Donovan later testified that no one at Nappi ever told her she could not take
time for an additional therapy appointment each week."  DRPSAMF ¶ 371.
Ms. Donovan cited her deposition about her January 18, 2019 meeting with Ms. Fox:

Q. So I understand at some point you spoke to Ms. Fox about FMLA leave, correct?
A. Yes.
Q. Okay.  And when did you have that discussion with her?
A. It was January 18th, I believe, 2019.
Q. Okay, And do you remember where the discussion took place?
A. In Christine's office.
Q. Was there anyone else present?
A. No.
Q. Okay.  So what do you remember being discussed during that meeting?
A. I discussed that I was unwell and needed further treatment and that I wanted to,
as I was eligible, to go back on to FMLA.

Donovan had been advised to be out of work, and Ms. Donovan explained that the leave was necessary for an additional weekly or bi-weekly appointment because she wanted to save her yearly allotted sick leave.[339]   DSMF ¶ 145; PRDSMF ¶ 145.   Ms. Donovan did not tell Ms. Fox exactly what the additional counseling appointments were for, although Ms. Fox knew Ms. Donovan had previously been diagnosed with depression and had attempted suicide.[340]   DSMF ¶ 146; PRDSMF ¶ 146; PSAMF ¶ 373; DRPSAMF ¶ 373.   She indicated that she at least needed an additional therapy session per week.[341]   PSAMF ¶ 373; DRPSAMF ¶ 373.

The leave Ms. Donovan was requesting was not based on a doctor's recommendation, and she admitted that she had not even spoken to her medical providers about requesting leave.[342]   DSMF ¶ 147; PRDSMF ¶ 147.   Ms. Fox told Ms. Donovan that because she was salaried, there was no reason she couldn't flex her schedule and she therefore did not need to take leave and fill out the FMLA

---

*Donovan Dep.* 152:4-19.  The record confirms that PSAMF ¶ 371 is fully supported by the record, and the Court rejects as frivolous Nappi's qualified response.

[339]   Ms. Donovan qualifies DSMF ¶ 145, admitting that she "said she needed to attend additional appointments, but [explaining she] also needed the intermittent FMLA leave because she had no remaining sick time."  PRDSMF ¶ 145.  Having reviewed the relevant record, the Court accepts Ms. Donovan's qualification and slightly alters DSMF ¶ 145 to reflect the record.

[340]   Ms. Donovan denies DSMF ¶ 146, saying she "did discuss these details during the meeting, and Fox knew that [she] struggled with depression and needed additional counseling appointments."  PRDSMF ¶ 146.  Having reviewed the relevant record, the Court accepts Ms. Donovan's denial as a qualification and alters DSMF ¶ 146 to reflect the full record.

[341]   PSAMF ¶ 373 states that "[w]hen Donovan requested FMLA she did not specify whether she needed inpatient care or additional visits, she just stated she needed more therapy."  Nappi qualifies the fact, saying "[w]hile Ms. Donovan did testify at the cited pages that she did not specify at the meeting with Ms. Fox whether she needed inpatient care or additional appointments, Ms. Donovan later testified that she told Ms. Fox at that meeting that she was 'looking at definitely a second appointment a week.'"  DRPSAMF ¶ 373.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 373 and admits the fact.

[342]   Ms. Donovan denies DSMF ¶ 147, saying Ms. Fox "knew that Donovan struggled with depression and needed additional counseling appointments . . . [and] that Donovan had been hospitalized and taken short term disability leave for these conditions in the past."  PRDSMF ¶ 147.  Ms. Donovan's denial is beyond the scope of the fact, and the Court admits DSMF ¶ 147.

paperwork for an additional weekly appointment.[343]   DSMF ¶¶ 148-150; PRDSMF ¶¶ 148-150.   Ms. Fox told Ms. Donovan she was just "looking for a life raft"; Ms. Donovan understood Ms. Fox to imply that she was requesting FMLA leave to be able to take additional time off without being penalized.[344]   PSAMF ¶ 372; DRPSAMF ¶ 372.   Ms. Fox denied telling Ms. Donovan that she was just looking for a "life raft" by asking for FMLA leave, but Ms. Fox admitted that she asked Ms. Donovan "why she was so focused on asking for FMLA leave."   PSAMF ¶ 210; DRPSAMF ¶ 210. Pursuant to Nappi policy, Ms. Donovan did not need formal approval to attend weekly medical appointments, but Ms. Fox encouraged her to talk to Mr. Watson, not an HR employee, about needing time off for appointments.[345]   DSMF ¶ 44; PRDSMF ¶ 44; PSAMF ¶ 200; DRPSAMF ¶ 200.

Ms. Donovan indicated that she understood the arrangement regarding using flex time instead of FMLA leave for the appointments.   DSMF ¶ 152; PRDSMF ¶ 152.

---

[343]   DSMF ¶ 148 states that "Ms. Fox told Ms. Donovan that there was no reason that she would not be able to take leave."   Ms. Donovan denies DSMF ¶ 148, saying Ms. Fox wanted her "to 'flex' her time rather than take intermittent FMLA leave, which Nappi did not provide paperwork for or advise employees of their rights and responsibilities regarding intermittent leave."   PRDSMF ¶ 148.   Having reviewed the relevant record, the Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 148 to reflect the record.

[344]   Nappi objects to PSAMF ¶ 372, saying it is "based upon inadmissible speculation of which Ms. Donovan has no personal knowledge" but admits that "Ms. Donovan testified to the assertion."   DRPSAMF ¶ 372.   The Court overrules Nappi's objection and admits the fact because it is limited only to what Ms. Donovan understood Ms. Fox to be implying.

[345]   Ms. Donovan denies DSMF ¶ 44, saying that Ms. Fox "instructed [her] to discuss her need for time off for additional appointments with Watson."   PRDSMF ¶ 44.   Ms. Donovan's denial is beyond the scope of the fact and included in the statement of facts at PSAMF ¶ 200.   The Court admits DSMF ¶ 44.

Nappi qualifies its response to PSAMF ¶ 200, stating that the record citation does not support the assertion that Ms. Fox told Ms. Donovan to talk to Mr. Watson about needing time off for counseling.   DRPSAMF ¶ 200.   Nappi says that Ms. Fox testified that she told Ms. Donovan just to communicate that she needed extra time.   *Id.*   The Court reviewed the cited portion of Ms. Fox's deposition testimony and concludes that PSAFM ¶ 200 is fully supported by Ms. Fox's testimony.   The Court rejects Nappi's qualified response.

Although Ms. Fox thought that Ms. Donovan seemed relieved after this conversation, Ms. Donovan was not relieved and instead understood that Ms. Fox was not going to be a resource for her.[346, 347] DSMF ¶ 152; PRDSMF ¶ 152.  Ms. Donovan continued to

---

[346]    DSMF ¶ 152 states that "Ms. Donovan indicated that she understood the arrangement and seemed relieved after the conversation."  Ms. Donovan denies DSMF ¶ 152, saying she "was not relieved after the conversation in which Fox denied her FMLA" and she "testified that she understood Fox was no longer a resource for her."  PRDSMF ¶ 152.  Having reviewed the relevant record, the Court accepts Ms. Donovan's denial as a qualification and alters DSMF ¶ 152 to reflect the full record.

[347]    DSMF ¶ 151 provides that "Ms. Donovan was not expected to make up the appointment time if she worked less than 40 hours in a week."  Ms. Donovan denies DSMF ¶ 151, saying Ms. Fox "told her to flex her work and make it up at another time."  PRDSMF ¶ 151.  Ms. Fox testified:

> Q.  How many hours a week were -- was [Ms. Donovan] expected to work?
> A.  Based on until the job was – you know, when you're salary exempt, it's based on what the job requires.  It – it fluctuates.
> Q.  Was she expected to work a minimum of 40 hours a week?
> A.  I mean generally, yes, for full time.  But there's – there's flexibility here and in most salary – you know, where I've worked before, when you're salary exempt, you – you flex your schedule based on both your – you know, your personal and your business needs to make you – you know, to have that work like balance.
> Q.  And do you know – was it your expectation that if she was taking additional time to go to these appointments, that she make up for it at the other end somehow?
> A.  No, not if – absolutely not.
> Q.  Is that – I'm sorry.  I don't mean to cut you off there.
> A.  I mean, not for an exempt level.  I mean, if she needed to because of, you know, urgent business needs, then – but it – there wasn't an expectation that she make up the time.
> Q.  So when you say you can flex your time, typically my understanding of that is that, you know, if you want to start later and work later or start earlier, end earlier, or take a break in the day and then finish it off a little later, that that's something that you can do for the flex time.  Is that kind of what you were suggesting to [Ms. Donovan] at that time?
> A.  Yes.
> Q.  Okay.  And did you follow up with [her] about whether because of what she was going through she did not have the capacity to do that, to make up for it at the other end?
> A.  In the conversation that we had on January 16, she – she definitely seemed to understand it, yes.

*Donovan Dep.* at 152:1-153:14.  Based on the record and on a lack of clarity, the Court finds it unclear whether Ms. Donovan was expected to flex the time off for appointments if she worked under forty hours per week.  As the Court is required to view contested factual matters in the light most favorable to Ms. Donovan, the Court omits DSMF ¶ 151.

do her job even after her meeting with Ms. Fox.[348] DSMF ¶ 153; PRDSMF ¶ 153.  No one at Nappi explicitly told Ms. Donovan that she could not attend an additional weekly therapy session.[349]  DSMF ¶ 155; PRDSMF ¶ 155.

Ms. Donovan did not receive additional therapy because her FMLA was denied.[350]  PSAMF ¶ 374; DRPSAMF ¶ 374.  Ms. Donovan felt like she could not take

---

[348]    DSMF ¶ 154 states that "Ms. Donovan never suggested to Ms. Fox or management that the deficiencies in her job performance were due to any mental health condition or disability."  Ms. Donovan denies DSMF ¶ 154, saying "[d]uring a meeting in which Fox discussed Donovan's performance issues, Donovan provided to Fox that she needed FMLA time off because of her worsening mental health . . .  Fox provided the FMLA would take care of attendance but not performance" and she "understood that Donovan's mental health impacted her job performance."  PRDSMF ¶ 154.

On September 13, 2018, Ms. Fox sent an email to Mr. Watson referring to Ms. Donovan's mental health, stating in part:

> She was pretty emotional and seems very fragile so I spent some time with her to encourage her to take things step by step so she doesn't overwhelm herself (which she clearly is doing!!) FYI: I'm not certain but I believe putting the house on the market is due to a foreclosure process. Most importantly, I wanted you to be aware that I am now definitely seeing Helena display some of the issues she had last year and hope that she is still under treatment as her anxiety seems to be escalating over the past 3+ months. I'm certain that the stress of going thru a potential foreclosure process is very significant. At the same time, it's imperative that she get the help/tools she needs to cope with all her stressors and at the same time, keep on going what Nappi needs her to be doing. She did tell me that she is still under treatment.

*Pl.'s R.*, Attach 6, *September 13, 2018 Email* (Page ID 1582).  The Court concludes that the record demonstrates that Ms. Fox was generally aware of Ms. Donovan's mental health issues and the impact they may have on her work at Nappi.  The Court accepts Ms. Donovan's denial and omits DSMF ¶ 154.

[349]    DSMF ¶ 155 states that "[n]o one at Nappi told Ms. Donovan that she could not attend an additional weekly therapy session."  Ms. Donovan qualifies DSMF ¶ 155, saying that Ms. Fox "told Donovan she could take the appointments, but told Donovan to flex her time and make up missed hours at another time [even though] Fox understood that Donovan was concerned about missing work and scrutiny from Watson."  PRDSMF ¶ 155.  Having reviewed the relevant record, the Court slightly alters DSMF ¶ 155 to reflect the record.

[350]    Nappi qualifies PSAMF ¶ 374, saying "[w]hile Ms. Donovan did testify that she was denied FMLA leave . . . she then testified (repeatedly) that no one at Nappi ever told her that she could not take the time for the additional therapy, which was the sole reason she requested FMLA leave" and that "she told Ms. Fox that she wanted to take intermittent FMLA leave related to an additional therapy appointment each week . . . [and] Ms. Fox told her, 'there's no reason [she] wouldn't be able to take leave.'"  DRPSAMF ¶ 375.  Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 374 because regardless of whether Ms. Donovan was told she could attend an additional weekly appointment without obtaining FMLA leave, viewing the facts in the light most favorable to Ms. Donovan, the denial of her request to pursue FMLA leave led her to forego the additional weekly therapy appointment.

time to attend additional appointments because Ms. Fox had denied her FMLA at a time when she was already attending once-a-week appointments and was under scrutiny at work.[351]   PSAMF ¶ 375; DRPSAMF ¶ 375.  Ms. Donovan testified that it was obvious to her that her depression and anxiety were exacerbated because of the lack of sleep, the state of her mental health, and requesting FMLA, such that she would eventually be unable to perform her duties.[352]   PSAMF ¶ 311; DRPSAMF ¶ 311.

Ms. Fox admitted that Ms. Donovan was concerned that Mr. Watson would be critical of her for attendance issues if she did not get approved for FMLA.  PSAMF ¶ 197; DRPSAMF ¶ 197.  Nonetheless, Ms. Fox did not give Ms. Donovan the FMLA paperwork she requested.[353]   Id.  With intermittent FMLA leave, Nappi typically does not provide or require paperwork.   PSAMF ¶ 198; DRPSAMF ¶ 198. Ms. Fox's

---

[351]     Nappi denies PSAMF ¶ 375, saying "Ms. Donovan did not testify that she was denied FMLA leave.  Rather, she testified that she could not attend the addition[al] weekly appointment, even though Ms. Fox told her she could, because she felt she was under scrutiny and she did not feel it would be acceptable for her to take additional time to attend a second weekly appointment." DRPSAMF ¶ 375.  Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 375.  Viewing contested facts in the light most favorable to Ms. Donovan, she states that she felt she could not attend the additional appointment because Ms. Fox had denied her FMLA request and because Ms. Fox was scrutinizing her, even though Ms. Fox told her she could attend the appointment without formal leave.

[352]     PSAMF ¶ 311 provides that "Donovan testified that it was obvious that her depression and anxiety were exacerbated because of the lack of sleep and the state of her mental health and requesting FMLA, that she would eventually be unable to perform her duties."

Nappi denies the fact, saying "Ms. Donovan testified that she did not discuss the specifics of her mental health with her managers at Nappi, had not discussed her treatment since 2017, and when she discussed leave with Ms. Fox in 2017 did not give her any specifics."  DRPSAMF ¶ 311.  Nappi's objection is largely beyond the scope of the fact and the Court refuses to accept Nappi's denial. However, the Court treats the denial as a qualification and slightly alters PSAMF ¶ 311 to indicate the situation was obvious to Ms. Donovan herself.

[353]     Nappi denies PSAMF ¶ 197, saying "Ms. Fox testified that Ms. Donovan said Mr. Watson was not concerned about her attendance.  Further, Ms. Fox testified that she told Ms. Donovan 'she would definitely have the leave and she didn't need to have paperwork to prove to us, you know, why she needed the leave . . ..'"  DRPSAMF ¶ 197.  Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 197.

understanding is that FMLA paperwork is not necessary for intermittent FMLA leave; the only requirement is that the employee be given leave, not paperwork. *Id.* Nappi is "not focused on the administrative paperwork." *Id.* Ms. Fox expected Ms. Donovan to "flex" her time, meaning that if she needed to leave early for an appointment, she made up the time later rather than taking sick or designated FMLA leave.[354] PSAMF ¶ 199; DRPSAMF ¶ 199. Ms. Fox encouraged Ms. Donovan to talk to Mr. Watson, not an HR employee, about needing time off for counseling appointments.[355] PSAMF ¶ 200; DRPSAMF ¶ 200.

---

[354]   PSAMF ¶ 199 provides that "Fox expected Donovan to 'flex' her time, meaning that if she needed to leave early for an appointment, she made up the time later on rather than taking sick or designated FMLA leave."

Nappi qualifies PSAMF ¶ 199, saying '[t]he record citation does not support the assertion that Ms. Fox expected Ms. Donovan to 'flex' her time." DRPSAMF ¶ 199. Ms. Fox testified:

> Q.  And do you know -- was it your expectation that if she was taking additional time to go to these appointments, that she make up for it at the other end somehow?
> A. No, not if -- absolutely not.
> Q. Is that – I'm sorry.  I don't mean to cut you off.
> A. I mean, not for an exempt level.  I mean, if she needed to because of, you know, urgent business needs, then -- but it -- there wasn't an expectation that she make up the time.
> Q. So when you say you can flex your time, typically my understanding of that is that, you know, if you want to start later and work later or start earlier, end earlier, or take a break in the day and then finish it off a little later, that that's something that you can do for the flex time.  Is that kind of what you were suggesting to [Ms. Donovan] at the time?
> A. Yes.

*Fox Dep.* at 152:15-153:8.  PSAMF ¶ 199 is clearly supported by the record, and the Court admits the fact over objection.

[355]   PSAMF ¶ 200 provides that "Fox encouraged Donovan to talk to her supervisor (Matt Watson), not an HR employee, about needing time off for counseling appointments."  Nappi qualifies PSAMF ¶ 200, saying "[t]he record citation does not support the assertion that Ms. Fox told Ms. Donovan to talk to Mr. Watson about needing time off for counseling.  Ms. Fox testified that she told Ms. Donovan to just communicate that she needed extra time."  DRPSAMF ¶ 200.  Viewing the record in the light most favorable to Ms. Donovan, the Court interprets Ms. Fox's reference to "communicate" to mean "talk to," and the Court rejects Nappi's qualified response.

After Ms. Donovan requested an accommodation for FMLA leave in the January 16, 2019 meeting, Nappi drafted a performance improvement plan criticizing her performance.[356] PSAMF ¶ 201; DRPSAMF ¶ 201.[357] On March 15, 2019, Ms. Fox met with Ms. Donovan again. PSAMF ¶ 203; DRPSAMF ¶ 203. Ms. Donovan told her that nothing had changed in her relationship with Wine Sales Director Mr. Watson, except that he says hello and goodbye in the morning and evening.[358] PSAMF ¶ 203; DRPSAMF ¶ 203.

## L.    Helena Donovan's Coming Out

Ms. Donovan did not come out as gay to anyone at Nappi until mid-2018 at the earliest. DSMF ¶ 156; PRDSMF ¶ 156. Ms. Donovan was married to a man, Richard Stump, from 2005 until 2019, PSAMF ¶ 261; DRPSAMF ¶ 261, and moved in with her girlfriend, Kristie Donovan, in April of 2019, whom she would go on to marry in

---

[356]    PSAMF ¶ 201 provides that "[t]wo days after Donovan requested an accommodation for FMLA leave in the January 16[, 2019] meeting, Nappi drafted a performance improvement plan criticizing her performance."

Nappi denies PSAMF ¶ 201, saying "Mr. Watson testified that the date on the initial draft was a typo, and that he did not begin to work on the PIP until April of 2019." DRPSAMF ¶ 201. Reviewing the cited record at "ECF Doc. 52-3, PageID # 480," the Court finds no mention of either January 2019 or April 2019. The Court accordingly omits any reference to the date and otherwise admits PSAMF ¶ 201.

[357]    PSAMF ¶ 202 provides that "[t]wo days after Donovan requested an accommodation for FMLA, Fox met with Donovan to see how [Ms.] Donovan's conversation with Watson went regarding her need for additional therapy appointments after Fox instructed Donovan to share with Watson her need for additional therapy appointments." Nappi denies PSAMF ¶ 202 as "unsupported by the record" because "[t]here is no record citation to this factual assertion." DRPSAMF ¶ 202.

The Court agrees with Nappi. There is no record citation to PSAMF ¶ 202. The Court is under no obligation to independently search the record for the correct supporting citation. *See* D. ME. LOC. R. 56(f). Because Ms. Donovan has provided no citation for this fact and the Court was unable to locate it in reference to either the preceding or following facts, the Court omits PSAMF ¶ 202.

[358]    PSAMF ¶ 203 states that "[o]n March 15, 2019, Fox met with Donovan again. Donovan told her that nothing had changed in her relationship with Wine Sales Director Watson, except that he says hello and goodbye in the morning and evening."

Nappi objects to PSAMF ¶ 203 as inadmissible hearsay and further qualifies the fact, saying "Ms. Fox testified that Ms. Donovan told her that some things were going well, and some were not." DRPSAMF ¶ 203. The Court overrules Nappi's hearsay objection, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 203.

October of that year.  PSAMF ¶ 262; DRPSAMF ¶ 262.  She came out to Carol Murray, Mary Johnson, Patty Kroot, Katurah Ottowah, and Nicole Nappi in May of 2018.[359] PSAMF ¶ 287; DRPSAMF ¶ 287.   Upon marrying Kristie Donovan, Ms. Donovan notified Nappi management of her marriage when she submitted her name change form through Ms. Douglass.[360]  PSAMF ¶ 263; DRPSAMF ¶ 263.  Ms. Donovan also informed Katurah Ottawa, Carol Murray, Patty Kroot, and Mary Johnson, her friends at Nappi, of her recent marriage and name change.[361]   PSAMF ¶ 264; DRPSAMF ¶ 264.

---

[359]    PSAMF ¶ 287 states that "Donovan came out to Carol Murray, Mary Johnson, Patty Kroot, Katurah Ottowah, and Nicole Nappi in May of 2018 when she began dating Kristi."

Nappi qualifies the fact, saying "[t]he factual assertion does not accurately identify the individual Ms. Donovan allegedly started dating in May 2018."  DRPSAMF ¶ 287.  The Court agrees with Nappi that the cited deposition does not mention Ms. Donovan's coming out in relation to the date she began dating her girlfriend and the Court amends PSMAF ¶ 297 to comply with the cited record.

[360]    Nappi objects to PSAMF ¶ 263 as inadmissible hearsay and denies the fact, saying "Ms. Donovan testified that she advised Ms. Douglass of her name change.  The name change form does not indicate the reason for the change."  DRPSAMF ¶ 263.  Ms. Donovan testified:

> Q. Did you advise anybody with Nappi management that you had gotten married?
> A. Yes.
> Q. Who did you tell?
> A. Becky Douglas.
> Q. When did you tell her that?
> A. When I informed them of the name change.

*Donovan Dep.* at 16:4-10.  PSAMF ¶ 263 is fully supported by the record given Ms. Donovan's deposition testimony, and the Court admits the fact.

[361]    Nappi objects to PSAMF ¶ 264 as inadmissible hearsay and further qualifies the fact, saying "Ms. Donovan testified that she told Katurah Ottawa, Carol Murray, Patty Kroot, and Mary Johnson."  DRPSAMF ¶ 264.  The Court overrules Nappi's hearsay objection, and even though Nappi's content objection is beyond the scope of the fact, the Court notes that the addition of these names is consistent with PSAMF ¶ 287, and the Court therefore admits PSAMF ¶ 264 and includes the previously acknowledged names.

Ms. Donovan came out to Mr. Brown as gay some time before quitting but after Mr. Carr retired from Nappi.[362]  PSAMF ¶ 267; DRPSAMF ¶ 267.  Mr. Brown recalls Ms. Donovan coming out as lesbian in a conversation they had.  PSAMF ¶ 266; DRPSAMF ¶ 266.  When Ms. Donovan came out to Mr. Brown and told him that she had a same-sex partner, he was "really, really happy for her," and hugged her and told her that was wonderful news.[363]  DSMF ¶ 157; PRDSMF ¶ 157.  Mr. Brown responded to Ms. Donovan by telling her it was best not to come out.  He asked Ms. Donovan if she knew anyone else at Nappi that was gay?  And Ms. Donovan responded no.  Mr. Brown replied why do you think that is?  And that with over 200 employees there must have been gay people at Nappi that didn't come out because it wouldn't be viewed positively.[364]  PSAMF ¶ 267; DRPSAMF ¶ 267. Mr. Brown testified Nappi Distributors has 250 employees, PSAMF ¶ 268; DRPSAMF ¶ 268, and he is not aware of any other individuals at Nappi that are gay, lesbian, bisexual, and/or transgender.  PSAMF ¶ 269; DRPSAMF ¶ 269.  Mr. Brown is, however, aware

---

[362]    PSAMF ¶ 267 states that "Donovan came out to Brown as gay some time before retiring, but after Carr retired working at Nappi."  Nappi objects to the allegation that Ms. Donovan retired from Nappi, noting that she quit.  As the statements of material fact confirm that Ms. Donovan quit and did not retire from Nappi, DSMF ¶ 191; PRDSMF ¶ 191, the Court alters the statement to conform with Ms. Donovan's admission that she quit and did not retire.

[363]    Ms. Donovan failed to respond to DSMF ¶ 157 and the Court has deemed the statement admitted.

[364]    PSAMF ¶ 267 states that "Donovan came out to Brown as gay some time before retiring, but after Carr retired working at Nappi.  Brown responded to Donovan telling her it was best not to come out.  Asked Donovan if she knew anyone else at Nappi that was gay?  Donovan responded no.  Brown replied why do you think that is.  With over 200 employees there must have been gay people at Nappi that didn't come out because it wouldn't be viewed positively."

    Nappi qualifies the fact, saying "Mr. Brown testified that he does not recall exactly when Ms. Donovan came out, but that he was 'really, really happy for her,' and that he hugged her and thought it was wonderful news . . .."  DRPSAMF ¶ 267.  Nappi's content objection is already reflected in DSMF ¶ 157 and is beyond the scope of the fact; the Court admits PSAMF ¶ 267.

of individuals making homophobic comments at Nappi.[365]  PSAMF ¶ 270; DRPSAMF ¶ 270.

Ms. Donovan has no evidence beyond the timing of her coming out and Mr. Brown's ceasing to communicate readily with her to suggest that any change in his demeanor towards her was due to her sexual orientation.[366]  DSMF ¶ 158; PRDSMF ¶ 158.  Ms. Donovan also never reported that Mr. Brown was excluding her or ignoring her because she came out to him.[367]  DSMF ¶ 159; PRDSMF ¶ 159.

When Ms. Donovan came out to Ms. Fox in the summer or fall of 2019, it was the first time that Ms. Fox realized that Ms. Donovan was no longer with her ex-husband.  DSMF ¶ 160; PRDSMF ¶ 160.  Ms. Fox congratulated her, and did not discuss it with Ms. Donovan, or anyone else, again.  DSMF ¶ 161; PRDSMF ¶ 161.

Ms. Donovan claims that Ms. Hale became aware that she was gay in March 2019.[368]  DSMF ¶ 163; PRDSMF ¶ 163.  Ms. Donovan never informed Nappi that Ms.

---

[365]   Nappi qualifies PSAMF ¶ 270, saying "Brown clarified that homophobic behavior is 'not pervasive at all and [he] can't remember the last time [he] heard a comment that was in any way degrading to somebody because of their sexual orientation.'"  DRPSAMF ¶ 270.  Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 270.

[366]   DSMF ¶ 158 states that "Ms. Donovan has no evidence to suggest that any change in Mr. Brown's demeanor towards her was due to her sexual orientation."  Ms. Donovan denies DSMF ¶ 158, saying she "testified the temporal proximity from when she came out to Ian [Brown] to when he stopped speaking to her was almost immediate."  PRDSMF ¶ 158.  Even viewing these facts in the light most favorable to Ms. Donovan, as the Court is required to, it is feasible that these facts can exist simultaneously.  The Court therefore treats Ms. Donovan's denial as a qualification, updates the fact to conform with the entire record, and otherwise admits the fact.

[367]   Ms. Donovan denies DSMF ¶ 159, saying she "repeatedly reported that Brown was not communicating with her."  PRDSMF ¶ 159.  Although Ms. Donovan denied ¶ 158 and asserted that she repeatedly reported that Mr. Brown was not communicating with her, Ms. Donovan violated Local Rule 56(c) by failing to "support each denial . . . by a record citation."  D. ME. LOC. R. 56(c).  The Court therefore accepts DSMF ¶ 159.

[368]   DSMF ¶ 162 states that "Ms. Hale did not learn that Ms. Donovan was a lesbian until after Ms. Donovan had left Nappi."  Ms. Donovan denies DSMF ¶ 162, saying she "had a conversation with [Ms.] Hale regarding her sexual orientation and [Ms.] Hale asked [Ms.] Donovan how her daughter felt about it."  PRDSMF ¶ 162.  The relevant record indicates that Ms. Donovan and Ms. Hale

Hale's comments or behavior constituted harassment based on her sexual orientation. DSMF ¶ 164; PRDSMF ¶ 164.

Although Ms. Masters claims she was unaware that Ms. Donovan was a lesbian until after Ms. Donovan left Nappi, Ms. Donovan says that she had already told Mr. Watson about her girlfriend and Mr. Brown about her same-sex sexual orientation.[369,370] DSMF ¶ 165-166; PRDSMF ¶ 165-166. As for employees of Nappi, Ms. Donovan testified that she came out to Mr. Brown, Katurah Ottowa, Carol Murray, Patty Kroot, Mary Johnson, and Nicole Nappi. DSMF ¶ 169; PRDSMF ¶ 169. Ms. Donovan came out to Ms. Johnson as a lesbian in Ms. Donovan's office.[371] PSAMF ¶ 260; DRPSAMF ¶ 260. After Ms. Donovan attempted suicide, it became

---

conversed about same-sex sexual orientation during Ms. Hale's employment at Nappi —including Ms. Donovan's daughter's reaction to Ms. Donovan coming out. *Donovan Dep.* at 240:12-241:20. Although Ms. Hale testified that this conversation did not occur and that she did not know that Ms. Donovan had come out until after Ms. Donovan left her employment at Nappi, *V. Hale Dep.* at 106:3-107:16, taking the facts in the light most favorable to Ms. Donovan, the record indicates that Ms. Hale was aware that Ms. Donovan had come out before Ms. Donovan left her employment at Nappi. The Court omits DSMF ¶ 162.

[369] Ms. Donovan denies DSMF ¶ 165, saying she "told Watson about her girlfriend . . . [she] had already come out to Brown and other coworkers, [and a]fter Donovan's suicide attempt, it became common knowledge at Nappi despite it being confidential." PRDSMF ¶ 165. The Court accepts Ms. Donovan's qualification because it is consistent with other statements of material fact that the Court has accepted.

[370] DSMF ¶ 166 states that "Mr. Watson was unaware that Ms. Donovan was a lesbian until after Ms. Donovan had left Nappi." Ms. Donovan denies DSMF ¶ 166, saying she "told Watson about her girlfriend." PRDSMF ¶ 166. Ms. Donovan testified:

> Q. At any point after May of 2018, did you come out to any of your other co-workers?
> A. After that time?
> Q. Uh-huh.
> A. Yes, I came out to Matt Watson.
> Q. And when did you come out to him?
> A. That would have been March time of '19.

*Donovan Dep.* at 133:12-18. Viewing the facts in the light most favorable to Ms. Donovan, the Court accepts Ms. Donovan's denial and omits DSMF ¶ 166.

[371] Nappi objects to PSAMF ¶ 260 as inadmissible hearsay but otherwise admits the fact. The Court overrules Nappi's hearsay objection and admits the fact.

common knowledge at Nappi that Ms. Donovan had come out as a lesbian. *Id.* Ms.
Masters does not know of anyone else at Nappi who is gay, lesbian, or otherwise
LGBTQ. PSAMF ¶ 265; DRPSAMF ¶ 265.

Ms. Donovan came out to Mr. Watson in March of 2019, telling him that she
needed to take the afternoon off because her girlfriend was sick.[372] PSAMF ¶ 288;
DRPSAMF ¶ 288. Ms. Donovan testified that she "implied" she was gay during a
conversation with Mr. Watson because she told Mr. Watson she needed the afternoon
off to take her girlfriend to the doctors.[373] DSMF ¶ 167; PRDSMF ¶ 167. Ms.
Donovan contends in part that because she used the term "girlfriend" with Mr.
Watson, a term she used while still married to her husband, it follows that all Nappi
management must have been aware of her orientation.[374] DSMF ¶ 170; PRDSMF ¶
170. Ms. Donovan admitted that she did not feel as though Mr. Watson's criticism of

---

[372]     Nappi denies PSAMF ¶ 288, saying "Mr. Watson was unaware that Ms. Donovan was a lesbian
until the subject lawsuit." DRPSAMF ¶ 288. Taking the facts in the light most favorable to the
Plaintiff, as the Court must, and as PSAMF ¶ 288 is supported by the record, the Court admits the
fact over objection. Whether Mr. Watson understood Ms. Donovan to be coming out in this
conversation is not at issue in PSAMF ¶ 288 and is properly included in Nappi's own facts.
[373]     DSMF ¶ 167 states that "Ms. Donovan testified that she 'implied' she was gay during a
conversation with Mr. Watson because she used the term 'girlfriend' when explaining why she needed
to leave work early." Ms. Donovan qualifies DSMF ¶ 167, saying she "testified she needed to take her
girlfriend to the doctors." PRDSMF ¶ 167. Having reviewed the record, the Court slightly alters
DSMF ¶ 167 to reflect the record.
[374]     DSMF ¶ 170 provides that "Ms. Donovan contends that because she used the term 'girlfriend'
with Mr. Watson, a term she used while still married to her husband, it follows that all Nappi
management must have been aware of her orientation." Ms. Donovan denies DSMF ¶ 170, saying she
"had already come out to Brown and other coworkers . . . [a]fter Donovan's suicide attempt it became
common knowledge at Nappi despite it being confidential . . . [and a]fter Donovan told Watson, Hale
came into her office asking how Donovan's daughter felt about her being gay." PRDSMF ¶ 170. The
Court concludes that DSMF ¶ 170 is admissible, but to correct the misimpression that this was the
only basis upon which Ms. Donovan is relying to prove that Nappi was aware of her coming out as a
lesbian, the Court amends DSMF ¶ 170 to reflect that this is one among multiple facts that
demonstrate Nappi's knowledge of her coming out.

her job performance was entirely related to her sex or sexual orientation.[375]  DSMF ¶ 168; PRDSMF ¶ 168.

Ms. Donovan came out to Ms. Hale around the same time as Mr. Watson. PSAMF ¶ 289; DRPSAMF ¶ 289.  During this conversation Ms. Hale asked Ms. Donovan how her daughter felt about her being gay.[376]  *Id.*  Ms. Donovan believes the entire team treated her differently after she came out, including Mr. Brown who stopped talking to her.[377]  PSAMF ¶ 271; DRPSAMF ¶ 271.  Ms. Masters testified that on an occasion she was having a conversation with Ms. Hale about family and tough things she deals with in general and Ms. Hale shared that her mother was gay.[378]  PSAMF ¶ 272; DRPSAMF ¶ 272.  Ms. Johnson testified that during the time when Nappi maintained a smoking room, on one occasion she was in the smoking room with Ms. Hale, and Ms. Hale confided in her that her mother had come out as a

---

[375]    DSMF ¶ 168 states that "Ms. Donovan admitted that she did not feel as though Mr. Watson's criticism of her job performance was related to her sex or sexual orientation."  Ms. Donovan denies DSMF ¶ 168, saying she "testified it was in part related to her sex and sexual orientation."  PRDSMF ¶ 168.  Having reviewed the relevant record, the Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 168 to reflect the record.

[376]    Nappi objects to PSAMF ¶ 289 as inadmissible hearsay and denies the fact, saying "Ms. Hale testified that she was unaware Ms. Donovan was a lesbian until after she resigned."  DRPSAMF ¶ 289.  The Court overrules Nappi's hearsay objection and admits the fact.

[377]    Nappi qualifies PSAMF ¶ 271 as unsupported by the record and states that "Ms. Donovan testified that Mr. Brown did not say or do anything specific to suggest that the relationship changed because she told him she was gay."  DRPSAMF ¶ 271.  Ms. Donovan testified that after she came out to Mr. Brown, "there was a huge shift from being chitchatting in my office every day to not, basically. It was a very sudden difference."  PSAMF ¶ 271 is supported by the record, and the Court finds Nappi's content objection is beyond the scope of the fact; the Court  admits PSAMF ¶ 271.

[378]    Nappi objects to PSAMF ¶ 272 as inadmissible hearsay and further qualifies the fact, saying "Ms. Masters testified that she does not remember the conversation or how it transpired."  DRPSAMF ¶ 272.  Faced with conflicting evidence, the Court is obligated to view contested facts in the light most favorable to Ms. Donovan and therefore rejected Nappi's qualified response.  The Court overrules Nappi's hearsay objection, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 272.

lesbian and that she was very angry that her mother was gay.[379]   PSAMF ¶ 273;

DRPSAMF ¶ 273.  After Ms. Donovan came out to Ms. Hale in March 2019, Ms. Hale

and Ms. Douglas began to harass Ms. Donovan because of her sexual orientation by

telling her dirty jokes.[380]   PSAMF ¶ 290; DRPSAMF ¶ 290.

## M.   The Performance Improvement Plan

Sometime before January 18, 2019, Mr. Watson began to work on a PIP for Ms.

Donovan.[381]  DSMF ¶ 176; PRDSMF ¶ 176.  In early 2019, Nappi changed and defined

Ms. Donovan's role into that of a "wine buyer."  PSAMF ¶ 207; DRPSAMF ¶ 207.  The

change in Ms. Donovan's job description had been contemplated since 2018, but Nappi

---

[379]   Nappi objects to PSAMF ¶ 273 as inadmissible hearsay and further qualifies the fact, saying "Ms. Johnson testified that 'confided' was not the right word, and that Ms. Hale only told her that her mother had just come out as gay, and that it may impact her upcoming holiday.  Ms. Johnson admitted that she did not recall a lot of the conversation."  DRPSAMF ¶ 273.  The Court overrules Nappi's hearsay objection.  As Ms. Donovan believed that Ms. Hale was confiding this private information and Ms. Hale viewed her statement differently, the Court is obligated to view contested facts in the light most favorable to Ms. Donovan and retains her description: "confided."

[380]   Nappi denies PSAMF ¶ 290, saying "Ms. Donovan did not come out to Ms. Hale."  DRPSAMF ¶ 290.  The Court overrules Nappi's objection for the reason explained in the previous footnote and admits the fact.

[381]   DSMF ¶ 176 states that "After that initial meeting in April of 2019, Mr. Watson began to work on a PIP for Ms. Donovan."  Ms. Donovan denies DSMF ¶ 176, saying "Watson began drafting the PIP on January 18, 2019, two days after Donovan requested a reduced work schedule, leave for additional appointments, and FMLA paperwork."  PRDSMF ¶ 176.  Mr. Brown testified:

> Q:  Okay.  I'm going to show you a document that was produced to us.  It's Nappi Distributors 61 and we have marked this as Exhibit 15.  It looks like the performance expectation memo began January 18, 2019, according to this document.  Does that sound like the time when you all started formally addressing the performance issue with [Ms. Donovan]?
> . . .
> A.  Yeah, I mean I'm looking at the document and I'm looking at the date.  I think that's probably when it – well, it was when it was formally written, but the performance plan had started prior to that, not with that formal letter, but there was clearly discussion of performance regularly.  I mean Matt [Watson] and [Ms. Donovan] were having meetings if not daily, weekly, months prior to that formal writing.

*Brown Dep.* at 74:17-75:8.  The Court accepts Ms. Donovan's denial as a qualification and alters DSMF ¶ 176 to reflect the record.

finalized the new job description in or around April 2019 in conjunction with the discussion of putting Ms. Donovan on a performance improvement plan (PIP).[382] *Id.* In April 2019, Mr. Watson called a meeting with Ms. Donovan and Ms. Fox to discuss Ms. Donovan's work performance and significant issues with inventory. DSMF ¶ 171; PRDSMF ¶ 171. During that meeting, Mr. Watson and Ms. Donovan discussed specific concerns about particular retailers and suppliers and some of Ms. Donovan's responsibilities were reassigned to Ms. Hale. DSMF ¶ 172; PRDSMF ¶ 172.

Ms. Donovan had multiple coaching meetings with Mr. Watson and Ms. Fox before Nappi issued the PIP.[383] DSMF ¶ 173; PRDSMF ¶ 173. Despite months of meetings among Mr. Watson, Ms. Fox, and Ms. Donovan centered around coaching Ms. Donovan on ways to improve her job performance, at no point did Ms. Donovan indicate that her deficiencies were due to any alleged harassment or discrimination. DSMF ¶ 174; PRDSMF ¶ 174. Ms. Donovan did not feel as though the criticism of her work performance from Mr. Watson was related to her sex.[384] DSMF ¶ 175; PRDSMF ¶ 175.

---

[382] Nappi qualifies PSAMF ¶ 207, saying "[t]he record citation does not support the assertion that Nappi changed Ms. Donovan's role, but rather that the job description was developed and defined." DRPSAMF ¶ 207. Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 207.

[383] DSMF ¶ 173 states that "Ms. Donovan had more than one coaching meeting with Mr. Watson and Ms. Fox before the Performance Improvement Plan ("PIP") was issued." Ms. Donovan admits DSMF ¶ 173, but objects, saying she "testified there were three coaching meetings and at the third coaching meeting Donovan brought notes that she had prepared and Fox accused her of being combative." PRDSMF ¶ 173. Ms. Donovan's objection is beyond the scope of the fact, and the Court admits DSMF ¶ 173.

[384] Ms. Donovan denies DSMF ¶ 175, saying she "testified she believed he criticized her because of sex." PRDSMF ¶ 175. When asked whether she thought the "scrutiny that Matt [Watson] was engaged in had anything to do with [her] sex," Ms. Donovan testified "No, not from Matt [Watson]." *Donovan Dep.* at 194:13-15. Ms. Donovan provided no record citation to support her denial. The Court therefore admits DSMF ¶ 175.

Ms. Donovan was then issued a formalized PIP on September 30, 2019.  DSMF ¶ 177; PRDSMF ¶ 177.  Ms. Donovan testified that she had sufficient experience to address the issues raised in the PIP and that most of the action items on the PIP were things that she was "already doing."  DSMF ¶ 178; PRDSMF ¶ 178.  Ms. Donovan testified that everything in the PIP was within the parameters of her job, she was already performing what was asked of her in the PIP, and she was not being asked to do anything she was not qualified to do.[385]  DSMF ¶ 179; PRDSMF ¶ 179.  However, as elsewhere noted, Nappi had withdrawn administrative support for Ms. Donovan and Mr. Watson had excluded her from the monthly wine department meeting, which made it more difficult for her to perform her job duties.  *See* PSAMF ¶¶ 376, 396, 398.[386]  Ms. Donovan took no steps to try to meet the expectations outlined in the PIP

---

[385]    DSMF ¶ 179 states that "Ms. Donovan testified that everything in the PIP was within the parameters of her job, and she was not being asked to do anything for which she was not qualified." DSMF ¶ 179.  Ms. Donovan qualifies DSMF ¶ 179, saying she "testified she was already performing what was asked in the PIP.  However, she was entirely excluded from the team so unable to communicate, or improve in the ways the PIP stated." PRDSMF ¶ 179.  Having reviewed the relevant record, the Court accepts in part Ms. Donovan's qualification and adds to DSMF ¶ 179 to reflect the record.

[386]    DSMF ¶ 180 states that "[t]he PIP provides expectations for improvement but, as its terms reflect, does not alter the terms or conditions of Ms. Donovan's employment."  Ms. Donovan denies DSMF ¶ 180, saying "[t]he PIP specifically states that Donovan would be asked to resign from her position." PRDSMF ¶ 180.  The Performance Improvement Plan states in part:

> I've continued the temporary reassignment of some of your key duties because I do not have confidence yet in returning them to you given the state they were in as we were entering our critical peak summer season.

*Exhibit Dep. of Helena Donovan*, Attach 3*, Ex. 16 Performance Expectations – Improvement Required Email* at 1 (PIP Email).

The Court rejects DSMF ¶ 180 because on its face, the PIP changed Ms. Donovan's "key duties" and therefore must have changed the "terms and conditions of [her] employment."  The Court considers DSMF ¶ 180 to be argument, not undisputed fact, and too inaccurate to include in the statement of undisputed material facts.

because she was cut off from the rest of the team and instead resigned shortly after receiving it.[387]  DSMF ¶ 181; PRDSMF ¶ 181.

Mr. Brown testified that Nappi management made countless suggestions and recommendations as to how Ms. Donovan could create a plan to improve or change the way she did her job.[388]  DSMF ¶ 182; PRDSMF ¶ 182.  Mr. Brown also testified that towards the end of Ms. Donovan's employment, she had become "completely incompetent" and that "she was just not capable of making any decisions outside of the box."[389]  DSMF ¶ 183; PRDSMF ¶ 183.  He further stated that Ms. Donovan was "incapable of really doing much."[390]  DSMF ¶ 184; PRDSMF ¶ 184.  Mr. Brown testified that Ms. Donovan had been on a performance improvement plan before her resignation for "awhile.  Months, months."  PSAMF ¶ 399; DRPSAMF ¶ 399.  Mr.

---

[387]     DSMF ¶ 181 states that Ms. Donovan took "no steps to try to meet the expectations outlined in the PIP and instead resigned shortly after receiving it."  Ms. Donovan denies DSMF ¶ 181, saying she "testified she was unable to do the PIP because she was cut off from the rest of the team."  PRDSMF ¶ 181.  Having reviewed the relevant record, the Court accepts Ms. Donovan's denial as a qualification and adds to DSMF ¶ 181 to reflect the record.

[388]     DSMF ¶ 182 states that "Nappi management made countless suggestions and recommendations as to how Ms. Donovan could create a plan to improve or change the way she did her job."  Ms. Donovan denies DSMF ¶ 182, saying "[s]he was dismissed from wine meetings where incentives would be discussed—information that was crucial to ordering, Brown, Watson, and Masters stopped meeting with Donovan, Hale was withholding information from [her, and m]anagement told Donovan to come up with new ways to do her job differently without providing any guidelines."  PRDSMF ¶ 182.  When asked whether anybody at Nappi made suggestions or recommendations to Ms. Donovan on how she could improve doing her job, Mr. Brown testified: "Countless, countless.  I mean not only did we or Matt [Watson] specifically ask[] for her input into how she could improve and obviously was not getting it and we turned to other people to help with this go forward plan, but yes, it was very clear."  *Brown Dep.* at 82:4-12.  Having reviewed the relevant record, the Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 182 to indicate that this fact reflects Mr. Brown's view of the situation.

[389]     Ms. Donovan admits that Mr. Brown testified as such but qualifies DSMF ¶ 183, saying "Donovan admitted that she felt paralyzed, but not because of incompetence.  She felt like she was told to do one thing, expected to do another, both were contradictory and she feared getting in trouble for doing either."  PRDSMF ¶ 183.  Ms. Donovan's objection is beyond the scope of the fact, and the Court admits DSMF ¶ 183.

[390]     Ms. Donovan admits that Mr. Brown "stated this," but "[d]en[ies] that it was true."  PRDSMF ¶ 184.  Ms. Donovan's denial is beyond the scope of the fact, and the Court admits DSMF ¶ 184.

Brown testified that the performance plan had started prior to the formal letter drafted on January 18, 2019.  PSAMF ¶ 400; DRPSAMF ¶ 400.

Ms. Donovan was denied a raise in the summer of 2019 due to Mr. Watson's assessment that she was struggling with ongoing performance issues.[391, 392]  DSMF ¶ 185, 187; PRDSMF ¶ 185, 187; PSAMF ¶ 303; DRPSAMF ¶ 303.  Ms. Donovan concedes that Mr. Watson explained to her that based on her performance she would not receive a raise in the summer of 2019, and she admits that she was not surprised by this decision.  DSMF ¶ 188; PRDSMF ¶ 188.  Ms. Donovan has no information to support an allegation that she was the only employee denied an annual raise that year and admits that she does not know whether that allegation is true.  DSMF ¶ 186; PRDSMF ¶ 186.

When Ms. Donovan received the PIP, it was made very clear to her that she would be terminated in 120 days unless she met the expectations of the PIP, but the PIP was vague because it provided no parameters to meet, such as out-of-stock

---

[391]    DSMF ¶ 185 states that "Ms. Donovan did not receive a raise in the summer of 2019 due to her ongoing performance issues."  Ms. Donovan qualifies DSMF ¶ 185, saying she "[a]dmit that this is what Watson determined" but denies "that she was having ongoing performance issues because of performance deficiencies."  PRDSMF ¶ 185.  The Court slightly alters DSMF ¶ 185 to reflect the record and admits the fact.

[392]    Ms. Donovan denies DSMF ¶ 187, saying she denies that her "performance did not merit a raise."  PRDSMF ¶ 187.  Ms. Donovan's denial is beyond the scope of the fact, and the Court admits DSMF ¶ 187.

expectations, nor outlined specific guidelines, even though she was asked to come up with innovative ways to do her job.[393, 394]  PSAMF ¶ 304-305; DRPSAMF ¶ 304-305.

### N.   Helena Donovan's Resignation

Ms. Donovan quit her employment at Nappi on October 18, 2019, leaving a note on her computer.  DSMF ¶ 191; PRDSMF ¶ 191.  Prior to resigning, Ms. Donovan did not inform anyone at Nappi, aside from her friend Ms. Ottawa, of her intent to resign, although she admits it might have been appropriate for her to notify Ms. Fox.[395]  DSMF ¶ 192; PRDSMF ¶ 192.  Ms. Donovan did not inform anyone in management that she was resigning because she felt there was no one she could go to, and specifically, she did not inform Ms. Fox because at that point, she did not believe that Ms. Fox was a source for her to go to.  *Id.*

---

[393]     PSAMF ¶ 304 provides that "[w]hen Donovan received the Performance Improvement Plan it was made very clear to her that she would be terminated in 120 days unless she met the expectations of the PIP, but the PIP was vague in that she was given no parameters to meet such as out of stock expectations and because she wasn't given the information and the opportunity to meet the expectations identified in the PIP."  Nappi objects to PSAMF ¶ 304 as immaterial and further qualifies the fact, saying "Ms. Donovan testified that Mr. Watson expected her to come up with ideas for how to accomplish some of the tasks on the PIP, and she further testified that most of things on the PIP were things that she was already doing."  DRPSAMF ¶ 304.  The Court overrules Nappi's materiality objection, finds Nappi's content objection beyond the scope of the facts addressed, and admits PSAMF ¶ 304.

[394]     PSAMF ¶ 305 states that "Donovan was asked to come up with innovative ways to do her job differently with no specifics in order to meet the expectations in the PIP."  Nappi denies the fact, saying "Mr. Brown testified that the expectations within the plan had been discussed with Ms. Donovan 'many, many times over months' and that she was clearly expected to perform with urgency, follow-through, and attention to detail.  Further, Mr. Watson testified that with the PIP, he expected Ms. Donovan to take ownership, show a sense of urgency, and communicate effectively.  Moreover, Mr. Watson testified that Ms. Donovan told him that he was direct, and that she would show him she could do the job.  He testified that she was told repeatedly that the areas of improvement they were looking for were her ongoing lack of urgency, missed orders, and overstocks."  DRPSAMF ¶ 305.  The Court accepts Nappi's denial as a qualification and slightly alters PSAMF ¶ 305 to reflect the record.

[395]     Ms. Donovan denies DSMF ¶ 192, saying she "testified there was no one in management that she [generally felt that she] could go to" and "[Ms.] Fox was clearly not a source for her to actually go to."  PRDSMF ¶ 192. The Court amended DMF ¶ 192 to accurately reflect the cited record.

Prior to abruptly leaving, Ms. Donovan received three emails from Mr. Watson on October 18, 2019. DSMF ¶ 193; PRDSMF ¶ 193. Ms. Donovan said that something about the emails "pissed [her] off" because of his negative tone.[396] DSMF ¶ 194; PRDSMF ¶ 194. Ms. Donovan did not explain her reasons for leaving prior to filing this lawsuit. DSMF ¶ 195; PRDSMF ¶ 195.

Ms. Donovan did not tell anyone at Nappi that she left because she believed she was being discriminated against based on her sex.[397] DSMF ¶ 196; PRDSMF ¶ 196. Prior to leaving Nappi, Ms. Donovan may have told Nappi management that she felt she was being discriminated against based on sex as far as how Ms. Hale

---

[396]     DSMF ¶ 194 states that "Ms. Donovan said that something about the emails 'pissed [her] off' but she could not recall specifically what it was." Ms. Donovan denies DSMF ¶ 194, saying "the emails 'pissed her off' because of how Watson spoke to her, as it was always negative." PRDSMF ¶ 194. Regarding the referenced emails, Ms. Donovan testified that "[a]nything that Matt [Watson] spoke to [her] about was negative, and it didn't matter what came out of [her] mouth, it's going to be wrong . . . [so the emails were] just another situation that kind of compounded – compounded it." *Donovan Dep.* at 254:21-255:2. The Court accepts Ms. Donovan's denial as a qualification and alters DSMF ¶ 194 to reflect the record.

[397]     DSMF ¶ 198 states that "Ms. Donovan cannot recall specifically telling anyone at Nappi that she was discriminated against in terms of compensation because of her sex." Ms. Donovan denies DSMF ¶ 198, saying she "testified that she reported it to Carr or Bourque." PRDSMF ¶ 198. Ms. Donovan testified:

> Q. During your employment at Nappi, did you ever tell anyone with management that you felt you were being discriminated against with regard to the terms of your compensation?
> A. Initially.
> Q. Who did you talk to about that?
> A. It would have been I want to say Paul [Carr] or Jim [Bourque]. I'm sorry, I don't remember the specific.
> Q. What do you remember about that conversation?
> A. Well, the fact that that title was taken away from me, that my compensation was less than John [Houle]'s, that there was no apparent reason for it, other than the excuse that he was grandfathered, therefore, it must be because I am a woman. I could see no other reason for it, other than to be told that they didn't want to provide me with management bonuses or a car.

*Donovan Dep.* at 91:7-23. The Court accepts Ms. Donovan's denial and omits DSMF ¶ 198.

treated women.[398]  PSAMF ¶ 284; DRPSAMF ¶ 284.  Ms. Donovan did not tell anyone at Nappi or Nappi management that she resigned because she felt she was discriminated against based on disability.  DSMF ¶ 199; PRDSMF ¶ 199.

Nobody at Nappi specifically said anything to Ms. Donovan to indicate that they wanted her to terminate her employment because of her mental health condition; however, when Ms. Donovan told Ms. Fox that her mental health was worsening, Ms. Fox told her she was just looking for a life raft.[399]  DSMF ¶ 200; PRDSMF ¶ 200; PSAMF ¶ 372; DRPSAMF ¶ 372.  During her employment, Ms. Donovan never used "magic words" to tell anyone at Nappi that she felt she was being discriminated against based on a disability, but she repeatedly told Ms. Fox that she thought she was being treated differently.[400]  DSMF ¶ 201; PRDSMF ¶ 201.  Ms.

---

[398]     PSAMF ¶ 284 provides that "[p]rior to leaving Nappi, Donovan told Nappi management that she felt she was being discriminated against on the basis of sex as far as how Hale treated women." Nappi objects to PSAMF ¶ 284 as inadmissible hearsay and denies the fact as unsupported by the record.  DRPSAMF ¶ 284.  Ms. Donovan testified:

> Q: Okay, I understand your allegations in this case are that Valarie Hale bullied you, harassed you, these types of allegations.  Did you ever say to anyone at Nappi management that you felt  she was doing so because of your sex?
> A. I wouldn't say I didn't, but I can't specifically give you a conversation.

*Donovan Dep.* 90:18-24.  The Court overrules Nappi's hearsay objection, accepts Nappi's denial as a qualification, and alters PSAMF ¶ 284 to reflect the record.

[399]     DSMF ¶ 200 provides that "[n]obody at Nappi said anything to imply they wanted Ms. Donovan to terminate her employment on the basis of her mental health condition."  Ms. Donovan denies DSMF ¶ 200, saying she "testified that Nappi management was deliberately and consistently ensuring that her mental health worsened each day to the point where she wouldn't be able to perform her job," and when she "disclosed to Fox that her mental health was worsening Fox responded that Donovan was just looking for a life raft."  PRDSMF ¶ 200.  Having reviewed he relevant record, the Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 200 to reflect the record.

[400]     DSMF ¶ 201 states that "[i]n fact, during her employment, Ms. Donovan never told anyone at Nappi that she felt she was being discriminated against on the basis of a disability."  Ms. Donovan denies DSMF ¶ 201, saying she "did not use the 'magic words' on the basis of disability but she repeatedly reported to Fox that she was being treated differently."  PRDSMF ¶ 201.  The Court accepts Ms. Donovan's denial as a qualification and slightly alters DSMF ¶ 201 to reflect the record.

Donovan did not discuss the specifics of her mental health issues with Nappi managers—other than HR Director Ms. Fox.[401]  DSMF ¶ 202; PRDSMF ¶ 202.

Ms. Donovan testified that she resigned from Nappi on October 18, 2019, because of her health as she could no longer take the mistreatment from Ms. Hale, the hostility, toxic environment, the continual exclusion and nastiness, the talking behind her back, and not being invited to meetings, stating "I had enough, I just couldn't take it anymore."[402]  PSAMF ¶ 283; DRPSAMF ¶ 283.  Ms. Donovan believes Nappi wanted her gone because of her mental health and sexual orientation, because of how things escalated after she requested leave for her mental health, and when she came out as lesbian.[403]  PSAMF ¶ 306; DRPSAMF ¶ 306.  Ms. Donovan did not file a complaint of discrimination with the Maine Human Rights Commission until May of 2020—seven months after she quit her employment with Nappi.  DSMF ¶ 203; PRDSMF ¶ 203.   Since Ms. Donovan left Nappi, Ms. Hale assumed all the

---

[401]    DSMF ¶ 202 provides that "Ms. Donovan did not discuss the specifics of her mental health issues with her managers at Nappi."  Ms. Donovan denies DSMF ¶ 202, saying she "spoke in detail with Human Resources Manager Christine Fox of her mental health issues." PASMF ¶¶ 119, 121-122, 312.  The Court amended DSMF ¶ 202 to reflect Ms. Donovan's conversations with Ms. Fox.

[402]    PSAMF ¶ 283 provides that "Donovan testified that she resigned from Nappi on October 18, 2019, because of her mental health as she could no longer take the mistreatment from Hale, the hostility, toxic environment, the continual exclusion and nastiness, the talking behind her back, not invited to meetings stating 'I had enough, I just couldn't take it anymore.'"  Nappi qualifies PSAMF ¶ 283, saying "Ms. Donovan testified that she resigned because it was beneficial for her health and did not specify that it was her mental health."  DRPSAMF ¶ 283.  The Court omits "mental" from the fact and admits PSAMF ¶ 283.

[403]    Nappi qualifies PSAMF ¶ 306, saying "Ms. Donovan testified that criticism for her performance was 'already bad' before she came out or requested leave."  DRPSAMF ¶ 306.  Nappi's objection is beyond the scope of the fact, and the Court admits PSAMF ¶ 306.

responsibility that Ms. Donovan had, in addition to coordinating pricing and incentives.[404]  PSAMF ¶ 285; DRPSAMF ¶ 285.

### O.    Mary Johnson's Employment at Nappi

Ms. Johnson began working for Cumberland and York Distributors in April of 2000 and became an employee of Nappi when it purchased Cumberland and York in 2002.[405]  PSAMF ¶ 212; DRPSAMF ¶ 212.  Ms. Johnson interviewed for a beer sales representative position, but she was told she would be better suited for an administrative position.[406]  PSAMF ¶ 213; DRPSAMF ¶ 213.  Ms. Johnson believes it was implied that the administrative position would be better for her over the sales representative position because she had a child.[407]  PSAMF ¶ 214; DRPSAMF ¶ 214.  Ms. Johnson testified that she was paid on a salary basis as an administrative assistant and told that she was required to work no less than 40 hours per week.[408]

---

[404]    PSAMF ¶ 285 states that "[s]ince Donovan left Nappi, Hale became the wine purchaser." Nappi denies PSAMF ¶ 285, saying "Ms. Hale was promoted to Purchasing and Inventory Coordinator in mid-2020.  In that position, Ms. Hale assumed everything that Ms. Donovan was doing, in addition to coordinating pricing and incentives."  DRPSAMF ¶ 285.  The Court accepts Nappi's denial as a qualification and alters PSAMF ¶ 285 to reflect the record.

[405]    Nappi objects to PSAMF ¶ 212 as "immaterial to Ms. Donovan's claims" but otherwise admits the fact.  The Court overrules Nappi's objection and admits PSAMF ¶ 212.

[406]    PSAMF ¶ 213 provides that "Johnson interviewed for a sales representative position, but she was told she would be better suited for an administrative position."  Nappi objects to PSAMF ¶ 213 as inadmissible hearsay and immaterial and further qualifies the fact, saying "Ms. Johnson testified that she applied for a beer sales position at Cumberland & York – not at Nappi."  DRPSAMF ¶ 213.  The Court overrules Nappi's hearsay and immateriality objections and slightly alters the fact to reflect the record.

[407]    Nappi objects to PSAMF ¶ 214 as inadmissible hearsay and as "based on mere speculation." DRPSAMF ¶ 214.  Nappi further qualifies that fact, saying "Ms. Johnson testified that the events in the factual assertion occurred while she was applying at Cumberland & York."  *Id.*  The Court overrules Nappi's hearsay objection, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 214.

[408]    Nappi objects to PSAMF ¶ 215 as immaterial and qualifies the fact, saying "Ms. Johnson testified that nobody told her what her weekly hourly expectation was."  DRPSAMF ¶ 215.  The Court overrules Nappi's materiality objection.  Finding the fact supported by the record and taking the facts in the light most favorable to the Plaintiff, the Court admits the fact over objection.

PSAMF ¶ 215; DRPSAMF ¶ 215.  Ms. Johnson testified that she was paid hourly previously but was switched to salary without notice in January of 2003 when Nappi purchased Cumberland and York.[409]  PSAMF ¶ 216; DRPSAMF ¶ 216.  Ms. Johnson testified that she often worked 50-60 hours per week until September 15, 2020, at which point she began working 35 hours per week, but she was reprimanded by Mr. Black on at least one occasion in part for not working more than 40 hours per week.[410] PSAMF ¶ 217; DRPSAMF ¶ 217.

Ms. Johnson felt she could not go to Mr. Bourque with a problem because on one occasion someone reported that an employee had made a comment about her dress that made her feel uncomfortable and when Mr. Bourque discussed the incident with her, he questioned whether it had really happened and told her it was a strong statement to make.  PSAMF ¶ 220; DRPSAMF ¶ 220.  This response made Ms. Johnson feel that there would be no actions taken for any reported issues.[411]  *Id.*

---

[409]    Nappi objects to PSAMF ¶ 216 as immaterial but otherwise admits the fact.  DRPSAMF ¶ 216. The Court overrules Nappi's materiality objection.

[410]    PSAMF ¶ 217 provides that "Johnson testified that she often worked 50-60 hours per week until September 15, 2020, at which point she began working 35 hours per week, but she was reprimanded by Black for not working more than 40 hours per week."  Nappi objects to PSAMF ¶ 217 as immaterial and further qualifies the fact, saying "Ms. Johnson could not specifically recall being 'reprimanded' aside from one incident wherein she left early without permission and was required to use two hours of vacation time.  Further, Ms. Johnson testified that although she recorded her hours at one point, she had stopped but could not recall when."  DRPSAMF ¶ 217.  The Court overrules Nappi's materiality objection.  Having reviewed the relevant record, the Court adds to PSAMF ¶ 217 to reflect the record and admits the fact.

[411]    PSAMF ¶ 220 states that "Johnson felt she could not go to [Jim] Bourque with a problem because on one occasion she reported an employee who made a comment about her dress that made her feel uncomfortable and [Mr.] Bourque's response was 'Are you sure that really happened?' 'That's a very strong statement.'  This response made [Ms.] Johnson realize there would be no actions ever taken for any issues."  Nappi objects to PSAMF ¶ 220 as immaterial and further qualifies the fact, saying "Ms. Johnson testified that she could not remember what her complaint was, but that it was 'something about the way I was dressed.'  Further, she admitted that she did not report the incident to Mr. Bourque, but someone else did, and he discussed it with her while he was investigating it."  DRPSAMF ¶ 220.  The Court overrules Nappi's materiality objection and, having reviewed the record, slightly alters PSAMF ¶ 220 to reflect the record.

Ms. Johnson believes the environment at Nappi became toxic when Ms. Fox began working there.[412]  PSAMF ¶ 221; DRPSAMF ¶ 221.  Ms. Johnson reported an issue she was having with Ms. Hale to Ms. Fox where she felt Ms. Hale was trying to make her look bad to the owner of the company; in response Ms. Fox told Ms. Johnson to let it roll off her shoulders.[413]  PSAMF ¶ 222; DRPSAMF ¶ 222.  Ms. Johnson testified that on an occasion she went to Ms. Fox with an issue and Ms. Fox "turned psycho" and "went crazy."  PSAMF ¶ 223; DRPSAMF ¶ 223.  Ms. Johnson explained that she went to Ms. Fox's office to discuss an issue that could have involved employee performance issues when Ms. Fox held the desk and started telling Ms. Johnson that she felt threatened by her.  PSAMF ¶ 224; DRPSAMF ¶ 224.  In response, Ms. Johnson asked Ms. Fox if she was crazy and left.[414]  *Id.*  Ms. Johnson reported the incident to managers Mr. Black and Mr. Coffee who told Ms. Johnson not to interact with Ms. Fox further but did not provide her with an alternative individual to go to with HR concerns.[415]  PSAMF ¶ 225; DRPSAMF ¶ 225.

Ms. Johnson worked with Ms. Hale for 19 years.  PSAMF ¶ 226; DRPSAMF ¶ 226.  Ms. Johnson testified that Ms. Hale uses her sexuality to get her way with male

---

[412]   Nappi objects to PSAMF ¶ 221 as immaterial but otherwise admits the fact.  DRPSAMF ¶ 221.  The Court overrules Nappi's materiality objection and admits PSAMF ¶ 221.

[413]   Nappi objects to PSAMF ¶ 222 as immaterial but otherwise admits the fact.  DRPSAMF ¶ 222.  The Court overrules Nappi's materiality objection and admits PSAMF ¶ 222.

[414]   Nappi qualifies PSAMF ¶ 224, saying "Ms. Johnson testified that she did not recall the interaction."  DRPSAMF ¶ 224.  Having reviewed the relevant record, the Court finds the fact generally supported by the record, and, as the Court is required to view contested facts in the light most favorable to Ms. Donovan, the Court admits PSAMF ¶ 224 over objection.

[415]   Nappi objects to PSAMF ¶ 225 as inadmissible hearsay and further qualifies the fact, saying "Ms. Johnson testified that she could go to Tim Coffee and Chris Black, both members of management."  DRPSAMF ¶ 225.  The Court overrules Nappi's hearsay objection, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 225.

members of management and often engages in inappropriate behavior in the workplace by sitting very close to male members of management, including Mr. Watson; revealing her thong in the workplace; wearing revealing clothing such as low cut, tight tops; flirting with Frank Nappi Jr. by catcalling him to meet her in the smoking room; speaking vulgarly with male members; and swapping inappropriate emails with Mr. Maiorino.[416]  PSAMF ¶ 227; DRPSAMF ¶ 227.  Ms. Johnson knows Ms. Hale would exchange inappropriate emails with Mr. Maiorino because on one occasion he accidently sent one of these emails to Ms. Johnson and apologized to her for doing so.  PSAMF ¶ 228; DRPSAMF ¶ 228.  Ms. Johnson told Mr. Maiorino it was gross and she didn't need to be part of it, to which Mr. Maiorino explained that Ms. Hale liked the emails and sends them to him.[417, 418]  *Id.*

---

[416]    Nappi objects to PSAMF ¶ 227 as immaterial and further qualifies the fact, saying "Ms. Johnson clarified that the conduct occurred 'years ago,' and that the vulgar discussions to which she was referring were 'implied,' and she testified that she never spoke with Ms. Hale about an inappropriate email, nor did she ever receive an inappropriate email from Ms. Hale.  Further, in the record citation, Ms. Johnson admits that she did the same body language she observed from Ms. Hale to her supervisor, Chris Black.  Moreover, Ms. Hale testified that she was not copied on any inappropriate emails from Nappi employees or management."  DRPSAMF ¶ 227.  The Court overrules Nappi's materiality objection, finds Nappi's content objection beyond the scope of the fact, and, as the Court is required to view contested facts in the light most favorable to Ms. Donovan, admits PSAMF ¶ 227.

[417]    Nappi objects to PSAMF ¶ 228 as inadmissible hearsay and immaterial and further qualifies the fact, saying "Ms. Hale testified that she was not copied on any inappropriate emails from Nappi employees or management."  DRPSAMF ¶ 228.  The Court overrules Nappi's hearsay and materiality objections, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 228.

[418]    PSAMF ¶ 229 provides that "Johnson also testified that Hale exchanged dirty emails with members of management."  Nappi objects to PSAMF ¶ 229, saying "Ms. Johnson does not have the personal knowledge to testify to emails that someone else exchanged" and denies the fact because "Ms. Hale testified that she was not copied on any inappropriate emails from Nappi employees or management."  Having reviewed the record, the Court finds that the extent to which Ms. Johnson has personal knowledge of emails between Ms. Hale and members of management is captured in PSAMF ¶ 228.  Otherwise, the record does not support general knowledge of members of management about these emails.  The Court therefore sustains Nappi's objection and omits PSAMF ¶ 229.

Ms. Johnson had breast reduction surgery while employed at Nappi.  PSAMF ¶ 230; DRPSAMF ¶ 230.  On one occasion she could not attend a training because of a different medical appointment and Ms. Johnson testified that when she told this to Ms. Hale, Ms. Hale responded by grabbing her own breasts, rubbing them, and asking "Oh is it for these."[419]  *Id.*  On one occasion, Ms. Hale accused Ms. Johnson of spreading a rumor that she was having an affair with Mr. Hale, one of the wine department managers.[420]  PSAMF ¶ 231; DRPSAMF ¶ 231.  Ms. Hale later married Mr. Hale.[421]  PSAMF ¶ 232; DRPSAMF ¶ 232.

Ms. Johnson testified that in April of 2019 "After a beer vendor trade show, I was with some colleagues at the Top of the East.  Mr. Watson was there and very intoxicated.  As I walked to Nosh Restaurant, he asked to walk with me.  He was prying about my breast surgery in a way that made me feel uncomfortable.  I told him to drop the subject.  Mr. Watson then continued on to tell me that he 'creeped on my Facebook' profile and that I always smiled and looked so happy but at work I looked like a miserable bitch.  He told me that I should quit my job at Nappi and work at my

---

[419]     Nappi objects to PSAMF ¶ 230 as inadmissible hearsay and immaterial and further qualifies the fact, saying "Ms. Hale testified that the only discussion she had with Ms. Johnson surrounding her procedure was excitement because she knew Ms. Johnson was happy about it."  DRPSAMF ¶ 230.  The Court overrules Nappi's hearsay objection for the reason explained in footnote 17, overrules Nappi's materiality objection, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 230.

[420]     Nappi objects to PSAMF ¶ 231 as inadmissible hearsay and immaterial and further qualifies the fact, saying "Ms. Hale testified that she did discuss whether Ms. Hale was having an affair with someone, but she misunderstood the 'Michael' to whom they were referring."  DRPSAMF ¶ 231.  Ms. Johnson testified: "[Ms. Hale] had accused me of spreading a rumor that she was having an affair with Michael Hale which was the wine -- one of the wine managers or supervisors."  *Nappi R.*, Attach 20, *Dep. of Mary Johnson* at 27:16-19 (*Johnson Dep.*).  The Court overrules Nappi's hearsay and materiality objections, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 231.

[421]     Nappi objects to PSAMF ¶ 232 as immaterial but otherwise admits the fact.  DRPSAMF ¶ 232.  The Court overrules Nappi's materiality objection and admits PSAMF ¶ 232.

night job.  I was very offended and believed it was sexist."[422]   PSAMF ¶ 233;
DRPSAMF ¶ 233.

On October 10, 2019, John Lambert showed Ms. Hale a picture of something
on his phone and loudly joked, so that everyone in the cubicles including Ms. Johnson
could hear, about it "not needing him to blow it up," implying it was sexual in nature.
PSAMF ¶ 234; DRPSAMF ¶ 234.  As Chris DeVinney walked by, Ms. Hale made him
stop to look at the picture.[423]  *Id.*

Ms. Johnson testified that on one occasion the owners of Nappi required the
females working in the cubicles to watch a stripper at work,[424]   PSAMF ¶ 235;
DRPSAMF ¶ 235, and that she reported the strippers to Mr. Chris Black and Mr.
Coffee.[425]   PSAMF ¶ 236; DRPSAMF ¶ 236.  Ms. Johnson also testified that Frank
Nappi, Sr. pulled Ms. Johnson into his office and told her to tell owner Frank Nappi,
Jr.'s wife, Venus, to not have a stripper in the place, to get rid of all the pictures on
the computer, and that "dumb-dumb" was not getting a stripper for his birthday.[426]
PSAMF ¶ 237; DRPSAMF ¶ 237.

---

[422]    Nappi object to PSAMF ¶ 233 as inadmissible hearsay and immaterial and further qualifies
the fact, saying "[Mr.] Watson testified that he was not aware that Ms. Johnson had breast reduction
surgery, and did not have a conversation with her about it . . . [and] denied the remainder of the
allegations in this factual assertion."   DRPSAMF ¶ 233.  The Court overrules Nappi's hearsay and
materiality objections, and, taking the facts in the light most favorable to the Plaintiff, finds that the
record citation supports the fact and admits PSAMF ¶ 231.

[423]    Nappi objects to PSAMF ¶ 234 as inadmissible hearsay and immaterial and further qualifies
the fact, saying "Ms. Johnson testified that she could not see what was on Mr. Lambert's phone."
DRPSAMF ¶ 234.  The Court overrules Nappi's hearsay and materiality objections, finds Nappi's fact
objection beyond the scope of the fact, and admits PSAMF ¶ 234.

[424]    Nappi objects to PSAMF ¶ 235 as immaterial and further qualifies the fact, saying "Ms.
Johnson clarified that this occurred 'a long time ago,' and that it was one male stripper who was
brought to the office by a person who was not an employee of Nappi to celebrate a milestone birthday."
DRPSAMF ¶ 235.  The Court overrules Nappi's materiality objection and admits PSAMF ¶ 235.

[425]    Nappi objects to PSAMF ¶ 236 and the Court overrules Nappi's objection.

[426]    Nappi objects to PSAMF ¶ 237 and the Court overrules Nappi's objection.

Ms. Johnson testified that Ms. Fox made her feel uncomfortable in part because of sexual comments Ms. Fox made to her on three occasions.[427]   PSAMF ¶ 238; DRPSAMF ¶ 238.   On one occasion as Ms. Johnson was walking past Ms. Fox, Ms. Fox said to Ms. Johnson "nice ass" and then later apologized saying she should not have made the comment, which Ms. Johnson agreed to.[428]   PSAMF ¶ 239; DRPSAMF ¶ 239.   On another occasion Ms. Fox gave a "booty call whistle" to Ms. Johnson and stated: "well, you keep looking good, I'm going to keep whistling at you."[429]   PSAMF ¶ 240; DRPSAMF ¶ 240.   On yet another occasion Ms. Fox approached Ms. Johnson and whispered in her ear "I don't know what you're doing but you're looking really good lately."[430]   PSAMF ¶ 241; DRPSAMF ¶ 241.

Ms. Johnson reported these incidents with Ms. Fox to Mr. Black and Mr. Coffee, but they did nothing to address the issues.[431]   PSAMF ¶ 242; DRPSAMF ¶ 242.   Ms. Johnson testified that on a number of occasions she reported to Mr. Black that she was being bullied by Ms. Hale.   PSAMF ¶ 243; DRPSAMF ¶ 243.   Mr. Black

---

[427]   Nappi objects to PSAMF ¶ 238 as inadmissible hearsay and immaterial and further qualifies the fact, saying "Ms. Johnson testified that she could not recall the day or time that these comments allegedly occurred."   The Court overrules Nappi's hearsay and materiality objections, finds Nappi's fact objection beyond the scope of the fact, and admits PSAMF ¶ 238.

[428]   Nappi objects to PSAMF ¶ 239 as inadmissible hearsay and immaterial and further qualifies the fact, saying "Ms. Johnson testified only that she 'thought [she] heard the comment.'"   The Court overrules Nappi's hearsay and materiality objections for the reason explained in footnote 17, overrules Nappi's materiality objection, finds Nappi's fact objection beyond the scope of the fact, and admits PSAMF ¶ 239.

[429]   Nappi objects to PSAMF ¶ 240 as immaterial and further qualifies the fact, saying "Ms. Johnson testified to that, but also admitted that she told people about this allegation because she wanted to cause a stir."   DRPSAMF ¶ 240.   The Court overrules Nappi's materiality objection, finds Nappi's fact objection beyond the scope of the fact, and admits PSAMF ¶ 240.

[430]   Nappi makes the same objection to PSAMF ¶ 241 as to PSAMF ¶ 240, and the Court overrules Nappi's objection for the same reason explained in the prior footnote.

[431]   Nappi makes the same objection to PSAMF ¶ 242 as to PSAMF ¶¶ 240-41, and the Court overrules Nappi's objection for the same reason explained in the prior footnote.

responded that Ms. Johnson was intimidating.[432]  *Id.*  Ms. Johnson testified that Ms. Hale maliciously withheld information to intentionally cause Ms. Johnson to struggle with her job.[433, 434]  PSAMF ¶ 244; DRPSAMF ¶ 244.

During a meeting with Ms. Fox in her last week at Nappi, having declined an exit interview, Ms. Johnson explained to Ms. Fox that she felt very unsupported by her as the Human Resources representative.  PSAMF ¶ 255; DRPSAMF ¶ 255.  Ms. Johnson explained that when she went to Ms. Fox with work issues she left without results and that she feared going to her office due to Ms. Fox's attacking Ms. Johnson and retaliating against her by saying she felt threatened.  *Id.*  Ms. Johnson testified that in this meeting with Ms. Fox she explained that on one occasion she came to her with an issue involving Ms. Hale and she told her that she needed to be like Teflon and let it roll off her.  PSAMF ¶ 256; DRPSAMF ¶ 256.  In response, Ms. Fox accused Ms. Johnson of lying and said, "You're lying, I never said that to you, I said that to [Ms. Donovan]."[435]  *Id.*

---

[432]     Nappi objects to PSAMF ¶ 243 as inadmissible hearsay and further qualifies the fact, saying "Ms. Johnson testified that Mr. Black told her that after she also reported bullying by Becky Douglass and Sara Ouellette."  The Court overrules Nappi's hearsay objection, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 243.

[433]     Nappi qualifies PSAMF ¶ 244, saying "Ms. Johnson testified about a specific example wherein Ms. Hale discussed a project with her two weeks before it needed to be done, and it was not Ms. Hale's responsibility to tell Ms. Johnson about her job and that she should have gotten information from her supervisor.  In another example, Ms. Johnson accused someone of not giving her information she needed, but admitted that it was not Ms. Hale but an IT person.  Further, she testified that aside from those instances, and one occurrence where she needed an organizational chart, she could not recall any other examples."  DRPSAMF ¶ 244.  The Court finds Nappi's qualification largely beyond the scope of the fact but omits "on numerous occasion" from PSAMF ¶ 244 and otherwise admits the fact.

[434]     The Court omits PSAMF ¶ 245 because the fact duplicates PSAMF ¶ 222.

[435]     Nappi objects to PSAMF ¶ 256 as inadmissible hearsay and denies the fact, saying "Ms. Fox testified that she did not say that."  DRPSAMF ¶ 256.  The Court overrules Nappi's hearsay objection and, taking the facts in the light most favorable to the Plaintiff, admits PSAMF ¶ 256 over objection.

Ms. Donovan told Ms. Johnson that she felt she was bullied by Ms. Hale.[436] PSAMF ¶ 257; DRPSAMF ¶ 257.  Ms. Murray told Ms. Johnson she felt bullied by Ms. Hale and that she reported the issue to Mr. Black.[437]  PSAMF ¶ 258; DRPSAMF ¶ 258.  Ms. Murray told Ms. Donovan that Ms. Hale was "particularly nasty and that she had been bullied and intimidated by Ms. Hale for years and she was glad I had started there because Ms. Hale would now leave her alone."[438]  PSAMF ¶ 259; DRPSAMF ¶ 259.  Ms. Johnson testified that Nappi never had an HR department that you could go to if you needed to report an issue or to discuss a situation that made you feel uncomfortable.[439]  PSAMF ¶ 218; DRPSAMF ¶ 218.

---

[436]     PSAMF ¶ 257 provides that "[Ms.] Donovan reported to [Ms.] Johnson that she felt she was bullied by [Ms.] Hale."  DRPSAMF ¶ 257.  Nappi objects to PSAMF ¶ 257 as inadmissible hearsay and qualifies the fact, saying "Ms. Johnson did not testify that she characterized these complaints as 'reports,' but rather that Ms. Donovan told her that Ms. Hale copied Ms. Donovan's supervisors in emails."  DRPSAMF ¶ 257.  The Court overrules Nappi's hearsay objection, slightly alters PSAMF ¶ 257 to reflect the record, and admits the fact.

[437]     Nappi objects to PSAMF ¶ 258 as inadmissible hearsay but otherwise admits the fact.  DRPSAMF ¶ 258.  The Court overrules Nappi's hearsay objection and admits the fact.

[438]     PSAMF ¶ 259 provides that "Carol Murray told Donovan that Hale was 'particularly nasty' and that she had been bullied by Valarie [Hale] for years and she was glad I had started there because Valarie [Hale] would now leave her alone."  Nappi objects to PSAMF ¶ 259 as inadmissible hearsay and further qualifies the fact, saying "[t]he record citation is inaccurately quoted in the factual assertion."  DRPSAMF ¶ 259.

The cited transcript reads:

Q.  Is there anyone else who warned you when you first started about this conduct?
A.  Carol Murray.
Q.  What did Ms. Murray say?
A.   Just that Valerie was particularly nasty and that she had been bullied and intimidated by Val[a]rie for years and she was glad I had started there because Val[a]rie would now leave her alone.

The Court overrules Nappi's hearsay objection.  To rectify the inaccurate citation objection, the Court adds that Ms. Murray said she had been both bullied <u>and intimidated</u> by Ms. Hale for years.

[439]     Nappi objects to PSAMF ¶ 218 as immaterial and further qualifies the fact, saying "Ms. Johnson could not provide specifics as to why she testified as she did, indicating that she did not recall the interaction . . . [and] testified that she could approach Ms. Fox with issues about job performance."  DRPSAMF ¶ 218.  The Court overrules Nappi's materiality objection, finds Nappi's content objection beyond the scope of the fact, and admits PSAMF ¶ 218.

Ms. Donovan never told Ms. Johnson that she was suffering from depression, but Ms. Johnson could see that she was depressed from her observations of Donovan.[440]   PSAMF ¶ 274; DRPSAMF ¶ 274.   Ms. Johnson was aware of Ms. Donovan's suicide attempts.  PSAMF ¶ 275; DRPSAMF ¶ 275.  Ms. Masters observed Ms. Donovan crying at work.  PSAMF ¶ 276; DRPSAMF ¶ 276.  Ms. Johnson kept a journal of work events because she felt like she was on the radar for attack.[441] PSAMF ¶ 277; DRPSAMF ¶ 277.  In that journal, Ms. Johnson wrote an entry the day after Ms. Donovan resigned from her position that states:

> Day started w/ Val [Hale]'s mouth again! Swearing & cussing.  Talking dirty to anyone that will listen.  By 11:45 I was informed by Kate that [Ms. Donovan] had walked off the job.  The bullying was too much. Yesterday she showed me an email where Val [Hale] told her she was too busy to do something & [Ms. Donovan] will now need to do it.  Matt Watson was not cc'd.  Katurah informed me that [Ms. Donovan] needed her coats & calendar.  I went in and saw the note she left.  "I resign" on the screen of her PC.  At approx. 1:30 Val [Hale] called Nick [Nappi] & asked him to come to her desk.  She brought him & Steve Stultz to [Ms. Donovan]'s office by skipping & saying Nick "Ha Ha—I've got something to show you—" she was thrilled she went to the conference room by fish tank & made a call.  Cornered Michelle [Tourangeau]—Ran to tell Ian [Brown].  Went to tell Christine [Fox].  Informed Anthony to redirect [Ms. Donovan]'s email.  This girl was once again impressed with herself and destroying another persons career.  She was on the phone with someone

---

[440]    PSAMF ¶ 274 states that "Donovan never told Johnson she was suffering from depression, but Johnson could see that she was depressed from her observations of Donovan."  Nappi qualifies PSAMF ¶ 274, saying "Ms. Johnson admitted that she is not a medical professional and instead relied on her experience as a bartender to make that assumption . . . [and] Ms. Johnson does not have the foundation to testify to medical conditions she perceived in Ms. Donovan, as it is speculative and impermissible lay opinion."

    The Court overrules Nappi's objection as frivolous.  Ms. Johnson's observations of Ms. Donovan fit well within Federal Rule of Evidence 701.  A lay witness does not need a medical degree to observe that someone was depressed in the lay sense of the term.

[441]    Nappi objects to PSAMF ¶ 277 as immaterial and further qualifies the fact, saying "Ms. Johnson did not call it a 'log' but rather a journal and admitted that it is in her regular practice to keep journals."  The Court overrules Nappi's materiality objection, finds Nappi's content objection largely beyond the scope of the fact, but changes "log" to "journal" to reflect the record.

proclaiming she will now be even busier but we've been through this before![442]

PSAMF ¶ 278; DRPSAMF ¶ 278.

Ms. Johnson did not observe Ms. Hale to be devastated by Ms. Donovan's resignation and does not believe she was devastated because she was excited to show Nick Nappi Ms. Donovan's resignation.[443]   PSAMF ¶ 279; DRPSAMF ¶ 279.   After Ms. Donovan left her employment with Nappi, Ms. Johnson left Ms. Donovan a voicemail:

> Hi Helena, I am so sorry you were driven to this. It is just unacceptable and it is so wrong. I am so sorry that people didn't listen to you and understand what you were enduring from that evil person or all the evils you were working with day in and day out. It is really unfair that the toxic work environment and um you were definitely harassed, and I hope you express that to someone um because that was your career and that is just wrong. Um good luck. I will talk to you soon. Bye love have a good weekend. As good as you can.[444]

PSAMF ¶ 280; DRPSAMF ¶ 280. Ms. Johnson testified that the evil person she was referring to was Ms. Hale and that her advice to Ms. Donovan to "express that to someone" meant to seek legal counsel.[445]   PSAMF ¶ 281; DRPSAMF ¶ 281.   Ms. Johnson recommended that Ms. Donovan have her attorneys subpoena Nappi's out-of-stock records because Ms. Hale was complaining about Ms. Donovan's out of stocks

---

[442]   Nappi denies PSAMF ¶ 278 as unsupported by the record because "[t]he referenced journal entry was not dated on the day that Ms. Donovan resigned." DRPSAMF ¶ 278. Having reviewed the relevant record, the Court confirms that Ms. Johnson's entry is dated October 19, the day after Ms. Donovan resigned. The Court accepts Nappi's denial as a qualification and changes "the day" to "the day after" to reflect the record.

[443]   Nappi objects to PSAMF ¶ 279 as inadmissible hearsay but otherwise admits the fact. The Court overrules Nappi's hearsay objection and admits the fact.

[444]   Nappi objects to PSAMF ¶ 280 as inadmissible hearsay but otherwise admits the fact. The Court overrules Nappi's hearsay objection and admits the fact.

[445]   Nappi objects to PSAMF ¶ 281 as inadmissible hearsay but otherwise admits the fact. The Court overrules Nappi's hearsay objection and admits the fact.

yet after taking over Ms. Donovan's role she was out of stock all the time.[446]  PSAMF ¶ 282; DRPSAMF ¶ 282.

### P.    Other Facts

Elmer Alcott was aware of Mr. Maiorino's sexually explicit work communications.[447]  PSAMF ¶ 319; DRPSAMF ¶ 319.  Mr. Alcott and other employees and members of management themselves received sexually explicit work emails from Mr. Maiorino.[448]  PSAMF ¶ 320; DRPSAMF ¶ 320.  One email Mr. Alcott and other Nappi employees and managers received from Mr. Maiorino joked about how men had it easier than women and one specific reference was to how men have it easier because they do the same work for more pay.[449]  PSAMF ¶ 321; DRPSAMF ¶ 321.  Mr. Alcott agreed that emails like those contained in Alcott Ex. 1 were distributed in the workplace.[450]  PSAMF ¶ 322; DRPSAMF ¶ 322.  Mr. Alcott testified that Nappi had antidiscrimination classes at Nappi, but all he learned was that if you're a white man and under 50 you have no rights.[451]  PSAMF ¶ 323; DRPSAMF ¶ 323.

---

[446]    Nappi objects to PSAMF ¶ 282 as inadmissible hearsay and further qualifies the fact, saying "[Ms. Johnson] told Ms. Donovan to subpoena the records, not request them."  DRPSAMF ¶ 282.  [The Court overrules Nappi's hearsay objection, changes "request" to "subpoena," and admits the fact.

[447]    Nappi objects to PSAMF ¶ 319 as immaterial but otherwise admits the fact.  The Court overrules Nappi's materiality objection and admits PSAMF ¶ 319.

[448]    Nappi objects to PSAMF ¶ 320 as immaterial and inadmissible hearsay but otherwise admits the fact.  DRPSAMF ¶ 320.  The Court overrules Nappi's hearsay and materiality objections and admits PSAMF ¶ 320.

[449]    Nappi objects to PSAMF ¶ 321 as immaterial and inadmissible hearsay but otherwise admits the fact.  DRPSAMF ¶ 321.  The Court overrules Nappi's hearsay and materiality objections and admits PSAMF ¶ 321.

[450]    Nappi objects to PSAMF ¶ 322 as immaterial but otherwise admits the fact.  DRPSAMF ¶ 322.  The Court overrules Nappi's materiality objection and admits PSAMF ¶ 322.

[451]    Nappi objects to PSAMF ¶ 323 as immaterial but otherwise admits the fact.  DRPSAMF ¶ 323.  The Court overrules Nappi's materiality objection and admits PSAMF ¶ 323.

### III.    THE PARTIES' POSITIONS

#### A.    Nappi's Motion for Summary Judgment

Nappi argues that the Court should grant summary judgment in its favor on all of Ms. Donovan's claims because it "did not discriminate against [Ms. Donovan] for any reason, let alone due to her gender, sexual orientation, or disability." *Def.'s Mot.* at 1. Nappi contends that all claims are unsupported by the record.

##### 1.    Medical Leave Claims

Nappi submits that assuming "Ms. Donovan could show that she meets the first two requirements for FMLA interference, she cannot satisfy the other three." *Def.'s Mot.* at 3. According to Nappi, "[t]he summary judgment record does not support an assertion that Ms. Donovan was entitled to FMLA leave for an additional weekly therapy session" because there is "no evidence that Ms. Donovan's alleged mental health issues prevented her from performing the essential functions of her position" and she "continued to do her job even after her alleged meeting with [HR] when [she] allegedly raised the issue of intermittent FMLA leave." *Id.* at 4. Nappi further submits that "there is absolutely no evidence that a healthcare provider found that Ms. Donovan was unable to work at all or unable to perform any one of the essential functions of her position," and that Ms. Donovan "acknowledges that her alleged request for intermittent leave was not based on any doctor's recommendation." *Id.*

Nappi contends that "[i]n order to prevail on the fourth element of her FMLA claim, Ms. Donovan must demonstrate that she provided Nappi with a probable basis for FMLA leave by giving them enough information to determine whether FMLA may

apply to the leave request" and that "a mere demand for leave is insufficient." *Id.* According to Nappi, it "agreed to provide Ms. Donovan with the flexibility to ensure she could attend the extra therapy sessions" and Ms. Donovan "did not protest this arrangement or further suggest that she needed FMLA leave," thus failing "to provide Nappi with sufficient information for it to determine whether the FMLA applied to her request for intermittent leave." *Id.*

Finally, Nappi insists that Ms. Donovan "cannot meet the fifth element of an FMLA interference claim because she cannot establish that Nappi denied her benefits to which she was entitled" because Ms. Donovan "admitted that no one at Nappi refused to allow her to attend an extra weekly therapy appointment" and "concede[d] that at no time did anyone from Nappi ever tell her that she was not permitted to take time to attend any health care appointment she wished." *Id.* at 5.

### 2.    Disability Claims

Nappi contends that it "did not discriminate against Ms. Donovan on the basis of disability in violation of the ADA" because there is "no record evidence to demonstrate that Ms. Donovan informed Nappi that she was disabled, that she requested an accommodation for any alleged disability, or that she was denied the same." *Id.*

Nappi relies on *Reed v. Lepage Bakeries, Inc.*, 244 F.3d 254 (1st Cir. 2001) to support its contention that Ms. Donovan did not sufficiently place Nappi on notice of her disability and, even should she have been granted specific accommodation to attend weekly counseling, Nappi did not prevent her from exercising this reasonable accommodation. *Def.'s Mot.* at 6-7. Nappi submits that "[a]lthough certain employees

of Nappi may have been aware of Ms. Donovan's suicide attempt in 2017, that alone is insufficient to properly place Nappi on notice of a disability." *Id.* at 7. Nappi moreover submits that Ms. Donovan "never suggested to Ms. Fox or management that the deficiencies in her job performance were due to any mental health condition or disability." *Id.* at 7-8.

Lastly, Nappi argues that "Ms. Donovan was not denied a reasonable accommodation" because "upon returning from her leave following her suicide attempt, Ms. Donovan was permitted to attend therapy sessions." *Id.* at 8. Nappi insists that "[t]o the extent Ms. Donovan decided not to attend any additional appointments—appointments that, notably were never recommended by a healthcare provider—that was her decision, and not the result of any action or inaction on the part of anyone at Nappi," making it such that she has "failed to establish a viable ADA claim and Nappi is entitled to summary judgment as a matter of law on Counts III and VI." *Id.*

### 3. Title VII and Maine Human Rights Act Claims

Nappi contends that "even if [Ms. Donovan] could meet her prima facie case of alleged discriminatory actions based on some of her allegations, Nappi had legitimate, nondiscriminatory reasons for its actions." *Id.* at 10. Nappi first submits that "[i]t is undisputed that Ms. Donovan—as a gay woman—is the member of protected classes" and "for the purpose of the summary judgment motion, Nappi will not contest that Ms. Donovan was qualified for (but not necessarily proficient in) her job." *Id.* Nappi then submits that "while most of Ms. Donovan's alleged 'adverse actions' are either unsupported or legally inadequate to support a discrimination

156

claim, Nappi acknowledges—for the purposes of the summary judgment motion only—that certain allegations might generate a factual issue as to whether Ms. Donovan suffered an adverse employment action." *Id.* Nappi therefore "accepts for the purposes of summary judgment that Ms. Donovan may be able to establish a prima facie case." *Id.*

According to Nappi, however, "even if Ms. Donovan can generate an issue of fact with regard to certain alleged 'adverse actions'—specifically, the alleged differential in pay from her predecessor, the alleged 'removal' of certain benefits, and the lack of a raise in the summer of 2019—Nappi had a legitimate, non-discriminatory reason for each of those actions." *Id.* at 11. First, Nappi contends that it "compensated Ms. Donovan differently than John Houle (including pay and benefits) based on legitimate, nondiscriminatory reasons" including "experience, seniority, and an agreement as part of Nappi's acquisition of Mr. Houle's previous employer." *Id.* at 11-12.

Nappi likewise submits that "assuming Ms. Donovan could show she was the only employee who did not receive a raise in the summer of 2019, Nappi had a legitimate, nondiscriminatory reason for that as well" because Mr. Watson "determined that Ms. Donovan's performance did not merit a raise." *Id.* at 12. Finally, Nappi submits that "even if Nappi's issuance of a PIP could constitute an adverse action, that action was taken for legitimate, nondiscriminatory reasons" because "noncompliance with company procedures and subsequent employees performing tasks better than the plaintiff are both legitimate, nondiscriminatory

reasons for employment action." *Id.* at 12-13. According to Nappi, Ms. Donovan's work performance was inadequate, large portions of her job were being performed by other individuals, and she was receiving regular coaching in an effort to improve her performance." *Id.* at 13.

Regarding Ms. Donovan's hostile work environment claim, Nappi acknowledges that Ms. Donovan is a member of protected classes and "[a]lthough Nappi disputes [Ms. Donovan's] allegations [that she was subjected to unwelcome harassment], it acknowledges that Ms. Donovan's testimony alone is likely sufficient to establish a factual issue as to whether she experienced these conditions." *Id.* at 15. Nappi contends, however, that Ms. Donovan cannot "establish that the alleged harassment was causally related to her sex or sexual orientation" because she "has provided no evidence of a causal relationship linking the alleged harassment by Ms. Hale to her sex" and instead "she simply speculates that Ms. Hale is 'threatened' by women." *Id.* at 15-16. Likewise, Nappi asserts that "Ms. Donovan has presented no evidence that the alleged hostile work environment was caused by her sexual orientation" because she "did not come out as gay to anyone at Nappi until mid-2018 at the earliest," "did not come out to Ms. Hale until around March of 2019," and "to Mr. Watson in March of 2019." *Id.* at 16. Nappi submits that "even if Ms. Donovan could demonstrate that Mr. Watson was aware in March of 2019 that she was gay, his alleged increased criticisms of her job performance that started in 2018 could not have been caused by that knowledge." *Id.*

According to Nappi, Ms. Donovan "has alleged only that Ms. Hale was 'difficult,' that she was critical of her job performance, that she reported Ms. Donovan's job deficiencies to superiors, and that she has claimed that she wanted Ms. Donovan's job—all of which is insufficient to establish the type of severe and pervasive conduct required to establish a hostile work environment."  *Id.* 17-18. Nappi insists that "[i]f Ms. Donovan truly believed she was facing a hostile work environment as a result of her status as a female or lesbian, the reasonable course of action would have been to notify management [and h]er failure to do so suggests that she did not believe the conduct to be subjectively offensive."  *Id.* at 18.  Moreover, Nappi posits that "even if Ms. Donovan can generate a factual issue with regard to the subjective standard, the record makes clear that Ms. Donovan cannot meet the objective standard" because "a reasonable person would not find such conduct, including a female co-worker being 'difficult,' the alleged increased scrutiny of Ms. Donovan's work, or the alleged 'exclusion' from certain wine team functions, to be hostile or abusive."  *Id.* at 18-19.

Finally, Nappi asserts that "to the extent Ms. Donovan's hostile work environment rests on the alleged conduct of her co-workers, she fails the sixth element of the test—namely, she has not demonstrated a basis for liability on behalf of Nappi" because she "has alleged that she was treated differently by Ms. Hale, a non-supervisory female co-worker, because of her sex."  *Id.* at 19.  According to Nappi, it was "aware of one specific incident of inappropriate workplace conduct by Ms. Hale, which was not based upon sex or sexual orientation, but rather dissatisfaction with

Ms. Donovan's work performance, and Nappi promptly addressed the conduct," and Ms. Donovan is "unable to establish that Nappi knew or should have known of the sexual harassment." *Id.* at 20.

### 4.    Retaliation Claims

Nappi insists that "the record does not contain evidence to support a prima facie case of retaliation" but that "[e]ven if it did, any adverse employment actions she alleges are based on Nappi's legitimate, non-discriminatory business reasons." *Id.* at 21.  First, Nappi contends that the "record does not reflect that the Plaintiff engaged in protected conduct" because although Ms. Donovan "made complaints about the conduct of her co-worker, Ms. Hale, shortly after being hired in December of 2013 and again in June of 2018, Ms. Donovan did not tell members of Nappi management that she believed Ms. Hale [or other co-workers were] discriminating against her" on the basis of her sex or her sexual orientation. *Id.* at 21-22.  Moreover, according to Nappi, Ms. Donovan "did not file a complaint of discrimination with the Maine Human Rights Commission until May of 2020—seven months after she quit her employment with Nappi" and thus "Ms. Donovan cannot establish that she engaged in protected activity" for the purposes of retaliation. *Id.* at 22.

Next, Nappi contends that there is "no causal connection between the alleged 'adverse actions' and any protected conduct." *Id.*  According to Nappi, since "there is no record evidence to suggest that Ms. Donovan ever advised any of the decisionmakers at Nappi that she felt she was being discriminated against on the basis of sex or sexual orientation, she cannot meet the causal connection requirement of her prima facie case." *Id.*  Finally, Nappi submits that if a prima facie case is met,

Nappi is nonetheless entitled to summary judgment because it "had legitimate, nondiscriminatory reasons for its actions" as outlined above under the Title VII claim. *Id.* at 22-23.

### 5. Equal Pay Act Claims

Nappi asserts that "Ms. Donovan's claim under the EPA fails because, even if she could establish that she and her predecessor performed the same job—which Nappi disputes—it is undisputed that Ms. Donovan's predecessor was significantly more experienced and had more seniority at the company than she did, which constitute legitimate non-discriminatory reasons for why he was paid more than Ms. Donovan." *Id.* at 23. Nappi submits that "[w]hen it hired Ms. Donovan . . . Nappi set her compensation according to her level of experience as a wine buyer" and although "Ms. Donovan had two years of previous experience as a wine buyer for another distributor prior to her employment at Nappi, she had nowhere near the level of experience of Mr. Houle." *Id.* at 24-25. Nappi further submits that "there can be no dispute that Mr. Houle, who had been the wine purchasing manager at Nappi for more than ten years at the time Ms. Donovan was hired, had substantially more seniority at Nappi than Ms. Donovan ever attained in her tenure with the company." *Id.* at 25. Nappi therefore contends that it has "sufficiently met its burden of establishing that any pay discrepancy between Mr. Houle and Ms. Donovan was based on legitimate factors other than sex . . . [and] Nappi is entitled to judgment as a matter of law on Count VII of Plaintiff's Complaint." *Id.* at 25.

### B.    Helena Donovan's Opposition

Ms. Donovan urges the Court to deny Nappi's request because disputes of material fact preclude summary judgment on all claims.

### 1.    Medical Leave Claims

Ms. Donovan submits that there is sufficient evidence to support her claims under the FMLA and the MFMLR because she "requested FMLA leave on January 16, 2019, during a meeting with Human Resources Director Christine Fox" and Ms. Fox "refused to provide [her] with the requisite forms and paperwork . . . [when Ms.] Donovan provided that she requested leave because of her worsening depression causing her inability to do her job, and feared that she might again attempt suicide." *Pl.'s Opp'n* at 3.   According to Ms. Donovan, "she did not attend additional appointments because she worried about the scrutiny she'd be under for attendance without the protection of FMLA."  *Id.*  Ms. Donovan asserts that "[a] reasonable juror viewing the evidence in the light most favorable to Donovan as nonmovant could find, at the least, that the defendant interfered with her rights to FMLA leave by discouraging and preventing her from taking such leave or making such a request." *Id.* at 4.

### 2.    Disability Claims

Ms. Donovan submits that while Nappi "asserts that it was not aware of Ms. Donovan's disability . . . th[at] assertion is false" because "[t]he record is replete with evidence of Nappi's knowledge of Ms. Donovan's disability."  *Id.*  She explains that "she spoke at length with Ms. Fox about her diagnoses, treatment, and progress following her suicide attempt in 2017" and "Ms. Fox also acknowledged receiving and

reviewing medical documentation submitted in correspondence with Ms. Donovan's short-term disability and FMLA in 2017 which established that Ms. Donovan suffered from Major Recurrent Depression." *Id.* Ms. Donovan further submits that if there was "any lack of notice or understanding of Ms. Donovan's need for accommodation, it is due to the fact that Nappi failed to engage in the interactive process when Ms. Donovan disclosed her worsening mental health condition and requested FMLA on January 16 and 18 of 2019." *Id.* at 5. Ms. Donovan contends that "[h]ad Nappi granted [her] FMLA, continuous or intermittent, [Ms.] Donovan could have had time to focus on her mental health and adjusting her medication so that she could, again, successfully return to work full time." *Id.* at 6.

In response to Nappi's argument that it "did not fail to accommodate Ms. Donovan because [it] never denied [her] an accommodation," Ms. Donovan asserts that this "statement is not accurate" because Ms. Fox "denied Ms. Donovan's request for FMLA and refused to provide her the paperwork" instead instructing her that "if she needed additional appointments to tell her manager . . . and flex the time to make up for any missed work at a different time." *Id.* According to Ms. Donovan, however, she "was not requesting to flex her time and make up the additional hours," Nappi did deny her request to pursue FMLA, and she "did not attend additional appointments because she was denied FMLA," making it such that "Nappi failed to provide [her] a reasonable accommodation." *Id.* at 6-7.

### 3. Title VII and Maine Human Rights Act Claims

Ms. Donovan contends that although "Nappi asserts that the adverse actions such as denying her raise, removing job duties, eliminating management title, paying

at a lower rate than predecessor, removing from communications, and PIP resulted from Donovan's poor performance," when "viewing the evidence in the light most favorable to the Plaintiff, a reasonable factfinder could conclude that [she] was performing her duties as expected until Watson arrived and after learning of Donovan's disability on September 13, 2018, or after learning she was gay in March of 2019 began to discriminate[] against Plaintiff." *Id.* at 13-14.

### 4. Retaliation Claims

Ms. Donovan asserts that Nappi retaliated against her because of her disability when she "was denied FMLA despite being qualified for the benefit," when her "1.5% raise in 2019 was rescinded," when she "was excluded from wine management meetings where information was discussed that was imperative for her to do her job successfully," and when she "had job duties taken away." *Id.* at 7. Moreover, she submits that "[n]o one offered [her] Excel training" and she was "provided a PIP which was vague with no measurables to determine whether she met or did not meet the expectations of the PIP." *Id.* at 8. She contends that she was "uneventfully employed for 5 years and suffered an employer's adverse action on the heels of notifying her employer of her worsening mental health condition and requesting medical leave as an accommodation." *Id.* at 9.

Ms. Donovan contends that temporal proximity exists here and urges the Court to "examine the timing between when she disclosed her disability and worsening mental health condition and when [she] suffered an adverse employment action from Nappi." *Id.* She further contends that "[b]ased on these facts, a fact-finder could infer

164

that her managers had knowledge of [her] disability" and "[t]he documentation shows that after this series of events, suddenly [she] was 'inept' and 'incompetent.'" *Id.*

Regarding retaliation under Title VII and the MHRA, Ms. Donovan disagrees with Nappi's position that her "complaints to her supervisors, managers, and Human Resources Director do not qualify as protected conduct under either Title VII or MHRA because it was too vague to sufficiently identify the type of discrimination she believed she was facing." *Id.* at 14. She submits that to the contrary, she "repeatedly made complaints of mistreatment from Hale" and "testified the mistreatment was so intolerable that she attempted suicide in September 2017." *Id.* at 15. She further submits that she "sent an email to management about the 'backstabbing bitches in the office' referring to Hale and her friends, in an email communicating her intent to commit suicide to Brown and Fox." *Id.*

She adds that she "also reported being excluded, isolated, unfairly criticized, by . . . Watson." *Id.* at 16. According to Ms. Donovan, "within four months of beginning work at Nappi, Watson had already begun drafting the PIP on January 18, 2019 that was eventually presented to Donovan on September 30, 2019" and "[i]t is unclear whether this was retaliatory or discriminatory motive on the part of Watson, or through cat's paw discrimination/retaliation based on his relationship with Hale" because Ms. Hale "spoke poorly of Donovan to whomever would listen that had influence." *Id.*

Ms. Donovan contends that while "Nappi claims that the cause of the adverse actions was [her] job performance . . . according to management [she] performed her

job well until January 2019—two days after she requested an accommodation, three months after Fox told Watson of Donovan's mental health, four months after Watson begam working at Nappi, and one month after [she] came out to Brown."

### 5. Equal Pay Act Claims

Ms. Donovan submits that her EPA claim "can be summarized by Defendant's decision to pay her less than her predecessor, John Houle, for performing the exact same duties" and that "Nappi achieved its disparate pay practices through different means." *Id.* at 11. She explains how she "began working at Nappi Distributors in 2013 and was paid a salary of $53,000 . . . [and b]y the time she left Nappi in 2019 she was earning a salary of $60,000" while Mr. Houle's "income in 2013 was $70,000." *Id.* Moreover, she adds that "Nappi removed manager from Donovan's job title which made her ineligible for manager bonuses and a company vehicle, because Alcott did not want [her] to be entitled to manager bonuses and a company vehicle." *Id.* Ms. Donovan further submits that "[i]t is significant that the female wine purchaser was paid nearly $20,000 less than the male that had previously held the wine purchaser position" and "[c]oupled with evidence that there were discriminatory hiring practices at Nappi, the facts taken holistically are more than enough to demonstrate a violation of the EPA." *Id.* at 12.

### C. Nappi's Reply

### 1. Medical Leave Claims

Nappi submits that "to the extent Ms. Donovan suggests in her Opposition that she told Fox about the specific reason she required an additional weekly therapy session or that she told Ms. Fox that she would be unable to work without the

additional weekly session . . . Ms. Donovan's own testimony contradicts both assertions." *Def.'s Reply* at 4. According to Nappi, "[i]t is also undisputed that Ms. Donovan requested leave in order to attend one additional therapy appointment per week, and she was explicitly told by Nappi management that she could attend that appointment without taking FMLA leave." *Id.* Nappi further submits that "Ms. Donovan now attempts to distract the Court from her admission that she was granted the flexibility to attend the requested additional appointment by arguing that she did not know the details concerning the requested leave" when "[t]o the contrary, the record clearly demonstrates that Ms. Donovan expressly requested leave to attend one additional therapy appointment per week—an appointment for which her provider never recommended taking FMLA leave—and Nappi granted her the ability to do so without question or qualification." *Id.* at 4-5.

### 2. Disability Claims

Nappi contends that "Ms. Donovan's arguments with regard to her claim under the [ADA] are not supported by competent record evidence or law" because "assuming Nappi managers were aware that Ms. Donovan struggled with depression and sought counseling to address that issue, such knowledge is inadequate to place Nappi on notice that the depression constituted a 'disability' under the ADA." *Id.* at 5. Nappi asserts that here "the record establishes that the only 'accommodation' Ms. Donovan requested was permission to attend an additional weekly or bi-weekly therapy appointment" and "[i]t is undisputed that Nappi management expressly granted her permission to do so." *Id.* at 6. Nappi insists that "[w]ith the information that Ms. Fox was given, Nappi provided the accommodation that was requested and had no

reason to believe that alternative accommodations should have been explored." *Id.*
Nappi additionally contends that "Ms. Donovan's claim of retaliation under the ADA
cannot survive summary judgment" because she "cannot make out a prima facie case
for retaliation" and even if she could, "Nappi has articulated legitimate
nondiscriminatory reasons for the actions Ms. Donovan claims are retaliatory." *Id.*

### 3.   Title VII and Maine Human Rights Act Claims

Nappi submits that Ms. Donovan "has not demonstrated that she was
discriminated against on the basis of sex or sexual orientation, and she has not
demonstrated that any of Nappi's legitimate nondiscriminatory reasons for its actions
were pretextual" when in fact "the competent record evidence is clear that" the reason
she was both "issued a PIP and denied an annual raise in the summer of 2019" was
due to her "poor job performance." *Id.*   Nappi further submits that although Ms.
Donovan "argues that she was performing her duties as expected until Nappi hired
Mr. Watson . . . she has not refuted the record evidence that she faced criticism for
her performance well before Mr. Carr retired in 2017, and that the myriad
deficiencies in the way she managed her job responsibilities became particularly
apparent when Brown and [Ms.] Hale had to assume her job duties during her 2017
medical leave." *Id.* at 8-9.   Nappi insists that "[m]oreover, Ms. Donovan cannot
establish that the individuals whom she claims provided the most criticism, Ms. Hale
and Mr. Watson, were even aware that she was gay—and certainly nothing to suggest
a discriminatory animus *because* she was gay." *Id.* at 9 (emphasis in *Def.'s Reply*).

### 4.    Retaliation Claims

Nappi contends that "Ms. Donovan has failed to demonstrate required elements of her claim of retaliation under Title VII and the [MHRA]" because she "has not demonstrated that she engaged in any protected activity" and "even if Ms. Donovan could show that she engaged in protected activity, she cannot demonstrate any causal connection between the alleged activity and any adverse action." *Id.* at 10.  Nappi asserts that Ms. Donovan herself "concedes that she cannot identify the causal connection, instead admitting that 'it's unclear,'" to which Nappi retorts that "[m]erely hypothesizing a variety of unsupported theories is insufficient to defeat a motion for summary judgment." *Id.*   In response to Ms. Donovan's temporal proximity argument, Nappi submits that "Ms. Donovan admitted that the alleged complaint about losing her title and a pay discrepancy . . . occurred nine years before any alleged adverse action," so "there is insufficient evidence to infer a temporal causal connection between the protected activity and any alleged retaliation." *Id.* at 12.

### 5.    Equal Pay Act Claims

Nappi submits that it is "entitled to judgment on Plaintiff's EPA claim because she failed to contest Nappi's legitimate reasons for compensating the Plaintiff as it did" because she "failed to address, even in part, Nappi's affirmative defenses under the [EPA.]" *Id.* at 8.  Nappi asserts that "[t]o the contrary, Ms. Donovan admits that Mr. Houle had worked at Nappi for fifteen years when she was hired and had considerably more experience than her" and urges the Court that Ms. Donovan has "waived any arguments she may have had concerning those defenses." *Id.*

169

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)).  Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v.*

*Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).   "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.   DISCUSSION

To recap, Ms. Donovan brings claims for: 1) Count I, violation of the FMLA, 2) Count II, violation of the MFMLR; 3) Count III, disability discrimination in violation of the ADA; 4) Count IV, sex-based and sexual orientation-based discrimination in violation of Title VII, 5) Count V, retaliation in violation of Title VII for reporting gender and sex-based discrimination, 6) Count VI, sex-based and retaliation discrimination in violation of the MHRA,  and, 7) Count VII, violation of the EPA .

The Court denies Nappi's Motion for Summary Judgment as to four of Ms. Donovan's claims: Count I, FMLA interference, Count II, MPMLR interference, Count III, ADA-prohibited disability discrimination, and Count VII, EPA violation, and grants Nappi's Motion for Summary Judgment as to three of Ms. Donovan's claims (sex-based and sexual orientation-based discrimination in violation of Title VII and the MHRA; retaliation in violation of Title VII).

### A.   Interference of the Family and Medical Leave Act and Violation of Maine's Family Medical Leave Requirements

Ms. Donovan alleges that Nappi "interfered with [her] substantive rights under the FMLA by denying, discouraging, or restraining her request for a full medical leave of absence." *Compl.* ¶ 71. Ms. Donovan asserts that instead of granting

her FMLA leave, Nappi "mocked and criticized [her] when she needed time off for mental health treatment." *Id.* Ms. Donovan alleges that this same "conduct amounts to a violation of the Maine FMLA," known as the Maine Family Medical Leave Requirements (MFMLR). *Compl.* ¶ 76.

### 1.   Legal Standard

Section 2615(a)(1) of the FMLA states that: "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title." "In order to make out a prima facie case for FMLA interference, a plaintiff must show that (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave her employer notice of her intention to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Kempton v. Delhaize Am. Shared Servs. Grp. LLC*, No. 2:14-cv-00494-JDL, 2016 U.S. Dist. LEXIS 35621, at *4 (D. Me. Mar. 17, 2016). No showing as to employer's intent is required. *Colburn v. Parker Hannifin/Nichols Portland Div.,* 429 F.3d 325, 331 (1st Cir. 2005). At issue in FMLA interference claims "is simply whether the employer provided its employee the entitlements set forth in the FMLA . . .." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998). A plaintiff does not have an actionable FMLA interference claim unless they can demonstrate that the employer took an action that "could chill desire to take FMLA leave." *Kimes v. Univ. of Scranton*, 126 F. Supp. 3d 477, 501 (M.D. Pa. 2015).

Although the burden for invoking FMLA rights is low, it is not met by merely demanding leave. *Matthys v. Wabash Nat'l*, 799 F. Supp. 2d 891, 905 (N.D. Ind.

2011).  Rather, employees must provide an employer with enough information to determine whether FMLA would apply to the request.  *Id.*

MFMLR protections are identical to FMLA protections, so the same analysis will apply to both claims. *Crosby v. F.W. Webb, Co.*, No. 2:12-cv-135-NT, 2014 U.S. Dist. LEXIS 40065, at *31-32 (D. Me. Mar. 26, 2014).

### 2.    Analysis – Prima Facie Case

Nappi wisely does not contest that Ms. Donovan can establish the first two showings required for a prima facie case of FMLA interference: 1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA.  The record plainly demonstrates she has met the employment duration (at least 12 months) and time worked (at least 1250 hours) requirements, DSMF ¶ 1; PRDSMF ¶ 1; PSAMF ¶ 193; DRPSAMF ¶ 193, and that Nappi has sufficient employees to be covered by the FMLA. [452] PSAMF ¶ 268; DRPSAMF ¶ 268; 29 C.F.R. § 825.110.  Defendant Nappi claims Ms. Donovan "cannot satisfy the other three" requirements, but to no avail.

Entitlement to leave requires Ms. Donovan to show that she had "a serious health condition that ma[de] [her] unable to perform the functions of [her] position[.]" 29 U.S.C. Sec 2612(a)(1)(D).  The relevant regulation defines five broad categories of serious health conditions: (a) incapacity and treatment, (b) pregnancy or prenatal care, (c) chronic conditions, (d) permanent or long-term conditions, and (e) conditions requiring multiple treatments.  29 C.F.R. § 825.115.  "A chronic serious health

---

[452]     Ms. Donovan was employed by Nappi for more than five years and expected to work approximately forty (40) hours a week. Even accounting for her leaves, she easily met these requirements.

condition is one which: (1) Requires periodic visits (defined as at least twice a year) for treatment by a healthcare provider, or by a nurse under direct supervision of a health care provider; (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)." 29 C.F.R. § 825.115(c).  For years Ms. Donovan was treated for and prescribed medication to treat her anxiety, panic disorder, Post Traumatic Stress Disorder (PTSD), and major depressive disorder recurrent.  PSAMF ¶ 12, 14, 16-17, 33; DRPSAMF ¶ 12, 14, 16-17, 33.  Major depressive disorder recurrent means there is a history of major depressive episodes with varying degrees of mild, moderate, and severe.  PSAMF ¶ 34; DRPSAMF ¶ 34.  Given these facts and drawing all reasonable inferences in favor of Ms. Donovan, the Court readily concludes a reasonable factfinder could find these conditions meet the "serious health condition" standard.

The Court turns to whether these conditions made her unable to perform the functions of employment.  The FMLA does not require this impairment to be permanent; instead, as noted above, the impairment can be periodic.  Ms. Donovan's mental healthcare provider, Dr. Altschule, testified that if Ms. Donovan had presented him with FMLA paperwork as of [January 21, 2019,] he would have agreed that she needed leave and would have recommended a continuous leave, a leave of absence, as opposed to intermittent leave, due to the history of attempted suicide coupled with the ongoing stressor increasing Ms. Donovan's anxiety and feelings of hopelessness.  PSAMF ¶¶ 48-49, 54-55; DRPSAMF ¶¶ 48-49.  The Court finds that a reasonable factfinder could find this to be sufficient evidence that a medical provider believed Ms. Donovan could not

perform the essential functions of her position and her leave was "medically necessary." *Washington v. Honeywell Int'l, Inc.*, 323 F. Supp.3d 309, 315 (D.R.I. 2018) (quoting 29 U.S.C. Section 2612(b)(1)).

The fourth element of FMLA interference requires Ms. Donovan demonstrate she gave her employer notice of her intention to take leave. On January 18, 2019, Ms. Donovan met with Ms. Fox and asked for leave pursuant to the FMLA because she needed additional help. DSMF ¶ 144; PRDSMF ¶ 144. Ms. Donovan was specific that she was unwell because of her depression. PSAMF ¶ 371; DRPSAMF ¶ 371. Moreover, she indicated that she at least needed an additional therapy session per week. PSAMF ¶ 373; DRPSAMF ¶ 373. The Court finds a reasonable factfinder could find these facts show Ms. Donovan gave Nappi notice of her intent to take leave.

The final element requires Ms. Donovan to show she was denied the FMLA benefits to which she was entitled. Caselaw makes clear denial "includes 'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'" *Tucker v. Town of Scarborough*, No. 2:19-CV-00213-GZS, 2020 WL 3271936, at *5 (D. Me. June 17, 2020) (citing 29 C.F.R. § 825.220(b)). While "[n]o one at Nappi explicitly told Ms. Donovan that she could not attend an additional weekly therapy session," DSMF ¶ 155; PRDSMF ¶ 155, the record includes comments and suggestions made by Nappi employees that a reasonable factfinder could find interfered with Ms. Donovan using FMLA leave by discouraging her. First, Ms. Fox did not give Ms. Donovan the FMLA paperwork she requested. PSAMF ¶ 197; DRPSAMF ¶ 197. Second, Ms. Fox encouraged Ms. Donovan to talk to Mr. Watson, not an HR employee, about needing time off for counseling appointments. PSAMF ¶

200; DRPSAMF ¶ 200.  Further, Ms. Fox told Ms. Donovan that because she was salaried, there was no reason she couldn't flex her schedule and she therefore did not need to take leave and fill out the FMLA paperwork for an additional weekly appointment, DSMF ¶¶ 148-150; PRDSMF ¶¶ 148-150, and  Ms. Fox admitted that she asked Ms. Donovan "why she was so focused on asking for FMLA leave."  PSAMF ¶ 210; DRPSAMF ¶ 210.  Taken together, all these actions other than simply handing Ms. Donovan the requested paperwork, at the very least create a question of material fact whether Nappi's actions unlawfully discouraged Ms. Donovan to not take FMLA leave.

Given there is sufficient evidence to establish all the necessary elements for a prima facie case of FMLA and MFMLR interference, Nappi is not entitled to summary judgment on Counts I and II of Plaintiff's Complaint.

### B.    Disability Discrimination in Violation of the ADA and the MHRA[453]

Ms. Donovan brings claims for disability discrimination in violation of the ADA and the MHRA. Nappi contends there is "no record evidence to demonstrated that Ms. Donovan informed Nappi that she was disabled, that she requested an accommodation for any alleged disability, or that she was denied the same." *Def's Mot.* at 5.

---

[453]    Since the MHRA generally resembles federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA.  *See Carnicella v. Mercy Hosp.*, 2017 ME 161, ¶ 20 n.3, 168 A.3d 768 ("Because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA") (citing *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 14 n.7, 824 A.2d 48)).

### 1.    Legal Standard

The ADA imposes liability on an employer for "not making reasonable accommodations to the known physical or mental limitations" of an employee.  *Reed*, 244 F.3d at 260-61.   "Thus, to survive summary judgment on a failure-to-accommodate claim, an employee must furnish evidence that she was disabled within the meaning of the ADA; that she was a qualified individual; and that her employer knew about her disability yet neglected to accommodate it."  *Trahan v. Wayfair Maine, LLC*, 957 F.3d 54, 64 (1st Cir. 2020) (citing *Pena v. Honeywell Int'l, Inc.*, 923 F.3d 18, 31 (1st Cir. 2019)); *accord Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 102 (1st Cir. 2007).  The ADA defines "disability" as "A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).

Under the ADA, the plaintiff bears the burden of proving that the defendant could provide a reasonable accommodation for her disability.  *Reed*, 244 F.3d at 258.  "More specifically, the plaintiff's burden under the ADA is 'to show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances.'"  *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 136 (1st Cir. 2009) (quoting *Reed*, 244 F.3d at 259).  Additionally, the plaintiff bears the burden of putting the employer adequately on notice "of her disability and need for accommodation."  *Reed*, 244 F.3d at 260.  Alternatively, the plaintiff may demonstrate that she was prevented from invoking the request for accommodation.  *Id.*

A plaintiff cannot demonstrate that she provided her employer with sufficient notice of disability merely by introducing evidence that an employer witnessed symptoms. *Id.* Similarly, "'[t]he employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace,' or simply relies on the employer's general awareness of his need for accommodations where the purported conflict with a medical condition in particular situations is not obvious." *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 85 (1st Cir. 2016) (inline citations omitted) (quoting *Reed,* 244 F.3d at 261; and citing *Enica v. Principi,* 544 F.3d 328, 339–40 (1st Cir. 2008)).

## 2.    Analysis – Prima Facie Case

"For purposes of the ADA, one is considered disabled if she (a) has a physical or mental impairment that substantially limits one or more of her major life activities; (b) has a record of such an impairment; or (c) is regarded as having such an impairment." *Ruiz Rivera,* 521 F.3d at 82; *accord Bailey v. Georgia–Pacific Corp.,* 306 F.3d 1162, 1166 (1st Cir.2002), 42 U.S.C. § 12102(1). Ms. Donovan offers evidence of mental impairments including anxiety, panic disorder, Post Traumatic Stress Disorder (PTSD), and major depressive disorder recurrent. PSAMF ¶ 12, 14, 16-17, 33; DRPSAMF ¶ 12, 14, 16-17, 33. Nappi does not argue whether Ms. Donovan is disabled or a qualified individual under the ADA. In turn, this Court views the evidence of disability in the light most favorable to Ms. Donovan and finds there is enough evidence in the record for a reasonable factfinder to find Ms. Donovan meets this bar. *See Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 20 (1st Cir.2004) (depression is a mental impairment that may in some circumstances constitute a

disability under federal law); *Equal Employment Opportunity Comm'n v. Amego, Inc.,* 110 F.3d 135, 141 (1st Cir.1997) (assuming for summary judgment purposes that plaintiff's depression and post-traumatic stress disorder rendered him "a disabled person within the meaning of the ADA").

Nappi contends that "Ms. Donovan did not put Nappi on adequate notice of her disability and her need for an accommodation." *Def.'s Mot.* at 7.  For adequate notice, Ms. Donovan's request had to be "'sufficiently direct and specific,' giving notice that she need[ed] a 'special accommodation.'" *Reed*, 244 F.3d at 260 (1st Cir. 2001) (quoting *Wynne v. Tufts Univ.*, 976 F.2d 791, 795 (1st Cir. 1992)).  Indeed, "[t]he employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace, or simply relies on the employer's general awareness of his need for accommodations where the purported conflict with a medical condition in particular situations is not obvious." *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 85 (1st Cir. 2016) (internal quotations omitted).  Instead, "the plaintiff must adduce specific facts showing that a trier of fact reasonably could find in [their] favor." *Id.* at 83 (citing *Anderson,* 477 U.S. at 249–50). "Conclusory allegations, improbable inferences, and unsupported speculation will not make the grade." *Murray,* 821 F.3d 77 at 82 (citing *Celotex,* 477 U.S. at 323–24; *Pina v. Children's Place,* 740 F.3d 785, 795–96 (1st Cir. 2014)).

Viewed in the light most favorable to her, Ms. Donovan offers evidence in the record that she directly and specifically gave notice she needed special accommodation.  After an attempted suicide, Ms. Donovan took a leave of absence

from Nappi pursuant to FMLA and short-term disability.  DSMF ¶ 35; PRDSMF ¶ 35.  Ms. Fox, the Human Resources Manager at Nappi, PSAMF ¶ 56; DRPSAMF ¶ 56, knew of Ms. Donovan's major depression diagnosis, PSAMF ¶ 121; DRPSAMF ¶ 121, and helped Ms. Donovan apply for short-term disability benefits during her medical leave in September 2017 during Ms. Donovan's hospitalization at Spring Harbor.  PSAMF ¶ 120; DRPSAMF ¶ 120.  The next month, in October of 2017, Ms. Donovan also visited Ms. Fox in person and handed her a physician-signed form which listed PTSD and major depressive disorder (severe, recurrent) as Ms. Donovan's diagnoses.  Ms. Fox admitted she understood these were Ms. Donovan's diagnoses.  PSAMF ¶ 122; DRPSAMF ¶ 122.  This Court finds that a reasonable factfinder could find these facts support Ms. Donovan's prima facie case of having given Nappi, through a designated representative—the HR manager—"sufficiently direct and specific" notice of her specific disability and the "special accommodation" needed for it.  *Reed*, 244 F.3d at 260 (1st Cir. 2001).

With the context of the 2017 events, Ms. Donovan's 2019 request for intermittent FMLA leave for additional weekly therapy sessions is a far cry from requiring Nappi to "divine the need for a special accommodation."  *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 85 (1st Cir. 2016).  Ms. Donovan did not "merely make[] a mundane request for a change at the workplace, or simply rel[y] on the employer's general awareness of [her] need for accommodations where the purported conflict with a medical condition [] is not obvious."  *Id.*  To the contrary, Ms. Donovan specifically names a special accommodation, FMLA leave, and names the purpose, an

extra therapy session—the very accommodation used less than a year and a half prior for her documented disability. Taken together, the Court finds a reasonable factfinder could find this evidence shows Nappi knew of Ms. Donovan's disability and her need for an accommodation.

The final argument left then is whether Nappi denied Ms. Donovan a reasonable accommodation. For precisely the same reasons the Court discussed in the FMLA section, the Court concludes that Ms. Donovan has made out a prima facie case as to whether Nappi failed to accommodate her disability.

In their reply brief on the motion for summary judgment, Nappi contends that even if Ms. Donovan has met the burden, Nappi "has articulated legitimate nondiscriminatory reasons for the actions Ms. Donovan claims are retaliatory." *Def.'s Reply* at 6. Nappi goes on to say that "Ms. Donovan has entirely failed to address, even in a cursory manner, Nappi's proffered legitimate nondiscriminatory reasons for its actions, and has therefore waived her ADA claim as a matter of law." *Id.* at 7 (citing *March v Frey*, 458 F. Supp. 3d 16, 39 n.28 (D. Me. 2020)).

However, Nappi seeks to blame Ms. Donovan for its own omission. Addressing Nappi's claim that it did not discriminate against Ms. Donovan on the basis of disability, Nappi's memorandum appears on pages five through eight of its original motion under the subheading, **NAPPI DID NOT DISCRIMINATE AGAINST MS. DONOVAN ON THE BASIS OF DISABILITY IN VIOLATION OF THE ADA**. *Def.'s Mot.* at 5-8. Nappi states its position:

> [T]here is no record evidence to demonstrate that Ms. Donovan informed Nappi that she was disabled, that she requested an accommodation for

181

> any alleged disability, or that she was denied the same. Therefore,
> Nappi is entitled to summary judgment on Ms. Donovan's disability
> discrimination claims under the ADA and the MHRA.

*Id.* at 5. Missing from Nappi's formulation is any reference to its legitimate, nondiscriminatory reasons for its actions in response to Ms. Donovan's disability claims. Nappi discusses its position that Ms. Donovan "did not put Nappi on adequate notice of her disability and her need for an accommodation." *Id.* at 7. However, Nappi does not discuss any legitimate, nondiscriminatory business purpose for its actions in this section. *See id.* at 5-8. Nappi does later discuss its legitimate, nondiscriminatory reasons for its actions but only in the context of Ms. Donovan's sex-based discrimination claims. *See id.* at 10-14. But in its original filing, Nappi never asserts that its legitimate, nondiscriminatory reasons for its actions apply to Ms. Donovan's disability claims.

As Nappi first raised the issue of legitimate nondiscriminatory reasons for its actions in its reply briefing, not in its first memorandum in support of the motion for summary judgment, it failed to give Ms. Donovan notice that the issue is being contested, thereby requiring Ms. Donovan to anticipate Nappi's arguments before they are made in later briefing. "In this court, reply memoranda are to be 'strictly confined to replying to new matter raised in the objection or opposing memorandum'" and "[i]ssues raised for the first time in reply memoranda will not be considered." *Mitsubishi Caterpillar Forklift Am., Inc. v. Superior Serv. Assocs., Inc.*, 81 F. Supp. 2d 101, 114 (D. Me. 1999) (quoting Local Rule 7(c); and citing *In re One Bancorp Securities Litigation*, 134 F.R.D. 4, 10 n.5 (D. Me. 1991)). Since Nappi first raised its

argument of legitimate nondiscriminatory reasons in response to a prima facie case of failing to accommodate, this Court does not consider the issue.

Since Ms. Donovan has made a prima facie case of Nappi failing to accommodate her disability and Nappi's retort of legitimate nondiscriminatory reasons was not properly presented, Nappi is not entitled to judgment as a matter of law on Counts III and IV.

### C.    Title VII and MHRA Claims

Ms. Donovan brings claims for sex-based discrimination in violation of Title VII and the MHRA.  *Compl.* ¶¶ 91-92, 103.  Nappi argues that Ms. Donovan's Title VII and MHRA claims are unsupported by the record.  *Def.'s Mot.* at 10.

### 1.    Legal Standard

Title VII protects against workplace discrimination on the basis of certain protected categories, including sex and sexual orientation.  42 U.S.C. § 2000e *et seq.*  The Maine Human Rights Act (MHRA) similarly protects the interests of individuals in fair employment against discrimination on the basis of sex and sexual orientation, amongst other categories.  5 M.R.S. § 4552.  Maine courts have used federal precedent surrounding Title VII for the purposes of construing and applying the provisions of the MHRA.  *Trott v. H.D. Goodall Hosp.*, 2013 ME 33, ¶ 15, 66 A.3d 7; *Bowen v. Dep't of Human Servs.*, 606 A.2d 1051, 1053 (Me. 1992); *see also Knight v. O'Reilly Auto Enters., LLC*, No. 2:17-cv-300-NT, 2019 U.S. Dist. LEXIS 47018, at *8 n.2 (D. Me. Mar. 21, 2019) ("Maine courts look to Title VII caselaw when considering MHRA claims") (citing *Cole v. Maine Office of Info. Tech.*, No. 1:17-CV-00071-JAW, 2018 U.S. Dist. LEXIS 163857, at *27 (D. Me. Sept. 25, 2018)).  Accordingly, the Court will apply

the same legal standard in considering whether the case survives summary judgment under both federal Title VII law and state MHRA law.  *See Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 436 n.3 (1st Cir. 1997).

In the absence of direct evidence of discrimination, the First Circuit employs the *McDonnell Douglas* burden-shifting framework to evaluate whether a plaintiff can make out an inferential case of the alleged discrimination.  *See Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 88 (1st Cir. 2018) (citing *McDonnell Douglas Corp.*, 411 US. 792); *Lockridge v. Univ. of Maine Sys.*, 597 F.3d 464, 470 (1st Cir. 2010)).  Under this analysis, a plaintiff must first show that a prima facie case of sex discrimination exists.  Under Title VII and consequentially the MHRA, Ms. Donovan must first demonstrate that "(1) [s]he is a member of a protected class; (2) [s]he met [her] employer's expectations; (3) [s]he suffered adverse employment action with respect to compensation; and (4) similarly-situated employees outside the protected class received more favorable treatment."  *Prescott v. Higgins*, 538 F.3d 32, 40 (1st Cir. 2008).  Such a showing is "not onerous and is easily made."  *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003).

Moving to step two, if such a showing can be made, then there is an inference of discrimination and "the burden of production shifts to the defendant to produce evidence 'that the adverse employment actions were taken for a legitimate, nondiscriminatory reason.'" *Cham v. Station Operators, Inc.,* 685 F.3d 87, 94 (1st Cir. 2012) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).  If the employer can demonstrate such a reason, the analysis then progresses to step three:

184

"[i]f the defendant carries this burden of production, [then] the plaintiff must prove, by a preponderance, that the defendant's explanation is a pretext for unlawful discrimination." *Mariani-Colon v. Dep't of Homeland Sec.*, 511 F.3d 216, 221 (1st Cir. 2007).

"A plaintiff may also establish a violation of Title VII by showing sex harassment based upon a hostile work environment." *Burns v. Johnson*, 829 F.3d 1, 9 (1st Cir. 2016). "To prove a claim of hostile work environment sexual harassment, a plaintiff must establish: (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established." *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 395 (1st Cir. 2002).

### 2.   Analysis

#### a.   Disparate Treatment

Nappi "acknowledges—for the purposes of summary judgment only—that certain allegations might generate a factual issue as to whether Ms. Donovan suffered an adverse employment action. Thus, Nappi accepts for the purposes of summary judgment that Ms. Donovan may be able to establish a prima facie case." *Def.'s Mot.* at 10. This Court assumes for the sake of analysis that Ms. Donovan can meet her

modest burden of establishing a prima facie case of disparate treatment and moves on to the real issues in this case. *See, e.g., Garcia v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 31 (1st Cir. 2008) ("On summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus") (citing *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996)).

Nappi has identified a legitimate, non-discriminatory reason for firing Ms. Donovan: her deficient performance. *See Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 100 (1st Cir. 2007) (defendant employer stated a legitimate reason for firing employee because of her failure to follow instructions regarding a presentation to superiors). These performance deficiencies include, but are not limited to, "Ms. Donovan's work performance [being] inadequate, large portions of her job [] being performed by other individuals, and [her] receiving regular coaching in an effort to improve her performance." *Def.'s Mot.* at 13 (citing DSMF ¶¶ 52, 172-174); *accord Def.'s Mot.* at 13-14 (alleging inventory, urgency, strategy, communication, and time-management issues) (citing DSMF ¶¶ 48, 49, 54, 60-61, 64-67, 69-73, 75, 77, 81, 84, 88, 90, 94, 96-99, 102, 106).

Thus, the Court focuses on whether Ms. Donovan has provided sufficient evidence to demonstrate that this explanation is a pretext and that her sex or sexual orientation were motivating factors in her alleged adverse employment actions. *See Dávila v. Corporación De P.R. Para La Difusión Pública*, 498 F.3d 9, 16 (1st Cir.2007)

186

("At summary judgment, this question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that [she] was fired because of [her gender]").

Ms. Donovan argues Nappi's rationale is pretextual. Ms. Donovan first contends that "viewing the evidence in the light most favorable to [her], a reasonable factfinder could conclude that [she] was performing her duties as expected until Watson arrived" and "after learning she was gay in March of 2019 began to discriminate[] against [her]." *Pl.'s Opp'n* at 14. Ms. Donovan further claims that "Brown's statement to Donovan when she came out to him as gay heeded as a warning that there would be consequences for doing so at Nappi," that there were "homophobic slurs used at Nappi," that Hale and Douglas made "crass, sexual jokes to Donovan after she came out," and that Hale "expressed bias against gays and lesbians" to Ms. Donovan. *Id.*

The record contains no direct evidence of gender bias by Mr. Watson. While Ms. Donovan claims she was performing her duties as expected until Mr. Watson arrived, the record—even taken in the light most favorable to Ms. Donovan—does not support this assertion.

Before Mr. Watson began at Nappi, Ms. Donovan faced criticism for her job performance. For example, Ms. Fox first received a formal complaint related to Ms. Donovan's role on or around June 14, 2016, when she met with Nick Nappi to discuss his frustrations with purchasing, inventory, logistics, and out-of-stock issues. DSMF ¶ 49; PRDSMF ¶ 49. Mr. Watson's predecessor, Mr. Carr, similarly experienced

issues with Ms. Donovan's performance, reassigning some of Ms. Donovan's tasks to Ms. Hale because Ms. Donovan was struggling to perform them properly.  DSMF ¶ 52; PRDSMF ¶ 52.  Additionally, while helping to handle Ms. Donovan's tasks during her mental health leave in 2017, Mr. Brown felt that he had been misled by Ms. Donovan and that after he and Ms. Hale "had to dig into it significantly" he learned "that the way she was structuring her job was completely inept," DSMF ¶ 58; PRDSMF ¶ 58; PSAMF ¶ 90; DRPSAMF ¶ 90, and "completely absurd,"  PSAMF ¶ 91; DRPSAMF ¶ 91, because she was ordering wine alphabetically instead of by amount needed, demonstrating a "lack of urgency and ability to prioritize."  DSMF ¶ 75; PRDSMF ¶ 75.  In early 2018, Mr. Brown, who was then the interim wine director, had meetings with Ms. Donovan, on a near-daily basis, to address what he considered to be issues around purchasing and out-of-stocks.  DSMF ¶¶ 76-77; PRDSMF ¶¶ 76-77.

Beyond the criticism before Mr. Watson joined Nappi, Mr. Watson also criticized Ms. Donovan's work before learning of her sexual orientation.  Sometime before January 18, 2019, Mr. Watson began to work on a PIP for Ms. Donovan.  DSMF ¶ 176; PRDSMF ¶ 176.  This predates her coming out to him by several weeks.

Despite all this evidence of Ms. Donovan's work deficiency, it is plausible for a case to present itself where multiple supervisors worried about someone's deficient performance and the final supervisor, upon learning of the Plaintiff's sexuality, decided to discriminate against her and used her work deficiency as pretext to discriminate.  "Pretext can by such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Adamson v. Walgreens Co.*, 750 F.3d 73, 79 (1st Cir. 2014). "At summary judgment, this question reduces to whether or not the plaintiff has adduced *minimally sufficient evidence* to permit a reasonable factfinder to conclude that [she] was fired because of [her gender]"). *Dávila v. Corporación De P.R. Para La Difusión Pública*, 498 F.3d 9, 16 (1st Cir.2007) (emphasis added).

Ms. Donovan does not point to any specific weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Nappi's proffered legitimate reasons. Ms. Donovan does, however, contend Ian Brown's statement to Ms. Donovan when she came out to him was a warning that there would be consequences for doing so at Nappi. *Pl.'s Opp'n* at 14. In this discussion, Mr. Brown told Ms. Donovan it was best not to come out and that it would not be viewed positively at Nappi. PSAMF ¶ 267; DRPSAMF ¶ 267. Taken in the light most favorable to Ms. Donovan, a reasonable factfinder could find Mr. Brown's statements were a warning about the potential response at Nappi to her coming out.

The record, however, reveals that the person who created the performance improvement plan for Ms. Donovan was Matt Watson, not Ian Brown. Furthermore, the record confirms that Mr. Watson began creating the performance improvement plan before Ms. Donovan came out to him. Nor is there any evidence in this record that Mr. Watson harbored discriminatory bias against Ms. Donovan because of her

189

sexual orientation.  Looking at the evidence in the light most favorable to Ms. Donovan, the Court is unable to find a link between Mr. Watson's actions that led to Ms. Donovan's resignation and her revelation that she is a lesbian.

Similarly, any "homophobic slurs used at Nappi," that Ms. Hale and Ms. Douglas made "crass, sexual jokes to Donovan after she came out," and that Ms. Hale "expressed bias against gays and lesbians" to Ms. Donovan, *Pl.'s Opp'n* at 14, do not offer evidence that Mr. Watson, the person who denied Ms. Donovan's raise and put her on the performance improvement plan, did so discriminatorily or pretextually. Nor has Ms. Donovan asserted the so-called "cat's paw" theory of liability where a non-decisionmaker exhibited discriminatory animus and the decisionmaker became a conduit for the non-decisionmaker's prejudice.  *See Ako-Annan v. E. Me. Med. Ctr.*, 1:19-cv-00544-JAW, 2021 U.S. Dist. LEXIS 157866, at *80 (D. Me. Aug. 20, 2021).

Taken together, Ms. Donovan has not provided sufficient evidence in this record to create a jury question as to whether Nappi's explanation for putting her on a performance improvement plan for deficient performance was pretextual and that the real reason for her performance improvement plan and lack of raise was discrimination based on her sex or sexual orientation.

### b.    Hostile Work Environment

Ms. Donovan alleges Nappi subjected her to a hostile work environment in violation of Title VII. *Compl.* At 13, ¶ 92.  Nappi contends her allegations do not constitute a hostile work environment as a matter of law because Ms. Donovan cannot establish five of the six elements required to succeed on a hostile work environment

claim. *Def.'s Mot.* at 14-20.  Ms. Donovan did not respond to Nappi's arguments, *see Pl.'s Opp'n* at 1-21, and she has therefore waived her right to object.

Nevertheless, Nappi bears the burden at the summary judgment stage. Therefore, with Nappi's arguments in mind, the Court reviews the record to see if any reasonable trier of fact could find that Ms. Donovan establishes the six required elements: "(1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established." *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 395 (1st Cir. 2002).

### i.    Sex-based hostile workplace environment

It is undisputed that Ms. Donovan, a woman, is a member of a protected class; she therefore has established the first element for a sex-based hostile workplace environment claim.  *See Def.'s Mot.* at 10.

With respect to the second element, Ms. Donovan proffered evidence that she was yelled at by Ms. Hale and felt physically threatened by her.  PSAMF ¶ 151, 310; DRPSAMF ¶ 151, 310.  She also alleges that Ms. Hale bullied her by how she spoke to her and refused to cooperate with her.  DSMF ¶ 120; PRDSMF ¶ 120; PSAMF ¶ 27-28; DRPSAMF ¶ 27-28.  Ms. Donovan also claims she was excluded from meetings and other communications, loss job duties, and faced unfair criticism of her job

performance, including a performance improvement plan. DSMF ¶ 55, 104-105; PRDSMF ¶ 55; PSAMF ¶ 207; DRPSAMF ¶ 207. Taken together, these allegations at minimum establish a factual issue as to whether she experienced these conditions, therefore meeting her burden at the summary judgment stage. *See Rosario v. Dep't of Army*, 607 F.3d 241, 248 (1st Cir. 2010) ("'the accumulated effect' of repeated verbal attacks and physical intimidation in the workplace may reasonably be found to constitute sexual harassment within the meaning of Title VII") (citing *O'Rourke v. City of Providence*, 235 F.3d 713, 729 (1st Cir. 2001)); *see also O'Rourke*, 235 F.3d at 729 ("where a plaintiff endures harassing conduct, although not explicitly sexual in nature, which undermines her ability to succeed at her job, those acts should be considered along with overtly sexually abusive conduct in assessing a hostile work environment claim").

The third element requires that Ms. Donovan produce sufficient facts to indicate that the harassment was based upon her sex. Ms. Donovan, however, has failed to connect her alleged harassment to her gender. While Ms. Donovan claims that Ms. Hale did not treat male employees as poorly as female employees, that is insufficient. *See Rivera-Rivera v. Medina, Inc.*, 898 F.3d 77, 94 (1st Cir. 2018) ("[Employee], however, has failed to connect her alleged harassment to gender at all. Sure, she mentions that Eduardo and Pepin did not engage in the same type of screaming and yelling at male employees. But that doesn't tell us much. Indeed, there is a plethora of reasons [her] superiors might have yelled and screamed at her (and not their male employees) that have no nexus to her gender"). Much like in

192

*Rivera-Rivera,* Ms. Donovan "has not done enough dot connecting for us to conclude that the harassment she alleges has as its basis her membership in a protected class—here, being a woman. Consequently, we cannot allow a Title VII-based hostile work environment claim to move forward." *Id.*

While Nappi contends that Ms. Donovan cannot meet the other elements, this Court need not reach those elements; Ms. Donovan failed to provide sufficient facts to meet one of the required elements, meaning no reasonable trier of fact could rule in her favor. Therefore, Nappi is entitled to judgment as a matter of law on Ms. Donovan's sex-based hostile work environment claim.

### ii. Sexual orientation-based hostile workplace environment

It is undisputed that Ms. Donovan, a gay woman, is a member of a protected class; she therefore has established the first element for a sexual orientation-based hostile workplace environment claim. *See Def.'s Mot.* at 10.

With respect to the second and third elements, the record supports that Ms. Donovan has experienced crass, sexual jokes from Ms. Hale and Ms. Douglas, that Ms. Hale expressed issues with gays and lesbians directly to Ms. Donovan, and that homophobic slurs have been used at Nappi. The sexual nature of the jokes and the explicit mention of or allusion to sexual orientation establish that, viewed in the light most favorable to Ms. Donovan, these accumulated facts meet her burden of establishing these elements. *See O'Rourke*, 235 F.3d at 729 ("Evidence of sexual remarks, innuendos, ridicule and intimidation may be sufficient to support a jury verdict for a hostile work environment").

The next question is whether the harassment was sufficiently severe or pervasive to alter the conditions of Ms. Donovan's employment and create an abusive work environment.  *Quiles-Quiles v. Henderson*, 439 F.3d 1, 7 (1st Cir. 2006).  The Court considers the entirety of the circumstances when making this determination.  These circumstances include but are not limited to "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." *Pomales v. Celulares Telefonia, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006).  However, "[s]ubject to some policing at the outer bonds, it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 18-19 (1st Cir. 2002) (internal quotation marks omitted).  Here, the frequency of the discriminatory conduct is unclear.  The record does not clarify whether the conduct was humiliating or a mere offensive utterance and whether it unreasonably interfered with Ms. Donovan's work performance.  However, Ms. Donovan has offered enough evidence to create a disputed questions of material fact and has met her burden to stave off summary judgment.

The fifth element requires a showing that the sexually objectionable conduct was both objectively and subjectively offensive.  Ms. Donovan finds it to be subjectively offensive as evidenced by her complaint.  Likewise, a reasonable person

could find it hostile to face crass, sexual jokes and to be told that someone has an issue with individuals who share one of your core identities.

The sixth element to survive summary judgment is establishing some basis for employer liability. To establish employer liability for a non-supervisory co-worker, a plaintiff must demonstrate that the employer "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *White v. N.H. Dep't of Corr.*, 221 F.3d 254, 261 (1st Cir. 2000). While there is evidence that Ms. Donovan reported bullying from Ms. Hale, there is no record support that Ms. Donovan ever informed anyone at Nappi that she was facing sexual remarks, innuendos, or sexual ridicule from Ms. Hale or Ms. Douglas, or anyone else. In turn, Ms. Donovan has not offered any evidence from which a reasonable factfinder could find that she met the sixth element of a sexual orientation-based hostile work environment claim – that there is some basis for employer liability. Therefore, Nappi is entitled to judgment as a matter of law on the hostile work environment claim.

### D.     Retaliation in Violation of Title VII

Ms. Donovan alleges that she "opposed a practice made unlawful by Title VII by making an explicit report of gender and sex-based discrimination that she suffered from her coworkers" and "[a]s a result of [her] protected conduct, Nappi took adverse action against her." *Compl.* ¶¶ 95; 98. Ms. Donovan further alleges that she "also came out as a lesbian at work, after which she experienced more sex-based discrimination by coworker." *Compl.* ¶ 96. Nappi responds that "the record does not contain evidence to support a prima facie case of retaliation" and that "[e]ven if it did,

any adverse employment actions [Ms. Donovan] alleges are based on Nappi's legitimate, non-discriminatory business reasons." *Def.'s Mot.* at 21.

### 1.    Legal Standard

To determine whether Ms. Donovan's retaliation claim under Title VII can survive summary judgment, the Court applies the familiar *McDonnell Douglas* three-step burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Forsythe v. Wayfair Inc.*, 27 F.4th 67, 76 (1st Cir. 2022). To establish a prima facie case of unlawful retaliation under Title VII, Ms. Donovan must show that "(1) [s]he engaged in protected conduct; (2) [s]he suffered an adverse employment action; and (3) that a causal nexus exists between the protected conduct and the adverse action." *Henderson v. Mass. Bay Transp. Auth.*, 977 F.3d 20, 39 (1st Cir. 2020) (quoting *Carlson v. Univ. of New Eng.*, 899 F.3d 36, 43 (1st Cir. 2018)).  If Ms. Donovan can meet this prima facie showing, the burden of production shifts to Nappi to articulate a "legitimate, non-retaliatory reason" for the allegedly adverse action. *Ponte*, 741 F.3d at 323.  If Nappi succeeds, then Ms. Donovan must show that a reasonable juror could find that Nappi's "proffered reason was mere pretext" for retaliation. *Id.*

Protected conduct under § 2000e-3(a) includes "participation activity," or direct engagement with Title VII proceedings, as well as "oppositional conduct," or "informally opposing an employment activity that might violate Title VII." *See Ray v. Ropes & Gray LLP*, 799 F.3d 99, 107–08 (1st Cir. 2015).  Participation activity includes filing a Title VII complaint, informally filing or defending a charge of discrimination, testifying as a witness in a proceeding, or helping a coworker assert

her rights.  *Id.* at 107.  Oppositional conduct includes "responding to an employer's inquiries about inappropriate behavior, writing letters protesting an employer's allegedly unlawful actions, or picketing and boycotting an employer."  *Id.* at 108.  To be clear, "[p]rotected conduct includes not only the filing of administrative complaints but also complaining to one's superiors."  *Valentin–Almeyda v. Municipality of Aguadilla,* 447 F.3d 85, 94 (1st Cir.2006).  Moreover, "the complained-of conduct need not actually be illegal, but the employee must prove that a reasonable person might have believed that it was."  *Tripp v. Cole,* 425 F.3d 5, 9 (1st Cir.2005) (cleaned up); *see also Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 262 (1st Cir.1999) (explaining that "an employee's reasonable belief that [the conduct] crosses the line suffices").

### 2.    Analysis – Prima Facie Case

Ms. Donovan proffers no evidence that she engaged in protected activity so this Court's inquiry focuses on oppositional conduct.  Ms. Donovan alleges she complained to Mr. Carr and Mr. Bourque of Ms. Hale's conduct almost immediately after starting work because of a level of hostility in the workplace she had never experienced.  PSAMF ¶ 19; DRPSAMF ¶ 19.  Ms. Donovan further testified that she reported issues with Ms. Hale to Mr. Carr many times before his retirement.  PSAMF ¶ 292; DRPSAMF ¶ 292.  Ms. Donovan later complained to Mr. Brown that she was having issues with Ms. Hale and that Ms. Hale was bullying her.  PSAMF ¶¶ 127, 146; DRPSAMF ¶¶ 127, 146.  Similarly, Ms. Donovan emailed Mr. Brown on June 18, 2018 and told him that on that very day Ms. Hale "shouted at [her] for the entire office to hear," PSAMF ¶ 152; DRPSAMF ¶ 152, and did so in a manner which physically

197

threatened her.  PSAMF ¶ 310; DRPSAMF ¶ 310.  Put simply, there is ample evidence in the record that Ms. Donovan "repeatedly made complaints of mistreatment from Val Hale." *Pl.'s Opp'n* at 17.

The difficulty for Ms. Donovan is that "Title VII does not ban harassment alone, no matter how severe or pervasive." *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 138 (1st Cir. 2013).  "'Harassing' and 'harassment' have different meanings in different contexts, broadly covering situations involving words and actions 'that, being directed at a specific person, annoy[ ], alarm[ ], or cause[ ] substantial emotional distress in that person and serve[ ] no legitimate purpose'—like when a 'creditor uses threatening or abusive tactics to collect a debt.'" *Id.* (quoting *Black's Law Dictionary* 784 (9th ed. 2009)).  The gravamen of Nappi's counterargument is the fact that Ms. Donovan never reported that she was being excluded, ignored, or harassed due to sex or sexual orientation discrimination.  DSMF ¶¶ 123, 164, 197.  In fact, Ms. Donovan even told management she "didn't understand why" Ms. Hale was so difficult toward her. DSMF ¶ 124; PRDSMF ¶ 124.

"Of course we are not suggesting that she had to throw around buzzwords like 'sex' or 'sexual' harassment.  We say only that she had to say something to put [the employer] on notice that the complained-of harassment was sex- [or sexual-orientation-] based." *Medina-Rivera*, 713 F.3d at 138.  While "the opposition clause sweeps even more broadly and protects an employee for more informally opposing an employment activity that might violate Title VII," *Ray*, 799 F.3d at 108, this Circuit requires individuals bringing Title VII retaliation claims to have indicated that the

law, not merely workplace decorum, was being violated. *See Medina-Rivera*, 713 at 138; *accord Crawford v. Metropolitan Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009) ("When an employee communicates to her employer a belief that the employer has engaged in … a form of *employment discrimination*, that communication virtually always constitutes the employee's opposition to the activity") (emphasis added). Having failed to proffer evidence that she provided notice to Nappi that she was facing discrimination, or that the harassment she faced was due to her sex or sexual orientation, Ms. Donovan has not made a sufficient showing that she engaged in protected activity under Title VII.

Having failed to show that she engaged in protected conduct, Ms. Donovan fails to make a prima facie case, and therefore also fails at the first step of the *McDonnell Douglas* burden-shifting framework. As follows, this Court addresses neither whether Nappi articulated a legitimate, non-retaliatory reason for the allegedly adverse action nor whether a reasonable juror could find that Nappi's "proffered reason was mere pretext." In sum, Nappi is entitled to summary judgment on Ms. Donovan's Title VII retaliation claim.

### E.    Equal Pay Act Claims

Ms. Donovan alleges that Nappi violated the Equal Pay Act (EPA) by compensating her "less for a job requiring substantially equal skill, effort, and responsibility, which was performed under similar working conditions." *Compl.* ¶ 108.

### 1. Legal Standard

The EPA prohibits wage discrimination "between employees on the basis of sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).

To prove a violation of the EPA, a plaintiff must first make a prima facie showing "that the employer paid different wages to specific employees of different sexes for jobs performed under similar working conditions and requiring equal skill, effort and responsibility." *Ingram v. Brink's, Inc.*, 414 F.3d 222, 232 (1st Cir. 2005) (citing *Corning Glass Works*, 417 U.S. at 195).

Once the plaintiff establishes a prima facie case of unlawful wage discrimination, the burden shifts to the employer to show that the differential is justified under one of the EPA's four exceptions: (1) the payment was made pursuant to a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) a differential based on any other factor other than sex. 29 U.S.C. § 206(d)(1); s*ee also Corning Glass Works*, 417 U.S. at 196; *Ingram*, 414 F.3d at 232. "At this stage, the Act's exceptions serve as affirmative defenses on which the employer carries the burden of proof, not just production." *Ingram*, 414 F.3d at 232 (citing *Corning Glass,* 417 U.S. at 196).

### 2. Analysis – Prima Facie Case

First, Ms. Donovan must establish a prima facie case of discrimination based on sex. "To establish a prima-facie case under the Equal Pay Act, 'it is appropriate for the plaintiff to compare herself to only one male comparator to determine wage

differentials.'" *Díaz v. Infotech Aero. Servs.*, No. 10-1103 (JAF), 2012 U.S. Dist. LEXIS 6381, at *13 (D.P.R. Jan. 19, 2012) (quoting *Mullenix v. Forsyth Dental Infirmary for Children*, 965 F. Supp. 120, 140 n.38 (D. Mass. 1996)).

A wage discrimination claim under the EPA is based on different pay for substantially equal work. Ms. Donovan alleges and the record supports that Nappi paid her a lesser salary than her predecessor throughout her tenure at Nappi and removed manager from her title, disqualifying her for a manager bonus and a company vehicle.[454] Ms. Donovan contends Nappi violated the EPA through these actions because they represent lower pay for substantially equal work.

Nappi challenges Ms. Donovan's allegation by asserting that "it is disputed whether Mr. Houle and Ms. Donovan truly performed the same job" and that "even if Plaintiff could meet her burden to establish that she was paid less than Mr. Houle for 'substantially equal work,' Nappi is still entitled to judgment as a matter of law because any discrepancy in pay between the two employees was based on legitimate factors other than sex." *Def.'s Mot.* at 23-24. First, Nappi submits that Mr. Houle was significantly more experienced than Ms. Donovan and had more seniority at Nappi than Ms. Donovan ever did. DSMF ¶ 10. Nappi also submits "Mr. Houle's initial compensation at Nappi was based on his extensive experience as a wine buyer and the terms of the acquisition of Cumberland and York, and [that] eventually his seniority with the company factored into his compensation." *Def.'s Mot.* at 24; DSMF ¶ 11.

---

[454]    *See* supra n.6.

Here, the facts on the record do not make clear whether Ms. Donovan and Mr. Houle performed substantially equal work.[455]  Nonetheless, because a reasonable jury could find they are compensated differently (lower salary and less perks) for performing substantially equal work (overseeing wine purchasing for Nappi), Ms. Donovan meets her burden to establish a prima facie case of wage discrimination.

### 3.    Analysis – Equal Pay Act Exceptions

Next, Nappi must show that the differential is justified under one of the EPA's four exceptions.  Although Nappi does not explicitly submit under which of the EPA's four exceptions it seeks to justify its actions, the summary judgment record mentions seniority, additional experience, and the terms of an acquisition as factors in the pay differential, title change, and loss of both the manager bonus and the company vehicle.  The Court therefore considers whether Nappi's actions are justified under the EPA's seniority and any other factor other than sex defenses.

Nappi offers, and the record supports, factors other than sex that can arguably explain the difference in pay and job title between Ms. Donovan and her predecessor, Mr. Houle.  However, "[a]t this stage, the Act's exceptions serve as affirmative defenses on which the employer carries the burden of proof, not just production." *Ingram*, 414 F.3d at 232 (citing *Corning Glass,* 417 U.S. at 196).  As follows, Nappi is not entitled to summary judgment unless they can establish these defenses by a preponderance of evidence.  FED. R. CIV. P. 56(a).

---

[455]    *See Supra* at n.3.

202

Nappi fails to meet this burden. Nappi aptly points to *Corning Glass Works* for the proposition that the EPA "contemplates that . . . a male employee with 20 years' seniority can receive a higher wage than a woman with two years' seniority." 417 U.S. 188, 204 (1974). However, while Nappi claims seniority influences the different compensation, the record is devoid of any documentation supporting a "seniority system" and its corresponding salary calculation. In turn, there is sufficient dispute of material fact for a reasonable juror to find that seniority is merely a contributing factor, or pretext, for its compensation cuts. Similarly, Nappi has not shown that the agreement, as part of the Cumberland and York acquisition, and experience are more likely than not sufficient to explain the difference between Mr. Houle and Ms. Donovan's compensation and consequently the material facts that would support a finding of sex-based wage discrimination are genuinely in dispute.

The Court therefore cannot conclude that summary judgment in Nappi's favor is warranted as a matter of law. FED. R. CIV. P. 56(a).

## VI.   SUMMARY

The Court concludes that Ms. Donovan has plausibly alleged claims for FMLA interference in violation of the FMLA and MFMLR (Counts I and II); disability discrimination in violation of the ADA (Count III); and violation of the EPA (Count VII).

The Court concludes Ms. Donovan has not, even viewing the facts in the light most favorable to her as the nonmovant, plausibly alleged claims for sex-based discrimination in violation of Title VII and the MHRA (Counts IV and VI) or retaliation in violation of Title VII (Count V).

## VII.   CONCLUSION

The Court partially DENIES and partially GRANTS Nappi Distributors'

Motion for Summary Judgement (ECF No. 60).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 15th day of November, 2023